# EXHIBIT B

# (Valentine Life, Inc. Operating Agreement)

# EXHIBIT B

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

# OPERATING AGREEMENT FOR

# VALENTINE LIFE, LLC

# A NEVADA CORPORATION

THE OWNERSHIP INTERESTS IN VALENTINE LIFE, LLC (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN ARTICLE 8 OF THIS AGREEMENT AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS THEREOF.  THEREFORE, PURCHASERS OF THE INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME.  THE INTERESTS HAVE NOT BEEN REGISTERED:  (1) UNDER ANY STATE SECURITIES LAWS (THE "STATE ACTS"); (2) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"); OR (3) UNDER THE SECURITIES LAWS OF ANY FOREIGN JURISDICTION (THE "FOREIGN ACTS"), AND NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 8 OF THIS AGREEMENT AND:  (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACTS OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE FOREIGN ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER ANY APPLICABLE FOREIGN ACTS OR FOR WHICH SUCH REGISTRATION IS NOT OTHERWISE REQUIRED.

# OPERATING AGREEMENT FOR
# VALENTINE LIFE, LLC
## A NEVADA LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (this "Agreement") for VALENTINE LIFE, LLC(the "Company") is entered into by and between Real Social Dynamics Inc, a Nevada Corporation ("RSD"), as one Shareholder, Todd VanDeHey ("VanDeHey") as another Shareholder and such other parties as listed on Exhibit A attached hereto (together, the "Shareholders").

WHEREAS, the Company filed, on September 15, 2015, the Articles of Organization of VALENTINE LIFE, LLCwith the Secretary of State of the State of Nevada, a copy of which is attached hereto as Exhibit B; and

WHEREAS, the Shareholders desire to adopt an Operating Agreement to govern their respective rights and obligations as Shareholders of the Company and to set forth certain procedures for the governance of the Company.

NOW, THEREFORE in consideration of the premises, the mutual promises and obligations contained herein, and with the intent of being legally bound, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the capitalized words and phrases have the meanings set forth below:

Section 1.1    "Adjusted Capital Contribution" means, as of any day, a Shareholder's Capital Contribution(s) adjusted by distributions under Article 5.

Section 1.2    "Affiliate" has the meaning set forth in the Securities Exchange Act of 1934, as amended.

Section 1.3    "Agreement" means this Operating Agreement, as amended from time to time.

Section 1.4    "Business Day" means any Monday through Friday, excluding federal national holidays.

Section 1.5    "Capital Account" means with respect to each Shareholder the amount of money contributed by such Shareholder to the capital of the Company, increased by the aggregate fair market value (as determined by the Shareholders) of all property contributed by such Shareholder to the capital of the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), the aggregate amount of all Net Profits allocated to such Shareholder, and any and all items of gross income or gain specially allocated to such Shareholder pursuant to Section 4.1,

and decreased by the amount of money distributed to such Shareholder by the Company (exclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to such Shareholder), the aggregate fair market value (as determined by the Shareholders) of all property distributed to such Shareholder by the Company (net of liabilities secured by such distributed property that such Shareholder is considered to assume or take subject to under Section 752 of the Code), the amount of any Net Losses charged to such Shareholder, and any and all "nonrecourse deductions" specially allocated to such Shareholder pursuant to Article 4.

Section 1.6    "Cash Flow" means the excess, if any, of all cash receipts of the Company as of any applicable determination date in excess of the sum of (a) all cash disbursements (inclusive of any reimbursements made to any Shareholder and any repayment of loans made to any Shareholder, but exclusive of distributions to the Shareholders in their capacity as such) of the Company prior to that date, plus (b) any cash reserve, determined by the Shareholders, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide the funds therefore, or as otherwise established by the Shareholders under Section 5.3 of this Agreement.  Cash Flow shall be determined and distributed at such times as the Shareholders determine that funds are available therefore, taking into account the reasonable business needs of the Company.

Section 1.7    "Capital Contribution(s)" means, with respect to any Shareholder, the amount of money contributed to the Company.

Section 1.8    "Company" means VALENTINE LIFE, LLC, a Nevada limited liability company.

Section 1.9    "Company Property" means all real and personal property owned by the Company (including cash) and any improvements thereto, and shall include both tangible and intangible property.

Section 1.10    "Interest" means all of a Shareholder's interest in the Company held pursuant to Section 2.7 hereof, including any and all benefits to which the Shareholder may be entitled as provided in this Agreement, together with all obligations of the Shareholder to comply with the terms and provisions of this Agreement.

Section 1.11    "IRC" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

Section 1.12    "Liquidation" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining balance to the Shareholders).

