**OPP**
Joseph A. Gutierrez, Esq.
Nevada Bar No. 9046
Steven G. Knauss, Esq.
Nevada Bar No. 12242
**Maier Gutierrez & Associates**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: (702) 629-7900
Facsimile:  (702) 629-7925
E-mail:      jag@mgalaw.com
                sgk@mgalaw.com

*Attorneys for Defendants Real Social Dynamics, Inc.,*
*Nicholas Kho, and Owen Cook*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TODD VANDEHEY, an individual,<br><br>                        Plaintiff,<br><br>vs.<br><br>REAL SOCIAL DYNAMICS, INC., a Nevada corporation; NICHOLAS KHO, an individual; OWEN COOK, an individual,<br><br>                        Defendants. | Case No.: 2:17-cv-02230-JAD-NJK<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Hearing Date:  September 8, 2017<br>Hearing Time:  2:00pm |

Defendants REAL SOCIAL DYNAMICS, INC. ("RSD"), NICHOLAS KHO ("Kho"), and OWEN COOK ("Cook") (collectively "Defendants"), by and through their attorneys, the law firm of Maier Gutierrez & Associates, hereby file this opposition ("Opposition") to Plaintiff TODD VANDEHEY'S ("Vandehey") emergency motion for a temporary restraining order ("TRO") and preliminary injunction ("Injunction") (collectively "Motion") [ECF Nos. 7-8] on the grounds that it neither demonstrates a threat of irreparable harm, nor does it establish that Plaintiff is likely to succeed on the merits of any of his claims.

/ / /

/ / /

1

1    This Opposition is made and based upon the following memorandum of points and

2    authorities, the exhibits attached hereto, the papers and pleadings on file in this matter, and any

3    argument of counsel to be made at the time of the hearing.

4    DATED this 6th day of September, 2017.

5    Respectfully submitted,

6    MAIER GUTIERREZ & ASSOCIATES

7

8    /s/ Steven Knauss

JOSEPH A. GUTIERREZ, ESQ.

9    Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.

10   Nevada Bar No. 12242
*Attorneys for Defendants Real Social Dynamics,*

11   *Inc., Nicholas Kho, and Owen Cook*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In his motion, Vandehey is seeking restoration of his access to online accounts, websites, and customer data, as well an injunction preventing Defendants from interfering with his operation of the same.  However, Vandehey misleads this Court by suggesting that the Valentine Life Inc., LLC entity ("Valentine Life Inc."), or even Vandehey himself, possesses any ownership rights to these accounts or assets.  Vandehey's Motion encourages this false inference with artful descriptions of his management and operation of these assets, but conveniently omits the fact that the *entire technology infrastructure upon which Vandehey promoted himself was created, owned, and supported by RSD – not Valentine Life Inc*.

Vandehey became an independent contractor for RSD in 2004, and he remained under the terms of his contract until his termination for cause on August 14, 2017.  *See* Vandehey Independent Contractor Agreement with RSD attached as **Exhibit "A"**.  In exchange for his services, RSD not only generously compensated Vandehey (+$150,000.00/yr. in 2014 and 2015), but RSD provided Vandehey with use of social media accounts, unique website domains/content, email addresses, customer service tools (Ontraport), and a payment processor (InChek).  *See* Vandehey 1099-MISC Statements attached as **Exhibit "B"**.  RSD provided Vandehey with a staff, each of whom are also independent contractors for RSD.  *See* Affidavit of Nicholas Kho attached as **Exhibit "C"** at ¶ 48.

There is no legal or factual basis to conclude that simply providing Vandehey with the tools and contacts to support his contractual obligations now entitles him to claim ownership of any part of that infrastructure.  Unequivocally, all of the online accounts, websites, and customer data referenced in Vandehey's Motion are owned by RSD.  Therefore, when Vandehey was terminated with cause by RSD, it is common sense that his access to accounts, websites, and customers, was also terminated.

Valentine Life Inc., LLC was created in January 2016, with a single Bank of America checking account as its only asset. *See* Valentine Life Inc. Articles of Incorporation attached as **Exhibit "D"**.  The purpose of creating Valentine Life Inc. was to support a new back-end merchant account for online sales as well as allow for more transparent profit sharing between Vandehey and Defendants.  *See* Ex. "C" at ¶ 6.  This single bank account was intended to function as a transitory or holding account

through which disbursements could be easily tracked, but more importantly, it would be a straightforward ledger of deposits from purchases made by RSD customers, and withdrawals made by Vandehey for operations expenses and payroll.  *Id*.  However, Vandehey never provided transparency into the withdrawals made from the Bank of America account, and he failed to provide anything close to diligent accounting.  *Id*. at ¶¶ 43-44.  Vandehey's careless bookkeeping was in fact a prolonged and pernicious ruse to withdraw large sums of money from the account for his personal use and to repay his own personal credit debt.

Beginning April, 2017, the parties sought to negotiate the terms under which Valentine Life Inc., could be operated independently by Vandehey.  *Id*. at ¶ 55.  But, as Defendants sought a valuation of Valentine Life Inc. by assessing the profits, estimated overhead, and payroll, it became abundantly clear that over the past 20 months Vandehey intentionally misappropriated a significant amount of the funds deposited into the Valentine Life Inc. bank account.  *Id*. at ¶¶ 16, 27, 56, 60(j).  Suspicions were raised when Vandehey refused to disclose invoices for his expenses, or provide any accounting at all for the suspicious transactions.  *Id*. at ¶ 15.  As Defendants investigated further, they recognized large withdrawals for personal use.  *Id*. at ¶ 20.

