EXHIBIT "C"

AFFIDAVIT OF NICHOLAS KHO

# Affidavit of Nicholas Kho

STATE OF NEVADA    )
                            ) ss:
COUNTY OF CLARK   )

The undersigned, Nicholas Kho, being duly sworn, hereby deposes and says:

1. I am over the age of 18 and am a resident of the State of Nevada. I have personal knowledge of the facts herein, and, if called as a witness, could testify completely thereto.

2. I suffer no legal disabilities that would prevent me from testifying.

3. I have personal knowledge of the facts set forth below.

4. Real Social Dynamics (RSD) was created by me in 2002, and I am the President/CEO, Incorporator, Director and Founder of RSD. I'm in charge of all operations of the company relating to business administration, including finance, marketing, sales, human resources, Information Technology, video production, and content development for RSD and all brands associated with RSD, including RSD Todd, Todd Valentine, and all websites associated with the RSD Todd or Todd Valentine brand, all of which are brands that have been associated with RSD and are the RSD-owned intellectual property of RSD for well over a decade, including all RSD-copyrighted work of Todd VanDeHey, who is a RSD Contractor, who has agreed that all works that are created by him for RSD are works for hire, and that all RSD confidential information, including software, technology, customers, intellectual property, and business processes belong to RSD. Todd VanDeHey has worked with me on building value for RSD and the RSD Todd branded products and services since 2004, but he was terminated in August 2017.

5. In the winter of 2016, my office assistants and I filed for the creation of Valentine Life via LegalZoom.com with the intention of Valentine Life being formed as a LLC; therefore, RSD was the incorporator for Valentine Life. LegalZoom.com made a mistake and created Valentine Life as a C Corporation. The incorporation paperwork was delayed being sent to me by several months so neither Todd VanDeHey nor I knew about the corporation type error until January 2017. Todd and I acknowledged the error via email. LegalZoom.com told me over the phone that the papers were filed and that the completed paperwork, including the State Seal, would be mailed to me. The paperwork for Valentine Life was received by me in 2017 and it was shared with Todd VanDeHey.

6. I gave an operating agreement to Todd VanDeHey for Valentine Life and it was signed by Todd VanDeHey with the expectation that the company would be owned 50% by Todd VanDeHey and 50% by Real Social Dynamics. Todd VanDeHey sent an email to Real Social Dynamics (RSD) confirming the equity split, which I reconfirmed and agreed to was indeed a 50%/50% split of equity of Valentine Life between Real Social Dynamics and Todd VanDeHey. Todd understood that the company was created solely for the purpose of being a shell company to do merchant processing and to provide transparent accounting for budgetary reasons, and also understood he would remain a RSD Contractor.

7. An amendment was created and shared with Todd VanDeHey in-person at a meeting of the law offices of Maier Gutierrez & Associates, but it was not signed by Todd VanDeHey.

1

8. Todd and I agreed that Valentine Life would split the legal fees for the creation of an operating agreement amendment on behalf of Valentine Life if Valentine Life was the client for the legal fees because Todd had many additions that he wanted added to the operating agreement; however, instead of the agreement being actualized by Todd, it did not happen, and, Todd instead hired an attorney for himself personally. Therefore, all expenses of Todd for legal bills are his alone and not allowed to be considered an expense of Valentine Life. In addition, Todd denied all of attorneys that I recommended to Todd for Valentine Life as referrals of Maier Gutierrez & Associates. Since Todd denied the attorneys and got his own personal attorney from Nissembaum instead of attorneys for Valentine Life, Todd hired attorneys that were not part of our agreement. It is especially important to remember that since Todd hired attorneys for himself instead of Valentine Life, and utilized the attorneys and funds of Valentine Life to pay for the attorneys. I did not authorize Todd to hire attorneys to personally be involved with a legal dispute and the RSD Contractor Agreement (signed by Todd VanDeHey) states that all attorneys' fees for disputes between RSD and Todd, including both my attorneys and his own, are the responsibility of Todd VanDeHey to pay for personally. The fact that Todd is using RSD funds from the Valentine Life checking account to pay to represent himself in a dispute is clearly a conflict of interest and the usage of such funds was not authorized, and is in violation of the RSD Contractor Agreement and the Valentine Life Operating Agreement, both of which are documents signed by Todd VanDeHey. In addition, RSD made Nissembaum aware of the conflict of interest in a phone call in July 2017 that was recorded and transcribed, whereby RSD requested billing invoices from Nissembaum due to the fact that RSD was paying for the legal bills. During the same July 2017 phone call, RSD was made aware for the first time that Todd had hired Nissembaum Law to represent himself personally and not Valentine Life as a corporation, which was a major surprise to Maier Gutierrez & Associates RSD representatives, and myself because it was such a major violation of expectations.

9. We discussed the legal fees dispute in front of my attorneys, Joseph Gutierrez and Collin Jayne, in-person in the summer of 2016. In addition, we also reiterated our agreement with Todd VanDeHey that if he had personal rent expenses shared with RSD contracted staff that Todd would be responsible for at least $1,500/month payable directly to RSD on a monthly basis. In addition, if Todd had a personal residence with his girlfriend, Kaitlin Severin, separate from RSD contracted staff (other than Kaitlin Severin, a RSD Contractor), and then Todd's personal residence without the staff would be 100% covered by Todd VanDeHey. The agreements mentioned in section 8 between RSD and Todd was stated in the presence of Joseph Gutierrez and Collin Jayne of Maier Gutierrez & Associates. Unfortunately, Todd violated these terms. Bank of America provided me with statements that allowed me to discover that Todd had an undisclosed credit card that was opened in the name of Valentine Life (attached to the Valentine Life bank accounts at Bank of America) by Todd VanDeHey. On the same Valentine Life credit card statements, I discovered that Todd VanDeHey was paying for the unauthorized rent of 10 Hanover Square for Todd to live separate from his staff with Kaitlin Severin, which was solely as the personal residence of Todd with Kaitlin. To re-clarify this statement, 10 Hanover Square is a different address than the apartment of the staff of RSD Contractors that Todd was authorized to rent while being responsible for only $1,500/month of that rent, even though the rent was paid for by Valentine Life. The staff lodgings that was authorized was originally at 234 West 14th St Apartment 2 where the staff lived last year was the only authorized apartment to be paid for and with rent of $4495/month, which was shared with Kevin Juica and Yuriy Chernin. However, staff later upgraded the staff lodgings to an unauthorized more expensive luxury apartment at the address of 448 West 19th St PH for $7800/month. This lodging was being shared with David Zelman, Kevin Juica, Jon Piedra, and Garrett Darling. All of the RSD Contractors living at the staff lodgings paid Todd personally for rent even though Valentine Life covered rent. Since the rent was 50% paid for by RSD, it created a situation where Todd was profiting off of rent covered by RSD, but this was unauthorized. Rent payments were covered by Valentine Life (50% paid for by RSD), and I only submitted a guarantor form to authorize to rent 234 West 14th St Apartment 2, and my guarantor form was not to be used for any other apartment. I wonder if it was used for the other apartments, which were not authorized by RSD to be rented.

10. Although my office filed the incorporation paperwork for Valentine Life, Todd VanDeHey was originally listed as an Officer instead of myself as Officer so that Valentine Life could apply for a merchant account with low credit card processing rates because Real Social Dynamics and myself are on the Terminated Merchant File (TMF) List, which requires RSD to pay a higher merchant account rate due to being in the high-risk seminar business and for having previous merchant accounts closed. The plan was to add myself as Officer after Todd was approved for merchant accounts since Todd was not on the TMF List. Todd further acknowledged the equity ownership of Real Social Dynamics in Valentine Life in email as well as his knowledge that the VL account was created for the purpose of merchant account creation.

11. Upon review with the Inchek underwriter, Sam Ibrahim, the merchant account sheet for Valentine Life showed the company was listed as a LLC because both Todd VanDeHey and Real Social Dynamics thought that Valentine Life was a LLC upon application for a merchant account. Such merchant account paperwork listing Valentine Life as a LLC was provided to Real Social Dynamics, and Todd VanDeHey completed the merchant account paperwork and the merchant account was created. However, the merchant bank adjusted the merchant account for Valentine Life upon discovery that the initial paperwork was for a C Corporation, which was a surprise to both Real Social Dynamics and Todd VanDeHey, who sent emails to Real Social Dynamics staff inquiring about the confusion about the paperwork in addition to multiple phone calls about this issue to me.

12. In February 2017, Todd VanDeHey met at my residence at 8121 Gothic Avenue, Las Vegas, NV 89117 to discuss the accounting for Valentine Life, which included Todd VanDeHey's statement that all expenses were business expenses, including the legal fees which Todd acknowledged were split between Real Social Dynamics and Todd VanDeHey because the attorneys represented Valentine Life, even though this was a fabrication. In addition, Todd VanDeHey sent an email acknowledging the same and also had a recorded Skype meeting with me afterwards whereby Todd VanDeHey acknowledged the 50%/50% equity split, the sharing of the Valentine Life legal fees, and the personal rent payments that Todd VanDeHey was responsible for (including the $1,500/month for his "staff apartment" where he has a bedroom in addition to the separate apartment with his girlfriend). David Zelman, a RSD Contractor working with Todd, paid $1,000/month for renting a bedroom in an apartment paid for by Valentine Life and that 3 other staff members living in the same apartment paying rent as well. He told my assistant, Lisa, about the rent divisions in the staff lodgings mentioned above, and David also stated that Todd had a bedroom at the staff apartment with David Zelman. I believe that Todd uses the extra bedroom as a location to have sex with women external to where he lives with Kaitlin; therefore, Todd could keep his love affairs a secret from his girlfriend and avoid the drama that comes from such a betrayal because Todd has had similar apartment situations when he was living in Las Vegas for that purpose. In addition, Todd has a separate apartment that he shares with his newborn baby and his baby's mother & Todd's girlfriend, Kaitlin. Todd is responsible for paying $1,500/month personally for the apartment shared with David and for the entirety of the rent of the apartment with Kaitlin; however, part of (or the entirety of) the rent payment for Kaitlin's apartment was paid for out of the Valentine Life checking account.

13. After the creation of Valentine Life, revenues generated by business associated with Todd VanDeHey was to be deposited into the Valentine Life bank account, and that includes the rent money that Todd also receives for rent from staff, revenue earned from the Valentine Life merchant accounts, cash collected by RSD Todd staff, and PayPal payments earned by Todd VanDeHey for RSD work. The bank account was created with an initial deposit of $85,000.00, of which $15,000.00 was contributed by Vandehey, and $70,000.00 contributed by RSD. We have not received any deposits for the cash paid by David Zelman and other staff for the apartment that they occupy with Todd VanDeHey. In addition, all RSD Instructors have cash collected during live events that must be deposited into the Valentine Life bank account for

3

accounting; however, there is a lack of deposits of cash and PayPal payment deposits made to the Valentine Life bank account. Todd also had large group seminars, where he sold products with order forms so customers could pay with cash or credit card, and there has never been a cash deposit by Todd into any Valentine Life checking or savings account. This makes me suspicious that Todd may be pocketing all of the cash and hiding the sales from RSD so that he may steal the money from the business.

