```
─────────2:17-cv-2230-JAD-NJK - September 8, 2017─────────
```

1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3

4 TODD VANDEHEY,                )  Case No. 2:17-cv-2230-JAD-NJK
                                )
5              Plaintiff,       )  Las Vegas, Nevada
                                )  Friday, September 8, 2017
6       vs.                     )  1:06 p.m.
                                )  Courtroom 6D
7 REAL SOCIAL DYNAMICS, INC.,   )
  et al.,                       )  MOTION HEARING
8                               )
               Defendants.      )
9         _____)             *CERTIFIED COPY*

10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12         BEFORE THE HONORABLE JENNIFER A. DORSEY,
                 UNITED STATES DISTRICT JUDGE

13

14

15 APPEARANCES:

16 For Todd VanDeHey:

17         GEORGE F. OGILVIE, III, ESQ.
           McDonald Carano
18         2300 West Sahara Avenue, Suite 1200
           Las Vegas, Nevada 89102
19         (702) 873-4100
   (continued next page.)

20

21 Court Reporter:          Felicia Rene Zabin, FCRR, RPR, CCR 478
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada 89101
23                          (702) 676-1087, FZ@nvd.uscourts.gov

24

25 Proceedings reported by machine shorthand.  Transcript produced
   by computer-aided transcription.

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

```
 1  APPEARANCES CONTINUED:

 2  For Todd VanDeHey:

 3          STEVEN L. PROCACCINI, ESQ.
            Nissenbaum Law Group, LLC
 4          2400 Morris Avenue, Suite 301
            Union, New Jersey 07083

 5

 6  For Real Social Dynamics, Nicholas Kho, and Owen Cook:

 7          JOSEPH A. GUTIERREZ, ESQ.
            STEVEN KNAUSS, ESQ.
 8          Maier Gutierrez & Associates
            8816 Spanish Ridge Avenue
 9          Las Vegas, Nevada 89149
            (702) 629-7900
10

11  Also Present:

12          Todd VanDeHey
            Nicholas Kho
13

14

15

16

17

18

19

20

21

22

23

24

25
```

──────2:17-cv-2230-JAD-NJK - September 8, 2017──────

1          LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 8, 2017; 1:06 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  All rise.

5          THE COURT:  Good afternoon.  Please have a seat.

6          COURTROOM ADMINISTRATOR:  Now is the time set for a

7   motion hearing in Case No. 2:17-cv-2230-JAD-NJK, Todd VanDeHey

8   versus Real Social Dynamics, Inc., et al.

9          Counsel, please state yourself appearances.

10         MR. OGILVIE:  Good afternoon, Your Honor.  George

11  Ogilvie on behalf of Todd VanDeHey.  With me today is

12  Mr. Steven Procaccini who has been admitted pro hac.

13         THE COURT:  Good afternoon.

14         MR. GUTIERREZ:  Good afternoon, Your Honor.  Joseph

15  Gutierrez and Steven Knauss on behalf of the defendants, Real

16  Social Dynamics, Nicholas Kho, and Owen Cook.  With me today is

17  also Nicholas Kho.

18         THE COURT:  All right.  Good afternoon.

19         So this is the hearing set for the Motion for a TRO and

20  Preliminary Injunction.  I've reviewed all of the papers; I'm

21  familiar with the arguments.

22         Mr. Procaccini, am I pronouncing that right?

23         MR. PROCACCINI:  Yes, Your Honor.

24         THE COURT:  All right.

25         It's your motion so the argument is yours and the

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

───2:17-cv-2230-JAD-NJK - September 8, 2017───

1  podium is yours, sir, if you wouldn't mind taking the podium.

2          MR. PROCACCINI:  Thank you, Your Honor.

3          And with us, Your Honor, at counsel table is the

4  plaintiff, Mr. Todd VanDeHey.

5          THE COURT:  Thank you.

6          MR. PROCACCINI:  So, Your Honor, plaintiff has

7  presented an Emergency Motion for a Temporary Restraining Order

8  and an Order to Show Cause, as Your Honor had eluded to, and it

9  is for emergent relief to restore the plaintiff's company which

10 he maintained a 50 percent ownership of, which Valentine Life,

11 LLC.  The purpose of this motion is to maintain its immediate

12 viability to allow the parties to enter into some meaningful

13 Alternate Dispute Resolution through mediation or through

14 arbitration.

15         It's undisputed that the plaintiff and the defendants

16 have entered into an Operating Agreement in 2015 to establish

17 Valentine Life, LLC, to be a joint venture between the

18 plaintiff and the defendant and the purpose is to provide

19 coaching service, if you will, to a population that seeks to

20 improve its dating skills and those services are provided

21 through online platforms as well as through individual and

22 personal coaching seminars as well as webinars.

23         And the parties -- to understand the nature of the LLC

24 that's at issue, one needs to first appreciate the relationship

25 between the parties that goes back to 2002 where the plaintiff

1  and both of the individual defendants, Mr. Kho and Mr. Cook,

2  had met while the plaintiff was at Union College studying

3  mechanical engineering.  They became friends and then they

4  each -- all three of them entered into the dating/coaching

5  business and eventually the two individual defendants formed

6  Real Social Dynamics, RSD.

7          Shortly after meeting in 2004, the plaintiff became an

8  independent contractor for the defendant corporation.  And I

9  understand through the defendant's opposition that somehow they

10 are reading into the current relationship some form of a

11 noncompete or some of the terms of the original independent

12 contractor agreement that was entered into in 2004 which was

13 clearly superseded by the eventual Business Joint Venture that

14 was entered into in 2015 between the plaintiffs and the

15 defendants which was to form this Valentine Life, LLC, that had

16 no such restrictive covenants associated with it.

17         Through this joint venture both RSD as well as

18 Valentine Life have been able to thrive.  Mr. VanDeHey is a

19 very successful instructor and I believe even -- I don't know

20 if RSD would even dispute that he has become known as one of

21 the best instructors at RSD.  But certain parts of the

22 relationship and trust issues began to breakdown where, at

23 least from the plaintiff's perspective, there needed to be a

24 break, a final break, between RSD and Valentine Life to allow

25 each of the parties to move on.  And that's what led to the

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1   discussions back in April to find a way to formally separate

2   the RSD entity from both the Valentine Life and Todd VanDeHey's

3   side of the deal.

