JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: (702) 629-7900
Facsimile: (702) 629-7925
E-mail:     jag@mgalaw.com
            sgk@mgalaw.com

*Attorneys for Defendants Real Social Dynamics, Inc.,
Nicholas Kho, and Owen Cook*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| TODD VANDEHEY, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>REAL SOCIAL DYNAMICS, INC., a Nevada corporation; NICHOLAS KHO, an individual; OWEN COOK, an individual,<br><br>Defendants. | Case No.: 2:17-cv-02230-JAD-NJK<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY OMNIBUS MOTION (1) FOR EXPEDITED DISCOVERY AND (2) TO AMEND THE COMPLAINT** |

Defendants REAL SOCIAL DYNAMICS, INC. ("RSD"), NICHOLAS KHO ("Kho"), and OWEN COOK ("Cook") (collectively "Defendants"), by and through their attorneys, the law firm of MAIER GUTIERREZ & ASSOCIATES, hereby file this opposition ("Opposition") to Plaintiff TODD VANDEHEY'S ("Vandehey") emergency omnibus motion for expedited discovery and to amend the complaint [ECF Nos. 28 and 32] on the grounds that it is in direct contravention to the alternative dispute resolution clause within the operating agreement Vandehey has maintained as valid in both his prior written motions and in oral argument.

///

///

///

1

1    This Opposition is made and based upon the following memorandum of points and

2 authorities, the exhibits attached hereto, the papers and pleadings on file in this matter, and any

3 argument of counsel to be made at the time of the hearing.

4    DATED this 2nd day of October, 2017.

5                                        Respectfully submitted,

6                                        **MAIER GUTIERREZ & ASSOCIATES**

7

8                                        /s/ *Steven Knauss*

JOSEPH A. GUTIERREZ, ESQ.
9    Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
10   Nevada Bar No. 12242
*Attorneys for Defendants Real Social Dynamics,*
11   *Inc., Nicholas Kho, and Owen Cook*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   STATEMENT OF FACTS

In his emergency omnibus motion, Vandehey seeks two remedies. First, he requests expedited discovery to ascertain the facts and circumstances regarding alleged unauthorized access to Gmail and Hotmail email accounts, as well as a PayPal account, used by Vandehey. Second, he asks to amend his original complaint.

Leaving aside the frivolity of the allegations of unauthorized account access, which Vandehey simply describes and concedes as "suspicious activity", any leave taken to amend the Complaint in this case is improper because the parties have not yet fulfilled their obligations to participate in arbitration. *See* Declaration of Ondrej Krehel [ECF No. 31 and 35]. Without first complying with the arbitration terms of the Operating Agreement for Valentine Life, LLC, any action in furtherance of discovery or amendment of the complaint is premature at best, and bad faith at worst. *See* Operating Agreement of Valentine Life, LLC, attached as **Exhibit "A"**.

There is no question that the arbitration clause of the Valentine Life, LLC Operating Agreement is valid and enforceable because Vandehey admitted as much in both his complaint, his prior motion for a preliminary injunction, and then in oral argument before this Court:

19. Valentine Life is governed by the Operating Agreement.
20. The Operating Agreement provides in relevant part: …

Section 11.9 <u>Mediation/Arbitration – Dispute Resolution</u>. Any controversy or claim arising out of or relating to this Agreement or breach thereof shall first be submitted to mediation with a retired judge. If either party fails engage [sic] in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation. In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County. [T]he parties hereby consent to the jurisdiction of the Superior Court for Clark County, Nevada, and of the United States District Court for the Central District of Nevada, for injunctive relief, specific performance or other relief in aid of any proceedings hereunder, but not otherwise…

115. On or about August 17, 2017, the Parties agreed to invoke Section 11.9 of the Operating Agreement that provides "[any] controversy or claim arising out of or relating to [the Operating] Agreement" shall be submitted to mediation and if mediation fails, to arbitration.

120. ***The assets of Valentine Life are the subject matter of the parties' mediation/arbitration***.

*See* Vandehey Complaint [ECF No. 1] (emphasis added). Then, in his prior emergency motion, Vandehey clearly requests enforcement of the arbitration clause:

> Valentine Life is governed by an operating agreement dated October 5, 2015.
>
> Under Section 11.9 of the Operating Agreement, the parties are required to submit [a]ny controversy or claim arising out of or relating to [the Operating] Agreement to mediation and if mediation fails, to submit to arbitration. ***Pursuant to 11.9 of the Operating Agreement, Plaintiff and Defendants have agreed to do so***.

*See* Vandehey Emergency Motion for Preliminary Injunction [ECF Nos. 7 and 8] (emphasis added). Even within Vandehey's own draft of the proposed Order on his Emergency Motion in August, 2017, Vandehey requests this Court to explicitly enforce the arbitration clause of the operating agreement against the parties:

> **IT IS FURTHER ORDERED** that since the parties have advised the Court that they have agreed to mediate the dispute pursuant to Section 11.9 of the Operating Agreement, if that mediation is not completed by October 31, 2017 (unless that date is extended by mutual consent of the parties), they shall proceed to arbitration in accordance with that provision, unless any party has submitted a request to the other party(ies) to commence arbitration before that date.

*See* Vandehey Emergency Motion for Preliminary Injunction [ECF Nos. 7 and 8].

Without question, Vandehey has consistently maintained the validity and outright expectation that the parties **<u>must</u>** comply with the arbitration provision of Section 11.9 of the Valentine Life LLC Operating Agreement. However, now armed with little more than untenable suspicions and unsupported allegations, Vandehey is seeking to bypass the very legal mechanism he previously argued to enforce.

## II. LEGAL ARGUMENT

### A. THE PARTIES MUST FIRST PARTICIPATE IN ARBITRATION PRIOR TO SEEKING ANY OTHER REMEDY IN THIS CASE.

Courts are obliged to enforce a parties' agreement to arbitrate according to its terms. *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 680, 130 S.Ct. 1758, 1772 (2010). Except where evidence of enforceability or revocability exists, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 1745 (2011).

It is overwhelming clear that Vandehey holds the Operating Agreement, and the arbitration provision specifically, as valid and enforceable. He admitted the agreement as an exhibit in his complaint; he asked to enforce the arbitration clause in his emergency motion in August of 2017; and he even proposed an order for the Court requiring the parties comply with the arbitration provision.

Defendants are looking to hold Vandehey to his prior statements, and request this Court allow the parties to follow through with arbitration. To allow Vandehey to continue to pursue a futile strategy, when the parties have clearly consented to alternative dispute resolution, is a waste of this Court's time and resources.

**B.  ALL REMAINING RELIEF AVAILABLE TO VANDEHEY CAN BE SOUGHT AT ARBITRATION.**

On September 8, 2017, this Court denied Vandehey's emergency motion for a temporary restraining order and injunctive relief, finding no irreparable harm was committed against Vandehey. As a result, the only relief now available to Vandehey is monetary. Accordingly, an arbiter can and should adjudicate all the disputes remaining in this matter.

Pursuant to Section 11.9 of the Valentine Life, LLC Operating Agreement, Defendants have submitted an arbitration demand to JAMS as of September 28, 2017. *See* Statement of Demand for Arbitration, attached as **Exhibit "B"**. The matter is awaiting appointment of an arbitrator and Defendants will participate in all arbitration steps in good faith.

### III.  CONCLUSION

Based on the foregoing, Defendants respectfully request this Court deny Plaintiff's emergency omnibus motion in its entirety and order the parties to arbitration pursuant to Section 11.9 of the Valentine Life, LLC Operating Agreement.

DATED this 2nd day of October, 2017.

Respectfully submitted,

MAIER GUTIERREZ & ASSOCIATES

/s/ *Steven Knauss*

JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
*Attorneys for Defendants Real Social Dynamics, Inc., Nicholas Kho, and Owen Cook*

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Maier Gutierrez & Associates, and that on the 2nd day of October, 2017, a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY OMNIBUS MOTION (1) FOR EXPEDITED DISCOVERY AND (2) TO AMEND THE COMPLAINT** was electronically filed with the Clerk of the Court using the Court's CM/ECF system, and served to all parties and counsels of record registered to receive CM/ECF notifications.

_/s/ Charity Johnson_
An employee of MAIER GUTIERREZ & ASSOCIATES

# Exhibit "A"

# Operating Agreement of Valentine Life, LLC

# OPERATING AGREEMENT FOR

# VALENTINE LIFE, LLC

# A NEVADA CORPORATION

THE OWNERSHIP INTERESTS IN VALENTINE LIFE, LLC (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN ARTICLE 8 OF THIS AGREEMENT AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS THEREOF. THEREFORE, PURCHASERS OF THE INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME. THE INTERESTS HAVE NOT BEEN REGISTERED: (1) UNDER ANY STATE SECURITIES LAWS (THE "STATE ACTS"); (2) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"); OR (3) UNDER THE SECURITIES LAWS OF ANY FOREIGN JURISDICTION (THE "FOREIGN ACTS"), AND NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 8 OF THIS AGREEMENT AND: (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACTS OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE FOREIGN ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER ANY APPLICABLE FOREIGN ACTS OR FOR WHICH SUCH REGISTRATION IS NOT OTHERWISE REQUIRED.

# OPERATING AGREEMENT FOR
# VALENTINE LIFE, LLC
# A NEVADA LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (this "Agreement") for VALENTINE LIFE, LLC(the "Company") is entered into by and between Real Social Dynamics Inc, a Nevada Corporation ("RSD"), as one Shareholder, Todd VanDeHey ("VanDeHey") as another Shareholder and such other parties as listed on Exhibit A attached hereto (together, the "Shareholders").

WHEREAS, the Company filed, on September 15, 2015, the Articles of Organization of VALENTINE LIFE, LLCwith the Secretary of State of the State of Nevada, a copy of which is attached hereto as Exhibit B; and

WHEREAS, the Shareholders desire to adopt an Operating Agreement to govern their respective rights and obligations as Shareholders of the Company and to set forth certain procedures for the governance of the Company.

NOW, THEREFORE in consideration of the premises, the mutual promises and obligations contained herein, and with the intent of being legally bound, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the capitalized words and phrases have the meanings set forth below:

Section 1.1    "Adjusted Capital Contribution" means, as of any day, a Shareholder's Capital Contribution(s) adjusted by distributions under Article 5.

Section 1.2    "Affiliate" has the meaning set forth in the Securities Exchange Act of 1934, as amended.

Section 1.3    "Agreement" means this Operating Agreement, as amended from time to time.

Section 1.4    "Business Day" means any Monday through Friday, excluding federal national holidays.

Section 1.5    "Capital Account" means with respect to each Shareholder the amount of money contributed by such Shareholder to the capital of the Company, increased by the aggregate fair market value (as determined by the Shareholders) of all property contributed by such Shareholder to the capital of the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), the aggregate amount of all Net Profits allocated to such Shareholder, and any and all items of gross income or gain specially allocated to such Shareholder pursuant to Section 4.1,

and decreased by the amount of money distributed to such Shareholder by the Company (exclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to such Shareholder), the aggregate fair market value (as determined by the Shareholders) of all property distributed to such Shareholder by the Company (net of liabilities secured by such distributed property that such Shareholder is considered to assume or take subject to under Section 752 of the Code), the amount of any Net Losses charged to such Shareholder, and any and all "nonrecourse deductions" specially allocated to such Shareholder pursuant to Article 4.

Section 1.6    "Cash Flow" means the excess, if any, of all cash receipts of the Company as of any applicable determination date in excess of the sum of (a) all cash disbursements (inclusive of any reimbursements made to any Shareholder and any repayment of loans made to any Shareholder, but exclusive of distributions to the Shareholders in their capacity as such) of the Company prior to that date, plus (b) any cash reserve, determined by the Shareholders, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide the funds therefore, or as otherwise established by the Shareholders under Section 5.3 of this Agreement.  Cash Flow shall be determined and distributed at such times as the Shareholders determine that funds are available therefore, taking into account the reasonable business needs of the Company.

Section 1.7    "Capital Contribution(s)" means, with respect to any Shareholder, the amount of money contributed to the Company.

Section 1.8    "Company" means VALENTINE LIFE, LLC, a Nevada limited liability company.

Section 1.9    "Company Property" means all real and personal property owned by the Company (including cash) and any improvements thereto, and shall include both tangible and intangible property.

Section 1.10    "Interest" means all of a Shareholder's interest in the Company held pursuant to Section 2.7 hereof, including any and all benefits to which the Shareholder may be entitled as provided in this Agreement, together with all obligations of the Shareholder to comply with the terms and provisions of this Agreement.

Section 1.11    "IRC" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

Section 1.12    "Liquidation" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining balance to the Shareholders).

Section 1.13    "Liquidating Event" has the meaning set forth in Section 9.1 hereof.

Section 1.14    "Manager" means any Person designated or elected to manage the Company pursuant to Section 6.1 of this Agreement.

Section 1.15    "Shareholder" means any Person that becomes a Shareholder pursuant to the terms of this Agreement.

Section 1.16   "<u>Net Profits and Net Losses</u>" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss); provided, however, for purposes of computing such taxable income or loss, (i) such taxable income or loss shall be adjusted by any and all adjustments required to be made in order to maintain Capital Account balances in compliance with Treasury Regulations Section 1.704-1(b) and (ii) any and all items of gross income or gain and/or partnership and/or partner "nonrecourse deductions" specially allocated to any Shareholder pursuant to Section 4 shall not be taken into account in calculating such taxable income or loss.

Section 1.17   "<u>Percentage Interest</u>" means the percentage interest of each Shareholder as set forth on the attached <u>Exhibit A</u>, as amended from time to time in accordance with this Agreement.

Section 1.18   "<u>Permitted Transfer</u>" has the meaning set forth in Section 8.1 hereof.

Section 1.19   "<u>Person</u>" means any individual, partnership, corporation, trust, or other entity.

Section 1.20   "<u>Profits</u>" and "<u>Losses</u>" means the Company's net taxable income or loss, as calculated for federal tax purposes.

Section 1.21   "<u>Statute</u>" means the provisions of the Nevada Revised Statutes as set forth in Title 7, Chapter 86 of the State of Nevada, as amended from time to time (or any corresponding provisions of succeeding law).

Section 1.22    "<u>Term</u>" has the meaning set forth in Section 2.4.

Section 1.23   "<u>Transfer</u>" means the voluntary or involuntary, direct or indirect, assignment, sale, pledge, gift or other conveyance of any legal or beneficial interest in an Interest.

Section 1.24   "<u>Treasury Regulations</u>" means any proposed, temporary, and/or final federal income tax regulation promulgated by the United States Department of the Treasury as heretofore and hereafter amended from time to time (and/or any corresponding provisions of any superseding revenue law and/or regulation).

ARTICLE 2
FORMATION OF COMPANY

Section 2.1    <u>Formation</u>.  The Shareholders have formed the Company pursuant to the provisions of the Statute by causing Articles of Organization conforming to the requirements of the Statute to be filed with the Secretary of State of the State of Nevada.

Section 2.2    <u>Name</u>.  Unless and until amended in accordance with this Agreement and the Statute, the name of the Company is VALENTINE LIFE, INC.

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

Section 2.3     <u>Purpose</u>.

(a)     The purpose of the Company is to engage in any lawful activities for which a limited liability company may be organized under the Statute, provided that the Corporation shall not conduct any banking, insurance or trust company business. Specifically, the Company has been formed as a Corporation.

(b)     The Company may engage in any other lawful business activity permitted by the Statute subject to the unanimous written agreement of the Shareholders.

Section 2.4     <u>Term</u>. The term (the "<u>Term</u>") of the Company commenced on May1, 2015 and shall continue until the termination of the Company in accordance with Article 9 of this Agreement.