Section 1.13    "Liquidating Event" has the meaning set forth in Section 9.1 hereof.

Section 1.14    "Manager" means any Person designated or elected to manage the Company pursuant to Section 6.1 of this Agreement.

Section 1.15    "Shareholder" means any Person that becomes a Shareholder pursuant to the terms of this Agreement.

2

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

Section 1.16   "Net Profits and Net Losses" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss); provided, however, for purposes of computing such taxable income or loss, (i) such taxable income or loss shall be adjusted by any and all adjustments required to be made in order to maintain Capital Account balances in compliance with Treasury Regulations Section 1.704-1(b) and (ii) any and all items of gross income or gain and/or partnership and/or partner "nonrecourse deductions" specially allocated to any Shareholder pursuant to Section 4 shall not be taken into account in calculating such taxable income or loss.

Section 1.17   "Percentage Interest" means the percentage interest of each Shareholder as set forth on the attached Exhibit A, as amended from time to time in accordance with this Agreement.

Section 1.18   "Permitted Transfer" has the meaning set forth in Section 8.1 hereof.

Section 1.19   "Person" means any individual, partnership, corporation, trust, or other entity.

Section 1.20   "Profits" and "Losses" means the Company's net taxable income or loss, as calculated for federal tax purposes.

Section 1.21   "Statute" means the provisions of the Nevada Revised Statutes as set forth in Title 7, Chapter 86 of the State of Nevada, as amended from time to time (or any corresponding provisions of succeeding law).

Section 1.22   "Term" has the meaning set forth in Section 2.4.

Section 1.23   "Transfer" means the voluntary or involuntary, direct or indirect, assignment, sale, pledge, gift or other conveyance of any legal or beneficial interest in an Interest.

Section 1.24   "Treasury Regulations" means any proposed, temporary, and/or final federal income tax regulation promulgated by the United States Department of the Treasury as heretofore and hereafter amended from time to time (and/or any corresponding provisions of any superseding revenue law and/or regulation).

## ARTICLE 2
## FORMATION OF COMPANY

Section 2.1   Formation.  The Shareholders have formed the Company pursuant to the provisions of the Statute by causing Articles of Organization conforming to the requirements of the Statute to be filed with the Secretary of State of the State of Nevada.

Section 2.2   Name.  Unless and until amended in accordance with this Agreement and the Statute, the name of the Company is VALENTINE LIFE, INC.

3

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

Section 2.3     Purpose.

(a)     The purpose of the Company is to engage in any lawful activities for which a limited liability company may be organized under the Statute, provided that the Corporation shall not conduct any banking, insurance or trust company business.  Specifically, the Company has been formed as a Corporation.

(b)     The Company may engage in any other lawful business activity permitted by the Statute subject to the unanimous written agreement of the Shareholders.

Section 2.4     Term.  The term (the "Term") of the Company commenced on May1, 2015 and shall continue until the termination of the Company in accordance with Article 9 of this Agreement.

Section 2.5     Principal Place of Business.  The principal place of business of the Company shall be in Las Vegas, NV, USA, or at such other place as the Shareholders shall from time to time designate in writing.

Section 2.6     Agent for Service of Process.  Until such time as the Shareholders have appointed a different person in the State of Nevada to act as the agent of the Company for service of process, the agent for service of process for the Company shall be in Nevada.

Section 2.7     Shareholders and Interests. The names and addresses of each Shareholder, and the Percentage Interests issued to each Shareholder, are set forth on the attached Exhibit A.

Section 2.8     Independent Activities; Transactions with Affiliates.

(a)     The Shareholders shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and it shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its sole discretion.

(b)     Each Shareholder acknowledges that the other Shareholders and their Affiliates are free to engage or invest in an unlimited number of activities or businesses, any one or more of which may be related to the activities or businesses of the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Shareholder, and neither this Agreement nor any activity undertaken pursuant to this Agreement shall prevent any Shareholder from engaging in such activities, or require any Shareholder to permit the Company or any Shareholder to participate in any such activities.

(c)     To the extent permitted by applicable law and except as otherwise provided in this Agreement, the Shareholders are hereby authorized to purchase property from, sell property to, or otherwise deal with the Company, provided that any such purchase, sale or other transaction is unanimously agreed upon in writing by the Shareholders and is in the ordinary course of the Company's business and shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase, or other transaction had been entered into with an independent third party.

4

ARTICLE 3
SHAREHOLDERS' CAPITAL CONTRIBUTIONS

Section 3.1    Contributions. The names, addresses, Capital Contributions, Units and Percentage Interests of the Shareholders are set forth on Exhibit A.