For example, over $13,000.00 was withdrawn by Vandehey in January, 2017, for payment to the Nissenbaum Law Group, LLC, who represent Vandehey only in a personal capacity, and evidently did so long before there was any litigation between the parties.  *See* Valentine Life Inc. Bank of America account statements between Jan. 2016 to Jul. 2017 attached as **Exhibit "E"**, p. 94. Repeatedly and without authorization, Vandehey paid tens of thousands of dollars to unknown recipients (e.g. "Bond New York", "Cooper & Cooper", "XLRealProperty") for reasons not disclosed to Defendants. *Id*. at 64, 149.  In addition, Vandehey routinely transferred money to unknown bank accounts, made large payments to his personal credit card, and paid for his personal residences in New York City all from the Valentine Life Inc. bank account, not his personal account.  *Id*. at 102, 112.

The relationship between Vandehey and Defendants had lasted nearly 15 years.  *See* Ex. "C" at ¶ 66.  During that time, their collaboration was incredibly successful and there was undoubtedly a level of trust and confidence that manifested with Defendants encouraging Vandehey to pursue his own brand and lead his own team under the Valentine Life Inc. moniker.  However, Vandehey took

advantage of Defendants' goodwill by repeatedly, and surreptitiously, siphoning money out of the sole bank account, and one single asset, owned by Valentine Life Inc. over the past 20 months.

Consequently, Kho took appropriate action on August 15, 2017, to protect the remaining funds within the Valentine Life Inc. bank account by moving the entire balance to a separate, standalone account where it would remain untouched until the resolution of the pending legal matter and dissolution of the company. *See* Valentine Life Inc. Bank of America account statements for Aug. 2017 attached as **Exhibit "F"**, p. 2. Plaintiff omits the fact that after Kho moved the full balance of $69,876.34, Vandehey transferred the full balance back to the original Valentine Life Inc. bank account, and immediately after doing so, made seven (7) transfers to multiple American Express credit accounts for over $61,000. *Id.* at 1-2. In other words, knowing that his slush fund was about to close, Vandehey drained the account to pay off his personal debt.

The issues raised in Vandehey's Motion can all be remedied through litigation seeking monetary damages, not emergency injunctive relief. The issue of who is the rightful owner of a bank account balance or particular video content can be derived through arbitration, which is the rightful forum for this dispute. There is nothing immediate, unique, and/or that rises to the level of irreparable harm in the relief sought by Plaintiff. The aggregate of evidence offered herein shows that RSD is clearly the rightful owner of all of the assets over which Plaintiff is now seeking a mandatory injunction just to restore the "status quo".

To be clear, **until his termination on August 14, 2017, Vandehey was employed by RSD as an independent contractor – not Valentine Life, Inc., LLC**. *See* Ex. "A." All the work product, all the digital content, all the online accounts, and all the RSD customers Vandehey serviced, were the property of RSD – not Valentine Life Inc. All of Vandehey's staff was employed by RSD, not Valentine Life Inc., which again was only formed to track online sales and the withdrawals made by Vandehey for operations expenses and payroll.

The recourse sought by Vandehey from this Court is no different than a fired employee looking to regain access to his prior employer's office building, work computer, files, and staff. So it follows in this case, Vandehey has no standing to reclaim any property or assets listed in his Motion, and the funds removed from the Valentine Life Inc. bank account were done to preserve and protect the

1    remaining balance from further embezzlement by Vandehey.

2                              **II.    STATEMENT OF FACTS**

3        **A.  RSD FORMATION AND HISTORY BETWEEN THE PARTIES**

4            RSD was founded in 2002 by Nick Kho and Owen Cook to provide dating coaching as well as

5    direct dating instruction tailored to each customer's unique dating profile.  *See* Ex. "C" ¶ 64.  RSD

6    was the first to market live instruction at public venues such as bars, clubs, and parties, which gave it

7    a competitive edge over companies offering only a unilateral, seminar-type forum.  *Id.*  By employing

8    a small team of immensely talented instructors ("Instructors"), each with their own subordinate

9    coaches, in addition to their own support staff, using RSD equipment/processes, RSD could funnel

10   customers to the appropriate RSD Instructor allowing for a more cohesive relationship and, ultimately,

11   successful experience.  *Id.*

12           The top tier team of 10 to 15 Instructors has changed over time, but each instructor was first

13   mentored as a subordinate coach prior to elevating to the title of RSD Instructor (also called "Executive

14   Coaches" in the initial years of RSD operation).  *See* Ex. "A" ¶ 3; Ex. "C" ¶ 66.  It was Cook and Kho

15   who mentored the first class of instructors.  *See* Ex. "C" ¶ 66.  Vandehey was first introduced to RSD

16   as a paying customer under the coaching of Cook starting in 2003.  *Id.*  Vandehey quickly transitioned

17   to become a subordinate coach under Cook after he mentored Vandehey for approximately 12 months.

18   *Id.*   During this time, Vandehey adapted to Cook's instruction, style, and methodology.   *Id.*

19   Vandehey's success and natural skill led to RSD hiring him as an independent contractor in July of

20   2004.  *See* Ex. "A." Ex. "C" ¶ 66.

21           During the initial years of the company, nearly all its revenue was generated from coaching

22   and in-the-field instruction (hereinafter "programs") in Los Angeles, California.  *See* Ex. "C" ¶ 67.

23   Clients would routinely fly to Los Angeles to attend weekend or 3-day programs to derive the full

24   benefit of the unique, in-person coaching that RSD offered.  *Id.*

25           From 2003 to 2008, programs led by the RSD Instructors were conducted approximately once

26   a week, but as the company grew, the programs were occasionally conducted in a handful of other

27   large metropolitan areas throughout the United States.  *See* Ex. "C" ¶ 68.  To keep pace with growth,

28   roughly once a month, an RSD Instructor would travel to New York, Chicago, or Las Vegas to lead a

program for customers who either lived in those cities, or to which it was more convenient for them to travel.  *Id.*

Even during these initial years, RSD provided the entire physical and digital infrastructure upon which the Instructors would carry out their programs.  *Id.* at ¶ 69.  RSD created and assigned each Instructor's email addresses using the *realsocialdynamics.com* domain.  Id.  In fact, until his termination on August 14, 2017, Vandehey's contact email was *todd@realsocialdynamics.com*, the same email address created for him by RSD in 2004.  *Id.*

RSD staff reserved hotel suites, location meeting rooms or lounges, and homes or residences for both Instructors and customers during their weekend programs.  *Id.*  RSD was also responsible for marketing each Instructor and also managed the entire end-to-end payment capture system as well as the payroll and accounting operations.  *Id.*  **RSD even sought to protect their infrastructure in the Contractor Agreement by labeling the RSD customer lists, marketing material, and computer software as "Confidential" and explicitly stating that RSD owns all rights to said infrastructure without limitation**.  *See* Ex. "A" ¶¶ 16(a-g), 20 (emphasis added).