14. In July 2017, a meeting took place with Nissembaum Law, Maier Gutierrez & Associates, Todd VanDeHey, Owen Cook, and myself. At the meeting, an attorney of Todd VanDeHey claimed the operating agreement was intended to be a "draft", but Todd VanDeHey and Real Social Dynamics agreed instead that the operating agreement should be managing operations for Valentine Life and that the Operating Agreement was a fully executed operating agreement.

15. In a July 2017, during a phone call between Owen Cook and Todd VanDeHey, and also via an email sent to Owen Cook in July 2017, Todd VanDeHey claimed that I agreed to pay 100% of the legal fees for Todd VanDeHey, but that was a complete fabrication. The truth of the situation was that I told Todd VanDeHey in 2015 that I would consider paying the legal fees for Valentine Life to create an operating agreement amendment because I believed that the agreement would be done for less than $10,000 and under friendly discussion; however, Todd refused saying that he wanted Valentine Life to pay for the legal fees (and then secretly hired attorneys for himself personally to threaten to sue RSD instead). Originally, in 2015, Todd claimed he didn't want an issue whereby I was paying for his legal fees because that could call into question the legality of any agreements as a result. Therefore, we agreed Valentine Life would be paying for all legal fees. This agreement was reconfirmed in-person in front of Joseph Gutierrez and myself in-person during a visit by Todd VanDeHey to Las Vegas. It was also reconfirmed in a recorded Skype meeting between Nicholas Kho and Todd VanDeHey.

16. The agreement between Real Social Dynamics and Todd VanDeHey stated there would be full transparency and the operating agreement has a clause stating Real Social Dynamics and Todd VanDeHey would both be the signatories on the bank accounts for Real Social Dynamics to ensure that proper accounting was done. However, we have not had the name of a Real Social Dynamics represented as a signatory on the bank account for much of the duration of the existence of Valentine Life, and this needs to changed immediately after I discovered this in August 2017 to ensure that Real Social Dynamics does not lose account access and can properly monitor the accounting and fiscal responsibility of Real Social Dynamics, especially since RSD, our CPA, and attorneys began an investigation against Todd for potential embezzlement.

17. Todd has told Nicholas Kho, Joseph Gutierrez, Nissembaum Law, and myself during meetings in-person and via phone that he believes that he built Valentine Life with his own money as an initial investment. This is not true. RSD paid for the incorporation of Valentine Life and any money that Todd initially put into the bank account in the beginning was transferred out of the bank account shortly afterwards when RSD put its own money into the bank account from revenue generated from a merchant account attached to Valentine Life's bank account. Also, Valentine Life was created as a legitimate shell company whereby all assets and operations are owned by RSD. In addition, all resources to sustain any business operations relating to Valentine life were assets owned by RSD, including RSD contractors, social media, technology, sales team members, marketing team members, and travel team members that continued to build any business that provided revenue into the bank account of Valentine Life over the last 2 years, and included expenses that were paid to manage products and services created prior to the existence of Valentine Life. Todd claims that RSD has had no expenses for Valentine Life, but that is also a complete fabrication. In fact, RSD also provided all resources to cover all expenses relating to RSD Todd for over a decade before the existence of Valentine Life, which was primarily a shell company with no assets under its ownership. The original intention of creating Valentine Life was to (1) provide a backup merchant account in case RSD lost a merchant account and needed another merchant account to process money, and (2)

4

allow for both Todd and RSD to have a separate bank account visible by us both to clearly identify sales and expenses without any commingling of other business lines so that the split of profits from products and services associated with RSD Todd – branded products and services could be identified. My original belief was that accounting would be done bi-weekly since that is how we pay all RSD Instructors; however, we did get any complete income statements over the last 2 years from Todd other than screen-shots of executive summaries of what was considered by Todd to calculate approximate profits.

18. In the summer of 2016, it was agreed to during Skype meetings with Todd VanDeHey, Mikhail Kuznetsov, Stuart Lewis, Owen Cook, and myself that Real Social Dynamics would receive financial statements no less than monthly from Todd relating to the business operations associated with the RSD Todd Brand to explain the money coming in and out of the Valentine Life bank account. That did not occur and, instead, sporadic financial statements have been created, and, oftentimes, most financial statements lack details other than being a screen-shot of the accounting. Due to a lack of financial accounting, Todd VanDeHey has occasionally guessed at how much Real Social Dynamics would be paid and has sent a $15,000 transfer to Real Social Dynamics instead of calculated the profits transferred from the Valentine Life bank account, which were supposed to be split evenly between Real Social Dynamics and Todd VanDeHey. These guestimates are detailed in emails from Todd VanDeHey that were then forwarded to my attorneys at Maier Gutierrez & Associates as further evidence of improper handling of funds by Todd VanDeHey.

19. Real Social Dynamics has never received financial statements from Todd VanDeHey's American Express account (other than what appears to be custom excel statements from Todd VanDeHey that has chosen expenses from the online American Express (Amex) statements by Todd VanDeHey), which includes all transactions paid to Todd's personal credit card account, but are claimed by Todd to be expenses for Valentine Life. To create excuses for why Todd didn't want to share Amex statements, Todd claimed that the Amex statements had personal information on it that he didn't want to share, but he I told Todd that he should have redacted American Express statements to be provided to RSD to show all expenses relating to Valentine Life. This would lead to financial transparency, but Todd refused the request. In addition, Todd should never have used his personal Amex in the first place for business expenses because commingling of business and personal expenses is a white collar crime, and Todd's actions make me question if Todd used the personal Amex card as an excuse for business expenses to intentionally deceive RSD as to what were profits for RSD Todd business. Also, all Paypal statements and cash received by staff working with Todd in New York have not been accounted for with proper documentation. It is therefore requested that payment statements and cash reconciliation statements showing all payments made by clients to be also provided to Real Social Dynamics.

20. In the accounting of RSD profits from the Valentine Life bank account, I discovered that there are thousands of dollars of business expenses, including multiple expenses for food, beverage, and other personal expenses, that were not mutually authorized by both Todd VanDeHey and Real Social Dynamics, and Todd VanDeHey has written them off as business expenses. Such violations of expectations of Real Social Dynamics has led us to believe that there is a lack of transparency and violation of the operating agreement of how the finances of Valentine Life should be run. It has been reiterated multiple times that Valentine Life should have a CPA do the accounting for a fiscal audit and that the accountant should be responsible for payments made on behalf of Valentine Life in addition to removing the commingling of funds between the personal credit card & checking accounts of Todd VanDeHey and Valentine Life, whose bank account was said by Todd VanDeHey to be linked to his personal bank account. Todd VanDeHey claimed that due to his personal bank account being linked to the Valentine Life bank account was the reason for why he could not make transfers for the profits of Real Social Dynamics when was traveling outside of New York, which is an unacceptable rationale for not paying Real Social Dynamics the profits due to the agreement established between Todd VanDeHey and Real Social Dynamics.

5

21. Payments to RSD Contractor staff relating to RSD Todd are made on a monthly basis from the Valentine Life checking account; however, some payments to staff have been made via the personal bank account of Todd VanDeHey without full disclosure of how much payments were made to staff and with a reimbursement to the personal bank account of Todd VanDeHey. I have told Todd that this was unacceptable because it violates transparency and heightens my suspicions that something nefarious is taking place. All hires made by Todd VanDeHey over $50,000 should be approved in writing by both Todd VanDeHey and Real Social Dynamics since the Valentine Life operating agreement requires that all expenses over $50,000 should be accounted for and approved in writing by both Real Social Dynamics and Todd VanDeHey, and Todd has made payroll payments out of the Valentine Life bank account for payroll that is totaling over $50,000 in violation of the terms of the operating agreement. In addition, many other transfers that were lump-sum payments from the Valentine Life checking account over $50,000 have been made without approval of RSD.

22. Todd VanDeHey makes the false claims that the company, Valentine Life, was created by Todd and all start-up money required to start Valentine Life was due to his initial investment. However, that is a complete fabrication because the creation of the company was created entirely by the resources of Real Social Dynamics. Although Todd claims he put money into the Valentine Life checking account to open a bank account for Valentine Life, the funds that remained in the account after a short period of time was not Todd's initial funds rather it was money that was put into the account as a reserve by Real Social Dynamics for over $20,000. All funds associated with Todd personally were withdrawn shortly after the creation of the bank account. The funds that Todd put into the checking account to open the bank account was withdrawn shortly afterwards by Todd and transferred to his personal bank account. Also, RSD made multiple initial transfers into the bank account shortly after I opened the bank account of Valentine Life in-person with Todd present at the Las Vegas Bank of America branch office with the banker, Jason Sheldon. During the duration of the existence of Valentine Life, RSD and Todd created products and services to sell to a customer and prospect email list created and owned by Real Social Dynamics. The email list was temporarily utilized by Todd under an account in the name of both RSD and Valentine Life and uploaded to Ontraport so that staff working with Todd in-person could market to the customers. Ontraport is an email service provider, who had to receive written permission from myself prior to Todd being allowed to market to the customer list and also Ontraport required verification that all customers would be made fully aware that all email correspondence would still utilize the Real Social Dynamics branding and would not confuse RSD email list membership. This is because of the CAN-SPAM Act that state that customers and prospects are not legally allowed to be marketed to unless they opt-in to email lists and only receive correspondence on behalf of a company with the same branding and expected newsletter information as advertised when they opted into the RSD newsletter email capture form. Thus, since Todd is no longer allowed to use RSD-branding as a terminated contractor, he should not be allowed to market to the RSD customers as that would cause a violation of the CAN-SPAM act. There would be severe financial penalties and fines relating to a violation of these laws. Todd has occasionally violated the customer expectations in the past by marketing to customers non-RSD business, including telling me that he was getting hedge fund clients from RSD clients, including Tynan Hutchins. Later, Todd requested RSD permission to further market his hedge fund services and RSD declined the invitation. In addition, Real Social Dynamics funded over $20,000 worth of cinema cameras and video equipment utilized by RSD Todd during the existence of Valentine Life for products and promotional material. Also, over the last 15 years, Real Social Dynamics has trained its staff on proprietary processes and the members of Real Social Dynamics staff act as contractors to assist in the growth of any business whose revenue appeared in the bank accounts of Valentine Life. Also, the RSD Todd customer service, sales, website servers, and software utilized to create RSD Todd business were also funded by Real Social Dynamics to help the company get on its feet and all of such resources were utilized until Todd VanDeHey was terminated as a RSD Contractor and the business bank accounts (and the company) of Valentine Life were also dissolved in August 2017.