4           So, as of April of 2017, there is two equal parties

5   that had 50 percent equal shares in the company that is at

6   issue now.  Through the ensuing months, the negotiations

7   ultimately broke down with a final offer to sell RSD's portion

8   of the business on -- that was conveyed to the plaintiff on

9   August 11th.  There is a phone -- what is alleged to be a

10  transcript of a telephone conversation that was not in the

11  presence of counsel and which was not authorized by the

12  plaintiff to be audiotaped in this manner.  So we object to the

13  admissibility of the phone conversation as being violative of

14  Nevada's rules against one-party taping.

15          But we can look to that to see that there is -- that it

16  was far from a meeting of the minds to either come to a final

17  deal to sell Mr. VanDeHey RSD's portion of Valentine Life's

18  business and it was certainly not within the realm of

19  consideration or even agreement, for that matter, that as of

20  the end of that phone call somehow Mr. VanDeHey had

21  relinquished dissolution control to RSD.  In other words, in no

22  way can we read this transcript to say that somehow

23  Mr. VanDeHey had modified the 2015 Operation Agreement to

24  remove the formalities of dissolution which would require

25  unanimous consent of the shareholders.

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1          And this offer that is set forth in the taped

2   transcript from August 11th by its own terms is followed up by

3   an email from defendant's counsel on August 12th, 2017, which,

4   Your Honor, I can direct you to, which is attached as Exhibit K

5   to the opposition.  And, you know, we must note, too, that our

6   initial objection to this being offered as an exhibit is this

7   was in contemplation of a settlement.  And we don't think that

8   it's proper that this document was even brought to the Court's

9   attention, but here we are.  And there seems to be some sort of

10  a waiver of the settlement privilege.

11          We have an email here from defendant's counsel:

12  "Importance:  High.  Subject:  Terms of Dissolution of

13  Valentine Life."  And here what's set forth in these what

14  appear to be material terms would be that the Defendant RSD

15  would receive $75,000 from Mr. VanDeHey.  In return,

16  Mr. VanDeHey through operation and now through -- if this deal

17  were to go forward, Mr. VanDeHey would be 100 percent

18  controller of Valentine Life.  He would then receive control of

19  his brand, including his YouTube channel; any emails generated

20  therefrom; and access rights to any non-product-affiliated

21  websites; Valentine Life entity to be dissolved by RSD; and

22  Valentine Life financial merchant accounts to be closed.  This

23  email ends with:  "I understand the parties are eager to move

24  forward.  To that end, the terms described above are valid

25  until Tuesday, August 15 at 5:00 p.m. after which a full

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1    dissolution agreement with additional boilerplate language can

2    be drafted and reviewed by the attorneys."

3         Even by this very nature, this seems to be an offer for

4    the sale of one-half of a business.  It is certainly not a

5    final sale.  It is certainly not a memorialization that somehow

6    plaintiff agreed that now RSD can simply dissolve the

7    corporation.  And the fact that it's left open until Tuesday is

8    clearly an offer or a counteroffer and is not the final

9    memorialization of a document.

10        And to go one step further, Your Honor, it goes without

11   saying that in the opposition papers, they try to paint

12   Mr. VanDeHey as an employee who was terminated who is trying to

13   get access to his employer's computer.  Here you have a 50/50

14   partnership.  This was not an employer termination.  It seems

15   to be that -- but it's not clear through the papers -- that the

16   defendants are trying to take this August 11 taped phone call

17   and this August 12 email to be this was the day that

18   Mr. VanDeHey was terminated and he needed all of his rights

19   from his former employer to be cut off.  And the paper -- this

20   just does not convey that message.  What it does convey is an

21   offer to buy and an offer to sell a deal that broke down.  And

22   then what happened in the next few days is quite troubling, but

23   it really goes to show the motive.

24        So as April -- as August 12th passes, as we can see

25   from Mr. VanDeHey's supplemental declaration at Exhibits O, P,

─────2:17-cv-2230-JAD-NJK ─ September 8, 2017─────

1   and Q, we see documents that Defendant Mr. Kho filed with the

2   Secretary of State for the State of Nevada where -- if you'll

3   excuse me, Your Honor, if I can grab the exhibits.

4           THE COURT:  Sure.

5       (Pause in the proceedings.)

6           MR. PROCACCINI:  Your Honor, at Exhibit O, we have a

7   Statement of Change --

8           COURT REPORTER:  You are covering the microphone.

9           MR. PROCACCINI:  I see it.  Thank you.

10          At Exhibit O, we have a Statement of Change of

11  Registered Agent that is allegedly filed -- allegedly signed by

12  Plaintiff Mr. VanDeHey on March 9, 2017.  But we have reason to

13  believe that that is actually not his signature.

14          THE COURT:  I don't think I have that as O.  I'm sorry.

15  I might . . .

16          MR. PROCACCINI:  This -- Exhibit O on the supplemental

17  declaration that was filed on September --

18          THE COURT:  Oh, okay.

19          MR. PROCACCINI:  -- 1, 2017.

20          THE COURT:  All right.  Okay.  Hold on.

21      (Pause in the proceedings.)

22          THE COURT:  I was looking at Defendant's Exhibit O.

23      (Pause in the proceedings.)

24          THE COURT:  All right.  I'm there.

25          MR. PROCACCINI:  Okay.  So, Your Honor, this is a

————2:17-cv-2230-JAD-NJK - September 8, 2017————

1   Statement of Change of Registered Agent by Represented Parties

2   as filed on behalf of Valentine Life sometime on or about

3   March 10, 2017.

4          And here you see the second signature from the bottom,

5   "Todd VanDeHey, President."  And we -- there's reason to

6   dispute that this is actually his signature or his date.  But

7   we can take that -- take this as being the date that this was

8   filed.

9          In Exhibit P, this is now Valentine Life,

10  Incorporated's Amended Officer and Director List which is filed

11  the same day that we received this email from defendant's

12  counsel, on August 12, 2017.

13         Now, you have Nicholas Kho submitting an electronic

14  signature under the penalty of perjury where he's now listing

15  himself as being the President, the Secretary, the Treasurer,

16  and the Director for Valentine Life, Incorporated, despite the

17  fact that the Operating Agreement from 2015 sets forth

18  Mr. VanDeHey as the President.  There's been no other

19  agreement; there's been no agreement between the shareholders

20  to have Mr. VanDeHey replaced by Mr. Kho in any of these

21  capacities.