Section 2.5     <u>Principal Place of Business</u>. The principal place of business of the Company shall be in Las Vegas, NV, USA, or at such other place as the Shareholders shall from time to time designate in writing.

Section 2.6     <u>Agent for Service of Process</u>. Until such time as the Shareholders have appointed a different person in the State of Nevada to act as the agent of the Company for service of process, the agent for service of process for the Company shall be in Nevada.

Section 2.7     <u>Shareholders and Interests</u>. The names and addresses of each Shareholder, and the Percentage Interests issued to each Shareholder, are set forth on the attached <u>Exhibit A</u>.

Section 2.8     <u>Independent Activities; Transactions with Affiliates</u>.

(a)     The Shareholders shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and it shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its sole discretion.

(b)     Each Shareholder acknowledges that the other Shareholders and their Affiliates are free to engage or invest in an unlimited number of activities or businesses, any one or more of which may be related to the activities or businesses of the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Shareholder, and neither this Agreement nor any activity undertaken pursuant to this Agreement shall prevent any Shareholder from engaging in such activities, or require any Shareholder to permit the Company or any Shareholder to participate in any such activities.

(c)     To the extent permitted by applicable law and except as otherwise provided in this Agreement, the Shareholders are hereby authorized to purchase property from, sell property to, or otherwise deal with the Company, provided that any such purchase, sale or other transaction is unanimously agreed upon in writing by the Shareholders and is in the ordinary course of the Company's business and shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase, or other transaction had been entered into with an independent third party.

ARTICLE 3
SHAREHOLDERS' CAPITAL CONTRIBUTIONS

Section 3.1    Contributions. The names, addresses, Capital Contributions, Units and Percentage Interests of the Shareholders are set forth on Exhibit A.

Section 3.2    Interest On and Return of Capital.  No Shareholder shall receive any interest, salary or drawing with respect to its Capital Contributions or for services rendered on behalf of the Company or otherwise in its capacity as Shareholder, except as may be provided in this Agreement.  No Shareholder shall have the right to demand or receive property other than cash (and then only in accordance with this Agreement) in return for its Capital Contribution.

Section 3.3    Loans from Shareholders or Affiliates.  A Shareholder, or an Affiliate of a Shareholder, may make a loan to the Company on such terms and conditions as the Shareholders unanimously determine to be fair and reasonable in their sole discretion.

Section 3.4    Additional Capital Contributions.  Other than contributions by additional Shareholders, no Shareholder shall be required to make any Capital Contributions to the Company in excess of the amounts set forth in Exhibit A without the unanimous consent of all of the Shareholders which any such Shareholder may grant or withhold, condition or delay, in its sole and absolute discretion.

Section 3.5    Additional Shareholders.  The Shareholders shall not admit additional Persons as additional Shareholders under any circumstances.

ARTICLE 4
ALLOCATIONS

Section 4.1    Profits.  Profits for any taxable year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and in the reverse order and to the extent of, the aggregate Losses allocated to the Shareholders pursuant to Section 4.2 below for all periods, until the aggregate Profits allocated to the Shareholders pursuant to this Section 4.1(a) for all periods equals such aggregate Losses; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.2    Losses.  Losses for any tax year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and to the extent of, their respective positive Capital Account balance; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

DocuSign Envelope ID: 5A8B20EE-BE5E-47EB-8D32-788034183202

Section 4.3     Limitation on Loss Allocations.  Notwithstanding any other provisions of this Agreement, no allocation of Net Losses shall be made to any Shareholder to the extent such an allocation would cause or increase a deficit balance standing in such Shareholder's Capital Account (in excess of such Shareholder's allocable share of minimum gain and after taking into account any adjustments set forth in Treasury Regulation Section 1.704(b)-1(b)(2)(ii)(d)) and any such Net Losses shall instead be allocated to the Shareholders based upon their respective "interests" in the Company as determined in accordance with Treasury Regulation Section 1.704-1(b).  In addition, items of income and gain shall be specially allocated to the Shareholders in accordance with the qualified income offset provisions set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

Section 4.4     Cumulative Allocations.  The effect of the limitation on the amount of Net Losses and the qualified income offset provisions set forth in the first two (2) sentences of Section 4.3 above shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Article 4, so that the net amount of any items so allocated and the Net Profits, Net Losses and all other items allocated to each Shareholder pursuant to this Article 4 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Shareholder pursuant to the provisions of this Article 4 if such special allocations had not occurred.

Section 4.5     Differing Tax Basis; Tax Allocations.  Depreciation and/or cost recovery deductions and gain or loss with respect to each item of property treated as contributed to the capital of the Company shall be allocated among the Shareholders for federal income tax purposes in accordance with the principles of Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, and for state income tax purposes in accordance with comparable provisions of any applicable state law and the regulations promulgated thereunder, so as to take into account the variation, if any, between the adjusted tax basis of such property and its book value (as determined for purposes of the maintenance of Capital Accounts in accordance with this Agreement and Treasury Regulation Section 1.704-1(b)(2)(iv)(g)).

Section 4.6     Other Special Allocations.  The Company shall make other special allocations required or permitted in the Treasury Regulations under Section 704 of the Code after consultation with the Company's tax advisors so as to carry out the economic arrangement provided for in this Agreement and to have the Company's allocations respected for tax purposes.

ARTICLE 5
DISTRIBUTIONS

Section 5.1     Cash Flow.  Cash Flow, if any, shall be distributed at such dates as determined by unanimous written consent of the Shareholders to the Shareholders in proportion to their respective Percentage Interests. RSD and VanDeHey shall be sole signatories on the Company Bank Account.

Section 5.2     <u>Amounts Withheld</u>.  All amounts withheld or paid as taxes pursuant to any provision of tax law with respect to any payment, distribution or allocation to the Company or the Shareholders shall be treated as amounts distributed to the Shareholders pursuant to this Article 5 for all purposes under this Agreement.  The Company is authorized to withhold from distributions to the Shareholders to pay over to (or reimburse the Company for) any amounts required to be so withheld or paid and shall allocate any such amounts to the Shareholders with respect to which such amount was withheld.

Section 5.3     <u>Contingency Reserves</u>.   The Shareholders may establish cash reserves (whether or not reflected on the financial statements) as the Shareholders unanimously determine to be reasonable in connection with the operation of the Company business.

ARTICLE 6
<u>MANAGEMENT</u>

Section 6.1     <u>Manager</u>.   The Company shall be managed by RSD and VanDeHey. Meetings of the Manager shall be required annually.

Section 6.2     <u>Manager of Operational and Day-to-Day Business and Affairs</u>.   The operational and day-to-day business and affairs of the Company shall be operated and managed jointly by RSD and Todd VanDeHey.  RSD and VanDeHey are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that RSD and VanDeHey shall not take any action, make any determination or provide any consent expressly reserved by Section 6.4 of this Agreement to the Shareholders.  No Shareholder, other than RSD or VanDeHey (subject to the terms of this Agreement), shall, acting individually, have the power to sign or bind the Company unless duly authorized to do so by unanimous written consent of the Shareholders. Notwithstanding the foregoing, RSD and VanDeHey shall have no liability to the Shareholders or the Company for exceeding the authority granted to him in the event a decision made or an action taken by him was made or taken with a reasonable good faith belief that such decision or action was (i) within the scope of the operational and day-to-day business and affairs of the Company and (ii) not prohibited by the terms of this Agreement.

Section 6.3     <u>Corporate Sponsorship, and Event Planning</u>.  VanDeHey and RSD shall jointly be the manager of event planning, which shall include but not be limited to planning and putting on live seminars, field trips, making DVDs, writing books and creating any other such content and media in his good faith belief will further the success of the Company. In addition, VanDeHey will be the manager of corporate sponsorship, which shall include but not be limited to obtaining advertising fees from corporations, creating marketing creative, managing marketing campaigns, and fundraising for non-profit organizations. RSD will be the manager jointly and unanimously with VanDeHey, which shall include but not be limited to information technology for managing Shareholders, communication with speakers for live events, financial management tuition, and monitoring Shareholders' communication. VanDeHey and RSD are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that VanDeHey and RSD shall not take any action, make any determination or provide any consent with regard

7

solely to the content and marketing operations expressly reserved by Section 6.4 of this Agreement to the Shareholders. .

Section 6.4    Actions Expressly Reserved to the Shareholders.  Notwithstanding the authority granted to RSD in Section 6.2 above, RSD may not do or permit to be done any of the following without the unanimous written consent of the Shareholders:

(a)    Any act or thing which the Act or this Agreement requires to be approved, consented to or authorized by all the Shareholders;

(b)    Voluntarily cause the dissolution of the Company;

(c)    Sell all or a significant part of the Company assets, or engage in any material recapitalization or merger;

(d)    Incur any liabilities in excess of $50,000; or

(e)    File any lawsuit or proceedings.

Section 6.5    No Liability of Shareholders. All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Shareholder shall be obligated personally for any such debt, obligation or liability of the Company.

Section 6.6    Rights and Prohibitions of the Shareholders.

(a)    Except as otherwise restricted herein, the Shareholders shall be entitled to the rights provided by the Act and to such other rights as are expressly set forth elsewhere herein.

(b)    Except as otherwise expressly provided for in this Agreement, the Shareholders shall not have the right:

(i)    to have their Capital Contributions returned until such time as the Company is terminated and liquidated and all Company liabilities have been paid or funds have been set aside therefore, and then only in accordance with the provisions of this Agreement;

(ii)    to sell or assign their Interests in the Company except in accordance with Article 8 hereof;

(iii)    to withdraw or reduce their Capital Contributions; or

(iv)    to demand or receive property other than cash in return for their Capital Contributions.

Section 6.7    Limitation of Liability.  In carrying out its obligations hereunder, the Shareholders shall not be liable to the Company or to the Shareholders for: (a) errors of judgment; (b) any mistake of fact or of law; (c) any actions undertaken in good faith and believed to be either in furtherance of the Shareholders' obligations under this Agreement or in

8

the best interests of the Company; or (d) any actions taken pursuant to advice of counsel to the Company.

Section 6.8    Indemnification.    The Company, to the extent of its assets, hereby indemnifies the Shareholders against, and agrees to hold, save, and defend same wholly harmless from, any loss, expense, damage, or liability (including attorneys' fees and costs of litigation) suffered or incurred by any of them by reason of anything which the Shareholders may in good faith do or refrain from doing for and on behalf of the Company; provided, however, that the Company shall not be required to indemnify the Shareholders for any loss or damage that the Shareholders may incur as a result of intentional misconduct, gross negligence, fraud, or a knowing violation of law, or for any transaction for which such Shareholders received a personal benefit in violation or breach of any provision of this Agreement.

ARTICLE 7
ACCOUNTING

Section 7.1    Books and Records.    The Company's books of account shall be maintained and kept at the Company's principal place of business.  The Company's accounting period shall be the calendar year.

Section 7.2    Tax Information.    Necessary tax information shall be delivered to each Shareholder within ninety (90) days after the end of each tax year of the Company.

ARTICLE 8
RESTRICTION ON TRANSFER OF CORPORATION INTERESTS

Section 8.1    Transfer or Assignment of Interests.    No transfer, sale, hypothecation, pledge, encumbrance, assignment or other disposition (each of the foregoing, a "Transfer") of a Shareholder's Interest, or any part thereof, will be valid without the unanimous consent of the other Shareholder.  Any Transfer of an Interest, including an involuntary Transfer, which does not satisfy the requirements of this Section 8.1 shall be subject to the provisions of Section 8.3 hereof; provided, however, that any Transfer by a Shareholder to a trust or other entity wholly owned by or established for the benefit of such Shareholder, or to a parent, spouse, sibling or descendant of such Shareholder or to a trust established exclusively for the benefit of one or more of such Persons (any such Transfer, a "Permitted Transfer"), shall not require consent pursuant to this Section 8.1.

Section 8.2    Right of First Refusal Upon Sale.    Other than with respect to Permitted Transfers, in the event that any Shareholder receives a bona fide offer for the purchase and sale of all or any portion of such Shareholder's Interest, the Shareholder shall first offer to sell such Interest or portion thereof to the other Shareholders and to the Company in accordance with the provisions of this Section 8.2.

(a)    Notice of Offer to Sell.    Promptly following the receipt of an offer to purchase all or any portion of his, her or its Interest, a Shareholder shall deliver a written notice (the "Sale Notice") to the Corporation and the other Shareholders stating (i) such Shareholder's bona fide intention to sell his, her or its Interest, (ii) the name and address of the proposed

9

transferee, (iii) the Interest or portion thereof to be sold, and (v) the purchase price and terms of payment upon which the Shareholder proposes to sell such Interest.

(b)    <u>Election to Exercise Right of First Refusal</u>  Within 30 days after receipt of the Sale Notice, each non-selling Shareholder shall notify the Manager in writing of his, her or its desire to purchase a portion of the Interest subject to the Sale Notice.  The failure of any Shareholder to so notify the Manager within the applicable period shall constitute an election on the part of that Shareholder not to purchase any portion of the Interest subject to the Sale Notice. Each Shareholder so electing to purchase shall be entitled to purchase a portion of such Interest in the same proportion that the Percentage Interest of such Shareholder bears to the aggregate of the Percentage Interest of all of the Shareholders electing to so purchase the Interest subject to the Sale Notice.  In the event any Shareholder elects to purchase none or less than all of his, her or its pro rata share of such Interest, then the other Shareholders can elect to purchase more than their pro rata share.  If such Shareholders fail to purchase the entire Interest subject to the Sale Notice, the Company may purchase any remaining share of such Interest.

(c)    <u>Exercising Right of First Refusal</u>..  Within 90 days after receipt of the Sale Notice, the Company and the Shareholders electing to purchase the Interest subject to the Sale Notice shall exercise his or its first right to purchase or obtain such Interest upon the price and terms of payment designated in the Sale Notice by providing written notice to the other Shareholder of his election to purchase.  If the Sale Notice provides for the payment of non-cash consideration, the Company and the purchasing Shareholders each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered, as determined by the Managers or, in the absence of an agreement among the Managers as to such value, by a nationally recognized firm of appraisers jointly selected by the Manager.  If the third party offer is all cash paid at the close of escrow, the Shareholder or company shall have the right to pay for the purchase on reasonable terms over a period not to exceed one year by executing a promissory note with interest at 6% per annum with monthly payments of principal and interest, no prepayment penalty so long as the electing Shareholder or company puts up its memebership interest as collateral until the sale is completed.

(d)    <u>Lapse of Right of First Refusal</u>.  If the Company or the other Shareholders elect not to purchase or obtain all of the interest subject to the Sale Notice, then the selling Shareholder may sell the Interest described in the Sale Notice to the proposed transferee, provided such sale (i) is completed within 30 days after the expiration of the Company and the other Shareholders' right to purchase such Interest, (ii) is made on terms no less favorable to the selling Shareholder than as designated in the Sale Notice, and (iii) the requirements of Section 8.1 have been met.  If such interest is not so sold, the selling Shareholder must give notice in accordance with this Section 8.2 prior to any subsequent sale of such Shareholder's Interest.

Section 8.3    <u>Buyout Option</u>

(a)    <u>Buyout Notice</u>.  Any Shareholder (a "Remaining Shareholder") or its designated Affiliate shall have the right (the "Buyout Option") to purchase all, but not less than all, of the Interest of any other Shareholder (a "Departing Shareholder") in the event the Departing Shareholder Transfers any portion of such Shareholder's Corporation Interest other

DocuSign Envelope ID: 5A8B20EE-BE5E-47EB-8D32-788034183202

than as permitted pursuant to Section 8.1 hereof ( "Buyout Event 1")., or if the Shareholders are deadlocked for a period of at least 30 days on any decision requiring unanimous consent of the Shareholders ("Buyout Event 2").  Under Buyout Event 2 the Shareholder making the offer shall be called the Tendering Shareholder and the other Shareholder will be called the Responding Shareholder

(b)     Within 30 days of receipt of notice of  Buyout Event 1, the Remaining Shareholder shall give written notice (the "Buyout Notice") to the Departing Shareholder of the Remaining Shareholder's desire to purchase the Departing Shareholder's Company Interest.  In the event that there is more than one Remaining Shareholder at the time a Buyout Event occurs, the Remaining Shareholders shall be entitled to exercise the Buyout Option pro rata in accordance with their respective Percentage Interests.