Section 3.2    Interest On and Return of Capital. No Shareholder shall receive any interest, salary or drawing with respect to its Capital Contributions or for services rendered on behalf of the Company or otherwise in its capacity as Shareholder, except as may be provided in this Agreement. No Shareholder shall have the right to demand or receive property other than cash (and then only in accordance with this Agreement) in return for its Capital Contribution.

Section 3.3    Loans from Shareholders or Affiliates. A Shareholder, or an Affiliate of a Shareholder, may make a loan to the Company on such terms and conditions as the Shareholders unanimously determine to be fair and reasonable in their sole discretion.

Section 3.4    Additional Capital Contributions. Other than contributions by additional Shareholders, no Shareholder shall be required to make any Capital Contributions to the Company in excess of the amounts set forth in Exhibit A without the unanimous consent of all of the Shareholders which any such Shareholder may grant or withhold, condition or delay, in its sole and absolute discretion.

Section 3.5    Additional Shareholders. The Shareholders shall not admit additional Persons as additional Shareholders under any circumstances.

ARTICLE 4
ALLOCATIONS

Section 4.1    Profits. Profits for any taxable year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and in the reverse order and to the extent of, the aggregate Losses allocated to the Shareholders pursuant to Section 4.2 below for all periods, until the aggregate Profits allocated to the Shareholders pursuant to this Section 4.1(a) for all periods equals such aggregate Losses; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.2    Losses. Losses for any tax year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and to the extent of, their respective positive Capital Account balance; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

Section 4.3    Limitation on Loss Allocations.  Notwithstanding any other provisions of this Agreement, no allocation of Net Losses shall be made to any Shareholder to the extent such an allocation would cause or increase a deficit balance standing in such Shareholder's Capital Account (in excess of such Shareholder's allocable share of minimum gain and after taking into account any adjustments set forth in Treasury Regulation Section 1.704(b)-1(b)(2)(ii)(d)) and any such Net Losses shall instead be allocated to the Shareholders based upon their respective "interests" in the Company as determined in accordance with Treasury Regulation Section 1.704-1(b).  In addition, items of income and gain shall be specially allocated to the Shareholders in accordance with the qualified income offset provisions set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

Section 4.4    Cumulative Allocations.  The effect of the limitation on the amount of Net Losses and the qualified income offset provisions set forth in the first two (2) sentences of Section 4.3 above shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Article 4, so that the net amount of any items so allocated and the Net Profits, Net Losses and all other items allocated to each Shareholder pursuant to this Article 4 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Shareholder pursuant to the provisions of this Article 4 if such special allocations had not occurred.

Section 4.5    Differing Tax Basis; Tax Allocations.  Depreciation and/or cost recovery deductions and gain or loss with respect to each item of property treated as contributed to the capital of the Company shall be allocated among the Shareholders for federal income tax purposes in accordance with the principles of Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, and for state income tax purposes in accordance with comparable provisions of any applicable state law and the regulations promulgated thereunder, so as to take into account the variation, if any, between the adjusted tax basis of such property and its book value (as determined for purposes of the maintenance of Capital Accounts in accordance with this Agreement and Treasury Regulation Section 1.704-1(b)(2)(iv)(g)).

Section 4.6    Other Special Allocations.   The Company shall make other special allocations required or permitted in the Treasury Regulations under Section 704 of the Code after consultation with the Company's tax advisors so as to carry out the economic arrangement provided for in this Agreement and to have the Company's allocations respected for tax purposes.

## ARTICLE 5
## DISTRIBUTIONS

Section 5.1    Cash Flow.  Cash Flow, if any, shall be distributed at such dates as determined by unanimous written consent of the Shareholders to the Shareholders in proportion to their respective Percentage Interests. RSD and VanDeHey shall be sole signatories on the Company Bank Account.

Section 5.2    Amounts Withheld.  All amounts withheld or paid as taxes pursuant to any provision of tax law with respect to any payment, distribution or allocation to the Company or the Shareholders shall be treated as amounts distributed to the Shareholders pursuant to this Article 5 for all purposes under this Agreement.  The Company is authorized to withhold from distributions to the Shareholders to pay over to (or reimburse the Company for) any amounts required to be so withheld or paid and shall allocate any such amounts to the Shareholders with respect to which such amount was withheld.

Section 5.3    Contingency Reserves.  The Shareholders may establish cash reserves (whether or not reflected on the financial statements) as the Shareholders unanimously determine to be reasonable in connection with the operation of the Company business.

ARTICLE 6
MANAGEMENT

Section 6.1    Manager.  The Company shall be managed by RSD and VanDeHey. Meetings of the Manager shall be required annually.