**B.  ECONOMIC DOWNTURN FORCES RSD TO ADOPT A NEW BUSINESS MODEL**

Despite RSD's rapid growth and extraordinary success, the 2008 United States financial crisis and subsequent recession took a substantial toll on the company.  *See* Ex. "C" ¶ 70.  Customer volume plummeted and even those that wanted to stay with RSD could often not afford to travel to Los Angeles, which at the time, was still the primary venue for RSD Instructor programs.  *Id.*  With attendance at weekend programs dwindling, weekly events were supplanted with monthly ones to reduce costs.  *Id.*  However, Vandehey stayed with RSD and honored his agreement hosting programs in Los Angeles and Las Vegas when enough customers had enrolled.  *Id.*

To revive the company, throughout 2008 and 2009, Kho focused his efforts entirely on expanding RSD to as many markets as possible.  *Id.* at ¶ 71.  No longer concentrated on just a handful of large cities, Kho developed a roadshow to promote RSD both domestically and internationally.  *Id.*  He diversified RSD's product offering with pre-recorded videos and then undertook a grueling 18-month travel schedule to open up new markets in cities around the world.  *Id.*  However, in so doing, RSD incurred substantial debt, with the plan being to revive RSD tenfold what it was prior to 2008

and be able to pay off the debt within a year of ending the roadshow.  *Id.*

By 2010, Kho's plan was a complete success.  *Id.* at ¶ 72.  RSD was hosting programs in over 200 of cities all over the world, and RSD now had Instructors with new teams of subordinate coaches, and hundreds of volunteers.  *Id.*  RSD had paid back its debt, and at the same time, RSD's leadership team implemented an initiative to have all RSD Instructors supported with a complete social media platform which included creation of YouTube, Facebook, Google+, Instagram, and Twitter accounts, as well as unique websites for each RSD Instructor to promote their line of services.  *Id.*

Both Kho and Cook believed that offering free content across social media platforms was not just enticing to potential customers, but keeping active on social networks by sharing ideas or quickly responding to questions was the best way to build trust with customers and ensure their satisfaction.  *Id.* at ¶ 73.  The RSD Instructors had no responsibilities or obligations with regard to this expanded digital infrastructure beyond creating posts/video/tweets.  *Id.*  Even the video equipment used to create the high definition media was provided by RSD.  *Id.*

The idea was simple: let the Instructors focus only on their content, their programs, and the customers, then let RSD manage everything else.  *Id.* at ¶ 74.  Under Kho's leadership, RSD's technology and marketing departments implemented projects to ensure consistent branding across the platforms and that customer issues were routed appropriately.  *Id.*  If an Instructor experienced issues or technical problems with any of his social media accounts, he contacted RSD technical support who would resolve the issue.  All customer data and email lists were stored on RSD servers.  *Id.*  All website domains were purchased and renewed by RSD without any input or collaboration with the Instructor.  *Id.*  In fact, the specific website domains cited by Vandehey in his Motion **were purchased and renewed by RSD**.  *See* Screenshots of RSD/Nicholas Kho's GoDaddy account attached as **Exhibit "G"**.

Kho and Cook recognized the considerable value in having each Instructor simultaneously be a visible senior member of the RSD team, allowing for Instructor cross-promotion and collaboration, while at the same time also letting them promote their own "brand" with individual domains, allowing the Instructor to put forward their unique style and coaching technique to set them apart from other RSD Instructors.  *See* Ex. "C" at ¶ 75. Since 2010, this approach to Instructor management and

operations has been extremely successful not just with respect to revenue, but it has also greatly increased the overall quality of the programs created by RSD Instructors.  *Id.*

### C.  CREATION OF VALENTINE LIFE INC., LLC.

Throughout its existence, RSD has experienced difficulty with processing online payments via credit card.  *Id.* at ¶ 76.  The dating/pick-up industry often receives bad press, and as a result, major payment processors and 3rd party vendors often refuse to do business with RSD if they find their line of business to be morally objectionable.  *Id.*  As a result, RSD has become incredibly agile when an old payment processor refuses service, forcing RSD to quickly switch to a new processor/vendor.  *Id.*

One of the solutions implemented by RSD was to create standalone limited liability companies (LLCs) which would incur lower processing fees/rates, and would lack any negative press history, and then connect the new standalone LLC with a payment processor as a replacement when any other LLC's payment processor refuses service.  *Id.*  For example, if American Express unilaterally decided it would no longer accept payments through the website of an Instructor, RSD would quickly replace the shopping cart API code with that of a different LLC, update the site terms of use, and continue operations uninterrupted.  *Id.*

Having a backup payment processor under a new standalone LLC was the primary intent behind the parties creating Valentine Life Inc., LLC.  *Id.* at ¶77.  Vandehey could process all of his RSD products through the Valentine Life Inc. payment processor (InCheck), and deposit those payments into the single Bank of America account.  *Id.*  The ancillary benefit of creating the Valentine Life Inc., LLC bank account was to be clarity of accounting.  *Id.*  Revenue generated from customer purchases from Vandehey's websites would only be deposited into the Valentine Life Inc. bank account, which created a simple ledger for all parties.  *Id.*  Apart from easier financial reporting, and the gain of an additional payment processor, Valentine Life Inc. had ***no other purpose*** than to facilitate the financial transactions, disbursements, and withdrawals of the RSD customers that Vandehey retained.  *Id.*

RSD still paid Vandehey and his staff; RSD paid for the marketing supporting his programs; RSD provided all technical support for staff; RSD addressed all customer service issues; RSD owned the servers storing all the customer data.  Admittedly, Vandehey was granted authority to develop new

1    marketing strategies, and he could work to acquire new vendors if there was a business need.  But, the

2    autonomy imparted to him by Kho and Cook was in absolutely no way a transfer, sale, or gift of any

3    these RSD assets.  Tellingly, Plaintiff fails to cite to a single shred of evidence that would support a

4    claim that RSD transferred any of its property to Vandehey.