6

23. Todd VanDeHey is under a non-compete agreement due to his signing a RSD Contractor Agreement that has been signed by every RSD contractor that has ever worked for Real Social Dynamics. Valentine Life was allowed to exist because it was a partner shell company owned by Real Social Dynamics solely for clear accounting and merchant processing, and it was approved in writing. The process of how the RSD Contractor Agreement has been signed and completed by every contractor that has ever worked for Real Social Dynamics is a process that is both well known by every RSD Contractor, but it is also repeated in writing as a process that everyone associated with RSD must follow every time someone associated with RSD business is brought into the company to protect the interests of Real Social Dynamics. A standard process was created requiring all staff to sign the Contractor Agreement prior to Todd working for Real Social Dynamics. Until August 2017, Todd VanDeHey was a contractor for Real Social Dynamics along with every contractor that was paid from the Valentine Life checking accounts, and the same can be said about all staff working on RSD Todd brands, including all RSD Contractors that work in New York of David Zelman, Yuriy Chernin, Kevin Juica, Matt Palmer, Garrett Darling, Todd VanDeHey, and Kaitlin Severin. Todd was informed at an in-person meeting at Maier Gutierrez & Associates that all staff that are paid out of the Valentine Life bank account need to be contracted by RSD and all such contact information for these individuals must be sent to Real Social Dynamics prior to working with Todd VanDeHey.

24. Owen Cook and I have told Todd VanDeHey that if we do not agree to continue working together, then all access of Real Social Dynamics assets would be removed from Todd, and cannot be used by Todd VanDeHey, which includes the ability to compete against Real Social Dynamics, market to its clients, or utilize the borrowed email list & social media of Real Social Dynamics. All works created as a contractor for Real Social Dynamics are owned by Real Social Dynamics. We have told Todd VanDeHey that in the event of an agreement for an amendment of operating agreement we would allow for the social media, products, and email list to be owned by Valentine Life; however, such an amendment to the operating agreement has not been agreed to nor will it ever be agreed to because Valentine Life is dissolved.

25. Todd and RSD agreed that either Real Social Dynamics or Todd VanDeHey may choose to dissolve their business relationship at any time. Furthermore, we agreed during in-person meetings that if dissolution happened, then the company of Valentine Life would be dissolved as well and it cannot be used to compete against Real Social Dynamics. Owen Cook, Joseph Gutierrez, and I were witness to these meetings.

26. Email correspondence between Todd VanDeHey and myself via email has been reviewed by Lisa Dueker and myself. In addition, weekly meetings have been scheduled over the last 2 years between Todd VanDeHey, Stuart Lewis and/or Mikhail Kuznetsov. Many of these Skype meetings have been recorded and also meeting minutes have been written for some of the meetings. In addition, multiple meetings have occurred in-person between Real Social Dynamics Staff working with Todd, including the meeting whereby Todd VanDeHey agreed to paying for his personal rent regardless of whether he is living with RSD Contractors. RSD Contractors present to these meetings about Todd covering rent include Owen Cook, Nicholas Kho, Todd VanDeHey, and many others RSD Contractors.

27. Todd VanDeHey sent a document to me that I signed that allowed Todd VanDeHey to be temporarily listed as President of Valentine Life while an amendment to an operating agreement was being created; it was also agreed between Real Social Dynamics and Todd VanDeHey that both Todd and myself would be listed as Directors of Valentine Life. However, Todd was removed as President of Valentine Life due to his financial misappropriation and extreme damage caused by him to Valentine Life and RSD for what appears to be improper financial accounting, commingling, embezzlement, bank fraud, perjury, and unauthorized personal financial transfers that have no justification. Further details of Todd's improper behavior and damages caused by Todd VanDeHey to RSD are detailed in an Affidavit of Damages.

7

28. Although Todd VanDeHey manages many operations, I have clarified to Todd VanDeHey that we need unanimous approval for major changes in the business policies, including (but not limited to) expenses over $10,000 (and in writing if over $50,000), video quality for content, collaboration agreements with other RSD Instructors, amendments to the operating agreement for Valentine Life, and all business process changes.

29. Mikhail Kuznetsov, Stuart Lewis, Owen Cook, and/or myself have had multiple meetings with Todd over the phone every month since the incorporation of Valentine Life, and, also at least monthly since 2005, to discuss how we wanted to have operations run with any business associated with RSD and RSD Todd brands because Todd VanDeHey was continually changing operations without authorization or approval from RSD, including removing bank access, hiding customer details, and not allowing an accountant to analyze the financial records. Todd has violated many terms of the Valentine Life operating agreement and RSD Contractor Agreement. Although RSD has temporarily received bank access, we have not had access to the bank account for Valentine Life for most of the last 2 years due to Todd unilaterally deciding to remove me from the bank account and not provide reconciled income statements to RSD. Upon requesting new bank login information, Todd has delayed releasing this information for long periods of time, and this has occurred multiple times. In addition, I have spent hours discussing with Todd about how he needed to share RSD customer data with us so that we could see how much money was being made and reconcile that with bank accounts. Although much of the customer information was revealed to us, I have been notified from customers that many of them have paid for Todd services, but they are not in the RSD cart because Todd was processing their credit cards through a method of payment that was kept secret from RSD. I have continually told Todd over the last couple years that we wish to see a financial audit by a CPA due to the fact that we have not received proper accounting during the duration of Todd's involvement in business operations. In addition, we have further information being provided from RSD Contractors working with Todd in New York that Todd was involved in a devious plan to further defraud RSD and hide funds owed to RSD. Ever since the termination of Todd VanDeHey from RSD, there have been several RSD Contractors who have worked with Todd who has approached other RSD Instructors, and/or my office, and requested to be relocated from working with RSD Todd to work on the brands of other RSD Instructors.

30. Todd and RSD agreed that either party could dissolve the relationship at any time, which has been stated in-person at meetings with Owen Cook, Joseph Gutierrez, Todd VanDeHey, and Nicholas Kho present. Todd was terminated from RSD on August 11 on a phone call whereby Todd agreed to the dissolution of Valentine Life, and the company, Valentine Life, was dissolved on August 14, 2017. In addition, there is no further business relationship between Todd and Real Social Dynamics. All videos, social media, and emails for Valentine Life were generated and owned by Real Social Dynamics. Finally, all accounts associated with Valentine Life are to be shutdown, including social media, websites, merchant accounts, email services, software accounts, and bank accounts (which was supposed to have a reserve of $40,000 that is likely not existent anymore due to the unauthorized accrued liabilities by Todd VanDeHey for rent and legal bills). Any invoices for vendors or contractors that need to be paid known to Todd were requested so we can take care of them. Additionally, I hired a CPA in Las Vegas to care of the preparation and filing of the tax return for both Valentine Life and RSD. In addition, RSD staff are in the process of completing all client obligations that were associated with the RSD Todd brands. I reviewed the Valentine Life Operating agreement and I followed all proper steps. Also, on page 13 of the VL operating agreement, there are the steps of dissolution. Section 9.1 says the company will be dissolved upon Withdrawal of a Shareholder and I withdrew. Section 9.2 says the company will continue "solely for the purpose of winding up its affairs". Based on the above, I have solid justification for justifying our dissolution.

31. I originally met Todd VanDeHey when he was a Real Social Dynamics (RSD) student in Canada in 2003, and Todd was then contracted by Real Social Dynamics in 2004 to work as a RSD Instructor, whereby RSD Staff mentored Todd and taught him how to teach clients, market his services, and I created a team of other RSD Contractors to work under Todd to create videos for Real Social Dynamics, including videos that promoted RSD brands, including the RSD Todd brands. These videos were then uploaded to RSD social media attached to Real Social Dynamics corporate email accounts. Todd lived with me in a house at 1317 Londonderry Place from 2004 to 2005 in Los Angeles and then continued to live in Los Angeles on his own, including living in a van full-time, before moving Las Vegas with RSD Instructor Michael Jahina, then moving to Boston to live with me, and then moving to Las Vegas to work on the Vegas Immersion Program with me before moving to NYC to build RSD Immersion. I considered Todd a loyal guy, especially considering that in 2004, Todd even paid $1,500/month to live in a tent in my backyard and therefore it was a pleasure to live with Todd for such a long time. In 2013, Todd moved to Las Vegas to work on a Real Social Dynamics business-line, known as Vegas Immersion Program. I moved to Las Vegas to manage the Vegas Immersion Program. Also, I attended several events in Vegas Immersion as a manager and speaker to provide training to staff and to teach clients in Las Vegas. After Todd left Vegas Immersion to create RSD Immersion, RSD gave Todd $40,000 because Todd wanted to be compensated additional funds for the business-line even though it was never part of the agreement. RSD paid Todd the $40,000 to build rapport with Todd even though Todd took most of the Vegas Immersion assets into the new business-line of RSD Immersion, including staff, video equipment, and the business model of long-term immersion training from Vegas Immersion, to build RSD Immersion. The new RSD Immersion was promoted and sold on the RSD-owned website of RSDImmersion.com. Already existing products, including RSDImmersion.com, DayGameByTodd.com, 3GirlsADay.com, ValentineLife.com, and other products were promoted by Real Social Dynamics, and hosted on RSD web servers, and sold by RSD prior to the creation of Valentine Life. These products continued to sell after the creation of Valentine Life along with a couple additional products, all of which were created by RSD Contractors and RSD-owned technologies, such as video gear.

32. I gave a RSD Contractor Agreement to Todd VanDeHey and was witness to him signing the RSD Contractor Agreement, which is paperwork that every RSD Contractor is required to complete upon joining Real Social Dynamics. This agreement was accompanied by a meeting that I attended whereby I explained to Todd VanDeHey the terms of the agreement, and fully explained the terms that all products, videos, and work completed by Todd VanDeHey are works for hire for Real Social Dynamics. In addition, all assets, including RSD email accounts and social media belong to Real Social Dynamics. I also explained to Todd VanDeHey that there was a non-compete agreement and that the terms of the non-compete would be for 4 years after termination of Todd. Todd agreed to all terms and signed the agreement. If Todd created a business that was directly competing with RSD, not authorized by RSD in writing, then that business would be in violation of the RSD Contractor Agreement and Todd would be required to shutdown operations of such a business and return all revenue earned from any direct competition for 4 years after his termination in August 2017.

33. Todd VanDeHey was terminated by Real Social Dynamics on a phone call on August 11, 2017, whereby we discussed 2 separate agenda items. The first agenda item was an offer to allow Todd to purchase from Real Social Dynamics several assets that belong to RSD and this offer was later sent to Todd via an email, and the offer to purchase RSD assets was denied by Todd via email shortly after the offer. A second agenda item was that I told Todd that he was dissolving all business between RSD and Todd VanDeHey, which included Todd being terminated from RSD, dissolving Valentine Life, and removing all RSD assets from being utilized by Todd or Valentine Life, which included RSD YouTube accounts, RSD email, access to RSD customers and websites, and removing Todd from all RSD websites, including RSDNation.com.

34. All products and services are marketed on RSD-owned assets and all RSD Instructor-created digital products are owned by Real Social Dynamics. Over the last 2 years, Todd has spent less time both socializing with RSD Instructors and

9

cross-promoting with RSD Instructors than I would have like. So, overall the last couple of years, I have told Todd that he would have to change this behavior immediately if he wanted to continue to work with RSD. However, this did not occur, and Todd has demonstrated a negative attitude towards RSD and its business model by verbally disparaging RSD Staff behind their backs to me on phone calls and also directly to RSD Staff in multiple emails with malicious intent.