22         And then, Your Honor, to go to Exhibit Q, which is the

23  next exhibit in Mr. VanDeHey's supplemental declaration, we

24  have Mr. Kho signing as Officer for Valentine Life on

25  August 14, 2017, Certificate of Dissolution with the Secretary

—2:17-cv-2230-JAD-NJK - September 8, 2017—

1  of State in the State of Nevada.

2          While this was going on, Your Honor, Mr. Kho, in his

3  supporting affidavit in opposition to the motion for emergency

4  restraints, makes a lot of allegations about wrongdoing with

5  money and couldn't find traceability, couldn't find

6  accountability on one hand but yet then he is, quite frankly,

7  bragging about these monthly phone calls that he would have

8  with Mr. VanDeHey.  There were these monthly phone calls; they

9  were talking about very specific issues.  Yet he waits until

10 the day after his offer to sell his side of the company goes

11 down to dissolve all these, to change -- to remove without

12 authority Mr. VanDeHey from the LLC; goes to the bank,

13 presents -- we learned this morning that Mr. Kho presented

14 these fraudulent documents to the Bank of America in order to

15 have Mr. VanDeHey's name removed from the business account.

16          So the company was operating just fine for three and a

17 half years, up until the point that Mr. Kho's offer to sell his

18 share of the business was refused.  So this is revisionist

19 history to go through these 70 paragraphs of unsupported

20 allegations of wrongdoing, allega- -- you know, accusations of

21 there's someone in New York that says something bad may be

22 happening in New York that may be a collusion.

23          And, quite frankly, Your Honor, all of these issues can

24 be raised.  There is a forum for that.  It's the mediation or

25 the arbitration.  And there's a lot of issues going back and

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  forth.  The point is to make sure there's a live entity to even

2  fight over --

3          THE COURT:  What are --

4          MR. PROCACCINI:  -- at the end --

5          THE COURT:  -- those --

6          MR. PROCACCINI:  -- of this.

7          THE COURT:  -- issues?  Is it mediation?  Is it

8  arbitration?

9          MR. PROCACCINI:  Um-hum.

10          THE COURT:  No one's provided me the details of any --

11          MR. PROCACCINI:  Okay.

12          THE COURT:  -- of those claims.  What is the status of

13  that?  Where is it?  What's happening?

14          MR. PROCACCINI:  So -- I'm sorry, Your Honor.  So I

15  understand.  Are you asking about the procedure for the

16  Alternate Dispute Resolution or the actual substance of the

17  claims between the parties?

18          THE COURT:  Both.

19          MR. PROCACCINI:  Okay.

20          So, Your Honor, the Operation Agreement -- the

21  Operating Agreement provides that all disputes must first be

22  brought to mediation.  But both parties do not have to

23  participate in mediation.  But, if mediation is not successful,

24  then both parties have to participate in arbitration.

25          THE COURT:  Right.  And so where are we at on that?

2:17-cv-2230-JAD-NJK - September 8, 2017

1        MR. PROCACCINI:  Yeah.  So where we are at on that is

2   given the fact that that first step is not compulsory and given

3   that we -- both parties have agreed to mediation and, frankly,

4   both -- I believe the last that it stood -- and maybe Mr. --

5   maybe opposing counsel can add some more information -- but I

6   believe we actually even selected a potential mediator knowing

7   full well that the mediator can't be the eventual arbitrator if

8   it goes that far.  I do not believe that we've identified a

9   potential arbitrator.

10       And that's actually where it sat.  And the urgency of

11  the situation, the fact that the lights were just turned off

12  for this company, and this is -- you know, I'm sure you can

13  understand, Your Honor, when we're dealing with YouTube

14  websites and we're dealing with these online platforms, a lost

15  day is a lost month.  You know, a for sale sign in the

16  electronic age, you know, there's no way of knowing when that

17  for sale sign comes down.  So every day that Mr. VanDeHey and

18  Valentine Life are prevented from continuing this business that

19  supposedly was worth enough to be sold for $75,000 ten days ago

20  now we have Mr. Kho saying I don't know what the point of this

21  emergency motion is.  And he says that --

22      (Pause in the proceedings.)

23       MR. PROCACCINI:  -- "What Todd is request" -- at

24  page 22 of Mr. Kho's declaration, which is paragraph 61, sub

25  (b)(2) -- this pretty much sums it all, Your Honor -- sums it

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  up all, Your Honor, from the plaintiff's perspective, quote,

2  what Todd is requesting is also impossible to restore since

3  most of what is requested was permanently destroyed RSD assets

4  by proper owner RSD.

5           So it seems to be the argument that there's no need for

6  emergent relief.  We've destroyed 99 percent of this thing.

7  This thing is just about dead.  There's no need to revive it.

8  Just -- you know, we don't have to worry about these fraudulent

9  documents submitted to the Secretary of State or the fraudulent

10  documents that were presented to Bank of America to have names

11  of accounts removed.  We're just about done.  Just let us

12  finish the rest.

13          And, Your Honor, what's telling about this -- and I

14  don't know if it was artfully written but it's artfully true --

15  "What Todd is requesting is also impossible to restore since

16  most of what is requested was permanently destroyed."  But,

17  Your Honor, the good news is not all has been permanently

18  destroyed.  We believe that if the lights are turned back on,

19  that if Mr. VanDeHey's company is allowed back into what is

20  rightfully his -- which is access to his customer lists, access

21  to the merchant -- the merchant operating equipment necessary

22  to operate the company, such as these -- using online banking

23  software so that the clients can continue to pay for products

24  that they are accustomed to be getting from Mr. VanDeHey and

25  the goodwill that he provides -- there is still a company to be

1 saved.  But, if this is left in its current state for much

2 longer, frankly, we're gonna be left with a mediation arguing

3 over he took this; he didn't authorize that; he took -- he did

4 this; he did that.  What's the company worth?  Zero.  In fact,

5 you know what we're gonna be worried about?  Every time

6 Mr. VanDeHey opens up his mail he's gonna be wondering which

7 customer is suing him for products that they bought that they

8 are not getting now.

9        THE COURT:  Well, why would they be suing him

10 personally and not the company?

11        MR. PROCACCINI:  Well, they could.  But right now the

12 company has been dissolved.  I don't think it's too hard to try

13 to pierce him legally.  Right now, according to these papers,

14 he was the President and now he's disavowed all of his

15 positions; now the company's been dissolved.  They know who he

16 is.  He's easy to find.