(c)     Within thirty days (30) of receipt of the notice of Buyout Event 2, the Responding Shareholder shall have the right to elect, by delivery of written notice to the Tendering Shareholder no later than thirty (30) days following receipt of such offer by the Responding Shareholder, to either (i) sell its Ownership Interest to the Tendering Shareholder pursuant to the terms of the Offer or (ii) purchase the Ownership Interest of the Tendering Shareholder pursuant to the terms of the Offer. If the Responding Shareholder does not make such election, by written notice to the Tendering Shareholder, within thirty (30) days, then the Responding Shareholder shall be deemed to have elected to sell its Ownership Interest to the Tendering Shareholder.

(d)     <u>Purchase Price of the Shareholder's Company Interest</u>.  The purchase price of the Shareholder's Interest shall be the Fair Market Value thereof.  For purposes hereof, the "Fair Market Value" of such Interest shall be such value as is mutually agreed upon among the Shareholders but shall take into consideration all inventory, accounts receivable, and cash on hand and its subsidiaries as of the date of the notice, together with a schedule of all debt of the Corporation and its subsidiaries,; provided, however, that in the event that the Shareholders are unable to agree upon a Fair Market Value within 30 days of the date of either Buyout Notice, the Fair Market Value shall be determined by an independent appraiser affiliated with a nationally recognized firm of accountants, appraisers or investment bankers and selected by the Manager in the exercise of their reasonable discretion.  The appraiser shall render a written report setting forth its determination of Fair Market Value as promptly as possible..  In making such determination, the appraiser shall value the Company as a going concern and shall take into consideration (i) the transferability and liquidity of the Departing Shareholder's Interest, (ii) the fact that additional capital may be required, from time to time, in connection with the business of the Company, and (iii) the economic risk and liability associated with the ownership of such Interest.  Absent manifest error, the appraiser's determination of Fair Market Value shall be final and binding on all parties.  The fees and expenses of any appraiser shall be paid by the Company.

(e)     <u>Exercise Terms</u>.  The Buyout Notice, which shall be served by certified mail, return receipt requested, shall specify the date on which the Transfer pursuant to an exercise of the Buyout Option shall be consummated, which date shall be no earlier than 30 days nor later than 90 days from the date of the Buyout Notice, unless otherwise agreed by the Remaining Shareholder and the Departing Shareholder, or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder.  Except as may be

otherwise agreed by the Remaining Shareholder and the Departing Shareholder or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder, the Shareholder purchasing the other Shareholder's Ownership Interest shall pay at least 20% of the purchase price in cash, with the balance of the purchase price payable pursuant to a promissory note bearing interest at 110% of the then current applicable federal rate for mid-term obligations (as determined pursuant to Section 7872 of the Code). Such note shall be payable in equal installments of principal and interest over a period not to exceed five years. Any such promissory note may be prepaid at any time without premium or penalty. The Shareholder selling his Interest shall be transferred free and clear of all liens and encumbrances and, except as otherwise provided, the selling Shareholder shall be released at the closing from any guarantees, obligations, liabilities or similar undertakings to third parties given by such Shareholder on behalf of the Company.

(f)     Further Cooperation.  On the closing of the purchase and sale of the Departing Shareholder's Company Interest, or in the case of Buyout Event 2, between selling Shareholder's Company Interest pursuant to an exercise of the Buyout Option, each Shareholder shall execute, acknowledge and deliver to each other Shareholder such instruments, and take such actions, as each Shareholder may reasonably request in order to effect the purchase and sale of the Company Interest pursuant to the terms and conditions of this Section 8.3.

(g)     Company Option.  In the event the Remaining Shareholder under Buyout Event 1 elects not to exercise any of its rights under this Section 8.3, the Company, at its election, may assume such rights.

Section 8.4     Void Transfers.  If the Managers determine in their sole discretion that any Transfer would cause the termination of the Company under the Code, then such Transfer shall be null and void.

Section 8.5     Substitution of Shareholders.  A transferee of an Interest shall become a substitute Shareholder, provided that (i) the Transfer was valid under Section 8.1 hereof and not voided by the Manager pursuant to Section 8.4 hereof, (ii) the transferee has become a party to this Agreement, and (iii) the transferee pays any reasonable expenses in connection with his, her or its admission as a Shareholder.  A transferee who becomes a substituted Shareholder has, to the extent transferred, all of the rights, powers and duties of a Shareholder under this Agreement and the Statute.

Section 8.6     Subsequent Transfers Subject to Terms of Agreement.  After the consummation of any Transfer of any part of an Interest, the Interest or portion thereof so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions hereof.

Section 8.7     Purchase Terms Varied by Agreement.  Provided that the restrictions set forth in this Agreement have been satisfied, nothing contained herein is intended to prohibit Shareholders from agreeing upon other terms and conditions for the purchase by the Company or any other Shareholder of the Interest (or any portion thereof) of any Shareholder desiring to retire, withdraw or resign.

Section 8.8    Spousal Consent.  Each Shareholder who is married as of the date hereof or who subsequently becomes married shall obtain his or her spouse's signature to a spousal consent.

ARTICLE 9
DISSOLUTION, LIQUIDATION AND TERMINATION

Section 9.1    Liquidating Events.  Except as otherwise provided herein, the Company shall be dissolved, liquidated and terminated upon the occurrence of any of the following events ("Liquidating Events"):

(a)    the bankruptcy of RSD or VanDeHey;

(b)    the disposition by the Company of all or substantially all of its right, title and interest in and to its assets; provided, however, that if the Shareholders so determine, the Company may remain in existence to collect the proceeds from any notes and mortgages executed in favor of the Company arising out of the sale of Company Property;

(c)    the occurrence of any event that, under the laws of any jurisdiction governing the existence of the Company and, in contravention of the terms of this Agreement, shall dissolve the Company;

(d)    the bankruptcy of the Company;

(e)    the withdrawal of a Shareholder;

(f)    the express written agreement of all of the Shareholders; or

(g)    fifty years after commencement of the Term.

Section 9.2    Dissolution, Liquidation and Termination of Company.   Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Shareholders, and no Shareholder shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Article 9.  The Shareholders shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and the Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof.

Section 9.3    Distributions Upon Dissolution, Liquidation and Termination.   Upon dissolution, liquidation and termination of the Company pursuant to Section 9.2 hereof, and subject to Section 9.4, the Shareholders shall cause all proceeds derived from the liquidation of the Company Property to be applied and distributed in the following manner and order of priority:

        (a)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Shareholders, in the order of priority as provided by law;

        (b)    Second, to the payment and discharge of all of the Company's debts and liabilities to Shareholders; and

        (c)    Thereafter, to the Shareholders in proportion to, and to the extent of, the positive balance standing in each such Shareholder's Capital Account (after taking into account all Capital Account adjustments for the taxable year of such Liquidation).

Section 9.4   Negative Capital Account Restoration.  No Shareholder shall have any obligation whatsoever upon the Liquidation of such Shareholder's Interest, the Liquidation of the Company or in any other event, to contribute all or any portion of any negative balance standing in such Shareholder's Capital Account to the Company, to any other Shareholder or to any other person or entity.

ARTICLE 10
WAIVERS

Notwithstanding any provision of the Act, each Shareholder hereby waives any right to seek or assert: (a) judicial dissolution of the Company; (b) dissenters' rights; or (c) derivative actions on behalf of the Company.

ARTICLE 11
MISCELLANEOUS

Section 11.1   Notices.  Whenever any notice or consent or other written communication is required or permitted hereunder, such notice or consent or other communication shall be in writing and shall be: (a) delivered in person; (b) sent by United States mail; (c) delivered in person by an international air or local courier service; (d) transmitted by facsimile telecommunication or electronic mail when directed to the address, facsimile or electronic mail address, respectively, which was provided to the Company by the Shareholder. Except as expressly stated otherwise in this Agreement, any notice or other communication delivered by hand or by air courier shall be deemed effectively given when delivered, any notice or other communication sent by United States mail shall be deemed effectively given two Business Days after it is mailed, and any notice or other communication transmitted by facsimile telecommunication or electronic mail shall be deemed effectively given on the date of transmission.

Section 11.2   Partnership Intended Solely for Tax Purposes.  The Shareholders have formed the Company as a Nevada limited liability company under the Nevada Act, and do not intend to form a general or limited partnership under Nevada or any other state law. The Shareholders do not intend to be partners to one another or to any third party for any legal purposes other than tax purposes. The Shareholders intend the Company to be classified and treated as a partnership solely for federal and state income taxation purposes. Each Shareholder agrees to act consistently with the foregoing provisions of this Section 11.2 for all purposes, including, without limitation, for purposes of reporting the transactions contemplated herein to the Internal Revenue Service and all state and local taxing authorities.

Section 11.3   Effective Date of Agreement.   This Agreement shall become effective upon commencement of the Term.

Section 11.4   Binding Effect.   This Agreement shall be binding upon all of the parties hereto and their transferees, assigns, agents, successors in interest, personal representatives, estates, heirs and legatees.

Section 11.5   Counterparts.   This Agreement may be signed in multiple counterparts. Each counterpart will be considered an original, but all of them in the aggregate will constitute one instrument.

Section 11.6   Governing Law.   This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of Nevada.

Section 11.7   Amendments.   Amendments to this Agreement must be in writing and shall only be effective with the unanimous written consent or approval of the Shareholders.

Section 11.8   Entire Agreement.   This Agreement contains the entire understanding and agreement among the Shareholders regarding the subject matter hereof.   There are no agreements, arrangements or understandings, oral or written, between or among the Shareholders hereto relating to the subject matter of this Agreement that are not fully expressed herein.

Section 11.9   Mediation/Arbitration – Dispute Resolution.   Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge.   If either party fails engage in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation.   In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County.   Such controversy or claim shall be heard by a single arbitration (the "Arbitrator").   The award shall be made within six months of selection of the Arbitrator.   Judgment on the award may be entered in any court having jurisdiction and the parties hereby consent to the jurisdiction of the Superior Court for Clark County, Nevada, and of the United States District Court for the Central District of Nevada, for injunctive relief, specific performance or other relief in aid of any proceedings hereunder, but not otherwise.   The arbitration shall be held in Las Vegas, Nevada or as otherwise mutually agreed by the parties hereto.   The Arbitrator shall determine issues of arbitrability but may not limit, expand or otherwise modify the terms of this Agreement nor have any authority to award punitive or other damages in excess of compensatory damages and each party irrevocably waives any claim thereto.   The Arbitrator shall permit, to the extent reasonably necessary, all forms of discovery.   Both parties shall have the right without order from the Arbitrator to take one deposition of the principals involved in a controversy or claim submitted to arbitration hereunder and one deposition of a third party witness and an expert witness, if any.   The parties, their representatives, other participants and the Arbitrator shall hold the existence, content and result of the arbitration in confidence except as disclosure is required by law or as is reasonably necessary to defend claim or procedural rights of the party making the disclosure.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereunto have executed this Agreement as of the date set forth below.

Date: 10/5/2015
_____

**SHAREHOLDERS:**

_____
Real Social Dynamics

DocuSigned by:

*Todd Valentine*
Todd VanDeHey

**EXHIBIT A**

**VALENTINE LIFE, INC**

**SCHEDULE
OF
SHAREHOLDER NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, UNITS AND
PERCENTAGE INTERESTS**

**(as of September 15, 2015)**

| Names, Addresses, Facsimile Numbers and E-mail Addresses of Shareholders | Capital Contribution | Units | Percentage Interest |
|---|---|---|---|
| Real Social Dynamics<br>8491 West Sunset Boulevard<br>Suite 452<br>West Hollywood, CA 90069<br>United States of America | $50.00 | 50 Shares | 50.00% |
| Todd VanDeHey<br>145 E Harmon Avenue, Unit 20602<br>Las Vegas, NV 89109<br>United States of America | $50.00 | 50 Shares | 50.00% |
| TOTAL | $100 | 100,000 | 100.00% |

## <u>EXHIBIT B</u>

**VALENTINE LIFE, VALENTINE LIFE, INC
VALENTINE LIFE, INC**


**ARTICLES OF ORGANIZATION FILED SEPTEMBER 15, 2015**




[ATTACHED]

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

# Exhibit "B"

# Statement of Demand for Arbitration

1  **DEMD / COMP**
   JOSEPH A. GUTIERREZ, ESQ.
2  Nevada Bar No. 9046
   STEVEN G. KNAUSS, ESQ.
3  Nevada Bar No. 12242
   **MAIER GUTIERREZ & ASSOCIATES**
4  8816 Spanish Ridge Avenue
   Las Vegas, Nevada 89148
5  Telephone: (702) 629-7900
   Facsimile:  (702) 629-7925
6  E-mail:     jag@mgalaw.com
                sgk@mgalaw.com
7
   *Attorneys for Claimant/Plaintiff*
8  *Real Social Dynamics Inc.*

9            **JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)**

10                        **CLARK COUNTY, NEVADA**

11  ┌─────────────────────────────────────┐

12  REAL SOCIAL DYNAMICS INC., a Nevada    Arbitration No.:
    Corporation,
13
                    Claimant / Plaintiff,    **STATEMENT OF DEMAND FOR**
14                                           **ARBITRATION / COMPLAINT**

15  and

16  VALENTINE  LIFE  INC.,  LLC,  a  Nevada
    Corporation,
17
                    Nominal Plaintiff,
18
19  vs.

20  TODD VANDEHEY, an individual,

21                  Respondent / Defendant.

22  └─────────────────────────────────────┘

23          Claimant Real Social Dynamics Inc., by and through its attorney of record, the law firm MAIER

24  GUTIERREZ & ASSOCIATES, hereby complains and demands arbitration against the above-named

25  Respondent on the following grounds:

26                              **PARTIES**

27      1.      Claimant REAL SOCIAL DYNAMICS INC. ("RSD") is a Nevada corporation that, at

28  all times relevant hereto, was and is licensed to do business in Clark County, Nevada.

                                       1

2.      Respondent TODD VANDEHEY ("Vandehey") is an individual who, at all times relevant hereto, resided in the State of New York.

3.      Nominal Plaintiff VALENTINE LIFE INC., LLC ("Valentine Life") was a Nevada corporation that, at all times relevant hereto, was licensed to do business in Clark County, Nevada.

4.      Valentine Life was dissolved on August 14, 2017, but it is included in this action due to its connection with the matters in dispute, and in order for the court to decide all issues and make a proper judgment, its inclusion is necessary.

## PREDICATE FACTS

### SUBJECT MATTER JURISDICTION

5.      This court has subject matter jurisdiction under Article 6, Section 6 of the Nevada Constitution and under NRS 4.370 because the amount in controversy exceeds $15,000.00.

### PERSONAL JURISDICTION

6.      Under Nevada's long-arm statute, specific personal jurisdiction exists because Respondent has sufficient minimal contacts with Nevada such that the assertion of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1242 (1958).

7.      Additionally, all parties have given consent for this court to establish personal jurisdiction.

### VENUE

8.      Venue is appropriate in this court based upon the stipulation of the parties pursuant to Sections 11.6 and 11.9 of the Operating Agreement of Valentine Life dated October 5, 2015 ("Operating Agreement"), wherein the parties agreed that any dispute resolution arbitration would take place in Las Vegas, Nevada.