Section 6.2    Manager of Operational and Day-to-Day Business and Affairs.  The operational and day-to-day business and affairs of the Company shall be operated and managed jointly by RSD and Todd VanDeHey.  RSD and VanDeHey are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; provided, however, that RSD and VanDeHey shall not take any action, make any determination or provide any consent expressly reserved by Section 6.4 of this Agreement to the Shareholders.  No Shareholder, other than RSD or VanDeHey (subject to the terms of this Agreement), shall, acting individually, have the power to sign or bind the Company unless duly authorized to do so by unanimous written consent of the Shareholders. Notwithstanding the foregoing, RSD and VanDeHey shall have no liability to the Shareholders or the Company for exceeding the authority granted to him in the event a decision made or an action taken by him was made or taken with a reasonable good faith belief that such decision or action was (i) within the scope of the operational and day-to-day business and affairs of the Company and (ii) not prohibited by the terms of this Agreement.

Section 6.3    Corporate Sponsorship, and Event Planning.  VanDeHey and RSD shall jointly be the manager of event planning, which shall include but not be limited to planning and putting on live seminars, field trips, making DVDs, writing books and creating any other such content and media in his good faith belief will further the success of the Company. In addition, VanDeHey will be the manager of corporate sponsorship, which shall include but not be limited to obtaining advertising fees from corporations, creating marketing creative, managing marketing campaigns, and fundraising for non-profit organizations. RSD will be the manager jointly and unanimously with VanDeHey, which shall include but not be limited to information technology for managing Shareholders, communication with speakers for live events, financial management tuition, and monitoring Shareholders' communication. VanDeHey and RSD are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; provided, however, that VanDeHey and RSD shall not take any action, make any determination or provide any consent with regard

7

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

solely to the content and marketing operations expressly reserved by Section 6.4 of this Agreement to the Shareholders. .

Section 6.4    Actions Expressly Reserved to the Shareholders.   Notwithstanding the authority granted to RSD in Section 6.2 above, RSD may not do or permit to be done any of the following without the unanimous written consent of the Shareholders:

(a)    Any act or thing which the Act or this Agreement requires to be approved, consented to or authorized by all the Shareholders;

(b)    Voluntarily cause the dissolution of the Company;

(c)    Sell all or a significant part of the Company assets, or engage in any material recapitalization or merger;

(d)    Incur any liabilities in excess of $50,000; or

(e)    File any lawsuit or proceedings.

Section 6.5    No Liability of Shareholders. All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Shareholder shall be obligated personally for any such debt, obligation or liability of the Company.

Section 6.6    Rights and Prohibitions of the Shareholders.

(a)    Except as otherwise restricted herein, the Shareholders shall be entitled to the rights provided by the Act and to such other rights as are expressly set forth elsewhere herein.

(b)    Except as otherwise expressly provided for in this Agreement, the Shareholders shall not have the right:

(i)    to have their Capital Contributions returned until such time as the Company is terminated and liquidated and all Company liabilities have been paid or funds have been set aside therefore, and then only in accordance with the provisions of this Agreement;

(ii)    to sell or assign their Interests in the Company except in accordance with Article 8 hereof;

(iii)    to withdraw or reduce their Capital Contributions; or

(iv)    to demand or receive property other than cash in return for their Capital Contributions.

Section 6.7    Limitation of Liability.   In carrying out its obligations hereunder, the Shareholders shall not be liable to the Company or to the Shareholders for: (a) errors of judgment; (b) any mistake of fact or of law; (c) any actions undertaken in good faith and believed to be either in furtherance of the Shareholders' obligations under this Agreement or in

8

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

the best interests of the Company; or (d) any actions taken pursuant to advice of counsel to the Company.

Section 6.8   Indemnification.   The Company, to the extent of its assets, hereby indemnifies the Shareholders against, and agrees to hold, save, and defend same wholly harmless from, any loss, expense, damage, or liability (including attorneys' fees and costs of litigation) suffered or incurred by any of them by reason of anything which the Shareholders may in good faith do or refrain from doing for and on behalf of the Company; provided, however, that the Company shall not be required to indemnify the Shareholders for any loss or damage that the Shareholders may incur as a result of intentional misconduct, gross negligence, fraud, or a knowing violation of law, or for any transaction for which such Shareholders received a personal benefit in violation or breach of any provision of this Agreement.

ARTICLE 7
ACCOUNTING

Section 7.1   Books and Records.   The Company's books of account shall be maintained and kept at the Company's principal place of business.  The Company's accounting period shall be the calendar year.

Section 7.2   Tax Information.   Necessary tax information shall be delivered to each Shareholder within ninety (90) days after the end of each tax year of the Company.