5            **D.  VANDEHEY'S MISAPPROPRIATION OF RSD FUNDS**

6            Despite RSD's good will in allowing Vandehey to jointly operate the Valentine Life, Inc.

7    business with some degree of autonomy, Vandehey's accounting practices were grossly inadequate

8    and his level of communication regarding finances was sporadic and frequently deceptive.  *See* Ex.

9    "C" ¶¶ 19-20.  Often Vandehey's "accounting" was just an email with a screenshot of an excel

10   document, or a static email with brief summary numbers.  *See* Todd's accounting emails attached

11   **Exhibit "H"**.

12           Without question, Vandehey was tasked with managing his own team as well as leveraging the

13   marketing resources owned by RSD to further promote sales.  And though Vandehey could run a

14   profitable business, when left unchecked, he demonstrated clear intention to misappropriate the money

15   deposited into the Valentine Life Inc. bank account to enrich himself.

16           The bank account was created with an initial deposit of $85,000.00, of which $15,000.00 was

17   contributed by Vandehey, and $70,000.00 contributed by RSD.  See Ex. "C" ¶ 13.  Suspicions of

18   misappropriation were first raised in March of 2016, when Vandehey removed Kho as signatory on

19   the bank account for approximately five (5) months.  *Id.* at ¶ 39.  When Vandehey reinstated Kho's

20   access in August of 2016, Kho was only allowed to view the account, which left Defendants with no

21   power to remove or transfer funds.  *Id.*  Then in April of 2017, Vandehey again removed Kho's access

22   to view the bank account and activity occurring therein.  *Id.*

23           However, there were only two sources of deposits into the bank account.  *Id.* at ¶ 60(p).  The

24   first was customer enrollment in RSD Immersion programs, which are boot camps and similar group

25   events with other RSD Instructors and staff.  *Id.*  The second source was digital product revenue

26   Vandehey was promoting through the websites built and maintained by RSD, which included, but was

27   not limited to, *valentinelife.com*, *3girlsaday.com*, *valentineuniversity.com*, and *daygamebytodd.com*.

28   *Id.*  In 2016, the average monthly deposit amount into the bank account was $57,000.00.  *See* Ex. "E".

1   From this pool of deposits, Vandehey began incrementally increasing his personal withdrawals

2   throughout 2016 and 2017.

3        Basic analysis of the bank account statements from January, 2016, until August, 2017, in

4   Exhibit E, ***shows nearly $500,000.00 in unaccounted for expenses***, <u>not</u> including payments to

5   Vandehey's American Express credit account for personal expenses.  *See* Summary of Bank of

6   America statements attached as **Exhibit "I"**, p. 1.

7        Of the half million dollars of those unauthorized or unknown expenses, over $92,000.00 was

8   spent on Vandehey's personal residences in New York City, over $74,000.00 was spent on legal fees

9   for the law firms representing Vandehey in a personal capacity, and over $311,000.00 was transferred

10  to unknown checking and/or savings accounts. *Id.*  Vandehey never provided detailed accounting for

11  any of these transfers, and Defendants had no knowledge of, nor did they ever approve, Vandehey

12  spending over **<u>$11,000.00 per month</u>** on rent for his residences.

13       Also, during this same period, Vandehey paid over $188,000.00 to his personal American

14  Express credit cards, with nearly one third of that amount paid on August 16 and 17, 2017, <u>after</u> Kho

15  attempted to freeze the money in the account by placing it into a separate suspense account pending

16  an outcome of this legal dispute.  *Id*. at 2.  *See* Screenshot of Bank of America suspense account

17  attached as **Exhibit "R"**.  Vandehey disclosed two American Express credit accounts to Defendants,

18  but only once, in December, 2016, did he ever disclose the account details. *See* Vandehey American

19  Express account summaries attached as **Exhibit "J"**.

20       Even then, Vandehey made no attempt to reconcile the accounts or, more importantly, identify

21  which line items were personal expenses and which were business related.  *See* Ex. "C" ¶ 29.  Instead,

22  Defendants were given 1,300 rows of Excel data (not official/original AmEx PDF Statements), and

23  then expected to decipher the payee of each charge and then determine its purpose.  *See* Ex. "J" at 1-

24  23.  Line items included thousands of dollars spent on Amazon.com, Amazon Marketplace, groceries,

25  possible restaurants/lodgings, and legal services.  *Id.*

26       Even more puzzling was Plaintiff's counsel's refusal in July 2017 to disclose redacted billing

27  that would explain the $52,907.00 in legal fees incurred by Vandehey and paid for by the Valentine

28  Life Inc., LLC bank account long before this case became a contentious matter.  *Id.* at ¶ 40.  Plaintiff's

counsel explicitly informed Defendants that her firm represents Vandehey in a personal capacity, and consistent with that representation, even this lawsuit was filed on behalf of Todd Vandehey, not Valentine Life, Inc.  *Id.*  Therefore, RSD and Valentine Life Inc. was not responsible to pay Vandehey's attorney fees.  Nonetheless, Vandehey withdrew $52,907.00 from the bank account to pay his attorney. *See* Ex. "C" ¶ 40; Ex. "E", p. 161.