35. I have regular meetings with every RSD Instructor, including RSD Todd. RSD Instructors are fully aware that the work they are creating belongs to Real Social Dynamics and that all RSD social media utilized by them are to be used by them only while they are working for RSD. All RSD Instructors have a team of RSD contractors working for them that is trained by RSD staff and they are utilizing technology that is owned and purchased by RSD. RSD Product website domains used by RSD Instructors are purchased by RSD and they are not paid for by any RSD Instructor as they are paid for by Real Social Dynamics and hosted on RSD web servers or RSD-owner social media accounts.

36. Similar to the Valentine Life Operating Agreement between Todd and RSD, I completed operating agreements with Luke Krogh and Julien Blanc, both of whom are RSD Instructors who have signed operating agreements to create a subsidiary LLC that are owned 50/50 by Real Social Dynamics and the RSD Instructor. The operating agreements were almost entirely duplicates of the Valentine Life operating agreement, except the names of the company were changed and a few other minor changes. These companies were created because Real Social Dynamics wanted to have each RSD Instructor to create a merchant account that could be utilized by RSD to sell products in the name of a new company, and to help facilitate easier accounting for RSD to distinguish between revenue and expenses of each brand. Creating backup merchant accounts was especially important because RSD has previously lost merchant accounts, which made it very difficult to process sales. In addition, it was made clear to each RSD Instructor that the RSD Contractor Agreement would remain in affect and that the subsidiary LLC bank accounts must provide full transparency since RSD and the RSD Instructors would split the profits made from the sales generated from the RSD brands, products, and services, whose revenue and expenses would be processed in the bank accounts of the subsidiary LLC companies. Through my conversations with Todd, Luke, and Julien, they all understand any work for these companies are still for Real Social Dynamics business because it has been clarified during meetings with me during face-to-face meetings, emails, the RSD Contractor Agreement, webinars (many of which were recorded by RSD or the RSD Instructor himself), and teleconferences (many of which were recorded by RSD or the RSD Instructor himself).

37. In February 2016, I met with Todd VanDeHey in Santa Monica, and we had a speaker phone conversation with Owen Cook, whereby we discussed how Todd wanted to rent an apartment in New York and how I would assist Todd VanDeHey with renting due to the fact that Todd's personal credit was too poor to rent the apartment on his own. I agreed that I would sign a document allowing Todd to use his name as a guarantor for just one apartment for $4,495/month and no other apartments. I provided Todd with a signed guarantor agreement for one apartment in New York to be rented in March 2016. In addition, Todd agreed that he would be personally responsible for $1,500/month for the apartment. Also, Todd agreed that if he ever got any other apartment with his girlfriend, Kaitlin Severin, in the future, then Todd would be 100% responsible for the apartment. Then, Valentine Life paid for the apartment rent in New York. In 2017, Todd moved into a new and different apartment, but the security deposit paid for by Valentine Life was not transferred back to Valentine Life and Todd pocketed it personally without authorization. In addition, I was shown checks that Todd made for renting an apartment for $7,800/month that he is sharing with staff, and I do not know if Valentine Life is paying for additional apartments for his staff and for him to live personally, but I've seen checks that Todd has written for multiple apartments in New York.

38. Since 2011, David Zelman, a videographer contracted by RSD, has worked primarily for my video team in Los Angeles. He was retained by Todd to work on video projects for RSD and David claims that he pays $1,000/month for renting a bedroom in an apartment paid for by Valentine Life and that 3 other staff members live in the same apartment paying rent as well. We were informed that Todd has a bedroom at the apartment with David Zelman that he uses as a location to have sex with women because it is external to where he lives with his girlfriend, Kaitlin, so that it doesn't disturb his family-life and kept secret from Kaitlin. In addition, he has a separate apartment that he shares with his baby and his baby's mother, Kaitlin. Todd is responsible for paying $1,500/month personally for the apartment shared with David and for the entirety of the rent of the apartment with Kaitlin according to our agreement; however, he also was not authorized to rent another apartment and expense it to Valentine Life because it is an expense of almost $100,000 annually inclusive of utilities. In addition, the rent money collected by David and his staff is revenue for Valentine Life (not Todd personally) and no deposits have been made into the Valentine Life bank account for any cash, meaning that Todd is not recording these payments and it seems like he may be pocketing the money personally for the rent payments from staff.

39. In July 2017, a meeting took place with Nissembaum Law, Joseph Gutierrez, Steven Knauss, Todd VanDeHey, Owen Cook, and myself. We discussed creating an amendment to the terms of business between RSD and Todd VanDeHey for 5 hours. Todd VanDeHey and Real Social Dynamics were discussing terms under which Todd could purchase RSD assets of RSD Todd YouTube Channels, RSD email lists, RSD products associated with RSD Todd, and the ability to create a company that competes with RSD. However, RSD and Todd were unable to come to an agreement after the 5-hour meeting that I attended. Therefore, there were no additional amendments agreed to from the meeting; however, Todd acknowledged that all RSD websites, brands, social media, emails, and products were owned by RSD and that he would attempt to purchase these assets from RSD in the event of a buy-out. Todd also acknowledged that Todd was not entitled to an additional salary or payments. In addition, during the 5-hour phone meeting, Nissembaum Law denied access to redacted legal bills statements for Todd's bills even though Valentine Life paid for it. Also, Nissembaum Law claimed that she thought that RSD was always a signatory on the bank account of Valentine Life even though Todd removed me as a signatory from the Santa Monica branch office without any authority until I regained access as a signatory over a year later. This was clear evidence of a lack of financial transparency. In addition, Owen and I discovered during our phone call with Laura Magedoff of Nissembaum Law that Todd VanDeHey used Valentine Life funds to pay for his personal legal bills instead of using the funds to have Valentine Life as a client, which was a misappropriation of the funds because we did not agree to that rather we agreed Valentine Life would pay for legal bills to support an agreement between RSD and Todd on behalf of Valentine Life.

40. In July 2017, Todd VanDeHey sent an email to me claiming that Owen Cook and I, whereby Todd falsely claimed that I had agreed to personally pay 100% of the legal fees for Valentine Life from my personal bank account instead of RSD, but that agreement was a complete fabrication. On the same day, Todd transferred $52,907 from the Valentine Life operating account to his personal bank account even though Valentine Life had already paid 100% of the legal fees directly to Nissembaum Law. Even if the false agreement between Todd and I existed, then Todd would only be entitled to half of the $52,907 (since that would be his half of the expenses covered); however, Todd's claim was false and he pocketed the $52,907 of company funds unilaterally and without any authorization as a personal disbursement to himself. During the same week of receiving the email, I called Todd VanDeHey and I reminded him that we had a conversation in 2015 that we would have Valentine Life pay for all the legal fees to create an operating agreement amendment whereby Valentine Life was the client. This agreement was reconfirmed in-person in front of Joseph Gutierrez and Nicholas Kho in-person during a visit by Todd VanDeHey to Las Vegas to visit me. It was also reconfirmed in a recorded Skype meeting between Nicholas Kho and Todd VanDeHey. In addition, during a phone call with Todd, Todd remembered the conversation and claimed he would agree return the $52,907 he took out of the operating account, but he added the

11

statement that only if we came to an agreement that was favorable to him would he return the money. To be honest, his comment seemed like extortion, and, when I told my staff about Todd's comments, we all felt betrayed and we unanimously agreed that it would be difficult to continue to work with Todd because it appeared to me that Todd was attempting to steal a lot of money from both RSD, and the Valentine Life bank accounts, in order to cover personal expenses that he has occurred due to having a higher cost of living in New York, especially after having a newborn baby.

41. In the operating agreement signed by Todd VanDeHey, it was further agreed that any expense over $50,000 on behalf of Valentine Life would be approved in writing by both Real Social Dynamics and Todd VanDeHey. This was been violated by the transfer of $52,907 to the account of Todd VanDeHey as an unauthorized reimbursement of personal legal fees. In addition, Real Social Dynamics has not been notified in advance of staff hires even when those expenses have totaled over $50,000.

42. Due to financial mismanagement, and the agreement that I would dissolve the company of Valentine Life in a phone call I had with Todd, Todd has been removed as an Officer of Valentine Life and the company was dissolved in August 2017. Real Social Dynamics expects to be repaid the damages caused by Todd VanDeHey, including $52,907 for the money that Todd took out of the Valentine life for reimbursement of personal legal fees and also for the fees that were paid by Valentine Life directly to Nissembaum Law of an additional $52,907 for a total of $105,814 for misappropriation of funds due to the fact that Todd transferred $52,907 to his personal checking account after Valentine Life had already paid $52,907 for Todd's authorized personal legal fees expenses. Also, both the $1,500/month in rent that Todd VanDeHey has accepted as personal rent at the apartment of David Zelman would have to be repaid since March 2016 for 18 months for a total of $27,000. In addition, any personal rent or utilities paid for the apartment shared with Kaitlin would also have to be returned to Valentine life if paid for by the operating account of Valentine Life. Thus, by adding the legal fees and rent bill for Todd VanDeHey, I believe that Todd owes a minimum of $132,814 to Real Social Dynamics. In addition, a financial audit needs to be completed for any and all other outstanding balances possibly owed by Todd, including an audit of his Paypal account, personal bank account, and American Express statements, and also all cash received by Todd from staff on a monthly basis, which, according to David, has been $1,000/month per staff member. Also, the unauthorized acceptance of a business loan used to pay Todd a personal disbursement was a misuse of funds. Finally the video production gear used by Todd VanDeHey must be returned to Real Social Dynamics.

43. It was agreed to during Skype meetings with Mikhail Kuznetsov, Stuart Lewis, Owen Cook, and myself that Real Social Dynamics would receive financial statements no less than monthly from Valentine Life. That did not occur and, instead, sporadic financial statements have been created, and, oftentimes, most financial statements lack details other than being a screen-shot of the accounting. Due to a lack of financial accounting, Todd VanDeHey has occasionally guessed at how much Real Social Dynamics would be paid and has sent guestimate transfers to Real Social Dynamics instead of calculated the profits for Valentine Life, which were supposed to be split evenly between Real Social Dynamics and Valentine Life; however, Todd makes several disbursements to his personal account without any accounting or reconciliation, which is presently being reviewed by a CPA (whose firm is not registered in the State in which it is doing business) that has refused to setup a time to talk to RSD representatives on the phone after over 30 attempts to arrange a meeting by RSD and Maier Gutierrez & Associates.