17        THE COURT:  But, according to the papers, it was

18 Mr. Kho who dissolved all of that.  He was the President at the

19 time.  So I think -- part of my challenge here, to be

20 completely candid with you, Mr. Procaccini, is that the

21 allegations, the damages that we're talking -- well, we're

22 talking a lot about money damages, number one; and, two, it's

23 Valentine Life's potential injuries, not the named plaintiff's

24 potential injuries here.  And there's a distinction because

25 Valentine Life is not the plaintiff here.

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1        MR. PROCACCINI:  Um-hum.

2        THE COURT:  And so the injuries that it might be

3    suffering -- loss of goodwill, whatever else --

4        MR. PROCACCINI:  Um-hum.

5        THE COURT:  -- you've alleged -- those don't belong --

6    those damages -- or those injuries do not inure to your client.

7    It's not his goodwill; it's the company's goodwill.  And,

8    beyond that, I'm struggling to find anything that's

9    irreparable.

10        MR. PROCACCINI:  Well, Your -- I mean, Your Honor, I --

11    Mr. VanDeHey is known as Mr. Valentine.  So the subscribers of

12    his services, the thousand customers that are out there, the

13    people that are spending thousands of dollars for him, they are

14    looking for Todd Valentine, who they know as Todd Valentine.

15    They're not saying, well, oh, I see.  He's an LLC.  They --

16    what they're --

17        THE COURT:  But he's --

18        MR. PROCACCINI:  -- writing about --

19        THE COURT:  -- he's not --

20        MR. PROCACCINI:  -- is him.

21        THE COURT:  -- the LLC.  There is an LLC --

22        MR. PROCACCINI:  That's correct.

23        THE COURT:  -- but --

24        MR. PROCACCINI:  There is an LLC.

25        THE COURT:  -- it is jointly owned 50/50 by these two

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

—2:17-cv-2230-JAD-NJK - September 8, 2017—

```
 1  sides in --
 2          MR. PROCACCINI:  That's --
 3          THE COURT:  -- here.
 4          MR. PROCACCINI:  -- correct.  Well, no longer, I guess.
 5  You know, right now Mr. VanDeHey has been completely shut out.
 6          He was a -- he was a board member.  He was a
 7  shareholder.  He was a 50/50 owner.  And someone just doctored
 8  the documents, sent 'em into the Secretary of State, and walks
 9  into a bank and now he's gone.
10          How -- and the irreparable injury, these people that
11  are gonna be suing, whether we can succeed to the defense
12  sayin', I'm sorry, you sued the wrong person; we're the LLC;
13  you came to my apartment in Manhattan to sue me, he's still
14  gonna have to defend himself.  Out there in this media -- in
15  this realm as far as his reputation goes, it is him that's not
16  providing the services.  Regard -- it almost doesn't matter
17  what this LLC is.
18          And the irreparable harm, Your Honor -- we can't
19  understate it enough -- these people out there that have bought
20  these webinars, these packages of webinars, they bought it
21  associated with him.  This isn't like going to Best Buy and
22  buying a TV.  You like the TV; you don't remember the salesman.
23  A lot of goodwill goes into the marketing of these products.
24  And right now Mr. VanDeHey doesn't know who's not satisfied
25  with whatever substitute instructor was being provided; does
```

1  not know whether substitute products were being provided.  I

2  did see something in here that has some form of compensation.

3  There is a discount package or some sort of a complimentary

4  service being provided.  Well, that's fine.  That'll just make

5  this customer get into RSD's product line.  That does nothing

6  to the expectations of these customers that have specifically

7  bought Mr. Valentine's products.

8          And right here, Your Honor, this was not a shell

9  corporation just to manage merchant accounts.  This is a

10  company that has been operated for 3 years on its own and has

11  thrived and thrived in a partnership with RSD.  So there is

12  goodwill associated with that.

13          And, Your Honor, the destruction -- this is not simply

14  about money.  The destruction of the business -- I mean, we

15  have here that RSD was going to sell their share for 75,000;

16  this will be dwarfed by the amount of liability and exposure

17  that my client has to third parties.

18          THE COURT:  Thank you.

19      (Pause in the proceedings.)

20          MR. GUTIERREZ:  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          MR. GUTIERREZ:  Your Honor, I want to address the

23  questions that you had for counsel that I think are exactly why

24  we're here today which is we're here for injunctive relief.

25  Not just any ordinary injunctive relief but a mandatory

—————2:17-cv-2230-JAD-NJK - September 8, 2017—————

 1  injunction which is a lot higher standard than the preliminary
 2  injunction standard that they've been quoting.
 3         And, in just going through the elements and the
 4  elements of irreparable harm, counsel could not articulate what
 5  irreparable harm they would have.  Not a single client can he
 6  point to or a single contractor could he point to that hasn't
 7  been paid that's even threatening a lawsuit.  That's all
 8  speculation.  In fact, the only evidence we have is Mr. Kho's
 9  affidavit that says every single customer we've reached out and
10  given them an option:  Here's an additional product.  We'll
11  help you this way.  Here are the RSD contractors that all have
12  agreements with RSD.  We'll pay their fees.
13         What Valentine Life is it's -- it has one asset, that
14  asset's a bank account that holds money that people are
15  fighting over.  That is not, in any court in this country,
16  irreparable harm ever.  And, if there was such an immediate
17  harm that we have, why hasn't the plaintiff filed any type of
18  arbitration demand or a complaint?  The only claim we even have
19  here is under NRS 38.222 which is, well, we belong in
20  arbitration but we're coming for injunctive relief.
21         So, when we step back and look at what are the actual
22  claims that they have a likelihood of succeeding on the merits,
23  they don't even have a claim.  They don't have a single claim
24  out there.  And, even under that claim, it's gonna fail as a
25  matter of law.  But, if you look at what they are asking for,

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  they are asking for all RSD assets.  Not once did counsel come

2  up here and say, oh, Valentine Life or Mr. VanDeHey himself

3  owns the email lists or the websites or the name RSD Todd.

4       In fact, what we've proven and what we've shown is we

5  have a 2004 contract agreement where everything that

6  Mr. VanDeHey's produced in conjunction with his work with RSD

7  belongs to RSD.  In fact, RSD has trademarks and copyrights on

8  all of this.  If any irreparable harm there is, is if there

9  is -- if these two -- if RSD and Mr. VanDeHey are forced to

10  work together, that would be irreparable harm as to RSD because

11  now we have trademark violations of the use of the name RSD

12  Todd; trade -- issues with copyrights on some of the products

13  that RSD owns that Mr. VanDeHey would try to sell.  Um --

14       THE COURT:  So one of the arguments that they raised is

15  that this independent contractor agreement was superseded by

16  the Valentine Life Operating Agreement.  What's your response

17  to that?