### ARBITRATION

9.      RSD has fully complied with Section 11.9 of the Valentine Life Operating Agreement regarding dispute resolution. RSD's proposal for a mediator and arbitrator on September 15, 2017 received no response from Vandehey. Accordingly, as this proceeds directly to arbitration, RSD is entitled to its attorney's fees and costs as the prevailing party.

## GENERAL ALLEGATIONS

### BACKGROUND OF RSD (CLAIMANT)

10.    RSD was founded in 2002 to provide dating coaching as well as live dating instruction tailored to each of its customer's unique dating profile.

11.    RSD was the first to market live instruction at public venues, such as bars, clubs, and parties, which gave it a competitive advantage over services offering only a traditional seminar forum.

12.    RSD's organizational structure includes a small team of approximately 10 to 15 lead instructors ("Instructors") each with their own style, demographic, and market, who manage and mentor subordinate coaches and staff. When an Instructor resigns, a subordinate coach familiar with the resigning Instructor's strategies will be promoted. This method of internal promotion allows for better team cohesion as well as allowing RSD to maintain a consistent size to the team of lead Instructors.

13.    RSD retains Instructors as independent contractors with both parties executing the Real Social Dynamics Contractor Agreement ("Contractor Agreement"), which defines the scope of work, compensation, benefits, confidentiality terms, protected work product, non-solicitation, non-competition, and termination clauses. *See* Real Social Dynamics Contractor Agreement attached hereto as **Exhibit 1**.

14.    Instructor responsibilities have evolved over the years. Between 2002 and 2010, Instructors were primarily responsible for leading weekend or 3-day overnight programs to immerse the customer into a social scene and offer live instruction (often called "boot camps"). However, starting in 2010, all Instructors were also supported with a complete social media platform which included creation of YouTube, Facebook, Google+, Instagram, and Twitter accounts, as well as unique websites for each RSD Instructor to promote their line of services.

15.    Instructors had no administrative obligations or supportive responsibilities with regard to the new, expanded digital infrastructure beyond creating the posts/videos/tweets, although the video equipment used to create the high definition media was provided to the Instructor by RSD.

16.    Since 2002 until the present day, RSD provides all Instructors with the necessary administrative support, human resources support, accounting services, customer care teams,

3

technology infrastructure/support, video equipment, and online payment processing tools to complete their contractual responsibilities.

17.    RSD's technology and marketing teams implemented projects ensuring that Instructor's websites conveyed consistent co-branding between the Instructor and RSD. Furthermore, these teams also created all the static website content, reserved domain names, and provided email boxes for all Instructors.

18.    RSD's technology team provides technical support for all Instructors to address any IT issue in real-time for either (1) payment processing or (2) social networking issues.

19.    All RSD/Instructor website terms of use and privacy policies were drafted with RSD listed as the entity owning and operating the website domain as well as the point of contact for questions or concerns.

20.    RSD staff reserves hotel suites and meeting rooms, and RSD staff rents homes or residences for both Instructors and customers during weekend programs and boot camps.

21.    RSD staff coordinates hotel and airline scheduling for the Instructors.

22.    RSD contracts with all 3rd party vendors to provide online payment processing through the Instructors' individual websites.

23.    RSD provides all accounting and payroll services for the Instructors and their staff.

24.    All customer data and contact lists are stored on RSD servers.

25.    All purchase order data and product information (programs and boot camps) are stored on RSD servers.

26.    Instructors are tasked with focusing solely on their ideas/strategies, their programs, and the customers, with RSD supporting every other aspect of the business.

**BACKGROUND OF VANDEHEY (RESPONDENT)**

27.    Vandehey's first contact with RSD was as a paying customer in early 2003.

28.    Vandehey quickly transitioned from customer to a subordinate coach under a top Instructor in mid-2003.

29.    After approximately 12 months as a subordinate coach, Vandehey was promoted to full Instructor in July 2004.

4

30.     Upon being promoted to full Instructor, Vandehey and RSD executed a Contractor Agreement on July 27, 2004.

31.     In exchange for his services as an Instructor, RSD generously compensated Vandehey. In 2014 and 2015, Vandehey's annual income paid by RSD was over $150,000.00/yr.

32.     Until August 11, 2017, RSD provided Vandehey with, inter alia:

> A.  the use of social media accounts and access to RSD's technical support team to address any problems with those accounts;
>
> B.  co-branded websites, including *valentinelife.com*, *rsdimmersion.com*, *daygamebytodd.com*, *valentineuniversity.com*, and *3girlsaday.com*;
>
> C.  his primary email address: todd@realsocialdynamics.com;
>
> D.  a small staff, each of whom were also independent contractors for RSD;
>
> E.  access to RSD's customer service tool (Ontraport);
>
> F.  video equipment to create media for uploading to social networks.

33.     From July 2004, until August 11, 2017, Vandehey and RSD remained bound by the terms of their valid Contractor Agreement. No modification or alteration of the fundamental terms of the Contractor Agreement has taken place, neither has any rescission or reformation of the contract occurred.

34.     In May 2017, Vandehey solicited RSD customers to invest in a fund managed by Vandehey (1) without obtaining RSD's consent per Paragraph 13 of the Contractor Agreement, and (2) in violation of the Securities Exchange Act of 1934 as Vandehey neither possesses a license to manage such a fund nor has he successfully passed the Series 65 examination. Vandehey was successful in obtaining capital for his investment fund from RSD customers without RSD's knowledge or consent.

### BACKGROUND OF VALENTINE LIFE (NOMINAL PLAINTIFF)

35.     Since it was founded, RSD has experienced difficulty with processing online payments via credit card. The dating/pick-up industry often receives negative press, and as a result, major payment processors and 3rd party vendors often refuse to do business with RSD if they find their line of business to be morally objectionable. As a result, when an active payment processor unexpectedly

1   refuses service, RSD must to quickly switch to a new processor/vendor or else risk declining payments

2   from customers making an online purchase.

3        36.    RSD's solution to this unexpected termination of an online payment processor, was to

4   create standalone limited liability companies (LLCs) which would incur lower processing fees/rates,

5   and lack any negative press history. Then connect the new standalone LLC with a payment processor

6   as a replacement when an active payment processor refuses service. For example, if a credit card

7   company unilaterally decided it would no longer accept payments through the website of an Instructor,

8   RSD would quickly replace the shopping cart API code with that of a different LLC, then update the

9   website terms of use, and continue operations uninterrupted.

10        37.    Having a backup payment processor under a new standalone LLC was the primary

11   intent behind the creation of Valentine Life.

12        38.    Because the payment processor must also link with a bank account under the standalone

13   LLC, the ancillary benefit of processing payments under a new entity would be clear, simplistic

14   accounting since only RSD and Vandehey would have legal authority to use the account.

15        39.    Initial discussions between RSD and Vandehey in early 2015 to create the entity that

16   would become Valentine Life was limited to a simple business model allowing Vandehey to process

17   payments for all of his RSD programs, through his RSD co-branded websites (e.g. *valentinelife.com*),

18   using a payment processor tied to a new entity, and then deposit those payments into a single Bank of

19   America checking account belonging to the new entity.

20        40.    The Bank of America checking account was intended to function as a transitory, or

21   holding, account through which disbursements to both RSD and Vandehey could be easily tracked,

22   but more importantly, it would function as a straightforward ledger of deposits from RSD customer

23   purchases, and withdrawals made by Vandehey for operational expenses and payroll.

24        41.    Apart from easier financial reporting, and the gain of an additional RSD payment

25   processor, Valentine Life would have no other purpose than to facilitate the financial transactions,

26   disbursements, and withdrawals of revenue generated from customers purchasing Vandehey programs

27   and boot camps.

28        42.    On October 5, 2015, prior to formation of the Valentine Life entity, RSD and Vandehey

1  executed an operating agreement for Valentine Life, LLC ("Operating Agreement"), which, among

2  other terms, assigned RSD and Vandehey each a 50% ownership interest in the entity.

3    43.    On January 5, 2016, Valentine Life was incorporated in Nevada.

4    44.    Starting in March 2016, the payment processor for Valentine Life (InChek), began

5  processing payments through the RSD/Vandehey co-branded websites and depositing those payments

6  into the Bank of America checking account created under Valentine Life.

7    45.    The only asset owned by Valentine Life was the single Bank of America checking

8  account where processed payments were deposited. No other asset, tangible or intangible, was every

9  transferred or otherwise gifted to the Valentine Life entity.

10    **REAL SOCIAL DYNAMICS CONTRACTOR AGREEMENT**

11    46.    The Contractor Agreement executed by both RSD and Vandehey on July 27, 2004,

12  unequivocally defines the terms, rights, and post-contractual obligations of each party, as well as

13  clearly labeling RSD as the "principal" and Vandehey as the "contractor".

14    47.    Between 2004 and 2006, at least 23 other independent contractors executed the exact

15  same version of the Contractor Agreement signed by Vandehey and RSD, and continue to be bound

16  by the same contract terms.

17    48.    Per Paragraph 2 of the Contractor Agreement, the term of the agreement was indefinite

18  and therefore valid until it was terminated by RSD on August 11, 2017:

19    2. Subject to termination as provided in this Agreement, the Contractor is
      contracted for an ***indefinite term***. The parties acknowledge that various
20    provisions of this Agreement survive past termination of Contract.

21    49.    Per Paragraph 13 of the Contractor Agreement, Vandehey was not permitted to derive

22  revenue from other businesses (or business opportunities) similar to his work with RSD without its

23  written consent:

24    13. It is understood and agreed that any business opportunity relating to or
      similar to the Principal's current or anticipated business opportunities (with the
25    exception of personal investments in less than 5% of the equity of a business,
      investments in established family businesses, real estate, or investments in
26    stocks and bonds traded on public stock exchanges) coming to the attention of
      the Contractor during the Contractor's Contract is an opportunity belonging to
27    the Principal. Therefor the Contractor will advise the Principal of the
      opportunity and cannot pursue the opportunity, directly or indirectly, without
28    the written consent of the Principal.

7

50.     With regard to Vandehey's legal right to claim ownership of, or usage rights to, any of his videos, email accounts, or other RSD property, Paragraphs 16 and 20 of the Contractor Agreement controls:

> 16. The Contractor acknowledges in any position the Contractor may hold, in and as a result of the Contractor's Contract by the Principal, the Contractor will, or may, be making us of, acquiring or adding to information about certain matters and things which are confidential to the Principal and which information is the exclusive property of the Principal, including, without limitation:
>
> a. 'Confidential Information' means all data and information relating to the business and management of the Principal, including proprietary and trade secret technology and accounting records to which access is obtained by the Contractor, including Work Product, Computer Software, Other Proprietary Data, Business Operations, Marketing and Development Operations, and Customers.

and

> 20. The Contractor acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Principal. Accordingly, the Contractor agrees and acknowledges that he will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the face that he may have created or contributed to the creation of the same.

51.     Paragraphs 24 and 27 define the obligations Vandehey has regarding non-solicitation and non-competition post-contract:

> 24. Any attempt on the part of the Contractor to induce others to leave the Principal's employ, or any effort by the Contractor to interfere with the Principal's relationship with its other Contractors and contractors [*sic*] would be harmful and damaging to the Principal. The Contractor agrees that during the term of his Contract with the Principal and for a period of five (5) years after the end of that term, the Contractor will not in any way, directly or indirectly…[induce, interfere, solicit or entice, other RSD employees].

and

> 25. Other than through Contract with a bona-fide independent party, or with the express written consent of the Principal, which will not be unreasonably withheld, the Contractor will not, during the continuance of the Agreement or within five (5) years after the termination of expiration, as the case may be, of this agreement, be directly or indirectly involved with a business which is in direct competition with the Principal in the business line of how to be successful with women and dating.

///

8

52.     With regard to the RSD's authority to terminate Vandehey, Paragraph 30 of the Contractor Agreement states:

> 30. Where the Contractor has breach any of the terms of this Agreement or where there is just cause for termination, the Principal may terminate the Contractor's Contract without notice.

53.     Regarding the remedies available to RSD should it terminate its contract with Vandehey, Paragraph 36 of the Contractor Agreement states:

> 36. In the event of a breach or threatened breach by the Contractor of any of the provisions of this Agreement, the Contractor agrees that the Principal is entitled to, in addition to and not in limitation of any other rights and remedies available to the Principal at law or in equity, to a permanent injunction in order to prevent or restrain any such breach by the Contractor or by the Contractor's partners, agents, representatives, servants, Contractors, and/or any and all persons directly or indirectly acting for or with the Contractor.

**OPERATION OF VALENTINE LIFE**

54.     Per the Operating Agreement of Valentine Life:

> Section 6.1 <u>Manager</u>. The Company shall be managed by RSD and VanDeHey…
>
> Section 6.2 <u>Manager of Operational and Day-to-Day Business Affairs</u>. The operational and day-to-day business and affairs of the Company shall be operated and managed jointly by RSD and Todd VanDeHey.

55.     Despite the Operating Agreement defining joint operational authority, Vandehey was given a small degree of autonomy. He has tasked with managing his own staff of RSD Contractors, and he could leverage marketing resources owned by RSD to further promote his programs and boot camps.

56.     However, throughout 2016 and 2017, even while Valentine Life was processing payments, RSD still paid for the marketing support for Vandehey's programs; RSD still managed and maintained all the static content on the co-branded websites; RSD still provided all technical support for Vandehey and his staff; RSD still addressed all customer service complaints; and RSD still owned the servers storing all customer data and contact information captured via the online shopping cart.

57.     The single asset of Valentine Life, the Bank of America checking account, was created with an initial deposit of $85,000.00, of which $15,000.00 was contributed by Vandehey, and $70,000.00 was contributed by RSD.

9

58.     All disbursements were to be equally allocated (50/50) to both RSD and Vandehey, and all RSD contractors working as Vandehey's staff were to be paid from the Valentine Life bank account.

59.     All business expenses incurred by Vandehey were to be submitted along with receipts/invoices to RSD's accounting team for review and audit.

60.     However, in February 2016, Vandehey removed RSD as signatory on the Valentine Life checking account which prevented RSD from viewing bank statements or managing any of the funds within the account.

61.     Five (5) months later, in July 2016, Vandehey reinstated RSD's access to the bank account as "view only", which left RSD with no authority to remove or transfer funds.

62.     Then, in April 2017, Vandehey again removed RSD's access to view the bank account and any activity occurring therein, but reinstated RSD's full access three (3) months later in July 2017.

63.     Moreover, throughout the operation of Valentine Life, Vandehey provided little more to RSD with regard to accounting other than short emails citing fugures/numbers with no supporting documents.

64.     Concurrently, in April 2017, the parties sought to negotiate the terms under which Valentine Life, could be operated independently by Vandehey, with only a profit share distributed to RSD.

65.     However, inspection of the Valentine Life bank statements and Vandehey's refusal to disclose invoices for his expenses along with his failure to provide any accounting at all for suspicious transactions led RSD to conclude Vandehey repeatedly, and surreptitiously, siphoned money out of the sole bank account, and one single asset, owned by Valentine Life Inc. over the past 20 months.

### MISAPPROPRIATION OF BANK ACCOUNT FUNDS BY VANDEHEY

66.     As RSD sought a valuation of Valentine Life by assessing the profits, estimated overhead, and payroll, it became abundantly clear that over the past 20 months Vandehey intentionally misappropriated a significant amount of the funds deposited into the Valentine Life bank account.

67.     Vandehey routinely transferred money to unknown bank accounts, made large payments to personal credit cards, and paid for his personal residences in New York City all from the

1    Valentine Life bank account without authorization by, or disclosure to, RSD.

2    68.    Between February 2016 and August 2017, the total amount Vandehey (1) transferred

3    directly to other bank accounts, plus (2) paid as rent for personal residences, plus (3) paid to attorneys

4    representing him in a personal capacity, is approximately $499,817.00. *See* Affidavit of Nicholas Kho

5    attached hereto as **Exhibit 2**.