ARTICLE 8
RESTRICTION ON TRANSFER OF CORPORATION INTERESTS

Section 8.1   Transfer or Assignment of Interests.   No transfer, sale, hypothecation, pledge, encumbrance, assignment or other disposition (each of the foregoing, a "Transfer") of a Shareholder's Interest, or any part thereof, will be valid without the unanimous consent of the other Shareholder.  Any Transfer of an Interest, including an involuntary Transfer, which does not satisfy the requirements of this Section 8.1 shall be subject to the provisions of Section 8.3 hereof; provided, however, that any Transfer by a Shareholder to a trust or other entity wholly owned by or established for the benefit of such Shareholder, or to a parent, spouse, sibling or descendant of such Shareholder or to a trust established exclusively for the benefit of one or more of such Persons (any such Transfer, a "Permitted Transfer"), shall not require consent pursuant to this Section 8.1.

Section 8.2   Right of First Refusal Upon Sale.   Other than with respect to Permitted Transfers, in the event that any Shareholder receives a bona fide offer for the purchase and sale of all or any portion of such Shareholder's Interest, the Shareholder shall first offer to sell such Interest or portion thereof to the other Shareholders and to the Company in accordance with the provisions of this Section 8.2.

(a)   Notice of Offer to Sell.  Promptly following the receipt of an offer to purchase all or any portion of his, her or its Interest, a Shareholder shall deliver a written notice (the "Sale Notice") to the Corporation and the other Shareholders stating (i) such Shareholder's bona fide intention to sell his, her or its Interest, (ii) the name and address of the proposed

9

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

transferee, (iii) the Interest or portion thereof to be sold, and (v) the purchase price and terms of payment upon which the Shareholder proposes to sell such Interest.

      (b)    <u>Election to Exercise Right of First Refusal</u>  Within 30 days after receipt of the Sale Notice, each non-selling Shareholder shall notify the Manager in writing of his, her or its desire to purchase a portion of the Interest subject to the Sale Notice.  The failure of any Shareholder to so notify the Manager within the applicable period shall constitute an election on the part of that Shareholder not to purchase any portion of the Interest subject to the Sale Notice. Each Shareholder so electing to purchase shall be entitled to purchase a portion of such Interest in the same proportion that the Percentage Interest of such Shareholder bears to the aggregate of the Percentage Interest of all of the Shareholders electing to so purchase the Interest subject to the Sale Notice.  In the event any Shareholder elects to purchase none or less than all of his, her or its pro rata share of such Interest, then the other Shareholders can elect to purchase more than their pro rata share.  If such Shareholders fail to purchase the entire Interest subject to the Sale Notice, the Company may purchase any remaining share of such Interest.

      (c)    <u>Exercising Right of First Refusal</u>..  Within 90 days after receipt of the Sale Notice, the Company and the Shareholders electing to purchase the Interest subject to the Sale Notice shall exercise his or its first right to purchase or obtain such Interest upon the price and terms of payment designated in the Sale Notice by providing written notice to the other Shareholder of his election to purchase.  If the Sale Notice provides for the payment of non-cash consideration, the Company and the purchasing Shareholders each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered, as determined by the Managers or, in the absence of an agreement among the Managers as to such value, by a nationally recognized firm of appraisers jointly selected by the Manager.  If the third party offer is all cash paid at the close of escrow, the Shareholder or company shall have the right to pay for the purchase on reasonable terms over a period not to exceed one year by executing a promissory note with interest at 6% per annum with monthly payments of principal and interest, no prepayment penalty so long as the electing Shareholder or company puts up its memebership interest as collateral until the sale is completed.

      (d)    <u>Lapse of Right of First Refusal</u>.  If the Company or the other Shareholders elect not to purchase or obtain all of the interest subject to the Sale Notice, then the selling Shareholder may sell the Interest described in the Sale Notice to the proposed transferee, provided such sale (i) is completed within 30 days after the expiration of the Company and the other Shareholders' right to purchase such Interest, (ii) is made on terms no less favorable to the selling Shareholder than as designated in the Sale Notice, and (iii) the requirements of Section 8.1 have been met.  If such interest is not so sold, the selling Shareholder must give notice in accordance with this Section 8.2 prior to any subsequent sale of such Shareholder's Interest.