### E.  NEGOTIATING THE BUYOUT OF VALENTINE LIFE, INC.

Between April 2017, and August 2017, the parties attempted to negotiate a solution to their deteriorating business relationship.  *See* Ex. "C" at ¶ 55.  However, a final agreement could not be reached and the parties were again frustrated by failure.

As Cook and Kho's suspicions grew with regard to Vandehey's likely embezzlement of RSD funds, they next sought to derive a flat buy-out term that would compensate RSD for its investment in Vandehey's digital infrastructure, but allow Vandehey to operate entirely on his own without any profit share or connection to RSD.  *Id.* at ¶ 39.  A final buy-out compromise was informally reached by the parties on August 11, 2017.  *See* August 11, 2017 email from Defendant's counsel to Plaintiff's counsel on attached hereto as **Exhibit "K"**.  It required Vandehey to pay RSD $75,000, and in exchange, RSD would give to Vandehey ownership of this YouTube channel and the videos therein. *Id.*

At the conclusion of this informal agreement, Kho explicitly disclosed to Vandehey that his relationship with RSD was officially terminated:

> *Nick*: Due to the fact that as of this phone call as soon as we hang up, the **relationship is dissolved**. We are removing access to the RSD software that you presently have access to, which includes the shopping cart, the RSD Vimeo account, the RSD email list, RSD Nation, ZenDesk, FTP, all membership sites, our Facebook groups and the YouTube channel, which we restore contingent upon payout.

*See* transcript of phone call between the parties on August 11, 2017 attached as **Exhibit "L"**, p. 4. (emphasis added).  Vandehey's response to Kho even acknowledged that doing so was completely within Defendants' authority and discretion:

> *Todd*: …I understand why you want to do that. I get it, you don't want me reaching out or doing anything, like, that would violate the terms or violate the spirit of this thing. I understand that. So I understand where

you're coming from on that…So what you decide to do on that, I'll leave
up to you.

*Id.*   Despite a clear statement to the contrary, Vandehey still brought this case to enforce that which

he already conceded to never having in the first place, namely, online accounts, websites, and customer

data.

After Vandehey's termination, and in light of his total lack of transparency into his operational

costs and overhead, Kho sought to protect the remaining balance in the Valentine Life Inc. bank

account by moving it to a standalone suspense account.  *See* Ex. "R".  Accordingly, on August 15,

2017, Kho transferred the full balance of $69,876.34 to a separate bank account where it would not be

comingled with RSD accounts or Vandehey's personal accounts.  *Id.*  However, the following day

Vandehey contacted Bank of America to report Kho's transfer as fraudulent, and as a result, Bank of

America moved the entire balance from Kho's suspense account back to the Valentine Life Inc.

account.  **Then, on the very next day, Vandehey made 7 transfers totaling $62,292.51 to his**

**American Express accounts, effectively draining the account to pay his personal debt**. *See* Ex. F,

p. 1-2.

Also on August 16, 2017, while Vandehey was transferring money from Valentine Life Inc. to

his American Express accounts, Vandehey's counsel requested Defendants' participate in mediation

per the terms of the Operating Agreement of Valentine Life Inc. to which Defendant's counsel agreed.

*See* **Exhibit "M"**, ¶ 11.9.  Shortly thereafter, on August 24, 2017, Vandehey filed his Complaint,

TRO, and Motion in this case to reclaim his alleged shared operational control of the RSD assets in

which he has absolutely no contractual or property rights of any kind.

## III.   ARGUMENT

### A. PLAINTIFF CANNOT SATISFY THE REQUISITE ELEMENTS NECESSARY FOR EMERGENCY INJUNCTIVE RELIEF

#### 1.  Legal Standard

Injunctive relief is an "extraordinary and drastic remedy" that is never awarded as of right.

*Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  Its purpose is to preserve the status quo ante litem (the

status that existed before the lawsuit) pending a determination of the case on the merits.  *Sierra Forest*

*Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009).  However, to obtain relief, the plaintiff seeking a preliminary injunction carries the burden of showing: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities tips in its favor; and (4) that the injunction is in the public interest.  *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.

## 2.  Vandehey Is Not Entitled to an Injunction on RSD Assets

Vandehey argues that a preliminary injunction is the appropriate remedy in this case because the parties are pending arbitration. Therefore, in order to protect the effectiveness of the arbital proceeding, the TRO and Injunction "are necessary to protect the ***assets and business of Valentine Life***…which Defendants have systematically disrupted, hindered and destroyed." ECF No. 8, p. 8 ln. 5-10 (emphasis added).  Tellingly, Vandehey is careful not to use the words "owned" or "possessed", because the entity Valentine Life Inc. ***does not own or possess <u>any</u> assets***, aside from a single Bank of America bank account.  *See* Ex. C ¶ 17.  Simply stated, Vandehey cannot ask this Court to protect assets in which he has no legal or contractual claim, either explicitly or implied.

In support of his argument, Vandehey cites cases outside the jurisdiction of the Ninth Circuit, but even if this Court were bound by those precedents, the underlying facts of each case are distinct from the one at bar.  In *Salvucci v. Sheehan*, the injunction was requested by a contractor, who partially completed construction of 4 of 6 residential homes, against the defendant property owner who was repeatedly mortgaging and encumbering the land.  The injunction was appropriate not just because arbitration was pending, but because the plaintiff had an existing property interest in the land. 212 N.E.2d 243, 244 (Mass. 1965).

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. District Court*, the injunction was granted in favor of a company looking to prevent an employee, who quit to join a competitors firm, from soliciting former clients.  The court in *Merrill Lynch* did not analyze the merits of the injunction, rather it simply held that the district court has the authority to grant preliminary injunctive relief, which is a point not at issue in the case at bar. 672 P.2d 1015, 1018 (Colo. 1983).