44. I have managed many of the RSD Contractors what have worked with Todd VanDeHey, including David Zelman, Kevin Juica, Yuriy Chernin, Todd VanDeHey, and other RSD Contractors that worked on building the RSD and RSD Todd brand, RSD projects, and RSD brands for years before the creation of Valentine Life as a LLC to process funds for RSD and for the hope for easier accounting process to be established for our corporate finance teams. My training was on

12

marketing, video-production, coaching, sales, project management, and leadership. From 2005 to 2016, RSD paid David Zelman, Kevin Juica, Yuriy Chernin, Jonathan Piedra, Todd VanDeHey, Matt Palmer and other RSD contractors for work done for RSD projects associated with the RSD Todd brand. In addition, funds were paid from the Valentine Life bank account for some of the payments to contractors in 2016 - 2017. All RSD Contractors continued to work with RSD assets even though they were receiving payments from the RSD and/or Valentine Life bank accounts. RSD has been responsible for filing the 1099 Contractor forms for all RSD Contractor. The RSD Chief Financial Officer, Michael Ampikapon, completes all of the 1099 Contractor filings on behalf of RSD.

45. I have explained to Todd VanDeHey over multiple phone, Skype, and in-person meetings that RSD requires more financial transparency because Todd has ignored multiple requests for transparency that were sent via emails, text messages, and phone meetings in which it was clarified that we needed access to all bank statements (including any records from his personal bank account whereby he claimed to pay his staff), Paypal statements, his American Express online account & statements, cash reconciliation for all payments he received, and an accountant to do a complete financial audit due to suspicious behavior, such as the removal of me as signatory from the bank account without authorization.

46. I have explained to Todd in multiple meetings about our discontent with the lack of financial transparency and his utilization of business funds spent intentionally and deceptively on personal expenses from the Valentine Life bank account. In addition, we are both not satisfied with the cash amounts in the bank transfers Todd has made to Todd's personal bank account in violation of our official RSD agreements and the Valentine Life Operating Agreement due to the amounts being well over 50% of the net profits of RSD Business in the Valentine Life checking account.

47. Customers contacted me via my social media after we terminated Todd on August 11, 2017. Some of these customers requested refunds from RSD Immersion programs that Todd Scheduled for September 2017. RSD has refunded customers out of RSD bank funds and assisted with fulfillment due to the fact that Todd transferred most of the funds out of the Valentine Life bank account ($61,302.51) to Todd's personal American Express account without any justification. Todd paid an accountant $12,000 and I the same CPA to a financial audit, but it appears as if the CPA may not be willing to provide information to RSD, which makes me wonder if the CPA is a personal friend and co-conspirator of Todd utilized to steal additional funds from both Valentine Life and RSD. Details of this are mentioned in the Affidavit of Damages. Before the creation of Valentine Life, RSD has had over a decade of customer service tickets relating to Todd (amounting for over 1000 tickets), and, after the creation of Valentine Life, RSD has also had 100's of email tickets relating to the RSD Todd business whereby RSD Contractors handled customer service, and 100's of phone calls over the last couple years since the creation of Valentine Life, which is important to note because RSD is the entity that all customers expect that they are doing business even when RSD funds are processed by a Valentine Life merchant account and most (if not all) customers believe that they are doing business with RSD even if Valentine Life appears on their bank statements. We have had several customers contact RSD who have seen Valentine Life on their credit card statements wondering what Valentine Life was after purchase and they wanted to verify that it was RSD and not fraud. On the other hand, some customers have reported the charges from Valentine Life as fraud and initiated chargebacks against Valentine Life as witnessed in the web portal of Inchek and its online merchant account statements. Inchek manages the Real Social Dynamics, Valentine Life, and all other RSD subsidiary merchant accounts. Their staff is fully aware of the relationship of RSD as the parent company of these subsidiary companies so that the underwriters offer the same rates and terms to all subsidiary companies of RSD (including Valentine Life) as they would offer to RSD itself.

13

48. Todd VanDeHey is under a non-compete agreement due to his signing a Contractor Agreement that is signed by every contractor that works for Real Social Dynamics and such agreement is in force today, but Valentine Life is allowed to exist because it is a partner company owned 50/50 by Real Social Dynamics. The RSD contractor agreement has been signed and completed by every contractor that has ever worked for Real Social Dynamics and it has not been modified ever since the process was created requiring all such staff to sign the Contractor Agreement prior to working for Real Social Dynamics. Presently, Todd VanDeHey is a contractor for Real Social Dynamics even though he operates a Real Social Dynamics business-line under Valentine Life. All staff working for Valentine Life, including David Zelman, Kevin Juica, Yuriy Chernin, and Todd VanDeHey are also RSD Contractors, all of who have also completed, signed and agreed to the terms of the RSD Contractor Agreement. Todd was informed at an in-person meeting at Maier Gutierrez & Associates that all staff that join Valentine Life need to be contracted and all such contact information for these individuals must be sent to Real Social Dynamics prior to working on Valentine Life, and all such staff must be added to the RSD Phone Directory so that we can track all staff working with Todd even after creation of Valentine Life.

49. I have told Todd VanDeHey that if we do not agree to continue working with Todd, then he would lose all access of Real Social Dynamics assets and all RSD assets cannot be used by Todd VanDeHey or Valentine Life, which includes the ability to compete against Real Social Dynamics, market to its clients, or utilize the borrowed email list, videos, products, contractors, video equipment, & social media of Real Social Dynamics. All works created as a contractor for Real Social Dynamics are owned by Real Social Dynamics as a work made for hire. All Instructors in Real Social Dynamics are trained and oriented by me upon joining Real Social Dynamics, and they are all made fully aware that all social media, email, and products created by Instructors are works made for hire. This was made fully aware to Todd both before and during the last phone call that I had with Todd in August 2017.

50. Any videos uploaded to RSD Todd YouTube channels and RSD social media was created by RSD Contractors and RSD-owned video equipment. All RSD Todd YouTube channels and RSD social media that feature RSD Todd (aka Todd Valentine) will also feature multiple videos of myself and other RSD Instructors so as to cross-promote the other RSD brands. In addition, every email sent from RSD and Valentine Life are notated with the words "RSD Instructor" in the signature. Websites, products, Todd-affiliated YouTube or social media accounts, and correspondence with customers will feature the words "RSD" and "Real Social Dynamics". In addition, the terms and conditions on ValentineLife.com and other Todd-affiliated websites have had "Website Terms and Conditions" and "Privacy Policy" disclosures that were written by Real Social Dynamics and are also notated as "Real Social Dynamics, Inc. Terms and Conditions". All RSD websites have the exact same "terms and conditions" and "privacy policy" as the Real Social Dynamics main website of http://www.realsocialdynamics.com.

51. During any RSD live event that any RSD Instructor has taught, there is an opportunity to collect cash payments. Todd has admitted to me that he has received cash and Paypal payments and has not made any deposits from either payment method into the Valentine Life bank account. This is highly suspicious because we usually have last-minute signups of clients who pay in cash regardless of whether there is a deposit.

52. Up until our final phone call in August 2017, Todd VanDeHey has told me in every conversation that we have had via phone that he wanted to remain a RSD Instructor and continue working with us; however, we created an offer to allow Todd to buy assets from RSD and continue to work on his own, but he has refused every deal that we have offered to him.

53. Although Todd VanDeHey managed some operations for the RSD Todd brands, I clarified to Todd VanDeHey in front of our legal counsel that we require unanimous approval for changes, including (but not limited to) expenses over $10,000,

14

video quality, and any changes to the Valentine Life Operating Agreement (which states any transfers over $50,000 must be approved in writing), and, which Todd has agreed to in front of Joseph Gutierrez, Collin Jayne, and myself at the offices of Maier Gutierrez & Associates in the Summer of 2016.

54. I personally feel betrayed by Todd due to both his lack of financial transparency and legal letters that have been sent to Real Social Dynamics making false claims against RSD; however, I still consider Todd someone that has been a close friend of mine and someone that I have had a lot of love and respect for. However, I do not believe that Todd is the same Todd that I knew several years ago. Also, I have come to the realization that when a friend steals from you, he is not your friend. Therefore, due to the broken trust, I don't consider Todd to be a friend of mine anymore.

55. Negotiations to determine how best to handle Valentine Life Inc. began in April, 2017. Todd and RSD agreed that either party could dissolve the relationship at any time, which has been stated in-person at meetings with Joseph Gutierrez, Todd VanDeHey, and myself present. Valentine Life was dissolved on August 14, 2017 due to an agreement made by Todd and RSD on a phone call meeting that I attended on August 11, 2017, which was recorded and transcribed as evidence that the company was properly dissolved. In addition, Todd was terminated as a RSD Contractor on the same date. There is no further business relationship between Todd and Real Social Dynamics. All videos, social media, and emails utilized by the teams of people working on the RSD Todd brands were created and owned by Real Social Dynamics. All official negotiations between Todd VanDeHey and Real Social Dynamics were handled by Nicholas Kho, who is the 100% shareholder and President of Real Social Dynamics.

56. As stated in the RSD Contractor Agreement, all documentation must be submitted to RSD to show proof of proper dissolution of termination as per point 46 of the Remedies section of the Contractor Agreement, which includes all Amex statements from November 2015-September 2017 for audit for potential embezzlement.

57. RSD owns all copyrights of all RSD Instructors and RSD has completed registered filings for all intellectual property of all videos and books ever created by a RSD Instructor.

58. Todd is in violation of the Operating Agreement for filing the verified complaint as opposed to waiting for mediation and he is liable for our legal fees due to violating the RSD Contractor Agreement Point 46 and also for filing for legal action against RSD in violation of the RSD Contractor Agreement.

59. We satisfied all RSD Todd product and service client fulfillment after the dissolution of Valentine Life by doing the following actions of having (1) our office permanently shutdown all recurring payments for VL customers so they are no longer billed by Clickbank for recurring services relating to RSD Todd, (2) we refunded all future RSD Todd program clients of RSD Immersion or transferred them by request of clients to other programs with additional bonus value of $1,000+ in RSD credit, and (3) all customer service tickets for digital products were taken care of and all issues resolved within 24 hours and Valentine University customers were given $400 in value via a RSD Mastermind lifetime membership (an archive of years of audio training from every RSD, including RSD Todd who is one of the instructors in RSD Mastermind along with dozens of others who taught with RSD over the last decade and all were paid $1k each per audio).

60. The Verified Complaint of Todd VanDeHey is filled with false information about Real Social Dynamics (RSD) and Valentine Life (VL), which I am noting below as disputes to the points listed in the Verified Complaint.

15

(a)   My Dispute to Point 13. The claim that Todd VanDeHey is the incorporator of Valentine Life is false because RSD is the incorporator. I created the company and my associate Vess, who assisted me. However, I signed the original Articles and listed Todd as an initial officer for the company for merchant account reasons. To the best of my knowledge, Todd has never incorporated any company in his entire life nor has he signed any Articles of Incorporation for any company ever. Also, all websites are owned and operated by me and are in my personal Godaddy.com account, where I manage all RSD domains. All websites were purchased by me and never reimbursed by VL or Todd. Also, most Valentine Associated websites were created by me and purchased by me via Godaddy.com prior to VL existing, including DayGamebyTodd.com, 3Girlsaday.com, and RSDImmersion.com. All of such websites were built by RSD staff and managed by RSD staff and were even managed by RSD staff after VL was created, which includes only RSD contractors.