18       MR. GUTIERREZ:  Absolutely not.  They worked hand in

19  hand together because there's not a single merger clause in

20  that.  If you look at the actual Operating Agreement, not a

21  single merger clause that says this agreement supersedes all

22  prior agreements.  And, in fact, this is a course and conduct

23  of how RSD operates.  They have another contractor named Luke

24  Crowe who has the same type of agreement, an Operating

25  Agreement with the company that he owns 50/50 with RSD and then

──────2:17-cv-2230-JAD-NJK - September 8, 2017──────

1  a separate Independent Contract Agreement.

2          And that's the exact same scenario we have here with

3  Mr. VanDeHey.  We have a company that was created.  It was

4  given one asset, which was a bank account, and everything else

5  was remained owned by RSD.  And that's the way RSD's been

6  operating this company and that's -- it's very clear that

7  plaintiff in how they pled their Complaint and how they

8  requested their relief in the Motion for Preliminary Injunction

9  never state that they own any of these assets.  All they say is

10 they operated them.  Well, that's what the Operating Agreement

11 says.  There's joint managerial control in operating this

12 company so . . .

13         And I think Your Honor raised a great point earlier is

14 if there is loss of goodwill and if there's a business harm

15 that belongs to Valentine Life who is not a party to this.  So

16 we're talking about Mr. VanDeHey individually and what his harm

17 is and that hasn't been shown.  There hasn't even been a

18 suggestion of that much less the high standard of proof that is

19 required for a mandatory injunction or for a likelihood of

20 success on the merits so . . .

21         And, Your Honor, if you could -- to go through what

22 counsel was stating about Mr. Kho's decision to dissolve the

23 company, why he did it, it's -- and it's apparent.  We go

24 through in detail the amount of damage that was uncovered

25 when -- financially to -- when RSD finally got ahold of the

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  bank account statements and the American Express card to see

2  what Mr. VanDeHey was doing with the money that was supposed to

3  be split.  Well, what they found was Mr. VanDeHey has paying

4  his personal residence.  He was paying for personal expenses.

5  He was not disclosing anything to them.  He was taking payments

6  from certain customers via PayPal and other means that was

7  never being disclosed to RSD.  And they had to put a stop to

8  it.  And, when they put a stop to it, they dissolved the

9  company.  That's -- the phone call was recorded because it was

10  a partner meeting to discuss dissolution.  That was the

11  agreement.  Mr. VanDeHey at no point objects to RSD taking its

12  assets, which they rightfully own, and moving forward.  And the

13  reason that they moved forward in such a manner and have the

14  split is because they have to have a separation between Todd

15  VanDeHey and RSD Todd which would be trademark infringement and

16  what they have.  We've provided all the registered trademarks

17  for Real Social Dynamics and RSD and RSD Immersion, and all

18  these products that they have.

19         So, Your Honor, just in going through the elements of

20  the relief that's being sought here today, we look at the

21  Winter case, which is the United States Supreme Court case on

22  injunctive relief, and we've talked about irreparable harm.  We

23  talked about that already.  They have not made a single

24  showing.  Their entire irreparable harm analysis is based

25  solely on speculation that a customer may get mad and at some

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  point find Mr. VanDeHey and then sue him.  That's not even

2  close to what they need to get into court today and get the

3  relief they sought.

4        We discussed the mitigation by RSD and what they did to

5  reach out to any customers that emailed them.  Um --

6        THE COURT:  Explain to me what's happened.  So, since

7  mid-August, the situation where the company -- where Valentine

8  Life gets dissolved.  Why did that happen?  How did that

9  happen?

10        MR. GUTIERREZ:  The --

11        THE COURT:  Under what authority did that happen?

12        MR. GUTIERREZ:  Under Section -- let me grab the

13  Operating Operation -- under Section 9.1 of the Operating

14  Agreement, which is a liq- --

15        THE COURT:  Exhibit M.

16        MR. GUTIERREZ:  -- a liquidating event, which is a

17  withdrawal of the shareholder --

18        THE COURT:  I'm sorry.  Tell me the section again.

19        MR. GUTIERREZ:  Sorry, Your Honor.  Section 9.1,

20  subsection (e) -- or (c), subsection (e), which states that

21  "Except as otherwise provided herein, the Company shall be

22  dissolved, liquidated and terminated upon the occurrence of any

23  of the following events," which are defined as "Liquidating

24  Events":

25        Section (e) says, "the withdrawal of a Shareholder."

2:17-cv-2230-JAD-NJK - September 8, 2017

1      So one shareholder withdraws, that's a liquidating

2  event that results in dissolution.  And that's what we have

3  here, Your Honor.  They're saying there's no basis for RSD to

4  dissolve the company.  That's exactly what they operated under.

5  And they had to dissolve the company and had to move forward so

6  there's separation and there is no more confusion that

7  Mr. VanDeHey is associated with RSD.  So there is -- I know the

8  plaintiff has kind of thrown smoke and mirrors sort of what's

9  been happening.  But every step that's been taken has been

10  taken pursuant to this Operating Agreement to move forward with

11  dissolution.

12      THE COURT:  So the evidence of the withdrawal is . . .

13      MR. GUTIERREZ:  RSD's withdrawal as a shareholder, as a

14  50/50 shareholder.  And the evidence would be -- I mean, what

15  we have is a conversation between Mr. Kho and Mr. VanDeHey and

16  Mr. Cook where it was stated that RSD is going to move forward

17  and move on.  And I think the exact words of Mr. VanDeHey:

18  Well, that that's the world we live in.  That's fine.  There's

19  nothing I can do to stop you.  And that's what we have here.

20  We were shocked when we see a complaint for injunctive relief.

21      THE COURT:  So hold on.  Let me understand.

22      So the shareholder that withdrew was RSD?

23      MR. GUTIERREZ:  Correct.

24      THE COURT:  And then RSD -- if RSD withdrew, then how

25  did RSD dissolve it?

————2:17-cv-2230-JAD-NJK - September 8, 2017————

1      MR. GUTIERREZ:  Because then, Your Honor, you go to the

2  next provision, which would be Section 6.4, which is the wind

3  down of the company.  I'm sorry.  6 point . . .

4    (Pause in the proceedings.)