6    69.    Between June 2016 and August 2017, the total amount Vandehey transferred to

7    American Express credit accounts both in his name as well as an unknown 3rd party, is approximately

8    $188,233.00

9    70.    To date, Vandehey refuses to disclose invoices or receipts for his expenses, or provide

10   any accounting for his withdrawals.

11   71.    To date, Vandehey refuses to provide redacted billing for attorney's fees to Nissenbaum

12   Law Group, LLC, who have disclosed they represent Vandehey in a personal capacity, but were paid

13   over $74,000.00 directly from the Valentine Life bank account between January 2017 and August

14   2017.

15   72.    To date, Vandehey refuses to disclose the source of over $94,000.00 in deposits

16   transferred from a PayPal account into the Valentine Life bank account.

17   73.    Repeatedly, and without authorization, Vandehey paid tens of thousands of dollars to

18   unknown recipients (e.g. "Bond New York", "Cooper & Cooper", "XLRealProperty") for reasons not

19   disclosed to RSD.

20   74.    Vandehey's careless bookkeeping was in fact a prolonged and pernicious ruse to

21   withdraw large sums of money from the Valentine Life bank account for his personal use and to repay

22   his own personal credit debt.

23              **RSD WITHDRAWS FROM VALENTINE LIFE AND PROTECTS ACCOUNT FUNDS**

24   75.    Upon seeing the totality of Vandehey's wrongful withdrawals from the Valentine Life

25   bank account, RSD gave verbal notice to Vandehey via recorded phone call on August 11, 2017, that

26   their business relationships were terminated ("Due to the fact that as of this phone call as soon as we

27   hang up, the relationship is dissolved. We are removing access to the RSD software that you presently

28   have access to.")

76.     The effect of RSD's statement to Vandehey on August 11, 2017 was two-fold: (1) Vandehey was terminated as an independent contractor for RSD, and (2) RSD effectively withdrew as a shareholder from Valentine Life.

77.     Pursuant to the Real Social Dynamics Contractor Agreement:

**Termination of Contract**

30.  Where the Contractor has breached any of the terms of this Agreement or where there is just cause for termination, the Principal may terminate the Contractor's Contract without notice.

78.     Pursuant to the Valentine Life Operating Agreement:

Section 9.1   **Liquidating Events**. …[T]he Company shall be dissolved, liquidated and terminated upon the occurrence of any of the following events:

(e) the withdrawal of a Shareholder;

79.     By the plain terms of both documents, RSD acted with full authority regarding both Vandehey's termination as an RSD Contractor, and its withdrawal from Valentine Life.

80.     Pursuant to a liquidating event, and in keeping with Section 9.2 of the Operating Agreement containing the wind up procedures of the corporation, RSD removed Vandehey as an officer of Valentine Life on August 11, 2017 and then filed a notice of dissolution with the Nevada Secretary of State on August 14, 2017.

81.     Furthermore, in consideration of Vandehey's aforementioned misappropriations, on August 15, 2017, RSD protected the remaining funds within the Valentine Life bank account by moving the entire remaining balance of $69,876.34 to a separate suspense account, where it would remain untouched until the resolution of the pending legal matter and final dissolution of Valentine Life.

82.     Pursuant to Section 9.2 of the Valentine Life Operating Agreement:

Dissolution, Liquidation and Termination of Company. Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Shareholders…The Shareholders shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and the Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof.

///

12

83.     RSD's action to protect the remaining funds in the Valentine Life bank account was consistent with the authority granted by Section 9.2 of the Operating Agreement. By transferring the full account balance to a suspense account, RSD was winding up the affairs of the business and taking full account of Valentine Life's property.

84.     However, on August 16, 2017, Vandehey falsely notified Bank of America that RSD's transfer of the account balance to a suspense account was fraudulent.

85.     As a result of Vandehey's intentional misrepresentation, Bank of America returned the full balance of $69,876.34 to the Valentine Life bank account.

86.     Immediately after the funds were returned to the Valentine Life bank account, Vandehey made seven (7) withdrawals totaling over $61,000.00 that transferred money to multiple American Express credit accounts.

### PUNITIVE DAMAGES

87.     Vandehey may be liable for punitive damages to the extent the evidence shows that (1) Vandehey is guilty of "oppression, fraud or malice, express or implied," (2) Vandehey's actions constituted conduct intended to injure RSD, and/or (3) Vandehey's actions constitute "despicable conduct which is engaged in with a conscious disregard of the rights of others" under NRS 42.001(3).

88.     As set forth fully in the following claims for relief, RSD's allegations against Vandehey for embezzlement and tortious breach of fiduciary duty to the extent such actions demonstrate fraud, will give rise to a claim for punitive damages against Vandehey.

### FIRST CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

89.     Claimant repeats and re-alleges the allegations of the preceding paragraphs of the Complaint as though fully set forth herein and incorporate the same herein by reference.

90.     By reason of his position as Manager and Shareholder with 50% ownership of Valentine Life, Vandehey owed both RSD and Valentine Life fiduciary obligations of good faith, loyalty, fair dealing, and candor, and was required to use his utmost ability to control and manage Valentine Life in a fair, just, honest, and equitable manner.

91.     Vandehey was required to act in furtherance of the best interests of RSD and Valentine

13

1  Life, and not in furtherance of his own personal interests.

2      92.     Confidential and fiduciary relations are synonymous, and may exist whenever trust and

3  confidence is reposed by one person in the integrity and fidelity of another.

4      93.     Vandehey breached his fiduciary obligations of good faith, loyalty, fair dealing, and

5  candor to RSD and Valentine Life by wrongfully taking funds from the Valentine Life bank account.

6      94.     Vandehey further breached his fiduciary obligations of good faith, loyalty, fair dealing,

7  and candor to RSD and Valentine Life by actively seeking to damage the business relationships RSD

8  and Valentine Life have with customers, vendors, and Instructors.

9      95.     Vandehey further breached his fiduciary obligations of good faith, loyalty, fair dealing,

10  and candor to RSD and Valentine Life by using customer payments belonging to RSD and Valentine

11  Life for their own financial benefit, and at the expense of RSD and Valentine Life.

12      96.     RSD and Valentine Life sustained damages as a result of Vandehey's breaches of his

13  fiduciary duties.

14      97.     As a direct and proximate result of Vandehey's breaches, individually, RSD and

15  Valentine Life have incurred damages in a sum excess of $15,000.

16      98.     The actions of Vandehey were willful, wanton, and malicious, entitling RSD and

17  Valentine Life to an award of punitive damages against Vandehey.

18      99.     RSD has been required to retain the services of an attorney to file and pursue this action

19  and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and

20  costs incurred in this action.

21  <u>**SECOND CLAIM FOR RELIEF**</u>

22  **BREACH OF CONTRACT (OPERATING AGREEMENT)**

23      100.    Claimant repeats and re-alleges the allegations of the preceding paragraphs of the

24  Complaint as though fully set forth herein and incorporate the same herein by reference.

25      101.    On or about October 5, 2015, RSD and Vandehey entered into the Valentine Life

26  Operating Agreement.

27      102.    The Valentine Life Operating Agreement is a valid and binding contract.

28      103.    RSD performed its obligations under the contract by granting Vandehey a 50%

14

1  Membership Interest in Valentine Life.

2  104.   Section 2.3 of the Valentine Life Operating Agreement sets forth the requirement that
3  members of the Company engage in lawful activities.

4  105.   Vandehey was a Member of Valentine Life.

5  106.   Vandehey materially breached the Valentine Life Operating Agreement by
6  withdrawing and transferring funds from the Valentine Life to his personal accounts in violation of
7  Section 2.3 of the Valentine Life Operating Agreement.

8  107.   This material breach of contract by Vandehey has caused damages to RSD and
9  Valentine Life in an amount in excess of $15,000, to be proven at trial.

10  108.   The actions of Vandehey were willful, wanton, and malicious, entitling RSD to an
11  award of punitive damages against Vandehey.

12  109.   RSD has been required to retain the services of an attorney to file and pursue this action
13  and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and
14  costs incurred in this action.

15  **THIRD CLAIM FOR RELIEF**

16  **BREACH OF CONTRACT (RSD CONTRACTOR AGREEMENT)**

17  110.   Claimant repeats and re-alleges the allegations of the preceding paragraphs of the
18  Complaint as though fully set forth herein and incorporate the same herein by reference.

19  111.   On or about July 27, 2004, Vandehey and RSD entered into the Real Social Dynamics
20  Contractor Agreement.

21  112.   The Real Social Dynamics Contractor Agreement is a valid and binding contract.

22  113.   RSD performed its part of the contract by compensating Vandehey in exchange for his
23  performance of Instructor responsibilities.

24  114.   Paragraph 30 of the Real Social Dynamics Contractor Agreement permits RSD to
25  terminate Vandehey without notice if he (1) breaches any terms of the Agreement or (2) when just
26  cause exists for termination.

27  115.   Paragraph 37 of the Real Social Dynamics Contractor Agreement requires Vandehey
28  to disclose financial records subsequent to his termination.

15

116.    Paragraph 45 of the Real Social Dynamics Contractor Agreement requires that Vandehey be liable for all legal costs incurred by him in the event he breaches the Agreement.

117.    Vandehey materially breached the Real Social Dynamics Contractor Agreement by (1) refusing to disclose financial and accounting records after his termination on August 11, 2017, and by (2) transferring Valentine Life funds to his attorney to pay for services.

118.    These material breaches of the Contractor Agreement by Vandehey have caused damages to RSD in an amount in excess of $15,000, to be proven at trial.

119.    The actions of Vandehey were willful, wanton, and malicious, entitling RSD to an award of punitive damages against Vandehey.

120.    RSD has been required to retain the services of an attorney to file and pursue this action and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and costs incurred in this action.

## FOURTH CLAIM FOR RELIEF

### CONTRACTUAL AND TORTIOUS BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

121.    Claimant repeats and re-alleges the allegations of the preceding paragraphs of the Complaint as though fully set forth herein and incorporate the same herein by reference.

122.    On or about October 5, 2015, RSD and Vandehey entered into the Valentine Life Operating Agreement.

123.    The Valentine Life Operating Agreement is a valid and binding contract.

124.    Every contract in Nevada has an implied covenant of good faith and fair dealing.

125.    Vandehey owed a duty of good faith to RSD and Valentine Life arising from the contract.

126.    A special element of reliance or fiduciary duty existed between RSD and Vandehey, because Vandehey was in an entrusted position to manage all the revenue generated from RSD customer purchases, and he had complete access to transfer or withdraw all funds from the Valentine Life bank account without restriction.

127.    Vandehey owed a duty of good faith to RSD that exists in every contract and forbids arbitrary, unfair acts by one party that disadvantage the other party.

16

128.    Vandehey breached the duty of good faith by: (1) taking funds from the Valentine Life bank account for personal use; (2) failing to provide accurate accounting of orders and revenue; and (3) failing to provide invoices or receipts for alleged business expenses.

129.    RSD's justified expectations were thus denied.

130.    The breaches of implied covenant of good faith and fair dealing by Vandehey, has caused damages to RSD in an amount in excess of $15,000.00, to be proven at trial.

131.    The actions of Vandehey were willful, wanton, and malicious, entitling Claimants to an award of punitive damages against Vandehey.

132.    RSD has been required to retain the services of an attorney to file and pursue this action and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and costs incurred in this action.

## FIFTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

133.    Claimant repeats and re-alleges the allegations of the preceding paragraphs of the Complaint as though fully set forth herein and incorporate the same herein by reference.

134.    By withdrawing funds from the Valentine Life bank account for personal use without authorization or approval, Vandehey has unjustly retained RSD revenue against fundamental principles of justice or equity and good conscience.

135.    The actions of Vandehey have caused damages to RSD in an amount in excess of $15,000.00, to be proven at trial.

136.    The actions of Vandehey were willful, wanton, and malicious, entitling RSD to an award of punitive damages against Vandehey.

137.    RSD has been required to retain the services of an attorney to file and pursue this action and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and costs incurred in this action.

///

///

///

## SIXTH CLAIM FOR RELIEF

### CONVERSION

138.    Claimant repeats and re-alleges the allegations of the preceding paragraphs of the Complaint as though fully set forth herein and incorporate the same herein by reference.

139.    By taking funds out of the Valentine Life bank account for personal use, and in violation of the Real Social Dynamics Contractor Agreement and Valentine Life Operating Agreement, Vandehey has committed a distinct act of dominion wrongfully exerted over said funds that are rightfully owned by RSD and Valentine Life.

140.    The actions of Vandehey are inconsistent with RSD and Valentine Life's ownership of the revenue and/or funds deposited into the Valentine Life bank account.

141.    The actions of Vandehey are in derogation, exclusion, and/or defiance of RSD and Valentine Life's lawful ownership of the funds and RSD's rights therein.

142.    The actions of Vandehey have caused damages to RSD in an amount in excess of $15,000.00, to be proven at trial.

143.    The actions of Vandehey were willful, wanton, and malicious, entitling RSD to an award of punitive damages against Vandehey.

144.    RSD has been required to retain the services of an attorney to file and pursue this action and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and costs incurred in this action.

## SEVENTH CLAIM FOR RELIEF

### CONSTRUCTIVE FRAUD

145.    Claimant repeats and re-alleges the allegations of the preceding paragraphs of the Complaint as though fully set forth herein and incorporate the same herein by reference.

146.    Vandehey was a trusted independent contractor of RSD, and as such, RSD instilled a special confidence in Vandehey so that he, both in equity and good conscience, was bound to act in good faith and with due regard to the interest of RSD.

147.    Accordingly, Vandehey's signatory authority for the revenue deposited into the Valentine Life bank account create a confidential and fiduciary relationship with RSD, and Vandehey

18

1   was required to act in furtherance of the best interest of RSD, so as to benefit RSD and not his own

2   personal interests.

3        148.   Vandehey breached RSD's confidential and fiducial relationship by (1) transferring

4   funds directly from the Valentine Life bank account to pay personal credit accounts, (2) transferring

5   funds directly from the Valentine Life bank account to pay for an attorney representing him in a

6   personal capacity; (3) paying for his personal residences with funds from the Valentine Life bank

7   account; and (4) sending RSD inaccurate and misleading financial summaries of online purchases and

8   deposits.

9        149.   Vandehey breached RSD's confidential and fiducial relationship on September 13,

10   2016, by sending an email to RSD with a summary of purchases made through Valentine Life's

11   payment processor. However, the sales totals sent to RSD did not reconcile with account statements

12   for the Valentine Life bank account, and were missing approximately one-third (1/3) of the customer

13   purchase deposits into the Valentine Life account. As a result of Vandehey's representations in his

14   email, RSD's accounting ledgers were inaccurate and detrimentally relied upon by RSD's financial

15   and tax teams.

16        150.   RSD sustained damages as a result of each of Vandehey's breaches of his fiduciary

17   duties.

18        151.   Vandehey's constructive fraud committed upon RSD over a period of approximately

19   20 months resulted in Vandehey failing to report approximately $499,000.00 of the deposits made to

20   Valentine Life, which caused damages to RSD for the same amount

21        152.   The actions of Vandehey were malicious, oppressive and or fraudulent entitling

22   plaintiff to award of punitive damages.

23        153.   RSD has been required to retain the services of an attorney to file and pursue this action

24   and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and

25   costs incurred in this action.

26                                     **EIGHTH CLAIM FOR RELIEF**

27                                        **INJUNCTIVE RELIEF**

28        154.   Claimant repeats and re-alleges the allegations of the preceding paragraphs of the

1    Complaint as though fully set forth herein and incorporate the same herein by reference.

2         155.   Vandehey's actions as set forth herein, give rise to multiple justiciable controversies,

3    including breach of the Contractor Agreement, conversion, fraud, and unjust enrichment.