    Section 8.3    <u>Buyout Option</u>

      (a)    <u>Buyout Notice</u>.  Any Shareholder (a "Remaining Shareholder") or its designated Affiliate shall have the right (the "Buyout Option") to purchase all, but not less than all, of the Interest of any other Shareholder (a "Departing Shareholder") in the event the Departing Shareholder Transfers any portion of such Shareholder's Corporation Interest other

than as permitted pursuant to Section 8.1 hereof ( "Buyout Event 1")., or if the Shareholders are deadlocked for a period of at least 30 days on any decision requiring unanimous consent of the Shareholders ("Buyout Event 2"). Under Buyout Event 2 the Shareholder making the offer shall be called the Tendering Shareholder and the other Shareholder will be called the Responding Shareholder

(b)     Within 30 days of receipt of notice of Buyout Event 1, the Remaining Shareholder shall give written notice (the "Buyout Notice") to the Departing Shareholder of the Remaining Shareholder's desire to purchase the Departing Shareholder's Company Interest. In the event that there is more than one Remaining Shareholder at the time a Buyout Event occurs, the Remaining Shareholders shall be entitled to exercise the Buyout Option pro rata in accordance with their respective Percentage Interests.

(c)     Within thirty days (30) of receipt of the notice of Buyout Event 2, the Responding Shareholder shall have the right to elect, by delivery of written notice to the Tendering Shareholder no later than thirty (30) days following receipt of such offer by the Responding Shareholder, to either (i) sell its Ownership Interest to the Tendering Shareholder pursuant to the terms of the Offer or (ii) purchase the Ownership Interest of the Tendering Shareholder pursuant to the terms of the Offer. If the Responding Shareholder does not make such election, by written notice to the Tendering Shareholder, within thirty (30) days, then the Responding Shareholder shall be deemed to have elected to sell its Ownership Interest to the Tendering Shareholder.

(d)     Purchase Price of the Shareholder's Company Interest. The purchase price of the Shareholder's Interest shall be the Fair Market Value thereof. For purposes hereof, the "Fair Market Value" of such Interest shall be such value as is mutually agreed upon among the Shareholders but shall take into consideration all inventory, accounts receivable, and cash on hand and its subsidiaries as of the date of the notice, together with a schedule of all debt of the Corporation and its subsidiaries,; provided, however, that in the event that the Shareholders are unable to agree upon a Fair Market Value within 30 days of the date of either Buyout Notice, the Fair Market Value shall be determined by an independent appraiser affiliated with a nationally recognized firm of accountants, appraisers or investment bankers and selected by the Manager in the exercise of their reasonable discretion. The appraiser shall render a written report setting forth its determination of Fair Market Value as promptly as possible.. In making such determination, the appraiser shall value the Company as a going concern and shall take into consideration (i) the transferability and liquidity of the Departing Shareholder's Interest, (ii) the fact that additional capital may be required, from time to time, in connection with the business of the Company, and (iii) the economic risk and liability associated with the ownership of such Interest. Absent manifest error, the appraiser's determination of Fair Market Value shall be final and binding on all parties. The fees and expenses of any appraiser shall be paid by the Company.

(e)     Exercise Terms. The Buyout Notice, which shall be served by certified mail, return receipt requested, shall specify the date on which the Transfer pursuant to an exercise of the Buyout Option shall be consummated, which date shall be no earlier than 30 days nor later than 90 days from the date of the Buyout Notice, unless otherwise agreed by the Remaining Shareholder and the Departing Shareholder, or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder. Except as may be

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

otherwise agreed by the Remaining Shareholder and the Departing Shareholder or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder, the Shareholder purchasing the other Shareholder's Ownership Interest shall pay at least 20% of the purchase price in cash, with the balance of the purchase price payable pursuant to a promissory note bearing interest at 110% of the then current applicable federal rate for mid-term obligations (as determined pursuant to Section 7872 of the Code).  Such note shall be payable in equal installments of principal and interest over a period not to exceed five years.  Any such promissory note may be prepaid at any time without premium or penalty.  The Shareholder selling his Interest shall be transferred free and clear of all liens and encumbrances and, except as otherwise provided, the selling Shareholder shall be released at the closing from any guarantees, obligations, liabilities or similar undertakings to third parties given by such Shareholder on behalf of the Company.

(f)     <u>Further Cooperation</u>.  On the closing of the purchase and sale of the Departing Shareholder's Company Interest, or in the case of Buyout Event 2, between selling Shareholder's Company Interest pursuant to an exercise of the Buyout Option, each Shareholder shall execute, acknowledge and deliver to each other Shareholder such instruments, and take such actions, as each Shareholder may reasonably request in order to effect the purchase and sale of the Company Interest pursuant to the terms and conditions of this Section 8.3.

(g)     <u>Company Option</u>.  In the event the Remaining Shareholder under Buyout Event 1 elects not to exercise any of its rights under this Section 8.3, the Company, at its election, may assume such rights.