Conversely, and directly on point, the Ninth Circuit has properly denied injunctive relief to a

plaintiff when the parties are bound to arbitration, where all of plaintiff's claims could be fully scrutinized and remedied. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).  Here, Vandehey seeks to compel Defendants to return the operation of Valentine Life Inc., to the status quo prior to terminating his access to accounts, websites, and customer data.  However, this would be improper and ineffective as a remedy, especially in light of both parties already in agreement to pursue mediation and arbitration per the terms of the Valentine Life Inc. Operating Agreement.

Adding to this, there was never a period of time wherein Valentine Life Inc., LLC owned the assets now claimed by Vandehey. Therefore, returning to the "status quo", as the phrase is intended by Vandehey, would mean forcing RSD to relinquish operational control of its wholly owned assets to an individual who has no legal claim to do so.  As recently as 3 months prior to the date the Complaint was filed in this case, in an email from Vandehey to RSD, Vandehey states "rsd todd [is] the actual fastest growing channel in RSD", "3 Girls A Day [is] RSD's best selling online game product", and "Daygame [was] RSD's biggest launch ever".  *See* email from Vandehey to RSD on May 21, 2017 attached as **Exhibit "Z"**. And again, in 2014, Vandehey explicitly asks permission from Defendants to allow him to launch his program/product: "Can I get permission to do a daygame product with launch date in June or July of next year?"  See email from Vandehey to Defendants on August 19, 2014 attached as **Exhibit "AA"**.  These are clear and unambiguous admissions that Vandehey's "RSD Todd" internet handle, and the products he promotes, are RSD property – not Valentine Life Inc., LLC.

Even if Valentine Life Inc. were restored to its true status quo, it was simply an LLC with two co-owners, one operating agreement, and one bank account.  Reviving the true status quo would be a mandatory injunction granting strictly monetary relief which would no effect on the relief he requests. Therefore, because there is no property or assets over which Vandehey can assert a legal right, he is not entitled to an injunction over said property or assets.

### 3.   Plaintiff's Motion Does Not Demonstrate Irreparable Harm

"The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  In making misleading claims about his right to access RSD property, Vandehey has not

demonstrated that he will suffer irreparable harm if an injunction is not issued.  The Ninth Circuit, along with the Nevada Supreme Court has held that "[g]enerally harm is 'irreparable' if it cannot adequately be remedied by compensatory damages." *Investors v. Bank of America*, NA, 585 Fed.Appx. 742 (9th Cir. 2014) (*citing Hamm v. Arrowcreek Homeowners' Ass'n*, 183 P.2d 895, 901 (2008)).

Vandehey may claim he was harmed when he was fired by RSD, however, a valid termination of a contractor's agreement is not an injunction-worthy act.  The Supreme Court has held that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. *Sampson v. Murray*, 94 S. Ct. 937, 952–53 (1974).  If that were the case, every employee who is terminated or laid off, would have standing to ***request a mandatory injunction*** against their former employer to ensure their paychecks and benefits continue indefinitely and allow ongoing use of the company's resources.

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 94 S. Ct. 937, 953 (1974).

It is undisputed that without the revenue derived from Vandehey's sales of programs on behalf of RSD, he will experience a temporary loss of income.  However, this is merely an economic harm remedied by an award of compensatory damages. In *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, the plaintiff argued that without an injunction it would be (1) unable to enter into a lease agreement, (2) begin stadium renovations, (3) obtain financing for the renovations, or (4) respond to the Raiders' alleged demand for a nonrefundable advance payment to cover transfer expenses.  634 F.2d 1197, 1202 (9th Cir. 1980). However, the Court concluded that all of those grievances are but monetary injuries which could be remedied by a damage award.  *Id*,

Even when viewed in light most favorable to Vandehey, the only harm he may have suffered was to the co-owned Valentine Life Inc. bank account when Kho transferred the entire balance to a suspense account.  And even if that act of preservation was done with no legal basis, and assuming this Court ignores the fact Vandehey quickly paid off personal debt with the same balance that was returned to the bank account, Vandehey's damages still remain purely a measure of financial

reparations. Therefore, injunctive relief is inappropriate here because there is no "reasonable probability" that real injury will occur before an injunction will be issued because there is nothing to enjoin. *Berryman v. Int'l Bhd. of Elec. Workers*, 82 Nev. 277, 280, 416 P.2d 387, 388-89 (1966).

In fact, Defendants took additional steps to ensure no harm was suffered to any RSD customers or staff. Starting August 11, 2017, all of RSD customers who enrolled in Vandehey's programs were notified and either (1) refunded their full payment, or (2) given the option to enroll in an alternate and more expensive program to ensure the customer was still satisfied with RSD services. *See* Ex. "C" at ¶ 47. Furthermore, for clients with recurring billings were immediately, and pro-actively notified of the staffing change and permitted to either cancel or transfer to a different RSD Instructor. *Id.*

These actions were taken by Defendants precisely because all of Vandehey's clients were, in fact, RSD clients. The clients' avenue of recourse when the websites cited in Vandehey's Motion were pulled down was the same as it had always been: to contact RSD customer support. *Id.* Thus, there was no harm to Vandehey, and any potential harm to "his" clients was mitigated by RSD customer support and the Defendants' reparative actions.

Defendants took similar action with regard to salaries owed to Vandehey's subordinate staff. Upon Vandehey's termination, RSD immediately fulfilled all salary/reimbursement obligations to RSD contractors. *Id.* at ¶ 47-48. This included Jonathan Piedra, Kevin Juica, and Yuriy Chernin, all of whom have executed Contractor Agreements with RSD, not Valentine Life Inc., LLC. *See* additional RSD Contractor Agreements attached as **Exhibit "X"**. Even though all three of these contractors were paid from the Valentine Life Inc. bank account throughout 2016 and 2017, the contractual obligation that they get paid was owed by RSD, not Vandehey or Valentine Life Inc.