(b)   My Dispute to Point 14. All social media was created prior to the existence of Valentine Life by RSD, except for the one YouTube Channel (1 minute Attraction) which was created by Todd, who upon a meeting and request properly transferred ownership of the YouTube channel to RSD. RSD owns all referenced social media. Also section 6.2 of the VL Operating Agreement specifically mentions how both RSD and Todd manage the day-to-day operations.

(c)   My Dispute to Point 15. All customers are RSD customers and when issues appear, they contact RSD customer service via Zendesk, which happened both before and after the creation of VL. After company dissolution, customers who contacted us notified us that they were surprised VL existed at all and didn't understand how they were paying Valentine Life nor did they even know that they were paying Valentine Life when they signed up for a RSD program with a RSD Instructor. Also, all VL staff are RSD Contractors who completed RSD Contractor Agreements, including Todd VanDeHey, Kevin Juica, Yuriy Chernin, David Zelman, Matt Palmer, Kaitlin Severin, and all others in the RSD team that assist with RSD Todd brands on customer services, finance, sales, and marketing processes who either live in or external to New York.

(d)   My Dispute to Point 16. VL was also paid by RSD as well since RSD processed all funds for 3GirlsaDay, much of RSD Immersion, and DayGameByTodd.com, all of which existed for years prior to the creation of VL, including Todd himself who was utilizing the Vegas Immersion reputation and RSD Instructor brand in all his marketing on behalf of RSD since VL was just a shell company to collect merchant funds on behalf of RSD and nothing more.

(e)   My Dispute to Point 21. VL was created in NV when 100% of all staff associated with VL lived in Las Vegas, including Nicholas Kho, Todd VanDeHey, Yuriy Chernin, Kevin Juica, Kaitlin Severin, David Zelman, and Matt Palmer. Also, I'm the President and I still live in Las Vegas.

(f)   My Dispute to Point 22. All staff includes not just the "7 VL staff mentioned in the Verified Complaint of Todd VanDeHey" (all of who are RSD contractors), but also all RSD staff that assist including at least 15 other RSD Contractors, including Michael Ampikapon (1 - finance), Stuart Lewis (2 - sales/ops advice), Hung Nguyen (3 - travel), Armin Mirzakhanlou (4 - venues), Nicholas Kho (5 - management), Owen Cook (6 - instructor/video management), David Latos (7 - customer service), David Zelman (8 - video), Huy Pham (9 - customer service), Peter Haubrich (10 - sales), Kevin Salinas (11 - sales), Mikhail Kuznetsov (12 - marketing), Lou Endoma (13 - marketing and fulfillment of products), Ryan Schullo (14 marketing), and Leon Shapaner (15 - accounting); all of these individuals are available to sign affidavits testifying that they knowingly work for RSD and served RSD

16

Todd brands in regards to each of the respective categories mentioned in the parentheses next to their name. In addition, dozens of other RSD staff have indirectly assisted building the RSD Todd brand and its development and videos, including all RSD Instructors and the administrations of 5-10 people that work below them.

(g)   My Dispute to Point 23. There are no offices. Just apartments. Everyone is a contractor with no regular office hours and can work from home and not from an office. Otherwise, they would be employees and not contractors. All of RSD was built on this basis premise. 2

(h)   My Dispute to Point 26. We didn't state Todd was sole operator and Todd signed the VL operating agreement whereby section 6.2 clearly states that both RSD and Todd are operators managing the company.

(i)   My Dispute to Point 28. All content created referenced in this point are RSD-owned assets. Content for RSD Social Media and RSD Websites was created by RSD videographers and multiple RSD instructors, including Owen Cook, Jeffy Allen, and Nicholas Kho who appears in Valentine University. Also, all video gear was owned by RSD and all staff building the videos and content was RSD and all content was on RSD owned social media and congruent with the look, feel, branding, and RSD corporate logo involved in the social media (including the YouTube and websites that reference RSD in the terms and conditions)

(j)   My Dispute to Point 33. False. In November 2015, I was an original signatory and both Laura Magedoff (opposing counsel at Nissembaum) & the Operating Agreement of VL stated that I should be a signatory during our phone meeting in July 2017. Without authorization in March 2016, Todd removed me as signatory at the Santa Monica branch of Bank of America and removed access to the online banking so I could not have financial transparency, which allowed him to hide expenses. In the summer of 2016, I regained access to online banking, but the access soon disappeared with excuses from Todd about how you need to login within 30 days or else you get your account access removed. Bank of America informed me that such a statement was a fabrication, which was verified because the username and password were both changed, which implies that Todd likely deleted the original account altogether to make it difficult to see financial statements or question any potential financial fraud. I later regained access and after I re-added myself as signatory at Bank of America after discovering Todd's embezzlement, my attorneys contacted Todd VanDeHey to let him know about how we were investigating him for embezzlement, and I transferred the funds to a separate bank account to protect the assets for review by a judge. Todd then went to the bank and stopped the pending transfer and then transferred almost all of the funds to his personal credit card account. After discovering the transfer made by Todd to his personal credit card account, which was the worst-case scenario to further his potential stealing, I went to the bank and closed the bank account and reported Todd's actions as fraud. The Bank of America Compliance Department agreed to me and started the process of returning the funds to me. Bank America agreed that I followed all proper procedure and that Todd committed bank fraud. Due to the actions of Todd's apparent attempt to steal all moneys out of the Valentine Life bank account, he was hurting the innocent RSD customers, who were having difficulty getting refunds because Todd stole their money to pay his personal credit card. I used RSD funds to cover their refunds until we got the money from Bank of America back from Todd's personal credit card, and these funds are covering the costs of fulfillment, refund requests, and dissolution costs. Therefore, RSD has spent 2 weeks focused on resolving customer issues as a number one priority via phone calls, emails, text messages, and meetings with RSD staff and clients to make sure that the brand of RSD was not damaged by Todd's improper actions of taking the money out of the Valentine Life accounts to cover his personal expenses. Customers had continually told our staff that they didn't know they were buying from Valentine Life and RSD

17

staff can provide affidavits from customer service staff testifying to this as well. In addition, we have several emails from clients that state the same and that they were not sure why RSD Todd could use the RSD brand so inappropriately nor did they understand that VL even existed at all since all clients whose funds were deposited into the VL bank account believed that they were RSD customers and not customers of VL, the shell company.

(k)     My Dispute to Point 34. RSD did not get fair profit distributions and Todd didn't even calculate profits and admitted to such in hiring a CPA for "catch up" for the last year and his CPA is not even from a "real company" as it is not even registered in the State of NY where it resides.

(l)     My Dispute to Point 41. I am not a Coach or in competition nor was any RSD Instructor. Todd's claim that RSD Instructors are in direct competition is a complete fabrication. They are part of a collaborative team. Todd viewed himself as a competitor because he was not viewing himself as a team member and created a fictitious reality. I'm the CEO and owner of all RSD assets, and VL is not a competitor rather it is just a shell company operating on behalf of RSD for RSD assets and contractors. We have never allowed RSD Instructors to directly compete internally and without systems to help each other work together as a collaborative team. Otherwise, if we allowed VL to be in competition, then Todd would be violating the non-compete clause of his RSD Contractor Agreement and we would never allow that to happen.

(m)     My Dispute to Point 46. False. VL has no assets. Any assets associated with RSD Todd are owned by RSD. All assets relating to RSD Todd brands belong to RSD and the assets were created almost entirely prior to the existence of VL, except for 3 products and a YouTube channel created entirely by RSD staff. RSD camera gear was used to create products sold to RSD Customers, which entirely make up all customers referenced to as "VL customers" by the Complaint. However, any product or YouTube channel relating to RSD Todd required RSD permission and RSD Staff, and belong to RSD as clearly stated in the RSD Contractor Agreement of every contractor that has ever been associated with RSD Todd brand, RSD Todd websites, and RSD Todd social media. In fact, even upon dissolving RSD Todd social media, RSD and Real Social Dynamics trademarks dominated the social media at the time of permanent dissolution.

(n)     My Dispute to Point 52. Todd's theft is the only real impairment to any operations and all business operations of RSD Contractors belong to RSD as stated clearly in the Confidential Information Section of the RSD Contractor Agreement.

(o)     My Dispute to Point 53. Todd gets approval on expenses continually on weekly calls with our staff and meetings with me/Owen and via multiple emails. Also, the VL Operating Agreement clearly states that expenses requires unanimous consent if over $50k (and consent must be in writing) further emphasizing why we need our authority and consent over expenses.

(p)     My Dispute to Point 56. No – the sale of all RSD products associated with RSD Todd has to happen after the mutually agreed upon dissolution on our final offer phone call. Every time a RSD Instructor has been terminated, all sales associated with the brand of RSD Instructor cease. Any sales done of RSD products and services were RSD sales even if they were deposited into a VL bank account. There were only two sources of deposits into the bank account. The first was customer enrollment in RSD Immersion programs, which are boot camps and similar group events with other RSD Instructors and staff.  The second source was digital product revenue Vandehey was promoting through the websites built and maintained by RSD, which included

18

(q)   My Dispute to Point 61. Damage is to RSD customers was completed by Todd's improper financial actions and any customers damaged were to RSD customers as VL didn't have customers. VL was solely a shell company processing money and assisting with accounting for RSD.

(r)   My Dispute to Point 64. RSD had full authority to cancel RSD Immersion or any other RSD live event since all such events are intellectual property of RSD. RSD Immersion is a RSD asset and even has the RSD registered trademark in its name. The intellectual property ownership claim that RSD has over live programs can be said about all Social Media, Websites, and Assets mentioned in the complaint all of which reference RSD and its trademarks in some way. Todd agreed to this in the RSD Contractor Agreement.

(s)   My Dispute to Point 66. False internet statements by a possible false customer is not reliable evidence as there is no evidence the user is a customer and our Zendesk support system tracks all customer email responses and all customers get replies in less than 24 hours as is the policy of our company. Also, this further shows customers who contact RSD (and not VL) to deal with problems and issues and it is an admission by opposing counsel that they acknowledge that they know customers contact RSD (not VL support) directly as they don't know VL exists even though it is in small print on some emails. RSD is listed all over the internet, products, social media, email promos from Todd, email promos from RSD, and even the RSD shopping cart. In addition, on 1 of the websites of valentinelife.com (prior to it being taken down - it also had RSD in the terms as Real Social Dynamics Inc. Terms and Conditions - and the terms were legal disclaimers taken verbatim from RSD websites) and "Real Social Dynamics" is readily seen and mentioned through most of the product as it references RSD Instructors and the product's content was primarily created in 2011, which is over 4 years prior to the creation of VL, further proving that VL was not the operating company or owner of the company because RSD is both the operator and owner of all intellectual property mentioned in the Verified Complaint.