5      MR. GUTIERREZ:  I'm sorry.  9.2, the very next section.

6  "Upon the occurrence of a Liquidating Event" -- which we

7  have -- "the Company shall continue solely for the purposes of

8  winding up its affairs . . ., liquidating its assets."

9       So that's what we have is RSD moving forward with

10 liquidating and dissolving the company.  And what is the

11 company?  What does the company have?  It's a single bank

12 account from Bank of America.  And, if that's what we're

13 fighting over, that's strictly monetary damages.  Strictly.  At

14 no point has anybody on the plaintiff's side raised the claim

15 that they are entitled to ownership rights of the content on

16 the YouTube channel, the email lists, the social media.  All of

17 the things that they've requested in their injunctive relief at

18 no point has anyone said that is owned by either Mr. VanDeHey,

19 who is the plaintiff, or even Valentine Life, who is a

20 nonparty.

21       So what we're talking about is a bank accounts with

22 money.  And whoever -- it's my understanding that Mr. VanDeHey

23 took the money to pay some of his American Express bills.  But

24 that's money that both sides can argue over at arbitration, not

25 emergency injunctive relief before this Court, Your Honor,

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  which is why we're here today.

2        Your Honor, we briefed at length the reasons for the

3  termination of Mr. VanDeHey as a contractor; what we believe

4  are misappropriation of funds.  That will be left for another

5  day, Your Honor, because this is not a fight about money which

6  we're here today for.

7        But, when you go to the likelihood of success on the

8  merits, Your Honor, we don't have any evidence or any proof

9  that would rise to that level of a likelihood of success on the

10 merits of their claims.  In fact, they don't have any claims.

11 The only claim they have is requesting arbitration.

12        So I'm really confused as to what that likelihood of

13 success would be and how they would meet that because it's

14 undisputed that the content and the email lists and the videos

15 that they want to be preserved to the status quo are owned by

16 RSD.  So it's why we used the same analogy of either an

17 employee or a contractor being terminated and then being asked

18 to have access to information, to emails, to clients, to work

19 product that is owned by the company.  That's exactly what we

20 have here.

21        So the next step, Your Honor, which they haven't talked

22 about is the balance of hardships which we -- the way it's

23 defined is looking at the effect of granting or denying a

24 temporary restraining order on either party -- or on this

25 party.  The effect of a TRO and the effect on RSD would have a

 1  massive impact because, as we detailed, this company's been

 2  around for over 15 years.  They've had a considerable amount of

 3  time developing their client base, securing their intellectual

 4  property, developing their platform, their training.  By

 5  allowing Mr. VanDeHey to have access to that again through

 6  Valentine Life, it would cause a huge likelihood of confusion

 7  as to who it belongs to and with their customer lists.

 8  Allowing him to have access to RSD's assets after what they've

 9  uncovered about his conduct with the finances would be

10  irreparable to the company.  What would he do with that content

11  that belongs to RSD?  What would he do with those email lists

12  that belong to RSD?  And what's why it's problematic and the

13  balance of hardships definitely favors RSD in this case, Your

14  Honor.

15          A case in point.  One of the emails that Mr. VanDeHey

16  is looking for is todd@realsocialdynamics.com.  Real Social

17  Dynamics is a registered trademark of the defendants.

18  Mr. VanDeHey has absolutely no right to that.  We don't have a

19  single license agreement, we don't have a single contract, we

20  don't have a single provision in the Operating Agreement that

21  says these assets owned by RSD can be used by Valentine Life or

22  Mr. VanDeHey.  Not a single one.

23          The final element, Your Honor, would be looking at the

24  public interests in this which a mandatory injunction, which is

25  the relief being sought here, would be against the public's

—————2:17-cv-2230-JAD-NJK - September 8, 2017—————

1   interest because it would allow lawfully terminated contractors

2   to force a company to rehire them.  I think that's the issue we

3   have.  To allow them to have access to assets they do not own,

4   unfettered access.

5          And I think that's where we're at, Your Honor.  I think

6   this is a case strictly about money; about the one asset that

7   Valentine Life does have, which is a bank account with a

8   balance of -- I don't know what it is -- but at one point

9   75,000.  That could be handled during arbitration.  How much

10  Mr. VanDeHey took from the company could be handled at

11  arbitration.  How much he believes he's owed from RSD can be

12  handled at arbitration.  But it's telling that there is no

13  urgency with this because there has been no complaint filed by

14  the -- or arbitration demand by the plaintiff.

15         So, as we sit here, Your Honor, there is no irreparable

16  harm; there's no likelihood of success on the merits; the

17  balance of hardship weighs heavily in RSD's favor; and the

18  public interest at this stage, Your Honor, for a mandatory

19  injunction does not support this type of relief.

20         Your Honor, if you have any questions -- I know you've

21  read everything -- I can -- I'd be more than happy to answer

22  any questions you have.

23         THE COURT:  I don't think I have anymore questions.

24         MR. GUTIERREZ:  Thank you, Your Honor.

25         THE COURT:  Thank you.

—2:17-cv-2230-JAD-NJK - September 8, 2017—

1             MR. PROCACCINI:  Your Honor, may I?

2             THE COURT:  Mr. Procaccini.

3             MR. PROCACCINI:  So, Your Honor, I don't -- I didn't

4    gain much clarity into the probing into this whole mechanism

5    that was used to dissolve Valentine Life.

6             And, at paragraph 30 of Mr. Kho's declaration, which is

7    Exhibit C to the opposition, at page 8 he says, "Section 9

8    [sic] says the company will be dissolved upon Withdrawal of a

9    Shareholder and I withdrew."  So I guess the withdrawn

10   shareholder then files documents with the Secretary of State to

11   appoint himself as President, Treasury, Vice President, and

12   Secretary.

13            THE COURT:  But isn't the whole gist of what

14   happened -- and how it got dissolved and why it got dissolved

15   and who gets what interest out of that -- isn't that what is

16   required to be mediated or arbitrated?

17            MR. PROCACCINI:  It frankly -- no.  It's all issues are

18   required to be mediated or arbitrated.  This -- the affidavit

19   of damages claims a total of $776,000 of unaccountable

20   income -- unaccountable moneys that's to be raised in the

21   arbitration and the mediation.  The irreparable harm, Your

22   Honor, is not quantified in dollars for the destruction of LLC;

23   it's to delay the initiation of the arbitration proceeding.