4         156.   Based on Vandehey's actions as set forth herein, RSD has a reasonable probability of

5    success on the merits for its claims.

6         157.   As a result of Vandehey's actions as set forth herein, RSD has suffered, or is likely to

7    suffer, irreparable harm including, but not limited to, loss of financial benefit as well as violations and

8    infringements upon RSD's copyrighted intellectual property, which constitutes serious and permanent

9    injury to RSD.

10        158.   RSD has a probable right to relief and will suffer immediate, severe, and irreparable

11   injury unless Vandehey is immediately restrained and enjoined from: (1) using videos, products,

12   programs, website content, or other property of RSD without permission or compensation, (2) selling

13   or advertising for sale any Valentine Life or RSD branded product or service; (3) fraudulently altering

14   any service, product, or program created with RSD equipment/hardware to omit reference to RSD as

15   the creator of said service, product, or program.

16        159.   The actions of Vandehey described herein have resulted in immediate harm to, inter

17   alia, RSD's business operation, reputation, and finances.

18        160.   RSD is entitled to injunctive relief to end such actions and prevent further harm.

19        161.   RSD has been required to retain the services of an attorney to file and pursue this action

20   and have thereby been damaged. Accordingly, RSD seeks an award of reasonable attorneys' fees and

21   costs incurred in this action.

22                          **PRAYER FOR RELIEF**

23        WHEREFORE, Claimant prays for judgment as follows:

24        1.     For an entry of judgment in favor of Claimant on the complaint and all claims for relief

25   asserted therein;

26        2.     For an award of compensatory, consequential, statutory, and exemplary damages in an

27   amount in excess of $15,000.00;

28

3.     For an award of punitive damages as a result of Respondent's intentional actions against Claimant;

4.     For an award of reasonable attorney's fees and costs incurred by Claimant in this action;

5.     For an award of pre and post-judgment interest; and

6.     For such other and further relief as the Court may deem just and proper.

DATED this 27th day of September, 2017.

Respectfully submitted,

MAIER GUTIERREZ & ASSOCIATES

JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
*Attorneys for Plaintiff Nicholas Kho*

21

# Exhibit 1

## REAL SOCIAL DYNAMICS
### Contractor Agreement

**THIS CONTRACTOR AGREEMENT** dated this 1st day of October, 2004

**BETWEEN:**

Real Social Dynamics of 8312 Carlin Avenue, Sacramento, CA 95823
(the "Principal")

-     AND –

Todd VanDeHey of 2305 Smith Court, Longmont, Colorado, 80501
(the "Contractor")

**BACKGROUND:**

A.   The Principal is duly incorporated, organized and existing under the laws of the State of Nevada.

B.   The Principal is of the opinion that the Contractor has the necessary qualifications, experience and abilities to assist and benefit the Principal in its business.

C.   The Principal desires to employ the Contractor and the Contractor has agree to accept and enter such Contract upon the terms and conditions set out in this Agreement.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

### Commencement Date and Term

1. The Contractor will commence Contract with the Principal on October 1, 2004 (the 'Commencement Date').

2. Subject to termination as provided in this Agreement, the Contractor is contracted for an indefinite term. The parties acknowledge that various provisions of this Agreement survive past termination of Contract.

### Position and Duties

3. The Principal agrees to employ the Contractor as an Executive Coach to be an Instructor for Real Social Dynamics Live Programs and complete Administrative Work, and the Contractor agrees to be contracted on the terms and conditions set out in this Agreement. The Contractor agrees to be subject to the general supervision of and act pursuant to the orders, advice and direction of the Principal.

4. The Contractor will perform any and all duties now and later assigned to the Contractor by the Principal. The Contractor will also perform such other duties as are customarily performed by one holding such a position in other, same or similar business or enterprises as that engaged in by the Principal.

5. The Contractor agrees to abide by the Principal's rules, regulations, and practices, including those concerning work schedules, vacation and sick leave, as they may from time to time be adopted or modified.

### Contractor Compensation

6. For the services rendered by the Contractor as required by this Agreement, the Principal will pay to the Contractor a salary set in accordance with the Principal's policy stated in the Contractor's Manual while this Agreement is in force. The Principal is entitled to deduct from the Contractor's compensation any applicable deductions and remittance as required by law.

7. The Contractor understands that the Contractor's compensation as provided in this Agreement will constitute the full and exclusive monetary consideration and compensation for all services performed by the Contractor and for the performance of all the Contractor's promises and obligations in this Agreement.

8. The Contractor understands and agrees that any additional compensation to the Contractor (whether a bonus or other form of additional compensation) will rest in the sole discretion of the Principal and that the Contractor will not earn or accrue any right to additional compensation by reason of the Contractor's Contract.

9. The Principal will reimburse the Contractor for all necessary expenses incurred by the Contractor while traveling pursuant to the Principal's directions.

10. The Principal agrees to permit a reasonable degree of flexibility in work hours. In cases where extra time is worked in a day or week, the Contractor agrees to take equivalent time off in place of overtime pay within three months, unless there is an express agreement to pay at overtime rates.

Contractor's Initials 
Principal's Initials NJK

**Contractor Benefits**

11.   The Contractor will be entitled to only those additional benefits that are currently in place for the Principal's Contractors as set out in the Principal's booklets and manuals.

12.   The Contractor will be entitled in each year to such vacations as are stipulated by the Principal's policies.

**Avoiding Conflict of Opportunities**

13.   It is understood and agreed that any business opportunity relating to or similar to the Principal's current or anticipated business opportunities (with the exception of personal investments in less than 5% of the equity of a business, investments in established family businesses, real estate, or investments in stocks and bonds traded on public stock exchanges) coming to the attention of the Contractor during the Contractor's Contract is an opportunity belonging to the Principal. Therefore, the Contractor will advise the Principal of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Principal.

14.   Without the written consent of the Principal, the Contractor further agrees not to:
    a.   solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Principal, and
    b.   directly or indirectly, engage or participate in any other business activities that the Principal, in its reasonable discretion, determines to be in conflict with the best interests of the Principal.

**Inability to Contract for Principal**

15.   In spite of anything contained in this Agreement to the contrary, the Contractor will not have the right to make any contracts or commitments for or on the behalf of the Principal without first obtaining the express written consent of the Principal.

**Confidential Information and Assignment of Inventions**

16.   The Contractor acknowledges in any position the Contractor may hold, in and as a result of the Contractor's Contract by the Principal, the Contractor will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Principal and which information is the exclusive property of the Principal, including, without limitation:

    a.   'Confidential Information' means all data and information relating to the business and management of the Principal, including proprietary and trade secret technology and accounting records to which access is obtained by the Contractor, including Work Product, Computer Software, Other Proprietary Date, Business Operations, Marketing and Development Operations, and Customers. Confidential Information will also include any information that has been disclosed by a third party to the Principal and governed by a non-disclosure agreement entered into between the third party and the Principal. Confidential Information will not include information that:

        i.   is generally known in the industry of the Principal;

        ii.   is now or subsequently becomes generally  available to the public through no wrongful act of the Contractor;

        iii.   the Contractor rightfully had in its possession prior to the disclosure to Contractor by the Principal;

        iv.   is independently created by the Contractor without direct or indirect use of the Confidential Information; or

        v.   the Contractor rightfully obtains from a third party who has the right to transfer or disclose it.

    b.   'Work Product' means work product resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development;

    c.   'Computer Software' which means computer software resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development, including but not limited to programs and program modules, routines and subroutines, processes, algorithms, design concepts, design specifications, (design notes, annotations, documentation, flowcharts, coding sheets, and the like), source code, object code and load modules, programming, program patches and system designs;

    d.   'Other Proprietary Data' means information relating to the Principal's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, test data and test results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

    e.   'Business Operations' means internal personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Principal's business;

    f.   'Marketing and Development Operations' means marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Principal which have been or are being discussed; and

Contractor's Initials 
Principal's Initials

g.    'Customers' means names of customers and their representatives, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by clients of the Principal.

## Confidential Obligations

17.    The Contractor agrees that a material term of the Contractor's contract with the Principal is to keep all Confidential Information absolutely confidential and protect its release from the public. The Contractor agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Contractor has obtained or which was disclosed to the Contractor by the Principal as a result of the Contractor's Contract by the Principal. The Contractor agrees that if there is any question as to such disclosure then the Contractor will seek out senior management of the Principal prior to making any disclosure of the Principal's information that may be covered by this Agreement.

18.    The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Contractor in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement.

19.    The Contractor may disclose any of the Confidential Information:

a.    To a third party where Principal has consented in writing to such disclosure; and

b.    To the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body, however, the Contractor will first have given prompt notice to the Principal of any possible or prospective order (or proceeding pursuant to which any order may result), and the Principal will have been afforded a reasonable opportunity to prevent or limit any disclosure.

## Ownership and Title

20.    The Contractor acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Principal. Accordingly, the Contractor specifically agrees and acknowledges that he will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the fact that he may have created or contributed to the creation of the same.

21.    The Contractor does hereby waive any moral rights that he may have with respect to the Confidential Information.

22.    The Contractor agrees to immediately disclose to the Principal all Confidential Information developed in whole or in part by the Contractor during the term of the Contractor's Contract with the Principal and to assign to the Principal any right, title or interest the Contractor may have in the Confidential Information. The Contractor agrees to execute any instruments and to do all other things reasonably requested by the Principal (both during and after the Contractor's Contract with the Principal) in order to vest more fully in the Principal all ownership rights in those items transferred by the Contractor to the Principal.

## Return of Confidential Information

23.    The Contractor agrees that, upon request of the Principal or upon termination or expiration, as the case may be, or Contract, the Contractor will turn over to the Principal all documents, disks or other computer media, or other material in the possession or control of the Contractor that:

a.    May contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

b.    Connected with or derived from the Contractor's services to the Principal.

## Non-Solicitation

24.    Any attempt on the part of the Contractor to induce others to leave the Principal's employ, or any effort by the Contractor to interfere with the Principal's relationship with its other Contractors and contractors would be harmful and damaging to the Principal. The Contractor agrees that during the term of his Contract with the Principal and for a period of five (5) years after the end of that term, the Contractor will not in any way, directly or indirectly:

a.    Induce or attempt to induce any Contractor or contractor of the Principal to quit Contract or retained with the Principal;

b.    Otherwise interfere with or disrupt the Principal's relationship with its Contractors and Employees;

c.    Discuss Contract opportunities or provide information about competitive Contract to any of the Principal's Contractors or Employees; or

d.    Solicit, entice, or hire away any Contractor or contractor of the Principal.

This obligation will be limited to those that were Contractors or contractors of the Principal when the Contractor was contracted by the Principal.

## Non-Competition

25.    Other than through Contract with a bona-fide independent party, or with the express written consent of the Principal, which will not be unreasonably withheld, the Contractor will not, during the continuance of the Agreement or within five (5) years after the termination or expiration, as the case may be, of this Agreement, be directly or indirectly involved with a business which is in direct competition with the Principal in the business line of how to be successful with women and dating.

Contractor's Initials _TV_
Principal's Initials _NJK_

26.   For a period of five (5) years from the date of termination or expiration, as the case may be, of the Contractor's Contract with the Principal, the Contractor will not divert or attempt to divert from the Principal any business the Principal had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Contractor's Contract with the Principal.

27.   The Contractor will not own, operate or work for a company or internet website that teaches men how to be successful with women and dating, for five (5) years from the date of termination or expiration, in Los Angeles, New York, San Francisco, Sydney, Melbourne, Toronto, Montreal, and London, and the Contractor will forfeit to Real Social Dynamics any revenue and income earned from operating or working for a company or internet website that teaches men how to be successful with women and dating during the 5 year period, and the Contractor is still obligated to keep all trade secrets confidential.

## Termination Due to Discontinuance of Business

28.   In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

## Termination For Disability

29.   In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

## Termination of Contract

30.   Where the Contractor has breached any of the terms of this Agreement or where there is just cause for termination, the Principal may terminate the Contractor's Contract without notice.

31.   The Contractor and the Principal agree that reasonable and sufficient notice of termination of Contract by the Principal is the greater of two weeks and any notice required under any relevant Contract legislation.

32.   If the Contractor wishes to terminate his Contract with the Principal, the Contractor will provide the Principal with two weeks' notice. As an alternative, if the Contractor co-operates with the training and development of a replacement, then sufficient notice is given if it is sufficient notice to allow the Principal to find and train the replacement.

33.   Should the Contractor terminate his Contract pursuant to this Agreement, and there is no constructive dismissal, the Contractor agrees to be reasonably available as a consultant for the purposes of maintaining any projects or developments created while contracted by the Principal. The Contractor agrees to negotiate the terms of the consulting work in good faith. In his capacity as a consultant for the Principal pursuant to this paragraph, the Contractor agrees to provide his present residential address and telephone number as well as his business address and telephone number.

34.   The time specified in the notice by either the Contractor or the Principal may expire on any day of the month and upon the date of termination the Principal will forthwith pay to the Contractor any outstanding portion of the wage, accrued vacation and banked time, if any, calculated to the date of termination. Notwithstanding the date of termination, the Contractor acknowledges and agrees to diligently execute and complete his Contract responsibilities to the Principal at the reasonable direction of the Principal. Failure of the Contractor to reasonably execute his obligations to the Principal during the notice period will be considered to be an abandonment of his obligations and will be sufficient cause for immediate termination of the Contractor without compensation or notice.

## Remedies

35.   The Contractor agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Principal, would gravely affect the effective and successful conduct of the Principal's business and goodwill, and would be a material breach of this Agreement.

36.   In the event of a breach or threatened breach by the Contractor of any of the provisions of this Agreement, the Contractor agrees that the Principal is entitled to, in addition to and not in limitation of any other rights and remedies available to the Principal at law or in equity, to a permanent injunction in order to prevent or restrain any such breach by the Contractor or by the Contractor's partners, agents, representatives, servants, Contractors, and/or any and all persons directly or indirectly acting for or with the Contractor.

37.   The Contractor agrees to co-operate with the Principal following termination by providing documentation and other information to permit the Principal to evaluate whether the Contractor is honoring his post-Contract obligations set out in this Agreement.

## Severability

38.   Principal and Contractor acknowledge that this Agreement is reasonable, valid and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the Contractor's intention to give the Principal the broadest possible protection against the disclosure of the Confidential Information, against the Contractor soliciting the Principal's Contractors and contractors and against the Contractor using such Confidential Information in competing with the Principal.

39.   In the event that any of the provisions of this Agreement will be held to be invalid or unenforceable in whole or in part, those provisions to the extent enforceable and all other provisions will nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Agreement and the remaining provisions had been executed by both parties subsequent to the expungement of the invalid provision.

Contractor's Initials TV
Principal's Initials NJK

**Notices**

40.  If Contractor loses or makes unauthorized disclosure of any of the Confidential Information, the Contractor will immediately notify the Principal and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

41.  All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and either served personally or sent by facsimile or e-mail. The address for any notice to be delivered to an of the parties to this Agreement is as follows:

    a.   Real Social Dynamics: 8312 Carlin Avenue, Sacramento, CA 95823
        Email: papa@realsocialdynamics.com

    b.   Todd VanDeHey: 2305 Smith Court, Longmont, Colorado, 80501
        Email: mike@realsocialdynamics.com

**Modification of Agreement**

42.  Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

**Governing Law**

43.  It is the intention of the parties to this Agreement that this Agreement and the performance under this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of Nevada, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**General Provisions**

44.  Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

45.  The Contractor is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Principal in enforcing this Agreement as a result of any default of this Agreement by the Contractor.