Section 8.4     <u>Void Transfers</u>.  If the Managers determine in their sole discretion that any Transfer would cause the termination of the Company under the Code, then such Transfer shall be null and void.

Section 8.5     <u>Substitution of Shareholders</u>.  A transferee of an Interest shall become a substitute Shareholder, provided that (i) the Transfer was valid under Section 8.1 hereof and not voided by the Manager pursuant to Section 8.4 hereof, (ii) the transferee has become a party to this Agreement, and (iii) the transferee pays any reasonable expenses in connection with his, her or its admission as a Shareholder.  A transferee who becomes a substituted Shareholder has, to the extent transferred, all of the rights, powers and duties of a Shareholder under this Agreement and the Statute.

Section 8.6     <u>Subsequent Transfers Subject to Terms of Agreement</u>.    After the consummation of any Transfer of any part of an Interest, the Interest or portion thereof so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions hereof.

Section 8.7     <u>Purchase Terms Varied by Agreement</u>.  Provided that the restrictions set forth in this Agreement have been satisfied, nothing contained herein is intended to prohibit Shareholders from agreeing upon other terms and conditions for the purchase by the Company or any other Shareholder of the Interest (or any portion thereof) of any Shareholder desiring to retire, withdraw or resign.

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

Section 8.8    Spousal Consent. Each Shareholder who is married as of the date hereof or who subsequently becomes married shall obtain his or her spouse's signature to a spousal consent.

ARTICLE 9
DISSOLUTION, LIQUIDATION AND TERMINATION

Section 9.1    Liquidating Events. Except as otherwise provided herein, the Company shall be dissolved, liquidated and terminated upon the occurrence of any of the following events ("Liquidating Events"):

    (a)    the bankruptcy of RSD or VanDeHey;

    (b)    the disposition by the Company of all or substantially all of its right, title and interest in and to its assets; provided, however, that if the Shareholders so determine, the Company may remain in existence to collect the proceeds from any notes and mortgages executed in favor of the Company arising out of the sale of Company Property;

    (c)    the occurrence of any event that, under the laws of any jurisdiction governing the existence of the Company and, in contravention of the terms of this Agreement, shall dissolve the Company;

    (d)    the bankruptcy of the Company;

    (e)    the withdrawal of a Shareholder;

    (f)    the express written agreement of all of the Shareholders; or

    (g)    fifty years after commencement of the Term.

Section 9.2    Dissolution, Liquidation and Termination of Company.    Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Shareholders, and no Shareholder shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Article 9. The Shareholders shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and the Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof.

Section 9.3    Distributions Upon Dissolution, Liquidation and Termination.    Upon dissolution, liquidation and termination of the Company pursuant to Section 9.2 hereof, and subject to Section 9.4, the Shareholders shall cause all proceeds derived from the liquidation of the Company Property to be applied and distributed in the following manner and order of priority:

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

(a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Shareholders, in the order of priority as provided by law;

(b)     Second, to the payment and discharge of all of the Company's debts and liabilities to Shareholders; and

(c)     Thereafter, to the Shareholders in proportion to, and to the extent of, the positive balance standing in each such Shareholder's Capital Account (after taking into account all Capital Account adjustments for the taxable year of such Liquidation).

Section 9.4   <u>Negative Capital Account Restoration</u>.  No Shareholder shall have any obligation whatsoever upon the Liquidation of such Shareholder's Interest, the Liquidation of the Company or in any other event, to contribute all or any portion of any negative balance standing in such Shareholder's Capital Account to the Company, to any other Shareholder or to any other person or entity.

ARTICLE 10
<u>WAIVERS</u>

Notwithstanding any provision of the Act, each Shareholder hereby waives any right to seek or assert: (a) judicial dissolution of the Company; (b) dissenters' rights; or (c) derivative actions on behalf of the Company.

ARTICLE 11
<u>MISCELLANEOUS</u>

Section 11.1   <u>Notices</u>.  Whenever any notice or consent or other written communication is required or permitted hereunder, such notice or consent or other communication shall be in writing and shall be: (a) delivered in person; (b) sent by United States mail; (c) delivered in person by an international air or local courier service; (d) transmitted by facsimile telecommunication or electronic mail when directed to the address, facsimile or electronic mail address, respectively, which was provided to the Company by the Shareholder.  Except as expressly stated otherwise in this Agreement, any notice or other communication delivered by hand or by air courier shall be deemed effectively given when delivered, any notice or other communication sent by United States mail shall be deemed effectively given two Business Days after it is mailed, and any notice or other communication transmitted by facsimile telecommunication or electronic mail shall be deemed effectively given on the date of transmission.