### 4.  Plaintiff's Complaint Will Not Succeed on the Merits

Vandehey could never succeed on the merits of his case because, prior to this lawsuit, all property and assets he identifies in his Motion were the property of RSD, not Valentine Life Inc. Any time period where Vandehey or Valentine Life Inc. claims to have owned the accounts, websites, data, and customers is purely fictional and a denial of reality. RSD solely owned all of the assets cited in Vandehey's Motion, except for the Bank of America checking account. To implement the "status quo" ante litem in this case would force RSD to reinstate Vandehey as an independent contractor,

whom RSD would still have a contractual right to terminate with or without cause.  *See* Ex. "C" at ¶ 30-34.

There is overwhelming evidence, even within Vandehey's Motion itself, showing that RSD owns the online accounts, websites, and customer data at issue:

- ▪ The "**RSD**" initialism is copyrighted by Real Social Dynamics, Inc. and the logo for "Real Social Dynamics, Inc." is copyrighted and owned by Kho.  *See* **Exhibits "N" and "P"**.  The use of these trademarks was rampant across all of the social media accounts through which RSD promoted Vandehey programs.  Thus, to avoid customer confusion after he was terminated by RSD, it had to remove all accounts, domains, and content that still put forward a message that Vandehey and RSD were working together.

- ▪ Vandehey's Motion exhibits request reinstatement of YouTube and Google+ channels using the name "**RSD Todd**". ECF No. 8, Exhibits M and J.

- ▪ Vandehey's Motion exhibits request reinstatement of a website domain "**RSDimmersion.com**".  ECF No. 8, Exhibit D.

- ▪ Vandehey participates in RSD forum discussions with the signature line "*TODD – RSD Senior Instructor SPECIAL EVENTS – Master Pickup Artist Extraordinaire*". *See* **Exhibit "O"**.

- ▪ Website domains were purchased and renewed solely by RSD and Kho including, but not limited to: *valentinelife.com*, *daygamebytodd.com*, *rsdimmersion.com*, *valentineuniversity.com*, and *3girlsaday.com*.  *See* **Exhibit "G"**.

- ▪ Websites had the legal terms and conditions of Real Social Dynamics, Inc., and clearly prompted visitors to contact support/admin at realsocialdynamics.com. *See* **Exhibit "Q"**.

Vandehey's Complaint rests entirely on the faulty premise that he owns the digital infrastructure upon which he completed his contractual obligations to RSD as an independent contractor for the past thirteen (13) years.  But, as the facts and evidence above undeniably show, Vandehey was always an RSD contractor, and as such, he took full advantage of the infrastructure built by RSD to allow him to perform his duties.  At no point in time, did RSD ever relinquish, transfer, or gift its ownership rights to any of its property to Vandehey.  The merits of Vandehey's case is simply that he was terminated with cause, and he hopes that fact alone is sufficient grounds to persuade

1    the Court to render a favorable outcome.

2                        **5.  Balance of Hardships**

3            Vandehey also argues in error with regard to the balance of equities in this matter and fails to

4    understand the technical repercussions of deactivating the social media accounts, websites, and email

5    domains.  Vandehey makes the false assumption that these assets can simply be reinstated by "flipping

6    a switch". *See* ECF No. 7, p. 14, ln. 1.  However, all such assets have since been deleted by RSD and

7    are irrecoverable.

8            The email box and archive for *todd@realsocialdynamics.com* was deleted from both the RSD

9    server and email vendor immediately after Vandehey's termination on August 11, 2017.  *See* Ex. "C"

10   at ¶ 61(a)(4).  The website content for all Vandehey's Instructor websites was deleted and the domains

11   pulled from public access.  Both the YouTube channel and Google+ accounts for RSDTodd were

12   closed per those sites' terms of use immediately after Vandehey's termination.[1]  It is dismissive for

13   Vandehey to summarily assume that the technical underpinnings of the RSD infrastructure can be so

14   easily restored, or that social media accounts can be quickly revived after their deletion is requested

15   and confirmed by the owner of the account.

16           Furthermore, swift and immediate action to delete the relevant RSD assets was necessary after

17   Vandehey's termination on August 11, 2017, because **RSD's disassociation from Vandehey was**

18   **required to avoid customer confusion**.  After his termination, a strong likelihood existed that a

19   customer no longer differentiate between RSD's assets and any potential asset owned by Vandehey.

20   Therefore, to lessen any risk of RSD's liability for copyright infringement and mitigate customer

21   confusion, it was imperative RSD pull down any association of visible association with Vandehey.

22           Defendants suspected Vandehey was promoting himself and selling programs through other,

23   undisclosed sales channels.  *See* Ex. "C" at ¶ 47.  Because of this, the likelihood of confusion for those

24   customers would be probable, and not simply a possibility, because the "RSD" moniker was openly

25   and obviously linked to Vandehey via screen names, social networking groups, and websites.  *See*

26

27   _____

28   [1] It is worth noting that Exhibit M in Vandehey's own Motion, displaying 6 pages of screen shots of RSD Todd's deleted Google+ account, clearly ***shows all videos were posted in 2014 or earlier***, prior to the existence of Valentine Life Inc. or its Operating Agreement. *See* ECF No. 7, Exhibit M.

1   *Groupion, LLC v. Groupon, Inc.*, 826 F.Supp.2d 1156, 1162 (N.D. Cal. 2011).

2         **6.   A Mandatory Injunction in this Case is Against the Public's Interest**

3         Vandehey is neither seeking to prevent an impending harm nor ensuring the status quo is

4   maintained.  Rather, Vandehey is looking to have this Court order Defendants to reinstate the online

5   accounts, websites, and customer data to which he claims to have a legal right.  A preliminary

6   injunction is treated as a mandatory injunction if the relief sought orders a responsible party to take

7   action.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Thus, Vandehey mischaracterizes

8   the relief he is requesting, which is not a *preliminary* injunction, but rather a *mandatory* one.