(t)   My Dispute to Point 83 - 90. We agreed to dissolution over the phone with Todd. Todd and RSD authorized dissolution. Although Todd is lying about the claim afterwards, it appears as if it is both a lie and perjury. In addition, on the phone call of dissolution, I specifically mention to Todd about the reason of why I would not allow RSD to be associated with Todd once dissolution happened and removal of Todd's access to Social Media belonging to RSD. Todd also acknowledged the logic and said that he accepted the facts. I also specifically mentioned how Search Engine Optimization algorithms was a concern of mine because I didn't want to further confuse RSD customers that Todd may be affiliated with RSD after a dissolution took place.

(u)   My Dispute to Point 98-101- Bank of America had me down as rightful signatory and also I was owner and signatory upon account closure and Todd made a false claim of fraud and had Todd listed for fraud as a red flag in their system as a violator of their terms of service for misrepresentation. Therefore, although the Bank of America representative allowed Todd to have the funds temporarily moved back to the Valentine Life account, the bank acknowledged the mistake of allowing Todd to have access to the funds and subsequently reinstated my ownership and signatory on the Valentine Life bank account, which allowed me to protect the remaining funds from Todd's further potential embezzlement of cash from RSD. In addition, when I closed the bank account, my name was on the signature card for the Valentine Life bank account. Todd's name was removed at the closing of the bank account to prevent Todd from further hurting the RSD brand and financial position with further misappropriation of funds. A CPA was hired to conduct a full financial audit to provide further evidence of Todd's mishandling of funds, which looks suspiciously like Todd may have had criminal intent.

19

61. The Motion for a Temporary Retraining Order (TRO) and Preliminary Injunction of Todd VanDeHey is filled with false information about Real Social Dynamics (RSD) and Valentine Life (VL), which I am notating below as disputes to the points listed in the Motion for a TRO and Preliminary Injunction. I'd like to dispute the (1) irreparable harm and (2) merits of the case claims for the TRO:

(a)   Firstly, I'd like to dispute the claims of irreparable harm.

1)   First of all, there is no live program business to be conducted for Valentine Life as we proceeded with the process to refund 100% of all clients entitled to a refund and provided added value in RSD credit worth thousands of dollars to clients, which satisfied the clients because they are RSD customers who came to RSD for great high quality educational content from RSD Instructors. In addition, RSD clients were also provided added value of additional webinars and videos of many RSD Instructors. The additional RSD Instructor content further satisfied clients and some of them even spent additional money on RSD programs or rescheduled RSD Immersion programs to other programs, such as the RSD Bootcamp, which is a more expensive program provided to RSD clients of canceled RSD Immersion programs for no added costs.

2)   Second, all recurring billings (including webinars or membership sites) have been canceled and any unfulfilled fulfillment for clients was met by RSD with our own webinars.

3)   All clients in both of the above 2 claims are RSD clients so any loss that could be claimed was done to RSD not VL and the RSD clients contacted RSD directly knowing that RSD is the company that they bought from and intended to buy from when they purchased any RSD Todd programs, products, and services.

4)   There is no way to even re-gain most of the assets that Todd lost access to because we permanently deleted (1) the email account (todd@realsocialdynamics.com) and (2) All 3 YouTube accounts. The only existing assets are Websites owned by RSD and never sold to Todd or paid for by Todd and were being negotiated for a sale whose offers were all declined. Any regaining of access would also further hurt customers, bring RSD to further financial risk, expose RSD clients to further potential brand confusion, and cause irreparable harm to RSD.

5)   RSD customer service staff for the last 2 years of Valentine Life (VL) existence, and the 11 years prior to VL being incorporated by RSD, was the same RSD Contractors that managed RSD Todd customer support (both Todd and myself handled some customer service himself both before and after the creation of RSD). Post-dissolution of VL, RSD staff continued to ensure that all customers and innocent victims were not harmed by over-delivering on programs purchased relating to RSD Todd and refunding and/or rescheduling live program clients of canceled RSD Immersion events that would have featured RSD Todd as the RSD Instructor present teaching the RSD students in New York and Amsterdam.

6)   RSD Staff are not harmed as I told Todd that we would handle their invoices and with all vendors; however, Todd sent an email saying that he wanted to handle these payments. RSD preferred to handle the final invoices until Todd took almost all the cash from the Valentine Life checking account for himself to

20

cover his personal credit card. However, many of the RSD Contractors that have worked with Todd still want to continue to work for RSD after the dissolution of VL and the termination of Todd VanDeHey from RSD because they have been loyal staff of RSD for many years.

7) VL doesn't need day-to-day business as it is dissolved and the bank account cannot be restored to a dissolved business.

8) All assets requested by Todd VanDeHey for access are assets owned by RSD, and it makes no sense to return to Todd access to any assets of RSD because Todd is a terminated contractor. By definition, Todd lost all access privileges when he was terminated from his work with RSD. Returning access to Todd would force the Court to require RSD to provide Todd when the same benefits he had working for our company for no reason. Todd has made the requests to gain access to several RSD-owned assets and Todd acknowledges that RSD owns all the assets, and it is made further evident because nowhere in any correspondence does he claim ownership of any assets. Therefore, the return of a RSD Corporate email account, bank account, and RSD Social Media makes no sense. This is especially true for a bank account whereby there is clear and undeniable evidence that Todd appears to be misappropriating funds, and a TRO should not be granted to return Social Media to Todd because much of the Social Media was deleted immediately upon dissolution of VL and the termination of Todd VanDeHey from RSD. The YouTube channels associated with RSD Todd was deleted and much of the Social Media in the name of RSD Todd (and created by RSD years before VL) have been permanently deleted as well. In addition, there is no justifiable reason in supplying Todd with access to RSD customers. Also, RSD has a non-solicitation clause and a non-compete clause in the RSD Contractor Agreement signed by Todd. So allowing Todd access to customers and RSD resources would allow him to compete against RSD instead of being a joint venture partner not in competition and be in violation of a non-compete and non-solicitation clause of the RSD Contractor Agreement.

9) Returning Todd access to RSD assets will further confuse clients who didn't realize they were doing business with VL and further hurt the RSD brand due to confusion since RSD Todd was fired from RSD for apparent stealing, lying to me, causing due suspicion that Todd was defrauding RSD, and a violation in expectations for financial and customer transparency. Todd's deceptive actions are already hurting RSD brand equity with causing irreparable harm due to false gossip and client confusions. In addition, Todd's actions have resulted in him spreading rumors to social media that is hurting Nick's personal reputation i.e. false libelous and slanderous rumors of Todd having sex with my wife, Amber, and discussions of financial negotiations that have never taken place falsely shared by either Todd or friends of Todd.

10) Irreparable harm is done to RSD due to Todd taking funds from RSD and the VL checking account for personal reasons. Some clients could not have immediate refunds because the money cannot be refunded to clients due to a lack of transparency of who was a client. Also, the action of Todd taking over $60,000 in the last couple days prior to the bank account being closed (and after having Todd informed by Maier Gutierrez & Associates that Todd was under investigation for embezzlement) resulted in RSD having to tell customers to do a chargeback first and then recover funds to pay clients to verify that the clients actually purchased from RSD. If they attempted a chargeback with RSD Staff on the phone, RSD was able to verify the accuracy of the charges and purchases relating to RSD. To honor the agreement between RSD and RSD customers who purchased, RSD paid refunds to clients out of RSD funds even though RSD

did not receive any of the revenue generated from their purchase. Also, to cover the debts, RSD had to borrow from my family to pay clients refunds due to needing funds to meet current RSD operations and deal with RSD Todd client obligations, which were difficult to meet due to Todd improperly taking funds from the Valentine Life business account for personal expenses.

(b)     Second, I'd like to dispute the merits of the case.

1) All assets mentioned in dispute in any paperwork from Todd VanDeHey are RSD assets, including staff, video gear, content (US government - registered intellectual property of copyrights and trademarks), and Confidential Information (including the support tickets, all of which was managed by RSD staff - who manage RSD Todd issues/tickets anyways), email accounts of Todd (todd@realsocialdynamics.com and todd@valentinelife.com) on RSD-owned URL domains, customer database of RSD customers that was only accessible to Todd during Todd's RSD contract, but which ended when he was terminated).

2) What Todd is requesting is also impossible to restore since most of what is requested was permanently destroyed RSD assets by the proper owner, RSD. In addition, RSD has properly accounted for and spent any funds transferred from Valentine Life after company dissolution to resolve final fulfillment of RSD Todd customers, and RSD is even dipping into RSD funds to cover the costs. In addition, RSD received a $20k loan from my family to cover the refunds and payroll of RSD staff to deal with Todd taking the money from the Valentine Life account that we needed to deal with fulfillment of clients.

3) The plans of the dispute resolution is to recover $100,000s from Todd VanDeHey that we believe he has hidden from RSD.

4) If opposing counsel wants to dispute the validity of the Operating Agreement because it is for a LLC instead of Corporation, then that shows we are now in a situation whereby all we have left to fall back on is the RSD Contractor Agreement, which clearly states that RSD is in charge of every aspect of the business. Even if the Court honors the Operating Agreement, VL was properly dissolved the company while simultaneously terminating Todd from RSD as a Contractor and dissolving the business as to the mutual agreement of Todd and RSD in a recorded phone conversation. Todd lied to pretend that the agreement didn't happen afterwards, which appears that Todd committed perjury.

5) Also, Todd's claim in his TRO Request in "MEMORANDUM AND AUTHORITIES" is full of falsities including:
(i) False: Todd is Sole Director and Incorporator ... Truth: I am incorporator and a Director,

(ii) False: VL operates the Websites and Social Media, Truth: RSD manages the websites, purchased the websites, hosts them on RSD servers (except 2 of the 9 sites – attractionunlocked.com, textanddatesmachine.com), and all Social Media (including Facebook and YouTube) for RSD Todd and every other Instructor has been owned and managed by RSD Staff and Todd has never been an Admin for any active social media other than having the same access level to post as any of our interns, videographers, and contractors,

22

(iii) False: VL communicates with its customers; Truth: RSD and VL both send out the emails to the customers, but RSD does most of the correspondence as VL only has access to the segment of customers that bought RSD Todd products or who signed up through an email capture page on RSD owned websites that are interested in RSD Todd,

(iv) False: RSD contributed to certain infrastructure, Truth: RSD is 100% of the Infrastructure of funds, staff, video gear, social media, websites, etc. all of which took millions of dollars of invested RSD money or over $30MM in expenses on these assets to build up over 15 years,

(v) False: RSD unilaterally restricted access, Truth: It was mutually agreed upon on phone with recording phone call and transcript,

(vi) False: RSD absconded funds, Truth: RSD only took a small amount of funds to cover overhead and still needed to borrow funds to fulfill RSD clients who contacted RSD via email and phone to deal with customer service due to Todd absconding Bank of America funds - whereas RSD took $12k, Todd took $62k but RSD's funds covered clients and Todd's covered himself

(vii) False: RSD hurt financial obligations Truth: RSD met obligations and attempted to close credit lines to prevent Todd further embezzling

62. The Supplemental Declaration of Todd VanDeHey is filled with false information about Real Social Dynamics (RSD) and Valentine Life (VL), which I am noting below as disputes to the points listed in the Supplemental Declaration of Todd VanDeHey. I include the referenced points of the Supplemental Declaration and my responses to counter the false allegations.