24            You know, NRS 38.222 empowers the court to provide a

25   provisional remedy to protect the effectiveness of the

——2:17-cv-2230-JAD-NJK - September 8, 2017——

1  arbitra- --

2          THE COURT:  Right.

3          MR. PROCACCINI:  -- the arbitral proceeding.

4          THE COURT:  Right.

5          When I've got somebody who is a party to the arbitral

6  proceeding.  But we don't have an arbitral proceeding yet.

7          MR. PROCACCINI:  Well, Your Honor, we -- when we filed

8  these papers, the intent was to plug a hole in the leak right

9  then and there, you know, as of a conversation on a Friday

10  night supposedly that led to an immediate termination; now we

11  have fraudulent documents filed with the Secretary of State;

12  seizures of bank accounts.  The point was to get to the status

13  quo ante.  The irreparable harm is to not be able to go back to

14  August 9th until all of these issues that seemed to be bubbling

15  up to the surface between these parties can be raised in an

16  arbitration or a mediation.

17          If there's no penalty to filing fraudulently documents

18  with the Secretary of State to seize what plaintiff's counsel

19  just said is the only asset of the company, the bank account,

20  then I don't know what deterrent, you know, there is to any

21  director just removing the board; taking a hundred percent of

22  what they say are the assets; and moving on because now there's

23  nothing left to mediate over.  There's nothing left to

24  arbitrate.  We've killed it; it's dead.  There's nothing to

25  fight over.  Then at that point -- so now we're being told that

1  because we were following the -- because we were seeking

2  emergent injunctive relief to basically prevent any more harm

3  from doing so, we should have filed an arbitration demand?

4  Then they would have had a motion to dismiss here because now

5  we've initiated an arbitration or we would have had a motion to

6  dismiss that because we have a --

7          THE COURT:  What I'm --

8          MR. PROCACCINI:  -- a TRO application.

9          THE COURT:  -- saying is the statute 38.222 is a remedy

10  for relief that a party to an arbitral proceeding --

11          MR. PROCACCINI:  Um-hum.

12          THE COURT:  -- can seek.  And we don't even have one of

13  those parties here yet because we don't have an arbitral

14  proceeding.  And you have an Operating Agreement that has an

15  arbitration provision; right?

16          MR. PROCACCINI:  Followed by a failed mediation

17  provision.  So perhaps, in hindsight, maybe that Monday morning

18  we should have just made a TRO for an arbitration that Monday

19  afternoon.  But we didn't know that the Secretary of State was

20  being advised of a different structure that we had never heard

21  of.  We didn't know that the Bank of America account had been

22  depleted.  At that point, we were agreeing on a mediation but

23  we were seeing that we had a dance partner that had no interest

24  in dancing.  We were being strung along, perhaps, with this

25  false hope that somehow Mr. VanDeHey would be able to actually

1  own a hundred percent of the company that he built from scratch

2  from a former 50 percent ownership interest.

3         And, you know, quite frankly, Your Honor, at that

4  point, time was of the essence.  Time still is of the essence.

5  As each day goes by, it looks more and more bleak that there

6  will be something eventually to fight over.  Right now the

7  patient is sick, but it's not dead.

8         Your Honor, if we're looking at the balance of the

9  hardships to be what RSD would have to do in order to plug this

10  company back in, what information it would have to make

11  available back to Mr. VanDeHey, there is no -- there is no

12  balance there.  There is no irreparable harm.  This is

13  information that Mr. VanDeHey, frankly, doesn't even receive.

14  We're talking about a third-party platform that uses an email

15  list in order to market and sell its products.  There is no

16  exposure to RSD if Mr. VanDeHey came in possession of that

17  information that's provided from that third-party provider.

18         There is no irreparable harm to RSD's trademark as if

19  as though it's inconceivable to have some sort of a sublicense

20  to use your brand where there's a comarketed affiliation, some

21  sort of a joint venture moving forward.  This is Valentine Life

22  in association with RSD on the YouTube channel.  This is smoke

23  and mirrors this whole threat of somehow invalidating the

24  trademark or copyrights of RSD if somehow Valentine Life

25  continues to use the brand that it's been associated with for

1  over three and a half years now.

2       So, Your Honor, if you have any other questions

3  regarding the dissolution of the company or in regard to the

4  irreparable harm.

5       THE COURT:  I don't think I do.

6       MR. PROCACCINI:  Thank you, Your Honor.

7       THE COURT:  Thank you so much.

8       All right, gentlemen.  Thank you for your briefing and

9  for your argument.

10      There are a lot of kind of loose ends here.  And the

11  first for me is the statute, whether I even have the authority

12  or whether this is the right forum for this dispute at this

13  moment in the first place because this is a Operating Agreement

14  that has an arbitration provision -- a mediation then

15  arbitration provision.  It's at Section 11.9 of the Operating

16  Agreement.  And the motion, the Emergency Motion for Temporary

17  Restraining Order and Preliminary Injunction, is frame up for

18  me to start out with NRS 38.222 and that section says that

19  "Before an arbitrator is appointed" -- in an arbitration,

20  essentially -- "and is authorized and able to act, the court,

21  upon motion of a party to an arbitral proceeding and for good

22  cause shown, may enter . . . provisional remedies."

23      And here I'm afraid that maybe we just have the cart

24  before the horse is part of the problem when I get to all of

25  these aspects of the analysis here, but it starts here because

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1   we don't have parties to an arbitral proceeding yet.  We may

2   have maybe parties to a mediation.  I don't know and no one's

3   demonstrated to me that those would be proper parties and that

4   that would trigger for me the ability to act under 38.222.  But

5   it seems that there's more that the parties needed to do here

6   before coming to me to try to seek relief and -- so it's

7   unclear if there's even been a proceeding that has been

8   triggered here, let alone an arbitral one, that would authorize

9   me to act under 38.222.

10          Nevertheless, even assuming that I have the power and

11   authority to provide the relief, this injunctive relief that's

12   requested, I still have to deny the motion.  And the first

13   reason that I have to deny the motion is when I'm applying the

14   *Winter* factors, *Winter v. Nat. Res. Def. Council* -- it's 555

15   U.S. 7; it's a 2008 case -- these are the factors that we all

16   know.

17          We all know that preliminary injunction is an

18   extraordinary remedy never awarded as a right.  I have wide

19   discretion to decide whether to grant preliminary injunctive

20   relief.  The moving party has to show, one, the likelihood of

21   success on the claims; two, irreparable harm without

22   preliminary relief; three, the balance of equities tips in the

23   movant's favor; and, four, that an injunction is in the public

24   interest.