46.  No failure or delay by the Principal in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.

47.  This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Principal and the Contractor.

48.  This Agreement may be executed in counterparts.

49.  Time is of the essence in this Agreement.

50.  If there is a previous Contract agreement between the parties to this Agreement, the parties agree that this Agreement will replace that previous Contract agreement and the Contractor acknowledges that this Agreement was entered into in consideration of a compensation increase commencing the start of this Agreement. The Contractor acknowledges that it was agreed at that time that a new Contract agreement would be entered into in consideration of the compensation increase.

51.  This Agreement and the Contractor Manual constitutes the entire agreement between the parties and there are no further items or provisions, either oral or written. As of the effective date of this Agreement, this Agreement supersedes all other agreements between the parties. The parties to this Agreement stipulate that neither of them has made any representations with respect to the subject matter of this Agreement except such representations as are specifically set forth in this Agreement. Each of the parties acknowledges that it has relied on its own judgment in entering into this Agreement.

**IN WITNESS WHEREOF** Real Social Dynamics has duly affixed its signature by a duly authorized officer on this 1st day of October, 2004. By signing below, the Contractor acknowledges that he/she understands and accepts this obligation.

_____      _____    7/27/04
Nicholas Kho, President                  Todd VanDeHey                    Date
Real Social Dynamics, Inc.

Contractor's Initials TV
Principal's Initials NK

# Exhibit 2

### AFFIDAVIT OF NICHOLAS KHO

STATE OF NEVADA

COUNTY OF CLARK

ss:

I, NICHOLAS KHO, being duly sworn, deposes and says that:

1. I am over the age of eighteen and I have personal knowledge of all matters set forth herein. If called to do so, I would competently and truthfully testify to all matters set forth herein, except for those matters stated to be based upon information and belief.

2. Between January 2016 and August 2017, Todd Vandehey ("Todd") stole a significant amount of money from Real Social Dynamics via the Valentine Life bank account.

3. As a signatory for Valentine Life bank accounts, Todd had access to corporate funds and has made a series of unauthorized expenses and bank transfers to personal accounts. In addition, Todd has created multiple credit card accounts and credit lines without authorization from RSD, Valentine Life, or any other Shareholder. Such business credit was utilized by for Todd's personal expenses without any authorization. Todd was not authorized any bonuses or any other salary for any business work other than disbursements of 50% of the net income of profits calculated as the sales generated from the RSD Todd business, all of whose revenues were supposed to be deposited into the Valentine Life bank account; however, the latter did not happen due to Todd hiding sales.

4. A transfer of $52,907 was made by Todd to his personal bank account from the Valentine Life checking account as a personal disbursement without any authorization or legitimate justification as it was not profits nor was it a reimbursement. Todd claims it was a reimbursement for money he paid for legal expenses on behalf of Valentine Life for an agreement, but this is false because funds were transferred from the Valentine Life checking account in order to pay for the legal expenses and also we discovered that Todd paid the $52,907 for legal fees for himself personally naming himself as the client. Then, Todd proceeded to use the $52,907 in funds from the Valentine Life bank account to sue RSD with the same money. Therefore, Todd owes to RSD both the $52,907 he misappropriated from the Valentine Life account to directly pay Nissenbaum Law in addition to the $52,907 that Todd pocketed in cash for a total of $105,814.

5. In addition, Todd agreed that the legal expenses were to be paid by funds in the Valentine Life bank account for an agreement to be drafted. In addition, I believe that Todd has used additional funds from the Valentine Life checking account to pay personal expenses on his personal American Express credit card and also sue RSD, and the expenses of Todd's personal credit card was paid for by unauthorized transfers made by Todd from the Valentine Life checking account to the personal American Express credit card of Todd Vandehey. Also, Todd made the false claim that I agreed to cover all his legal expenses and such a conversation never happened nor did I authorize the transfer. In addition, Todd's attorney, Nissenbaum Law refused to provide to me the redacted statements of legal work for Todd, which added to the evidence of a lack of financial transparency even though Todd Vandehey made transfers from the Valentine Life checking account to cover the legal fees of Nissenbaum Law. Over a conference call, including Todd, Owen Cook and I, Todd said he would provide statements only after an agreement was signed to amend the operating agreement for Valentine Life, which appeared to mean that Todd was refusing financial transparency for these legal bills, which appeared extremely high because almost all legal letters and terms were written by Maier Gutierrez & Associates and not by Nissenbaum Law. In addition, Nissenbaum is engaged in a conflict of interest whereby Valentine Life, a company owned by RSD, is paying for legal action

1

against RSD. According to the operating agreement of Valentine Life, any expense over $50,000 must be authorized by RSD and unanimous consent of all Shareholders. This would account for $52,907 x 2 (totaling $105,814) owed to RSD for Todd's unauthorized personal disbursement.

6.      Todd has had Valentine Life cover 100% of his personal rent in New York. This was not authorized nor was it a business expense. Todd agreed that he would pay $1,500/month of the rent incurred for an apartment he would share with staff. He has not reimbursed Valentine Life for these expenses even though he agreed to these expenses in phone conversations with Owen Cook and myself, and also reconfirmed in recorded Skype meetings between Todd Vandehey and Nicholas Kho. For the 18 months of Valentine Life covering Todd's personal rent, this would account for $27,000 in personal expenses owed from Todd to RSD for Todd's personal rent. However, Todd was not living with his staff, and, instead was living by himself or with his girlfriend and friends when they visited. Therefore, the entire amount of the $4,495 in monthly rent that was paid for via the Valentine Life checking account should be the responsibility of Todd. This accounts for 1 year of rent at $4,495 for a total of $53,940 and also additional rent of $1,500 of month for 6 months when he was living with staff for an additional $9,000. Therefore, the cumulative total of the liability for personal rent is $62,940.

7.      According to David Zelman, who was living at an apartment paid for by Valentine Life, RSD Contractors were paying Todd $1,000/month each and Todd has not deposited any money for funds collected to the Valentine Life bank account. There have been 4 RSD Contractors paying rent for 18 months and this accounts for $72,000 in funds that have not been accounted for by Todd Vandehey as collected revenue for sub-letting apartment space paid for by Valentine Life and it appears that Todd has instead pocketed the $72,000 as an unauthorized personal disbursement.

8.      Todd has made personal payments to his American Express Card in 2017 for a total of $61,302.51 after Valentine Life was dissolved using multiple smaller transactions to avoid detection. These transactions were fraudulent ACH transfers that were not authorized by Todd to make and these funds are owed to RSD as an unauthorized personal disbursement. There was no justification for transferring these funds to Todd's personal American Express card after dissolution of Valentine Life nor has Todd provided any business expense justification. American Express disclosed that funds have been partly transferred to the personal bank account of Todd's friend, Kaitlin Severin, because Todd did not have a credit-line of $61,302.51 available to him; however, Kaitlin may have a better credit score than Todd allowing her to get more credit-line and higher balances on American Express

9.      In 2017, Todd claims he paid for operations on his personal American Express card even after I told Todd Vandehey that he was not authorized to commingle his personal and business funds in-person when Todd visited my house. I informed Todd that this action was illegal and not allowed. In addition, I told Todd that RSD requires having a CPA review the American Express statements, which were never provided to me for any transaction in 2017. Also, other than the $61,302.51 that Todd transferred to his personal American Express card, Todd made additional transfers in 2017 to American Express for a total of $27,269.91.

10.     In 2016, Todd made $71,942.62 of charges on his personal American Express card. When requesting justification for these expenses via pdf statements from American Express, Todd instead gave custom Todd-created American Express Excel spreadsheets instead. Todd was not authorized to commingle business and personal expenses, which is also a potential crime to defraud RSD of money. In addition, the expenses that Todd submitted on his personal American Express included unjustified personal expenses, including personal food expenses at fine-dining restaurants and cafes, taxi and Uber expenses for his personal travel, extracurricular gym payments, Starbucks coffee, and payments to transfer travel points. None of the transactions sent to us in the custom excel sheets from Todd had a dollar amount next to them; instead, Todd submitted a total summation of all charges showing a grand total of $71,942.62 in questionable personal expenses paid for by the

Valentine Life operating checking account.

11.     Todd has in his possession audiovisual gear that has been paid for by Real Social Dynamics, which was utilized by Todd to create videos for RSD. Now that Todd no longer has business with RSD, the video equipment must be returned to Real Social Dynamics. This includes 2 A7s Sony camcorders, 1 Canon Mark iii 5D camera, 2 Manfrotto tripods, 1 Canon 50 lenses, 1 Canon 16-35mm lenses, 2 MacBook pro laptop computers, 10 LaCie hard drives, and 2 Metabones Adapters. The total value of this audiovisual gear is $20,139 and all of the mentioned video-equipment was put into the possession of Todd Vandehey prior to the creation of Valentine Life even though Todd utilized it before and after its incorporation due to the fact that Todd was working as a RSD Contractor on RSD official business. Now that Todd's business relationship with RSD has been dissolved, all of the RSD-owned video equipment must be returned to RSD or paid for in full by Todd to RSD for a total of $20,139, which excludes any shipping, handling, and taxes paid for by RSD. Additionally, I believe that Todd has purchased additional video equipment with RSD money that also must be returned.

12.     This year, Todd sent an email to me stating that he had taken out an unauthorized credit line for Valentine Life for $30,000 with 6 percent interest. He then paid to both RSD and himself a personal disbursement of $15,000 each for the credit line even though it was a loan. This was an unauthorized credit line, and it was an unauthorized series of disbursements because the only authorized disbursement to Todd or RSD should be for 50% split of calculated net profits. In addition, due to the fact that Todd took most of the money out of the Valentine Life business bank accounts and transferred the funds to his personal bank accounts and credit card accounts, the $30,000 credit line is still unpaid and the creditor is unknown. Also, I am wondering if the credit line exists at all because Todd has lied about so many other financial transactions and made other inappropriate financial payments. I believe that Todd committed fraud and lied about the creation of the credit-line and his only available credit was via credit cards at a rate much greater than 6% and likely over 20%.

13.     Todd got approval for two Bank of America credit cards in the name of Valentine Life that were not authorized to be created and he spent on one of the credit cards a total of $1,383.09 of expenses that were not authorized to be spent and the usage of these funds do not appear to have any business expenses justification.

14.     In August 2017, Todd retained the accounting services of I & U CPA services after sending an email to Owen Cook and I stating that he had not done proper accounting for the last year even though he was sending out personal disbursements to himself based on calculated net income. Todd paid $12,000 to I & U via 2 checks of $10,500 and $1500. Upon contacting the Department of Corporations in New York, we discovered that I & U is not a registered company in the State of New York. RSD staff, Magic Concierge, and Maier Gutierrez & Associates have been contacting I & U via phone and email for over 30 attempts in the last week and we have been unable to talk to anyone in the office of I & U. I personally contacted I & U via email and told the company that I needed to talk to them about the investigation we were conducting about the misappropriation of funds by Todd Vandehey in regards to their work with Valentine Life. Upon sending that email, a phone meeting was setup and I & U flaked on the meeting, claiming they called my phone, but there is no record of such phone call. In addition, I & U did not respond to any requests to additional phone calls. It is both curious that Todd setup such a large payment to I & U after knowing that we had already retained Tracee Gress as a CPA to do accounting, financial audit, and tax return. In addition, we looked up the address of I & U CPAs and their address on the 85th floor at 1 World Trade Center doesn't exist as office space according to the staff at 1 World Trade Center. Upon a phone call to Servcorp, which is located on the 85th floor of 1 World Trade Center, the front desk didn't know of I & U CPAs. On the other hand, the CEO of I & U, Ihsan Ugurlu, is listed as being registered as a CPA in New York. Additionally, when attempting to find a direct phone number to talk to someone at I & U, we could only find a phone number that goes to a voice-mail and a fax number. It makes me suspicious if I & U is a real company or if it a front company.

3

15.     Todd rented an apartment for $7,800/month payable (an expense of $94,800 over a one year lease) to 446-450 West 19 Realty LLC and never got approval from RSD as a Shareholder even though the operating agreement states expenses over $50,000 must be approved unanimously in advance. Rent was paid from the Valentine Life operating account for at least 2 months out as seen from checks deposited from the Valentine Life checking account.

16.     Rent checks were made payable to Garrett Darling ($1250), David Zelman ($2985), Jon Piedra ($525) and Kevin Juica ($3497), both of who are RSD Contractors working with Todd, even though both contractors were living at the apartment of 446-450 West 19 Realty paid for by Valentine Life. Therefore, it is questionable why Todd would be paying for rent to staff even though they are staying at the apartment paid for by Valentine Life. The total value of these checks is $8,257.

17.     Multiple pay checks were paid to RSD Contractors marking rent that was paid late or accounting corrections to RSD Contractors, such as Jon Piedra in May 2017 and Kevin Juica for multiple pay periods in November 2016. This has given me concern about improper fiscal management of payroll and tracking accounting with RSD staff and resources. Due to receiving multiple checks external to typical payroll, and marked with mysterious notations (i.e. rent or club bribes), I believe that Jon Piedra and Kevin Juica may also have been double paid money out of the Valentine Life bank account and then they paid some of these funds back to Todd Vandehey so that he may pocket additional misappropriated funds.

18.     In 2017, Todd solicited RSD management and contractors to invest in an improper and unethical scheme/hedge fund with guaranteed rates of return. Todd also solicited customers of RSD with this same proposal, but failed to obtain RSD's consent before doing so. Todd successfully convinced RSD customer, Tynan Hutchins, to invest in his hedge fund. In addition, Todd is not licensed to manage a hedge fund, which he does so from the State of New York, which requires hedge fund managers to be licensed and complete the Series 65. As a result of failing to be properly licensed, Todd is in violation of the Securities Exchange Act of 1934. Since 2010, Todd has also been soliciting investments into his company, Valentine Investment Partners LP (VIP), and also into Vandehey Capital LLC. Solicitation was done via seminars Todd conducted in Las Vegas to RSD and its business partners, as well as video presentations, and an website at viphedgefund.com. Todd failed to disclose that he was not licensed until he had a meeting with me in-person in Las Vegas in February 2017. Furthermore, Todd solicited RSD to similarly convince/pitch clients and staff to invest in his hedge fund without being licensed. I am suspicious that Todd's inability to raise enough money for his hedge fund, without generating enough investment returns to cover losses, was a central reason why Todd may have started to embezzle money from Valentine Life. Todd conveyed to me that he would use assets of Valentine Life to secure hedge fund investments for his clients, and Todd appears to have siphoned funds from the Valentine Life account to his personal account and Todd Valentine account, which appears to cover losses from his external investments. As a result, it leads me to believe that Todd was stealing from Valentine Life in order to cover losses from a Ponzi scheme, whereby Todd convinced VIP clients to provide Todd money to invest in his hedge fund, but Todd was using the money for personal expenses and not solely for investment purposes, which he led clients to believe. To hide his unethical scheme from RSD and other clients, Todd told me that he would hide the fact that he was soliciting investments without a license by getting clients to sign a contract to loan money to Todd at a 15% interest rate, which Todd said was the minimum amount of return that he could guarantee to the hedge fund investors, who signed a contract agreeing to this term. This is a highly unrealistic rate of return in the long run, and it is illegal to make a promise of such a return due to the SEC.gov making it clear on their website that you are committing fraud when you make a "promise of guaranteed returns with little or no risk". So I am suspicious that Todd failed to maintain this inflated investment return and that is why he attempted to steal from the Valentine Life operating account so that investors would not be incentivized to contact the SEC or other authorities to notify them of his illegal activities due to being unhappy with him losing the money that they invested into his hedge

fund. On the other hand, Todd was licensed to sell insurance in Colorado, and Todd failed to also disclose this external business activity to RSD. All unauthorized business activities by Todd involving insurance sales and hedge fund management are violations of Section 14b of the RSD Contractor Agreement that he signed due to Todd soliciting illegal business from RSD clients and financial transactions that RSD "determines to be in conflict with the best interests of the Principal [RSD]". Another disturbing fact is that it appears that Todd used Valentine Life funds to hire a law firm to work on his investment scheme as seen via bank transfer made from the Valentine Life operating account to a law firm that was utilized to work on the structure for his investment scheme. As a result of involving Valentine Life and RSD (and RSD clients) in an illegal investment scheme, Todd appears to have committed investment fraud, conversion, tortious interference, breach of contract, breach of fiduciary duty, unjust enrichment, and negligence. These violations include both civil and criminal actions by Todd.