Section 11.2   <u>Partnership Intended Solely for Tax Purposes</u>.  The Shareholders have formed the Company as a Nevada limited liability company under the Nevada Act, and do not intend to form a general or limited partnership under Nevada or any other state law.  The Shareholders do not intend to be partners to one another or to any third party for any legal purposes other than tax purposes.  The Shareholders intend the Company to be classified and treated as a partnership solely for federal and state income taxation purposes. Each Shareholder agrees to act consistently with the foregoing provisions of this Section 11.2 for all purposes, including, without limitation, for purposes of reporting the transactions contemplated herein to the Internal Revenue Service and all state and local taxing authorities.

14

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

Section 11.3   <u>Effective Date of Agreement</u>.  This Agreement shall become effective upon commencement of the Term.

Section 11.4   <u>Binding Effect</u>.  This Agreement shall be binding upon all of the parties hereto and their transferees, assigns, agents, successors in interest, personal representatives, estates, heirs and legatees.

Section 11.5   <u>Counterparts</u>.  This Agreement may be signed in multiple counterparts. Each counterpart will be considered an original, but all of them in the aggregate will constitute one instrument.

Section 11.6   <u>Governing Law</u>.  This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of Nevada.

Section 11.7   <u>Amendments</u>.  Amendments to this Agreement must be in writing and shall only be effective with the unanimous written consent or approval of the Shareholders.

Section 11.8   <u>Entire Agreement</u>.  This Agreement contains the entire understanding and agreement among the Shareholders regarding the subject matter hereof.   There are no agreements, arrangements or understandings, oral or written, between or among the Shareholders hereto relating to the subject matter of this Agreement that are not fully expressed herein.

Section 11.9   <u>Mediation/Arbitration – Dispute Resolution</u>.  Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge.  If either party fails engage in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation.  In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County.  Such controversy or claim shall be heard by a single arbitration (the "Arbitrator").   The award shall be made within six months of selection of the Arbitrator.  Judgment on the award may be entered in any court having jurisdiction and the parties hereby consent to the jurisdiction of the Superior Court for Clark County, Nevada, and of the United States District Court for the Central District of Nevada, for injunctive relief, specific performance or other relief in aid of any proceedings hereunder, but not otherwise.  The arbitration shall be held in Las Vegas, Nevada or as otherwise mutually agreed by the parties hereto.  The Arbitrator shall determine issues of arbitrability but may not limit, expand or otherwise modify the terms of this Agreement nor have any authority to award punitive or other damages in excess of compensatory damages and each party irrevocably waives any claim thereto.  The Arbitrator shall permit, to the extent reasonably necessary, all forms of discovery.  Both parties shall have the right without order from the Arbitrator to take one deposition of the principals involved in a controversy or claim submitted to arbitration hereunder and one deposition of a third party witness and an expert witness, if any.  The parties, their representatives, other participants and the Arbitrator shall hold the existence, content and result of the arbitration in confidence except as disclosure is required by law or as is reasonably necessary to defend claim or procedural rights of the party making the disclosure.

15

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

[SIGNATURE PAGE FOLLOWS]

Exhibit B      Valentine Life, Inc. Operating Agreement

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

IN WITNESS WHEREOF, the parties hereunto have executed this Agreement as of the date set forth below.

Date: 10/5/2015
_____

**SHAREHOLDERS:**

_____
Real Social Dynamics

DocuSigned by:

*Todd Vandehey*
_____
Todd VanDehey

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

**EXHIBIT A**

## VALENTINE LIFE, INC

### SCHEDULE
### OF
### SHAREHOLDER NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, UNITS AND PERCENTAGE INTERESTS

### (as of September 15, 2015)

| Names, Addresses, Facsimile Numbers and E-mail Addresses of Shareholders | Capital Contribution | Units | Percentage Interest |
|---|---|---|---|
| Real Social Dynamics<br>8491 West Sunset Boulevard<br>Suite 452<br>West Hollywood, CA 90069<br>United States of America | $50.00 | 50 Shares | 50.00% |
| Todd VanDeHey<br>145 E Harmon Avenue, Unit 20602<br>Las Vegas, NV 89109<br>United States of America | $50.00 | 50 Shares | 50.00% |
| TOTAL | $100 | 100,000 | 100.00% |

Exhibit B      Valentine Life, Inc. Operating Agreement

DocuSign Envelope ID: 5A8B20FE-BE5F-47FB-8D32-788034183202

## EXHIBIT B

**VALENTINE LIFE, VALENTINE LIFE, INC
VALENTINE LIFE, INC**


**ARTICLES OF ORGANIZATION FILED SEPTEMBER 15, 2015**




[ATTACHED]