9         However, the Ninth Circuit has clearly stated that "a mandatory injunction goes well beyond

10   simply maintaining the status quo *pendente lite* and is particularly disfavored".  *Id*. at 740.  Thus,

11   Vandehey must meet an ***even higher burden of proof*** and level of scrutiny to prove to this Court that

12   a mandatory injunction is the appropriate remedy.  In other words, he must establish that "the law and

13   facts *clearly favor* his position, not simply that he is *likely* to succeed."  *Id*. (emphasis original).

14         With that higher burden in mind, this Court should weigh the public's interest against the

15   consequences of issuing the mandatory injunction.  Vandehey argues the public interest is the

16   continued operation of a public-facing business, and shuttering the websites and accounts in this case

17   prevent him from contributing to the public.  *See* ECF No. 7, p. 14, ln. 20.  However, granting a

18   mandatory injunction under these facts would distort the legal rights of lawfully terminated

19   employees/contractors, opening the door to countless legal actions by fired employees trying to force

20   their prior employers to re-hire them. Clearly, the public interest falls to Defendants position and

21   Vandehey's Motion must fail.

22         **B.   Vandehey Harmed Defendants by Misappropriating Funds**

23         Vandehey's intentional misappropriation of RSD and Valentine Life Inc., funds over the past

24   twenty (20) months unmistakably harmed Defendant.  Examination of Vandehey's use of the

25   Valentine Life Inc., bank account shows a pattern of monthly transfers to unknown bank accounts,

26   large payments to American Express accounts, massive personal residence costs, and substantial

27   attorney's fees paid without authorization or approval from Defendants. The following acts

28   collectively demonstrate Vandehey was acting in his own self-interest, and not that of RSD, or

Valentine Life Inc., LLC:

**1.   Plaintiff Opened an Undisclosed Credit Account Against Valentine Life Inc.**

At a date unknown to Defendants, Vandehey opened a credit account against Valentine Life Inc. and made purchases against the line of credit. *See* **Exhibit "S"**. Vandehey has never disclosed statements for this account or otherwise attempted to reconcile the costs he incurred against revenue deposited into the Valentine Life Inc. bank account.

**2.   Plaintiff Was Spending Over $11,000/mo. On Rent for Personal Residences**

Starting May 2016, Vandehey was spending nearly $4,500/mo. on rent for his <u>personal residence</u> from the Valentine Life Inc. bank account. *See* **Exhibits "E" and "I"**.  Then, starting in December 2016, Vandehey began making a second rent/property payment of $3,500 every month. *Id.* By June and July 2017, Vandehey added a third rent expense of $7,800/mo. *Id.*  The justification for these costs was never provided to Defendants, and the escalating value of the rental properties is indicative of Vandehey becoming more brazen with the amount of money he could withdraw without suspicion.

**3.   Plaintiff's Explanation for Withdrawals Were Vague and Unilateral**

In February 2017, Vandehey withdrew $30,000.00 from the bank account and sent an email with merely five (5) sentences explaining why. *See* Vandehey email explaining $30,000 withdrawal attached as **Exhibit "T"**.  No accounting document was provided, and no mention of how or when the withdrawal could later be reconciled.

**4.   Plaintiff Explicitly Requested Kho Purchase Website Domains**

In April 2014, <u>well before</u> Valentine Life Inc. was created, Vandehey asked Kho to purchase five (5) domains with different permutations of the words "Valentine", "Todd", "RSD", and "University". *See* Vandehey email to Kho requesting the purchase of various domains attached as **Exhibit "U"**.   This clearly demonstrates Vandehey understood the RSD digital infrastructure competently enough to understand how he could promote himself on a website using RSD resources. Vandehey presents no evidence, agreement, or contract that would change this arrangement even after Valentine Life Inc. was created.

**5.   Defendants' Chief Financial Officer Compiled a List of Unverified Expenses/Transfers**

In January, 2017, RSD's Chief Financial Officer compiled a list of suspicious expenses made by Vandehey in 2016.  *See* January 17, 2017 email from Michael Ampikapon to Kho attached as **Exhibit "V"**.  This list identifies unusual transfers, unknown recipients of funds, unusual reimbursements, and unknown attorney fees.  During their negotiations in July, 2017, it was this list of expenses on which Defendants repeatedly requested Vandehey for transparency.  However, Vandehey refused to provide it.

**6.   Plaintiff's Sales Summary Chart Did Not Match Back-End Payment Processing**

In September, 2016, Vandehey provided the RSD executive team with a summary of his sales.  *See* Vandehey sales summary attached as **Exhibit "W"**.  However, the sales totals in his chart did not reconcile with the bank statements and are missing approximately one-third of the payments.  The likely explanation under these circumstances is that Vandehey was processing orders through a second shopping cart and keeping all of the revenue.

In addition to the financial harms listed above, a full Affidavit of Damages as reported by Defendant Kho is attached hereto as **Exhibit "Y"**.  Vandehey took advantage of his access to RSD customers and revenue for the past twenty (20) months.  Now, he has filed an unsupported Complaint and a frivolous Motion.  Defendants request this Court make a finding that Vandehey's case will not succeed on the merits and summarily deny his Motion for injunctive relief.

///
///
///
///
///
///
///
///
///
///
///

# IV.   CONCLUSION

Based on the foregoing, Defendants respectfully request this Court deny Plaintiff's emergency motion for a temporary restraining order and a preliminary injunction in its entirety. Vandehey has incurred no irreparable harm and his case will not succeed on the merits.  Furthermore, Vandehey filed his Complaint and the Motion in bad faith which should preclude him from any further relief.

DATED this 6th day of September, 2017.

Respectfully submitted,

MAIER GUTIERREZ & ASSOCIATES

/s/ *Steven Knauss*

JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
*Attorneys for Defendants Real Social Dynamics,*
*Inc., Nicholas Kho, and Owen Cook*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Maier Gutierrez & Associates, and that on the 6th day of September, 2017, a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court using the Court's CM/ECF system, and served to all parties and counsels of record registered to receive CM/ECF notifications.

_/s/ Charity Johnson_
An employee of MAIER GUTIERREZ & ASSOCIATES