(a) Point 1 - Todd was not the incorporator nor the sole authorized director. I am both the incorporator and Director of VL. RSD is officially the incorporator and Director for VL whereby I am the CEO/President of RSD.

(b) Point 5 - RSD only listed Todd as the Officer on the incorporation paperwork for VL for merchant account reasons as Todd and I agreed to this in advance, and we also have a precedent for doing a similar deal, which we did previously on Immersion VIP for Todd and Luke.

(c) Point 7 - Todd agreed to change registered agent to Bizfilings.com on a recorded Skype call with him and I. He authorized the changes and there was no material change on any paperwork other than the registered agent because Todd was unhappy with the mistakes made by Legalzoom.com and I agreed. The change of officers did not take place until I needed to file with the Secretary of State of Nevada, and the change of officers was needed to have me dissolve the company, which Todd agreed to on the phone call saying that I would be the one to do the dissolution and also needed to prevent embezzlement. All documents were submitted with consent.

(d) Point 12 - There was no forgery for submission of change of registered agent.

(e) Point 19 – False statements were made about the dissolution because the dissolution was made due to an agreement made on a recorded phone call between RSD and Todd.

23

(f) Point 20 - I am a Director, which was acknowledged by Todd and further acknowledged by Nissembaum Law when they sent to my legal counsel and me, a document stating that Todd could temporarily be President and that I was a Director, which I signed and returned to Todd.

(g) Point 21 - I am not a rogue individual rather I was a manager, director, owner of assets from RSD, and Shareholder & Incorporator of Valentine Life.

(h) Point 22 - There can be no return to August 10 status as YouTube is permanently deleted and same with RSD email making the request impossible. Also, Ontraport, Inchek, and any RSD-affiliated vendors have decided on their own not to due business with Todd of their own free will, and they are aware that doing business with Todd would be the same as doing business with a terminated RSD Contractor in violation of his Contractor Agreement. The email lists were deleted as well from accounts as I was the owner of the emails and also of any other assets, including the Websites and social media affiliated with RSD and RSD Todd.

63. The Affidavit of Damages that accompanies this Affidavit provides clear and undeniable evidence that Todd has misappropriated a lot of funds from the Valentine Life accounts and owes several hundred thousand dollars in damages to RSD. In addition, Todd wishes to regain access to social media, email, and website assets branded by US-government-registered trademarks of RSD, including RSD, RSD Inner Circle, and Real Social Dynamics, with the intention of marketed competing products and services, which is disallowed by both the RSD Contractor Agreement and in violation of the Digital Millennium Copyright Act (DMCA), which protects both the copyrights and trademarks of RSD. Therefore, allowing Todd to have such access would result in further irreparable harm to RSD as a terminated RSD Contractor.

64. In addition to the financial damages that can objectively be accounted for via a financial audit of a CPA, Todd has caused great financial damage to the brand equity of RSD by a lack of financial transparency and by taking the money that was owed to RSD in the Valentine Life bank accounts to cover RSD clients because it made it difficult for RSD to cover fulfillment and cover refunds. Due to having to go through extra steps to validate several RSD customers who purchased RSD Todd branded products and services, RSD had to delay refunds that usually are done within 24 hours; however, due to Todd hiding customer data, RSD had to go through extra steps to verify customers actually purchased from RSD because their purchase orders were hidden from the RSD shopping cart and database by Todd in a manner that made it appear to RSD that Todd was purposefully hiding these sales so that he could pocket the funds from the sales of theses customers intentionally, which caused customer service problems due to the difficulty in determining whether the customers made the purchases. RSD eventually created a streamlined process to service all customers and provided thousands of dollars in additional value to satisfy customers who purchased RSD Todd products and services if they had difficulty due to the lack of transparency of customer records and financial records by Todd VanDeHey's actions.

65. I was the founder of RSD in 2002 to provide dating coaching as well as direct dating instruction tailored to each customer's unique dating profile. RSD was the first company to market live instruction at public venues, such as bars, clubs, and parties, which gave RSD a competitive edge over companies offering a unilateral, seminar-type forum. By employing a small team of immensely talented instructors, each with its own subordinate coaches, in addition to RSD's own support staff, using RSD equipment/processes, RSD could funnel customers to the appropriate RSD Instructor allowing for a more cohesive relationship and, ultimately, successful experience.

66. The top tier team of 10 to 15 Instructors has changed over time, but each Instructor was first mentored as a subordinate coach prior to elevating to the title of RSD Instructor, known as Executive Coach, a title I gave to Instructors in the initial years of RSD operation. I hired Owen Cook to mentor Instructors in teaching while I mentored Instructors on business administration. Todd was first introduced to RSD as a paying customer under the coaching of Owen Cook in 2003 in Canada. Later, Todd was transitioned to become a subordinate coach under Owen Cook, who was mentored for approximately a year. During that time, Todd VanDeHey quickly adapted to Owen Cook's instruction, style, and methodology. Todd's success and skillsets allowed him to be hired as a RSD Instructor in 2004.

67. During the initial years of the company, nearly all of RSD's revenue was generated from coaching and the in-field instruction at live programs, primarily in Los Angeles, California. Clients would routinely fly to Los Angeles to attend the weekend programs, which lasted for 3 days (Friday to Sunday) to derive the full benefit of the unique, in-person coaching that RSD offered.

68. From 2003 to 2008, live programs, led by the RSD Instructors, were conducted approximately once a week, but as the company grew, the programs were occasionally conducted in a handful of other large metropolitan areas throughout the United States. To keep the pace with growth, roughly once a month, a RSD Instructor would travel to New York, Chicago, Las Vegas, and other cities to lead a program for customers who either lived in those cities, or to which it was more convenient for them to travel.

69. Even during these initial years, RSD provided the entire physical and digital infrastructure upon which the Instructors would carry out their live programs. RSD created and assigned each Instructor with an email address (with the domain @realsocialdynamics.com). In fact, until his termination on August 14, 2017, Todd had the contact email of todd@realsocialdynamics.com, the same email address created for him by RSD in 2003. RSD staff reserved hotel suites, location meeting rooms or lounges, and homes or residences for both Instructors and customers during their weekend programs. RSD was also responsible for marketing each Instructor and also managed the entire end-to-end payment capture system as well as the payroll and accounting operations.

70. Despite RSD's rapid growth and extraordinary success, the 2008 United States financial crisis and subsequent recession took a substantial toll on the company. Customer volume plummeted and even those that wanted to stay with RSD could often not afford to travel to Los Angeles, which at the time, was still the primary venue for RSD Instructor programs. With attendance at weekend programs dwindling, weekly events were supplanted with monthly ones to reduce costs. However, Todd VanDeHey stayed with RSD and honored his agreement hosting programs in Los Angeles and Las Vegas when enough customers had enrolled.

71. To revive the company, throughout 2008 and 2009, I focused my efforts on expanding RSD to as many markets as possible. No longer concentrated on just a handful of large cities, I created a roadshow to promote RSD domestically and internationally. I diversified RSD's product offering with pre-recorded videos and then undertook a grueling 18-month travel schedule to open up new markets in cities around the world. However, in so doing, RSD incurred substantial debt, with the plan being to revive RSD tenfold what it was prior to 2008 and be able to pay off the debt within a year of ending the roadshow.

25

72. By 2010, my plan was a complete success. RSD was a hosting programs in over 200 cities all over the world, and RSD now had Instructors with new teams of subordinate coaches, and hundreds of volunteers. RSD had paid back its debt, and, at the same time, the RSD Marketing Team implemented an initiative to have all RSD Instructors supported with a complete social media platform, which included creation of YouTube, Facebook, Google+, Instagram, and Twitter accounts, as well as unique websites for each RSD Instructor to promote their line of services.

73. I believed that offering free content across social media platforms was not just enticing to potential customers, but keeping active on social networks by sharing ideas or quickly responding to questions was the best way to build trust with customers and ensure their satisfaction. The RSD Instructors had no responsibilities or obligations with regard to this expanded digital infrastructure beyond creating posts/videos/tweets. Even the video equipment used to create the high definition media was provided by RSD.

74. The idea was simple: let the Instructors focus on their content, their programs, and the customers, and then let RSD manage everything else. I tasked the RSD technology and marketing departments with ensuring consistent branding across the platforms and that customer issues were routed appropriately. If an Instructor experienced issues or technical problems with any of his social media accounts, he contacted RSD technical support who would resolve the issue. All customer data and email lists were stored on RSD servers. All website domains were purchased and renewed by RSD without any input or collaboration with the Instructor. In fact, the specific website domains cited by VanDeHey in his Motion were purchased and renewed by RSD entirely.

75. I recognized the considerable value in having each Instructor simultaneously be a visible senior member of the RSD team, allowing for Instructor cross-promotion and collaboration, while at the same time also letting them promote their own "brand" with individual domains, allowing the Instructor to put forward their unique style and coaching technique to set them apart from other RSD Instructors. Since 2010, this approach to Instructor management and operations has been extremely successful not just with respect to revenue, but it has also greatly increased the overall quality of the programs created by RSD Instructors.

76. Throughout its existence, RSD has experienced difficulty with processing online payments via credit card.  The dating/pick-up industry often receives bad press, and as a result, major payment processors and 3rd party vendors often refuse to do business with RSD if they find their line of business to be morally objectionable.  As a result, RSD has become incredibly agile when an old payment processor refuses service, forcing RSD to quickly switch to a new processor/vendor.  One of the solutions implemented by RSD was to create standalone limited liability companies (LLCs) which would incur lower processing fees/rates, and would lack any negative press history, and then connect the new standalone LLC with a payment processor as a replacement when any other LLC's payment processor refuses service.  For example, if American Express unilaterally decided it would no longer accept payments through the website of an Instructor, RSD would quickly replace the shopping cart API code with that of a different LLC, update the site terms of use, and continue operations uninterrupted.

77. Having a backup payment processor under Valentine Life was the primary intent behind the parties creating the entity. Vandehey could process all of his RSD products through the Valentine Life Inc. payment processor, and deposit those payments into the single Bank of America account.  The ancillary benefit of creating the Valentine Life Inc., and the bank account was to be clarity of accounting.  Revenue generated from customer purchases from Vandehey's websites would only be deposited into the Valentine Life Inc. bank account, which created a simple ledger for all parties. Apart from

26

easier financial reporting, and the gain of an additional payment processor, Valentine Life Inc. had no other purpose than to facilitate the financial transactions, disbursements, and withdrawals of the RSD customers that Vandehey retained.

78. I am signing this affidavit freely and voluntarily.   If called to do so, I would competently and truthfully testify to all matters set forth herein

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Nicholas Kho

SUBSCRIBED and SWORN to before me this __ day of September, 2017.

Notary Public for Said County and State

NATALIE VAZQUEZ
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 05-20-21
Certificate No: 13-11107-1

27