25          The first prong and the first factor at which this

2:17-cv-2230-JAD-NJK - September 8, 2017

1  fails for me is the likelihood of success on the merits of a

2  claim.  And, number one, it's because I don't know what the

3  claims would even be here.  Nobody has -- nobody's pled a

4  claim.  I don't know who is gonna sue who or what the nature of

5  those claims are gonna be.  If it's gonna be usurpation, if

6  it's going to be -- I mean, it sounds like both parties are

7  going to possibly allege usurpation.  But it's so ill-defined

8  at this point that I don't even know what the claims would be

9  that I'm trying to evaluate on their merits.

10        So it's just so premature here, but -- so I think that

11  the plaintiff has not shown a likelihood of success on the

12  merits of a claim, much less that the law and the facts clearly

13  compel that he or Valentine Life and unidentified employees or

14  contractors should be given access to these assets:  these

15  communications websites, social media accounts, business

16  accounts, financial accounts, and funds.

17        First, even setting aside what those claims might be --

18  and just -- if I presume that it's going to involve RSD's

19  alleged breach of the Operating Agreement and the alleged

20  tortious conduct of winding this up possibly fraudulently, as

21  it's alleged -- been alleged here today, I find no evidence

22  from the plaintiff that these assets that he wants the access

23  to are his.  It seems to me that they are Valentine Life's

24  assets.  And who current owns that is unclear to me.

25        It's undisputed that certainly at some point there was

————2:17-cv-2230-JAD-NJK - September 8, 2017————

1   this 50/50 deal between Mr. VanDeHey and RSD in the Valentine

2   Life entity and that it was Valentine Life who has this

3   checking account with Bank of America.  And so I'm troubled to

4   find that it's the plaintiff who has the likelihood of success

5   on claims at this point and that the assets that he wants

6   access to are his and not Valentine Life's.

7            So the evidence that I have seen from the defendants

8   shows that -- and I know it's in some way disputed -- but I

9   haven't seen evidence that the independent contractor agreement

10  terminated with the beginning of the LLC agreement.  I just --

11  I have no evidence to tell me that that independent contractor

12  agreement is dead or ended or no longer valid and that

13  agreement says that -- or provides that confidential

14  information -- like work product, computer software,

15  proprietary data, business operations, marketing and

16  development operations, and customers' information -- is

17  property of RSD.  And the definitions that are provided in that

18  agreement for those items of confidential information seem to

19  be broad enough to me at this point, based on the limited

20  information I have, to cover the assets that are at issue in

21  this case.  And RSD argues that they are and VanDeHey has not

22  provided to me evidence to the contrary.  And the plaintiff

23  does not even -- has not clearly alleged or demonstrated to me

24  that he owns these -- any of these subject assets other than

25  Valentine Life owning of Bank of America checking account.  So

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  I just -- I have an absence of proof to get me to the point

2  where I could find a likelihood of success on the merits of

3  some claim that I'm guessing as to what it might be.

4       He has alleged that the websites and social media

5  accounts were operated by Valentine Life, but I don't think

6  that that's the same thing as being owned by.  And plaintiff

7  had agreed that "he would have no interest in the Confidential

8  Information including, without limitation, no interest in

9  know-how, copyright, trademarks, trade names, notwithstanding

10  the fact that he may have created or contributed to the

11  creation of them."  And, in that Independent Contractor

12  Agreement, he further agreed "to immediately disclose to [RSD]

13  all Confidential Information developed in whole or in part by

14  [him] during the term of [his] Contract with [RSD] and to

15  assign to [Real Social] any right, title or interest [he] may

16  have in it."  He also agreed that upon RSD's request, he would

17  "turn over to [RSD] all documents, disks or other computer

18  media, or other material in [his] possession or

19  control . . . ."

20       So I just can't find that the "likelihood of success on

21  the merits of a claim" prong has been satisfied here.

22       I also can't find that irreparable harm has been

23  demonstrated.  Money "damages" -- as we all know -- "are not

24  traditionally considered irreparable because the injury can

25  later be remedied by a monetary award."  "Those seeking

—————2:17-cv-2230-JAD-NJK - September 8, 2017—————

1  injunctive relief" must do more than just state or argue that

2  they will suffer irreparable harm, they "must proffer evidence

3  sufficient to establish a likelihood of irreparable harm."  The

4  moving party has to show that he will be injured in a way that

5  money cannot remedy.  I don't find that the plaintiff has made

6  this showing.  He argues that Valentine Life's goodwill,

7  advertising efforts, and reputation will be damaged if these

8  assets are not restored.  But he's the plaintiff, not Valentine

9  Life.  And he hasn't -- I don't find that the plaintiff has

10  demonstrated that he personally will suffer irreparable harm,

11  particularly anything that goes beyond money damages or that

12  can't be remedied with money damages at this point.

13          There's certainly the argument on both sides that

14  everybody was talking about buying him out for $75,000.  And

15  so -- I mean, that gives me some indication that we are talking

16  about money here and that whatever injury has occurred to this

17  entity -- because I don't even find that it was injury to him

18  personally based on these allegations and the way that this is

19  framed -- but that it would not be remedied by dollars at this

20  point, by a monetary award.

21          So, because the test for a preliminary injunctive

22  relief under *Winter* requires satisfaction of all of the

23  factors, the failure to satisfy these two is fatal to this

24  motion.  So I am denying the Motion for -- Emergency Motion for

25  a Temporary Restraining Order and Preliminary Injunction.  It

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  is found in the docket at Documents 7 and 8.  So those will be

2  denied.

3        I am not intending to enter a separate order.  The

4  transcript from this case -- from this hearing will be my order

5  and my findings and conclusions are contained on that.

6        MR. GUTIERREZ:  Thank you, Your Honor.

7        MR. PROCACCINI:  Thank you, Your Honor.

8        THE COURT:  Thank you, everyone.  Thank you for your

9  argument.

10     (Proceedings concluded at 2:01 p.m.)

11

12                        --oOo--

13              COURT REPORTER'S CERTIFICATE

14

15     I, FELICIA RENE ZABIN, Official Court Reporter, United

16  States District Court, District of Nevada, Las Vegas, Nevada,

17  do hereby certify that pursuant to 28 U.S.C. § 753 the

18  foreground is a true, complete, and correct transcript of the

19  proceedings had in connection with the above-entitled matter.

20

21  DATED:  September 12, 2017

22                         /s/ **Felicia Rene Zabin**
                        FELICIA RENE ZABIN, RPR, CCR NO. 478
23

24

25

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087