19.    My email account of papa@realsocialdynamics.com was linked to both the Valentine Life bank account and Todd's personal Bank of America bank account because it was attached to the Valentine Life bank account when I opened the account with Todd in-person in Las Vegas at Bank of America. By default, Bank of America links the personal account and business account of signatories whenever a business bank account is created. I have told Todd to unlink his personal account from his business account because Todd said to me multiple times that it was preventing him from paying RSD via a wire transfer; however, he later told me that his statement was untrue and that he was able to send money via wire transfers anytime. Thus, I believe he originally stated that he was unable to pay via wire transfer so that he could delay paying RSD while he was traveling internationally until he returned to the USA. As a result of my email account being associated with the personal and business accounts of both Todd Vandehey and Valentine Life, I have received a combined total of 17 NSF (Not Sufficient Fund) fee notifications sent to my email address, of combined NSF notifications between both the Valentine Life business account (1 NSF Fee) Todd's personal bank account (16 NSF fees). This has given me alarm about fiscal mismanagement by Todd in his banking because he was spending more money from these bank accounts than was in the accounts themselves.

20.    Due to Todd having poor financial credit ratings on Experian and Transunion, and the fact that Todd told me that he was not filing personal income tax returns, I signed a guarantor document to allow Todd to rent an apartment for $4,495/month (an expenses of $59,940/year in addition to utilities) because I had excellent credit ratings on Experian and Transunion and file both corporate and personal income tax returns to satisfy credit requirements to rent a luxury apartment. Checks were paid monthly to 234-236 W 14th LLC for Apartment 2A. Although Todd eventually moved out of this expensive apartment for an even more expensive apartment, I didn't authorize higher rent to be paid and Todd was fully aware that authorizations for additional expenditures over $50,000 without Shareholder authorization in violation of the Valentine Life operating agreement. In addition, I did not authorize Todd to use my name as a guarantor for any other apartment than the original apartment for $4,495/month.

21.    Unknown petty cash payments are seen on the June and July 2016 bank statements, such as $200 to John Piedra for petty cash, Yuriy Chernin for $60 with check notes of club bribes, petty cash, and $120 for club bribes to Jon Piedra. Also, there was an April 2017 petty cash payment to Todd for $300.07. These mysterious payments total $687.

22.    Todd has 2 merchant accounts to process credit cards and there were only deposits into the Valentine Life checking account from 1 of the 2 merchant accounts via Inchek, which makes me want to be able to audit the other merchant account to see if Todd misappropriated Valentine Life revenue from this other merchant account.

23.     Todd has 2 merchant accounts to process credit cards and there were only deposits into the Valentine Life checking account from 1 of the 2 merchant accounts via Inchek, which makes me want to be able to audit the other merchant account to see if Todd misappropriated Valentine Life revenue from this other merchant account.

24.     As RSD uses Clickbank as a credit card processing company that accepts credit cards similar to a merchant account. Todd changed the settings in the Real Social Dynamics Clickbank account to not release funds and also attempted to change the email on the account from a Real Social Dynamics email account to his personal account in order to hide the money in the account; however, my Chief Operations Officer, Stuart Lewis, was able to revert the changes Todd attempted to make so that we could regain financial transparency over funds from Clickbank.

25.     Although Todd and I signed a Valentine Life operating agreement stating that both RSD and Todd would be signatories on the Valentine Life bank accounts, Todd unilaterally decided to go to the Santa Monica branch of Bank of America in 2016 to remove me as a signatory on the bank account and then removed my access from the online banking. After multiple meetings over several months, Todd provided an online login; however, Todd removed the login access because he didn't want to give financial transparency to RSD. Therefore, I had a phone conversation with Todd and convinced him to give me a new login. He complied and gave me login access, but it expired because I didn't login for 30 days. Therefore, we requested another login and Todd complied with our request and provided a new login over 30 days after we requested a new login. I maintained access to the account until Todd removed me as a signatory from the account in August 2016 without authorization. Therefore, I re-added myself to the Valentine Life bank account due to the improper financial management actions of Todd Vandehey and then shutdown the account. Unfortunately, 2-3 days before I was able to shut down the account, Todd made an unauthorized transfer of $61,302.51 to his personal American Express account leaving $12,090.77 left in the account, which is less than the liabilities of the company and making it impossible for Valentine Life to complete outstanding fulfillment to clients without Real Social Dynamics using its own funds to process refunds and complete fulfillment of obligations to our clients and staff for Valentine Life responsibilities, including the responsibilities to pay credit-lines of $30,000 and other financial obligations that must be fulfilled due to the dissolution of Valentine Life and the financial mismanagement of Todd Vandehey via comingling funds and financial misappropriation of business funds to personal accounts established by Todd at various financial institutions. Fortunately, Bank of America has agreed that Todd committed bank fraud and they processed paperwork in order to recover the funds that were taken by Todd from the Valentine Life checking account via unauthorized ACH transfer to his personal account.

26.     David Zelman has informed RSD Staff that Todd is paying for an additional apartment for Todd's girlfriend and child that may be approximately $4,000-5,000/month and it is unknown if funds from the Valentine Life bank account are paying for this apartment or if Todd is using misappropriated funds to cover the rent for this apartment.

27.     Clients that are canceling RSD Immersion Programs in September are requesting refunds for their travel and I believe Valentine Life should be responsible for these refunds. Money inappropriately taken by Todd should cover these expenses. As a result, there are multiple clients who paid $1,497 for RSD Immersion and digital products relating to the RSD Todd brand that have requested refunds. In addition, travel expenses lost by clients are being reimbursed and these expenses should be expenses deducted from Valentine Life's funds. The total of refunds and travel reimbursements is $34,163.

28.     Todd pays RSD Contractors in the same sporadic manner that his personal distributions have been made. There is no tracking for how Todd paid RSD Contractors or accountability even though he has weekly meetings to discuss Todd's work with RSD Contractors with Mikhail Kuznetsov (RSD Chief Marketing Officer) and Stuart Lewis (Chief Operations Officer). RSD's Officers have

told Todd on multiple weekly meetings that RSD needs to know how RSD Contractors are being paid and for what services. I have personally reminded Todd that we need to track payments of all RSD Contractors working with Todd and justification for their work, and my statements were also made while at the offices of Maier Gutierrez & Associates in Las Vegas. Every check paid to RSD Contractors are for various amounts and even though payroll for RSD Contractors exceed $50,000, there is no justification or approval by RSD for the payroll of RSD Contractors, who also appear to receive sporadic bonuses as notated on checks. This is a violation of the operating agreement of Valentine Life, which requires expenses over $50,000 to receive unanimous approval from all Shareholders.

29.     Multiple RSD customers who have purchased products and services from RSD Todd-affiliated websites appear in the RSD Shopping Cart because Todd and RSD have an agreement that all customer data for clients who purchased RSD Todd services would be shared with RSD. However, multiple customers have contacted RSD customer service requesting refunds and they have not appeared in the RSD shopping cart. This means that Todd Vandehey has created separate online shopping carts whereby he is accepting orders that have remained hidden from RSD so that Todd does not have to disclose this revenue. These customers are requesting refunds from RSD Todd-affiliated products and services. In addition, we have had to pay for the payroll of bookkeepers, marketing staff, and customer service representatives that work for RSD to resolve customer issues and investigate how Todd may have inappropriately hidden clients' records and financial payments due to a lack of financial transparency and potential misappropriation of funds from Todd. So far, the payroll expenses for RSD Contractors working on these project to resolve Todd's improper actions is $15,853.97

30.     Todd is accepting money from a PayPal account for RSD Immersion program clients and other RSD students that have purchased products and services from RSD. These funds were paid into a Valentine Life PayPal account via credit card payments and PayPal payments. We have also received deposits for various amounts from a Valentine Life PayPal account, and the statements from that PayPal accounts have not been revealed to RSD by Todd, which makes me wonder if Todd is personally pocketed cash from the Valentine Life PayPal account or if he is paying for personal expenses from the Valentine Life PayPal account.

31.     On May 19, 2017, Todd has emailed Stuart Lewis, Michael Ampikapon (the Real Social Dynamics Chief Financial Officer), and I mentioning that he had to make a $6,785 transfer to his personal bank account in order to pay RSD Contractor payroll even though they are receiving checks from the Valentine Life bank account and Todd has not provided any evidence that he paid the RSD Contractors with the cash from Todd's personal bank account. This is suspicious because Todd could have sent a wire transfer to staff or had Bank of America send checks through the online banking portal instead of paying himself cash to pay for RSD Contractors' payroll.

32.     The amount of cash that Todd has transferred for 50% of profits to his personal checking account far exceeds the money transferred to the RSD checking account even though Todd has agreed via email, meetings, agreements, and in-person conversations that profit distributions between RSD and Todd should be the same.

33.     In 2016, Todd paid himself more than 50% of the profits by paying himself a much higher percentage of the profits than he paid to RSD. The amount paid from Valentine Life to RSD's checking account was a total of $52,391.73. On the other hand, the amount that Todd paid himself out of the Valentine Life checking account to his personal checking account was $203,727.97. Initial deposits from 2015 from RSD were $15,000 and $5,100 from Todd for a total of $20,100 (which can be attributed to money Todd earned from RSD as a RSD Contractor prior to the creation of Valentine Life). During January 2016, RSD made a deposit into the Valentine Life bank account for $21,744.34 and, in February 2016, RSD transferred to Valentine Life a payment of $66,557.26 (on February 26) and an additional payment of $7,500. The total of these deposits was $95,801.60 of which $15,000

was revenue from RSD Immersion and $100,901.60 was money owed to Todd. On March 11, Todd transferred $61,526.26 to himself personally and the balance owed to him shortly thereafter. If you deduct the $100,901.60 that Todd earned prior to Valentine Life from the $203,727.97 that Todd paid to himself from Valentine Life, you discover that Todd paid himself personal disbursements from profits of Valentine Life in the amount of $122,926.37, which is $50,434.64 more profits than the $52,391.73 that was paid to RSD in 2016. Therefore, Todd owes to RSD the $50,434.64 in excess payments that Todd paid to himself.

34.     Todd failed to pay proper profit distributions in 2017 by overpaying himself more money than he was supposed to according to the agreement that RSD and Todd would be sharing profits 50/50. In 2017, Todd paid to RSD a total of $93,173. On the other hand, in 2017, if you exclude the $52,907 payment made to Todd, the amount that Todd has paid himself in personal disbursements was $102,603.90. This means that Todd paid himself both the $52,907 in personal disbursement and an additional amount of $9,430.90 more than the amount that he paid to RSD in 2017. Therefore, Todd owes to RSD the $9,430.90 in excess personal payments that he paid to himself in unauthorized funds.

35.     Todd's legal counsel has also sent legal letters attempting to gain access to RSD assets and inappropriately filed a motion to seek a TRO (temporary restraining order) to attempt to allow Todd Vandehey to access RSD properties so that he can continue to misallocate funds and participate in hiding financial transparency from RSD. All legal costs associated with disputing Todd's false and malicious claims should be paid for by Todd Vandehey personally for frivolous attempts at motions and threats for lawsuits. On the other hand, Todd should also pay for the costs associated for additional legal work and accounting work to recover the funds that were misappropriated by Todd Vandehey, including any lawsuits where RSD is a Plaintiff against Todd for potential misappropriated funds and any additional violations by Todd.

36.     The profit margins for RSD Todd revenues have dropped to less than 50% of what they were from the time Todd was involved with managing some operations. During a phone call with Todd in August 2017, Todd admitted he expected profits to drop lower as well. This is unacceptable and also makes me wonder if the profits may not be as bad if there was proper reconciliation and a disallowance of excessive personal disbursements and personal expenses due to potential problems incurred from comingling and financial misappropriation and attempts by Todd to prevent proper accounting. Todd has continually claimed in meetings with me that he didn't want to spend money on accounting and that he preferred to do it himself, but I question his intentions of such a decision being solely for being thrifty with money. Todd's profits when compared to every other RSD Instructor business line are unusually low. In 2016, average instructor profits are 38.32% whereas Todd declares profits of 12.87%, which is the lowest among all 8 RSD Instructors working on the same compensation structure as RSD Todd. Comparatively, Todd's profit margin was 25.62% in 2015 and 20.49% in 2014.

37.     When Todd Vandehey made personal disbursements, he transferred the funds owed to himself personally into his personal bank account or his "personal business account" known as Todd Valentine Corporation, which acted as a holding company for Todd's personal funds. However, Todd also made personal transfers to his personal American Express, pocketed cash, made unknown transfers from the Valentine Life PayPal account, and also there is a credit line of $30,000 that Todd claimed to create for Valentine Life without any more details shared about the account.

38.     Todd violating the terms of his work under the RSD Contractor Agreement and is also under investigation for potential embezzlement by RSD. Therefore, he can be terminated from RSD and have the relationship dissolved at any point. In addition, Todd violated the terms of his RSD Contractor Agreement. For violation of the RSD Contractor Agreement Point 23, Todd did not return all Confidential Information back to RSD, including access to websites created by RSD Contractors (including textanddatesmachine.com, daygameaccelerator.com, and attractionunlocked.com). Also, Todd was found in violation of Point 37 of the RSD Contractor Agreement and he failed to provide

the requested accounting documentation, including legal bills, to assist in determining if Todd was in breach of contract. As a result, according to Point 45 of the RSD Contractor Agreement, Todd is liable to pay in full all legal expenses, including the legal bills of Real Social Dynamics as a result of default of this RSD Contractor Agreement. Although this amount will be expected to be much higher in the future, legal bills incurred by Real Social Dynamics as a result of the Contractor violating the RSD Contractor Agreement is presently at $8,843.33.

39.     RSD has had to process refunds and complete fulfillment for RSD Todd business after dissolution of Valentine Life and the termination of Todd Vandehey as a RSD Instructor and RSD Contractor. In order to satisfy RSD customers who purchased RSD Todd-affiliated products and canceled RSD Immersion programs, RSD has had to provide products and services for free to clients as added value to ensure that these customers remained happy. This includes transferring clients to more expensive programs, such as the RSD Bootcamp or giving digital products to clients. We also agreed to reimburse clients for their non-refundable travel costs for airfare and lodgings. The total additional expenses for Bootcamp upgrades, travel reimbursements, and digital product value that would retail over $80,000.

40.     Financial audit from a Certified Public Accountant must be completed on all financial records relating to Valentine Life to determine the total amount of misappropriated funds overall because there are additional damages that should be added to the list of expenses in addition to all of the damages listed on this Affidavit of Damages. The total dollar amount of misappropriated money listed in this Affidavit of Damages is for $812,665.97.

41.     I am signing this affidavit freely and voluntarily. If called to do so, I would competently and truthfully testify to all matters set forth herein.

FURTHER YOUR AFFIANT SAYETH NAUGHT.



_____
NICHOLAS KHO

SUBSCRIBED and SWORN to before me
this 27 day of September , 2017.

_____
NOTARY PUBLIC
In and for the State of Nevada, County of Clark

Charity Johnson
Notary Public
State of Nevada
My Comm. Exp. 02/19/2018
Certificate No. 10-1584-1

9