JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: (702) 629-7900
Facsimile: (702) 629-7925
E-mail:     jag@mgalaw.com
            sgk@mgalaw.com

*Attorneys for Defendants Real Social Dynamics, Inc.,*
*Nicholas Kho, and Owen Cook*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TODD VANDEHEY, an individual,<br><br>                    Plaintiff,<br><br>vs.<br><br>REAL SOCIAL DYNAMICS, INC., a Nevada corporation; NICHOLAS KHO, an individual; OWEN COOK, an individual,<br><br>                    Defendants. | Case No.: 2:17-cv-02230-JAD-NJK<br><br>**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFF'S AMENDED COMPLAINT** |

Defendants REAL SOCIAL DYNAMICS, INC. ("RSD"), NICHOLAS KHO ("Kho"), and OWEN COOK ("Cook") (collectively "Defendants"), by and through their attorneys, the law firm of MAIER GUTIERREZ & ASSOCIATES, hereby submit this Motion to Compel Arbitration and Dismiss Plaintiff's Amended Complaint ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(1), requesting the court dismiss the claims asserted in Plaintiff's Amended Complaint [ECF No. 41] for lack of subject matter jurisdiction and that Plaintiff be compelled to arbitrate the claims therein.

///

///

///

1

1    This Motion is based upon the papers and pleadings on file in this action, the memorandum

2    of points and authorities, the exhibits attached hereto, and any argument of counsel to be made at the

3    time of the hearing for this matter.

4    DATED this 10th day of November, 2017.

5                                                   Respectfully submitted,

6                                                   **MAIER GUTIERREZ & ASSOCIATES**

7

8                                                   /s/ *Steven Knauss*

                                                    JOSEPH A. GUTIERREZ, ESQ.
9                                                   Nevada Bar No. 9046
                                                    STEVEN G. KNAUSS, ESQ.
10                                                  Nevada Bar No. 12242
                                                    *Attorneys for Defendants Real Social Dynamics,*
11                                                  *Inc., Nicholas Kho, and Owen Cook*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I.   PROCEDURAL BACKGROUND

On August 22, 2017, Plaintiff Todd Vandehey ("Vandehey" or "Plaintiff") commenced this action by filing his Verified Complaint [ECF No. 1].  The Verified Complaint asserted one cause of action: Provisional Remedy (i.e. injunctive relief) pursuant to NRS 38.222.  On the same day, Plaintiff filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction [ECF Nos. 7, 8].  On September 6, 2017, Defendants filed an opposition to Plaintiff's Emergency Motion [ECF No. 22].

On September 8, 2017, the court held a motion hearing to address whether Plaintiff suffered irreparable harm and was likely to succeed on the merits.  Plaintiff's Emergency Motion was denied in its entirety with the court stating:

> The first prong and first factor at which this [motion] fails for me is the likelihood of success on the merits of a claim.  And, number one, it's because I don't know what the claims would even be here.  Nobody has pled a claim.  I don't know who is gonna sue who or what the nature of those claims are gonna be…**And the plaintiff has not clearly alleged, or demonstrated to me, that he owns any of these subject assets other than Valentine Life owning [a] Bank of America checking account**.

*See* Motion Hearing Transcript 9/8/2017, pg.34 ln.25 – pg.35 ln.5, pg. 36 ln. 22-25 (emphasis added) (attached hereto as **Exhibit 1**).  The court then addressed the issue of irreparable harm, stating:

> The moving party has to show that he will be injured in a way that money cannot remedy.  I don't find that the plaintiff has made this showing.  He argues that Valentine Life's goodwill, advertising efforts, and reputation will be damaged if these assets are not restored.  But he's the plaintiff, not Valentine Life.  **I don't find that the plaintiff has demonstrated that he personally will suffer irreparable harm, particularly anything that goes beyond money damages or that can't be remedied with money damages at this point**.

*See* Motion Hearing Transcript 9/8/2017, pg.38 ln.3-12 (emphasis added).

On September 28, 2017, Plaintiff filed a second Emergency Motion, but for expedited discovery and to amend his verified complaint [ECF Nos. 28, 32].  On October 2, 2017, Defendant filed an opposition to Plaintiff's second Emergency Motion [ECF No. 37], with Plaintiff's reply in support of his motion filed on October 3, 2017 [ECF Nos. 38, 39].  On October 4, 2017, the court granted Plaintiff's Emergency Motion to amend his complaint and to conduct expedited discovery.

To that end, on October 12, 2017, Plaintiff filed both his Amended Complaint [ECF No. 41] and a Motion for Summary Judgment at to Count One of the Amended Complaint [ECF No. 42].

## II.   STATEMENT OF FACTS

Plaintiff's Amended Complaint is the second time Vandehey has attempted to articulate claims against Defendants for alleged hostile actions taken in shuttering the Valentine Life Inc. entity, for restricting Vandehey's access to social media accounts, and for freezing assets within the Valentine Life Inc. bank account.   Although this motion abstains from scrutinizing the merits of Plaintiff's allegations, unquestionably they contain numerous falsehoods which not only undermine Plaintiff's credibility, but also demonstrate that he has no legal basis for the claims he is attempting to assert. The simple truth behind the allegations in the Amended Complaint is that Plaintiff is angry because he mistakenly believes he is entitled to property indisputably owned by Defendants.   The Amended Complaint is yet another attempt by Vandehey to air his displeasure with Defendants for terminating his employment and then denying him continued access to Defendants' infrastructure and assets.

Pertinent to this Motion, it is undisputed Plaintiff and Defendant RSD executed the Operating Agreement for Valentine Life Inc.   *See* Operating Agreement of Valentine Life attached as **Exhibit 2**. Section 11.9 of the Operating Agreement defines the alternative dispute resolutions to which the parties must adhere, and states in part:

> Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge.   If either party fails [to] engage in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation.   In the event that the mediation does not resolve the dispute, **the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County**.   [T]he parties hereby consent to the jurisdiction…of the United Stated District Court for the Central District of Nevada for injunctive relief, specific performance or other relief in aid of any proceedings hereunder.   The Arbitrator shall determine issues of arbitrability but may not limit, expand or otherwise modify the terms of this Agreement nor have any authority to award punitive or other damages in excess of compensatory damages.

*Id*. at § 11.9 (emphasis added).

Because both parties take the position that the Valentine Life Operating Agreement controls in this case, the Dispute Resolution clause above is also valid and enforceable.   Accordingly, this matter should be dismissed, with Plaintiff compelled to pursue the claims presented by way of his Amended Complaint through Arbitration as provided for in the Operating Agreement, which was entered into on or about October 5, 2015.

## III.   LEGAL ARGUMENT

Plaintiff's Amended Complaint against Defendants must be dismissed and arbitration must be compelled, as this court does not have subject matter jurisdiction over this matter.  Pursuant to the binding dispute resolution clause to which Plaintiff consented by executing the Valentine Life Operating Agreement, "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge…In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS)." Accordingly, because the court has no subject matter jurisdiction over Plaintiff's claims, the court should grant Defendants' motion to compel arbitration and dismiss the Amended Complaint.

### A.  THE PARTIES SHOULD BE COMPELLED TO ARBITRATE

The court should compel the parties to submit to arbitration because the Federal Arbitration Act ("FAA") reflects an overwhelming preference favoring arbitration, the arbitration clause in the Valentine Life Operating Agreement is valid and enforceable with no barriers to enforceability such as unconscionability, and both parties have expressed a clear intent to be bound by the arbitration clause.

### 1.  Legal Standard Favoring Arbitration

The FAA provides that arbitration agreements generally shall be "valid, irrevocable, and enforceable." 9 U.S.C. § 2.  "In enacting § 2 of the FAA, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."  *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).  Courts place arbitration agreements "upon the same footing as other contracts."  *Volt Info. Sciences, Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

Under the FAA, parties to an arbitration agreement may seek an order from the court to compel arbitration.  9 U.S.C. § 4.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  Thus, the court's "role under the [FAA] is…limited to determining (1) whether a valid

agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1261 (9th Cir. 2013).  If a district court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration.  *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1276-1277 (9th Cir. 2006).

## 2.   The Arbitration Clause is Valid and Enforceable

The court should compel arbitration because (1) there is an agreement between the parties to arbitrate, (2) Plaintiff's claims in this case fall within the scope of the arbitration clause, and (3) the clause is not substantively or procedurally unconscionable.  *See Ainsworth v. Paramount Residential Mortgage Grp., Inc.*, No. 2:11-CV-0007-LRH-PAL, 2011 WL 1496677, at *1 (D. Nev. Apr. 19, 2011) (citing *Lifescan, Inc. v. Premier Diabetic Services, Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004)).

The first two factors of *Ainsworth* are certainly satisfied here.  Plaintiff and Defendant RSD both voluntarily entered into the Valentine Life Operating Agreement containing the arbitration clause. After its execution in October 2015, both parties adhered to its terms and obligations, inclusive of Section 11.9 defining non-judicial dispute resolution. Furthermore, Plaintiff alleges the following in his Amended Complaint via section headers.

- Defendants took inimical actions against Valentine Life.  *See* ECH No. 41 at p. 8.
- Defendants engaged in ultra vires acts disrupting Valentine Life operations.  *Id*. at 9.
- Defendants restricted access to websites, preventing sales by Valentine Life.  *Id*. at 10.
- Defendants restricted access to social media promoting Valentine Life.  *Id*. at 12.
- Defendants restricted access to business accounts connected to Valentine Life.  *Id*. at 14.
- Defendants improperly removed funds from the Valentine Life bank account.  *Id*. at 15.
- Defendants forged documents concerning Valentine Life.  *Id*. at 16.
- Defendants improperly revised the list of officers/directors for Valentine Life.  *Id*. at 16.
- Defendants wrongfully dissolved Valentine Life.  *Id*. at 17.

To be clear, the ***entire*** factual underpinning of Plaintiff's Amended Complaint rests upon the allegations of wrongdoing Defendant committed against Valentine Life.  Count One, which puts the non-solicitation and non-competition clauses of Plaintiff's Contractor Agreement at issue, is still connected to Valentine Life because Plaintiff alleges those clauses now prevent him from rebuilding

the entity.  Counts Two through Four are connected to Valentine Life because Plaintiff used his personal email when conducting sales, marketing, and customer service pursuant to the Valentine Life Operating Agreement and his RSD Contractor Agreement.  *See* Todd Vandehey Contractor Agreement, attached hereto as **Exhibit 3**.  Count Five involves allegations of wrongfully converted funds from a PayPal account linked to todd@valentinelife.com, which Plaintiff alleges are both assets of Valentine Life.  Although much of Plaintiff's allegations are plagued with falsehoods, the claims fall within the scope of the arbitration clause with the Valentine Life Operating Agreement because they are all arise from Plaintiff and Defendants involvement with Valentine Life.

Here, the scope of the arbitration agreement entered into between the parties was designed to be extremely broad and to provide the sole dispute resolution mechanism.  It explicitly encompasses "any controversy or claims arising out of or relating to this Agreement or the breach thereof."  **Ex. 2** at § 11.9.  Thus, there can be no question that the substantive dispute between the parties is subject to arbitration, as it is clearly relating to the operations of Valentine Life.

### 3.   The Positions of the Parties

Both parties have evidenced a clear intention to arbitrate the issues underlying this case.  Plaintiff's counsel repeatedly articulated this position at the September 8, 2017 hearing on Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, stating:

> MR. PROCACCINI: …The purpose of this motion is to maintain [Valentine Life Inc.'s] immediate viability to allow the parties to enter into some meaningful Alternate Dispute Resolution through mediation or through arbitration.

*See* **Ex. 1** at pg.4 ln.11-14.

> MR. PROCACCINI: And, quite frankly, Your Honor, all of these issues can be raised. There is a forum for that.  It's the mediation or the arbitration.

*See* **Ex. 1** at pg.11 ln.23-25.

> MR. PROCACCINI: So, Your Honor, the Operation Agreement provides that all disputes must first be brought to mediation.  But both parties do not have to participate in mediation.  But, if mediation is not successful, then both parties have to participate in arbitration.

*See* **Ex. 1** at pg.12 ln.20-24.  Defendants' counsel clearly stated likewise:

> MR. GUTIERREZ: [T]his is a case strictly about money; about the one asset that Valentine Life does have, which is a bank account…that could be handled during

arbitration.   How much Mr. Vandehey took from the company could be handled at arbitration.  How much he believe he's owed from RSD can be handled at arbitration.

*See* **Ex. 1** at pg.28 ln.5-12.  There is no dispute between the parties as to whether there is an agreement to mediate and/or arbitrate Plaintiff's claims.  Counsel for both parties manifested a clear intent to arbitrate the underlying claims.  Indeed, the court spoke directly to this issue at the conclusion to the hearing on Plaintiff's Emergency Motion on September 8, 2017:

> THE COURT: And here I'm afraid that maybe we just have the cart before the horse is part of the problem when I get to all of these aspects of analysis here…[T]his is an Operating Agreement that has an arbitration provision…[I]t seems that there's more that the parties needed to do here before coming to me to try to seek relief.

*See* **Ex. 1** at pg.33 ln.10 – pg.34 ln.6.  Again, by their own statements to the court, both parties have acknowledged the validity of the arbitration provision within the Valentine Life Operating Agreement, and have also expressed an intent to comply with its terms.[1]  Plaintiff's Amended Complaint is nothing more than a second attempt to circumvent the alternative dispute resolution procedure previously agreed to by both parties.

### B.  PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED

Because the parties agreed to submit their dispute to arbitration pursuant to the FAA, the court should dismiss this action under Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1) a responding party may file a motion to dismiss the adverse party's claims based on the court's lack of subject matter jurisdiction.  Numerous court have held that, "[i]f a district court determines that parties have agreed to arbitrate a dispute, the district court…no longer has the authority to resolve arbitrable claims." *Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 732 (7th Cir. 2005) (citing 9 U.S.C. § 3).   Agreements to arbitrate have, therefore, been held to be jurisdictional.  S*ee Jacobsen v. J.K. Pontiac GMC Truck, Inc.*, 2001 WL 1568817, at *1 (N.D. Ill. Dec. 10, 2001); *Harris v. United States*, 841 F.2d 1097, 1099 (Fed. Cir. 1988) (upholding district court dismissal under Rule 12(b)(1)); *Atkins v. Louisville & Nashville R.R. Co.*, 819 F.2d 644, 647 (6th Cir. 1987) (dismissal proper under Rule 12(b)(1) for failure to exhaust mandatory remedies).

---

[1] In fact, the Defendant submitted a JAMS Demand for Arbitration Form on 9/27/2017 and an arbitrator (Hon. David T. Wall (Ret.)) was subsequently appointed on October 23, 2017.

Dismissal is the appropriate remedy when all of a plaintiff's claims are subject to arbitration. *Webb v. Harris*, 378 F.Supp.2d 608, 613 (M.D.N.C. 2005).  In the 9th Circuit, the courts have similarly held that upon a finding of an enforceable arbitration clause, the matter was properly dismissed under Rule 12(b)(1) while the parties exhausted their non-judicial remedies.  *L&M Creations, Inc. v. CRC Info. Sys.*, No. 2:10-CV-00685-GMN, 2011 WL 1103636, at *9 (D. Nev. Mar. 23, 2011); *Telepet USA, Inc. v. Qualxomm, Inc.*, No. 2:14-CV-00568-GMN, 2014 WL 6826833, at *3 (D. Nev. Dec. 3, 2014).

In this case, all of Plaintiff's claims are subject to binding arbitration.  Therefore, Defendants' respectfully request that this case be dismissed, with instructions that Plaintiff pursue his claims in arbitration.

## IV.   CONCLUSION

Based on the foregoing argument, Defendants respectfully request that the court enter an order dismissing this action and compelling the parties to submit to arbitration according to the terms of the Valentine Life Operating Agreement.

DATED this 10th day of November, 2017.

Respectfully submitted,

**MAIER GUTIERREZ & ASSOCIATES**

 /s/ *Steven Knauss*

JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
STEVEN G. KNAUSS, ESQ.
Nevada Bar No. 12242
*Attorneys for Defendants Real Social Dynamics, Inc., Nicholas Kho, and Owen Cook*

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of MAIER GUTIERREZ & ASSOCIATES, and that on the 10th day of November, 2017, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFF'S AMENDED COMPLAINT** was electronically filed with the Clerk of the Court using the Court's CM/ECF system, and served to all parties and counsels of record registered to receive CM/ECF notifications.

/s/ *Charity Johnson*

An employee of MAIER GUTIERREZ & ASSOCIATES

**INDEX OF EXHIBITS**

| Description | Exhibit No. |
|---|---|
| Motion Hearing Transcript (9/8/2017) | 1 |
| Valentine Life Operating Agreement | 2 |
| Todd Vandehey RSD Contractor Agreement | 3 |

# Exhibit 1

## Motion Hearing Transcript
## 9/8/2017

# Exhibit 1

```
                  2:17-cv-2230-JAD-NJK - September 8, 2017
```

 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEVADA

 3

 4 TODD VANDEHEY,                )  Case No. 2:17-cv-2230-JAD-NJK
                                 )
 5              Plaintiff,       )  Las Vegas, Nevada
                                 )  Friday, September 8, 2017
 6       vs.                     )  1:06 p.m.
                                 )  Courtroom 6D
 7 REAL SOCIAL DYNAMICS, INC.,   )
   et al.,                       )  MOTION HEARING
 8                               )
                Defendants.      )
 9              _____)            *ORIGINAL*

10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12      BEFORE THE HONORABLE JENNIFER A. DORSEY,
                UNITED STATES DISTRICT JUDGE

13

14

15 APPEARANCES:

16 For Todd VanDeHey:

17         GEORGE F. OGILVIE, III, ESQ.
           McDonald Carano
18         2300 West Sahara Avenue, Suite 1200
           Las Vegas, Nevada 89102
19         (702) 873-4100
   (continued next page.)
20

21 Court Reporter:          Felicia Rene Zabin, FCRR, RPR, CCR 478
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada 89101
23                          (702) 676-1087, FZ@nvd.uscourts.gov

24

   Proceedings reported by machine shorthand.  Transcript produced
25 by computer-aided transcription.

2:17-cv-2230-JAD-NJK - September 8, 2017

1  APPEARANCES CONTINUED:

2  For Todd VanDeHey:

3          STEVEN L. PROCACCINI, ESQ.
           Nissenbaum Law Group, LLC
4          2400 Morris Avenue, Suite 301
           Union, New Jersey 07083

5

6  For Real Social Dynamics, Nicholas Kho, and Owen Cook:

7          JOSEPH A. GUTIERREZ, ESQ.
           STEVEN KNAUSS, ESQ.
8          Maier Gutierrez & Associates
           8816 Spanish Ridge Avenue
9          Las Vegas, Nevada 89149
           (702) 629-7900

10

11 Also Present:

12         Todd VanDeHey
           Nicholas Kho

13

14

15

16

17

18

19

20

21

22

23

24

25

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1          LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 8, 2017; 1:06 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  All rise.

5          THE COURT:  Good afternoon.  Please have a seat.

6          COURTROOM ADMINISTRATOR:  Now is the time set for a

7   motion hearing in Case No. 2:17-cv-2230-JAD-NJK, Todd VanDeHey

8   versus Real Social Dynamics, Inc., et al.

9          Counsel, please state yourself appearances.

10          MR. OGILVIE:  Good afternoon, Your Honor.  George

11   Ogilvie on behalf of Todd VanDeHey.  With me today is

12   Mr. Steven Procaccini who has been admitted pro hac.

13          THE COURT:  Good afternoon.

14          MR. GUTIERREZ:  Good afternoon, Your Honor.  Joseph

15   Gutierrez and Steven Knauss on behalf of the defendants, Real

16   Social Dynamics, Nicholas Kho, and Owen Cook.  With me today is

17   also Nicholas Kho.

18          THE COURT:  All right.  Good afternoon.

19          So this is the hearing set for the Motion for a TRO and

20   Preliminary Injunction.  I've reviewed all of the papers; I'm

21   familiar with the arguments.

22          Mr. Procaccini, am I pronouncing that right?

23          MR. PROCACCINI:  Yes, Your Honor.

24          THE COURT:  All right.

25          It's your motion so the argument is yours and the

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  podium is yours, sir, if you wouldn't mind taking the podium.

2          MR. PROCACCINI:  Thank you, Your Honor.

3          And with us, Your Honor, at counsel table is the

4  plaintiff, Mr. Todd VanDeHey.

5          THE COURT:  Thank you.

6          MR. PROCACCINI:  So, Your Honor, plaintiff has

7  presented an Emergency Motion for a Temporary Restraining Order

8  and an Order to Show Cause, as Your Honor had eluded to, and it

9  is for emergent relief to restore the plaintiff's company which

10 he maintained a 50 percent ownership of, which Valentine Life,

11 LLC.  The purpose of this motion is to maintain its immediate

12 viability to allow the parties to enter into some meaningful

13 Alternate Dispute Resolution through mediation or through

14 arbitration.

15         It's undisputed that the plaintiff and the defendants

16 have entered into an Operating Agreement in 2015 to establish

17 Valentine Life, LLC, to be a joint venture between the

18 plaintiff and the defendant and the purpose is to provide

19 coaching service, if you will, to a population that seeks to

20 improve its dating skills and those services are provided

21 through online platforms as well as through individual and

22 personal coaching seminars as well as webinars.

23         And the parties -- to understand the nature of the LLC

24 that's at issue, one needs to first appreciate the relationship

25 between the parties that goes back to 2002 where the plaintiff

1  and both of the individual defendants, Mr. Kho and Mr. Cook,

2  had met while the plaintiff was at Union College studying

3  mechanical engineering.  They became friends and then they

4  each -- all three of them entered into the dating/coaching

5  business and eventually the two individual defendants formed

6  Real Social Dynamics, RSD.

7        Shortly after meeting in 2004, the plaintiff became an

8  independent contractor for the defendant corporation.  And I

9  understand through the defendant's opposition that somehow they

10 are reading into the current relationship some form of a

11 noncompete or some of the terms of the original independent

12 contractor agreement that was entered into in 2004 which was

13 clearly superseded by the eventual Business Joint Venture that

14 was entered into in 2015 between the plaintiffs and the

15 defendants which was to form this Valentine Life, LLC, that had

16 no such restrictive covenants associated with it.

17       Through this joint venture both RSD as well as

18 Valentine Life have been able to thrive.  Mr. VanDeHey is a

19 very successful instructor and I believe even -- I don't know

20 if RSD would even dispute that he has become known as one of

21 the best instructors at RSD.  But certain parts of the

22 relationship and trust issues began to breakdown where, at

23 least from the plaintiff's perspective, there needed to be a

24 break, a final break, between RSD and Valentine Life to allow

25 each of the parties to move on.  And that's what led to the

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  discussions back in April to find a way to formally separate

2  the RSD entity from both the Valentine Life and Todd VanDeHey's

3  side of the deal.

4        So, as of April of 2017, there is two equal parties

5  that had 50 percent equal shares in the company that is at

6  issue now.  Through the ensuing months, the negotiations

7  ultimately broke down with a final offer to sell RSD's portion

8  of the business on -- that was conveyed to the plaintiff on

9  August 11th.  There is a phone -- what is alleged to be a

10 transcript of a telephone conversation that was not in the

11 presence of counsel and which was not authorized by the

12 plaintiff to be audiotaped in this manner.  So we object to the

13 admissibility of the phone conversation as being violative of

14 Nevada's rules against one-party taping.

15       But we can look to that to see that there is -- that it

16 was far from a meeting of the minds to either come to a final

17 deal to sell Mr. VanDeHey RSD's portion of Valentine Life's

18 business and it was certainly not within the realm of

19 consideration or even agreement, for that matter, that as of

20 the end of that phone call somehow Mr. VanDeHey had

21 relinquished dissolution control to RSD.  In other words, in no

22 way can we read this transcript to say that somehow

23 Mr. VanDeHey had modified the 2015 Operation Agreement to

24 remove the formalities of dissolution which would require

25 unanimous consent of the shareholders.

2:17-cv-2230-JAD-NJK - September 8, 2017

1        And this offer that is set forth in the taped

2   transcript from August 11th by its own terms is followed up by

3   an email from defendant's counsel on August 12th, 2017, which,

4   Your Honor, I can direct you to, which is attached as Exhibit K

5   to the opposition.  And, you know, we must note, too, that our

6   initial objection to this being offered as an exhibit is this

7   was in contemplation of a settlement.  And we don't think that

8   it's proper that this document was even brought to the Court's

9   attention, but here we are.  And there seems to be some sort of

10  a waiver of the settlement privilege.

11       We have an email here from defendant's counsel:

12  "Importance:  High.  Subject:  Terms of Dissolution of

13  Valentine Life."  And here what's set forth in these what

14  appear to be material terms would be that the Defendant RSD

15  would receive $75,000 from Mr. VanDeHey.  In return,

16  Mr. VanDeHey through operation and now through -- if this deal

17  were to go forward, Mr. VanDeHey would be 100 percent

18  controller of Valentine Life.  He would then receive control of

19  his brand, including his YouTube channel; any emails generated

20  therefrom; and access rights to any non-product-affiliated

21  websites; Valentine Life entity to be dissolved by RSD; and

22  Valentine Life financial merchant accounts to be closed.  This

23  email ends with:  "I understand the parties are eager to move

24  forward.  To that end, the terms described above are valid

25  until Tuesday, August 15 at 5:00 p.m. after which a full

2:17-cv-2230-JAD-NJK - September 8, 2017

1  dissolution agreement with additional boilerplate language can

2  be drafted and reviewed by the attorneys."

3          Even by this very nature, this seems to be an offer for

4  the sale of one-half of a business.  It is certainly not a

5  final sale.  It is certainly not a memorialization that somehow

6  plaintiff agreed that now RSD can simply dissolve the

7  corporation.  And the fact that it's left open until Tuesday is

8  clearly an offer or a counteroffer and is not the final

9  memorialization of a document.

10          And to go one step further, Your Honor, it goes without

11  saying that in the opposition papers, they try to paint

12  Mr. VanDeHey as an employee who was terminated who is trying to

13  get access to his employer's computer.  Here you have a 50/50

14  partnership.  This was not an employer termination.  It seems

15  to be that -- but it's not clear through the papers -- that the

16  defendants are trying to take this August 11 taped phone call

17  and this August 12 email to be this was the day that

18  Mr. VanDeHey was terminated and he needed all of his rights

19  from his former employer to be cut off.  And the paper -- this

20  just does not convey that message.  What it does convey is an

21  offer to buy and an offer to sell a deal that broke down.  And

22  then what happened in the next few days is quite troubling, but

23  it really goes to show the motive.

24          So as April -- as August 12th passes, as we can see

25  from Mr. VanDeHey's supplemental declaration at Exhibits O, P,

1 and Q, we see documents that Defendant Mr. Kho filed with the

2 Secretary of State for the State of Nevada where -- if you'll

3 excuse me, Your Honor, if I can grab the exhibits.

4         THE COURT:  Sure.

5      (Pause in the proceedings.)

6         MR. PROCACCINI:  Your Honor, at Exhibit O, we have a

7 Statement of Change --

8         COURT REPORTER:  You are covering the microphone.

9         MR. PROCACCINI:  I see it.  Thank you.

10         At Exhibit O, we have a Statement of Change of

11 Registered Agent that is allegedly filed -- allegedly signed by

12 Plaintiff Mr. VanDeHey on March 9, 2017.  But we have reason to

13 believe that that is actually not his signature.

14         THE COURT:  I don't think I have that as O.  I'm sorry.

15 I might . . .

16         MR. PROCACCINI:  This -- Exhibit O on the supplemental

17 declaration that was filed on September --

18         THE COURT:  Oh, okay.

19         MR. PROCACCINI:  -- 1, 2017.

20         THE COURT:  All right.  Okay.  Hold on.

21      (Pause in the proceedings.)

22         THE COURT:  I was looking at Defendant's Exhibit O.

23      (Pause in the proceedings.)

24         THE COURT:  All right.  I'm there.

25         MR. PROCACCINI:  Okay.  So, Your Honor, this is a

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  Statement of Change of Registered Agent by Represented Parties

2  as filed on behalf of Valentine Life sometime on or about

3  March 10, 2017.

4         And here you see the second signature from the bottom,

5  "Todd VanDeHey, President."  And we -- there's reason to

6  dispute that this is actually his signature or his date.  But

7  we can take that -- take this as being the date that this was

8  filed.

9         In Exhibit P, this is now Valentine Life,

10  Incorporated's Amended Officer and Director List which is filed

11  the same day that we received this email from defendant's

12  counsel, on August 12, 2017.

13         Now, you have Nicholas Kho submitting an electronic

14  signature under the penalty of perjury where he's now listing

15  himself as being the President, the Secretary, the Treasurer,

16  and the Director for Valentine Life, Incorporated, despite the

17  fact that the Operating Agreement from 2015 sets forth

18  Mr. VanDeHey as the President.  There's been no other

19  agreement; there's been no agreement between the shareholders

20  to have Mr. VanDeHey replaced by Mr. Kho in any of these

21  capacities.

22         And then, Your Honor, to go to Exhibit Q, which is the

23  next exhibit in Mr. VanDeHey's supplemental declaration, we

24  have Mr. Kho signing as Officer for Valentine Life on

25  August 14, 2017, Certificate of Dissolution with the Secretary

─2:17-cv-2230-JAD-NJK - September 8, 2017─

1   of State in the State of Nevada.

2         While this was going on, Your Honor, Mr. Kho, in his

3   supporting affidavit in opposition to the motion for emergency

4   restraints, makes a lot of allegations about wrongdoing with

5   money and couldn't find traceability, couldn't find

6   accountability on one hand but yet then he is, quite frankly,

7   bragging about these monthly phone calls that he would have

8   with Mr. VanDeHey.  There were these monthly phone calls; they

9   were talking about very specific issues.  Yet he waits until

10  the day after his offer to sell his side of the company goes

11  down to dissolve all these, to change -- to remove without

12  authority Mr. VanDeHey from the LLC; goes to the bank,

13  presents -- we learned this morning that Mr. Kho presented

14  these fraudulent documents to the Bank of America in order to

15  have Mr. VanDeHey's name removed from the business account.

16        So the company was operating just fine for three and a

17  half years, up until the point that Mr. Kho's offer to sell his

18  share of the business was refused.  So this is revisionist

19  history to go through these 70 paragraphs of unsupported

20  allegations of wrongdoing, allega- -- you know, accusations of

21  there's someone in New York that says something bad may be

22  happening in New York that may be a collusion.

23        And, quite frankly, Your Honor, all of these issues can

24  be raised.  There is a forum for that.  It's the mediation or

25  the arbitration.  And there's a lot of issues going back and

—2:17-cv-2230-JAD-NJK - September 8, 2017—

1  forth.  The point is to make sure there's a live entity to even

2  fight over --

3          THE COURT:  What are --

4          MR. PROCACCINI:  -- at the end --

5          THE COURT:  -- those --

6          MR. PROCACCINI:  -- of this.

7          THE COURT:  -- issues?  Is it mediation?  Is it

8  arbitration?

9          MR. PROCACCINI:  Um-hum.

10          THE COURT:  No one's provided me the details of any --

11          MR. PROCACCINI:  Okay.

12          THE COURT:  -- of those claims.  What is the status of

13  that?  Where is it?  What's happening?

14          MR. PROCACCINI:  So -- I'm sorry, Your Honor.  So I

15  understand.  Are you asking about the procedure for the

16  Alternate Dispute Resolution or the actual substance of the

17  claims between the parties?

18          THE COURT:  Both.

19          MR. PROCACCINI:  Okay.

20          So, Your Honor, the Operation Agreement -- the

21  Operating Agreement provides that all disputes must first be

22  brought to mediation.  But both parties do not have to

23  participate in mediation.  But, if mediation is not successful,

24  then both parties have to participate in arbitration.

25          THE COURT:  Right.  And so where are we at on that?

1          MR. PROCACCINI:  Yeah.  So where we are at on that is

2     given the fact that that first step is not compulsory and given

3     that we -- both parties have agreed to mediation and, frankly,

4     both -- I believe the last that it stood -- and maybe Mr. --

5     maybe opposing counsel can add some more information -- but I

6     believe we actually even selected a potential mediator knowing

7     full well that the mediator can't be the eventual arbitrator if

8     it goes that far.  I do not believe that we've identified a

9     potential arbitrator.

10          And that's actually where it sat.  And the urgency of

11     the situation, the fact that the lights were just turned off

12     for this company, and this is -- you know, I'm sure you can

13     understand, Your Honor, when we're dealing with YouTube

14     websites and we're dealing with these online platforms, a lost

15     day is a lost month.  You know, a for sale sign in the

16     electronic age, you know, there's no way of knowing when that

17     for sale sign comes down.  So every day that Mr. VanDeHey and

18     Valentine Life are prevented from continuing this business that

19     supposedly was worth enough to be sold for $75,000 ten days ago

20     now we have Mr. Kho saying I don't know what the point of this

21     emergency motion is.  And he says that --

22          (Pause in the proceedings.)

23          MR. PROCACCINI:  -- "What Todd is request" -- at

24     page 22 of Mr. Kho's declaration, which is paragraph 61, sub

25     (b)(2) -- this pretty much sums it all, Your Honor -- sums it

───2:17-cv-2230-JAD-NJK - September 8, 2017───

1  up all, Your Honor, from the plaintiff's perspective, quote,

2  what Todd is requesting is also impossible to restore since

3  most of what is requested was permanently destroyed RSD assets

4  by proper owner RSD.

5         So it seems to be the argument that there's no need for

6  emergent relief.  We've destroyed 99 percent of this thing.

7  This thing is just about dead.  There's no need to revive it.

8  Just -- you know, we don't have to worry about these fraudulent

9  documents submitted to the Secretary of State or the fraudulent

10 documents that were presented to Bank of America to have names

11 of accounts removed.  We're just about done.  Just let us

12 finish the rest.

13        And, Your Honor, what's telling about this -- and I

14 don't know if it was artfully written but it's artfully true --

15 "What Todd is requesting is also impossible to restore since

16 most of what is requested was permanently destroyed."  But,

17 Your Honor, the good news is not all has been permanently

18 destroyed.  We believe that if the lights are turned back on,

19 that if Mr. VanDeHey's company is allowed back into what is

20 rightfully his -- which is access to his customer lists, access

21 to the merchant -- the merchant operating equipment necessary

22 to operate the company, such as these -- using online banking

23 software so that the clients can continue to pay for products

24 that they are accustomed to be getting from Mr. VanDeHey and

25 the goodwill that he provides -- there is still a company to be

2:17-cv-2230-JAD-NJK - September 8, 2017

1  saved.  But, if this is left in its current state for much

2  longer, frankly, we're gonna be left with a mediation arguing

3  over he took this; he didn't authorize that; he took -- he did

4  this; he did that.  What's the company worth?  Zero.  In fact,

5  you know what we're gonna be worried about?  Every time

6  Mr. VanDeHey opens up his mail he's gonna be wondering which

7  customer is suing him for products that they bought that they

8  are not getting now.

9        THE COURT:  Well, why would they be suing him

10 personally and not the company?

11       MR. PROCACCINI:  Well, they could.  But right now the

12 company has been dissolved.  I don't think it's too hard to try

13 to pierce him legally.  Right now, according to these papers,

14 he was the President and now he's disavowed all of his

15 positions; now the company's been dissolved.  They know who he

16 is.  He's easy to find.

17       THE COURT:  But, according to the papers, it was

18 Mr. Kho who dissolved all of that.  He was the President at the

19 time.  So I think -- part of my challenge here, to be

20 completely candid with you, Mr. Procaccini, is that the

21 allegations, the damages that we're talking -- well, we're

22 talking a lot about money damages, number one; and, two, it's

23 Valentine Life's potential injuries, not the named plaintiff's

24 potential injuries here.  And there's a distinction because

25 Valentine Life is not the plaintiff here.

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1          MR. PROCACCINI:  Um-hum.

2          THE COURT:  And so the injuries that it might be

3    suffering -- loss of goodwill, whatever else --

4          MR. PROCACCINI:  Um-hum.

5          THE COURT:  -- you've alleged -- those don't belong --

6    those damages -- or those injuries do not inure to your client.

7    It's not his goodwill; it's the company's goodwill.  And,

8    beyond that, I'm struggling to find anything that's

9    irreparable.

10          MR. PROCACCINI:  Well, Your -- I mean, Your Honor, I --

11   Mr. VanDeHey is known as Mr. Valentine.  So the subscribers of

12   his services, the thousand customers that are out there, the

13   people that are spending thousands of dollars for him, they are

14   looking for Todd Valentine, who they know as Todd Valentine.

15   They're not saying, well, oh, I see.  He's an LLC.  They --

16   what they're --

17          THE COURT:  But he's --

18          MR. PROCACCINI:  -- writing about --

19          THE COURT:  -- he's not --

20          MR. PROCACCINI:  -- is him.

21          THE COURT:  -- the LLC.  There is an LLC --

22          MR. PROCACCINI:  That's correct.

23          THE COURT:  -- but --

24          MR. PROCACCINI:  There is an LLC.

25          THE COURT:  -- it is jointly owned 50/50 by these two

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  sides in --

2         MR. PROCACCINI:  That's --

3         THE COURT:  -- here.

4         MR. PROCACCINI:  -- correct.  Well, no longer, I guess.

5  You know, right now Mr. VanDeHey has been completely shut out.

6         He was a -- he was a board member.  He was a

7  shareholder.  He was a 50/50 owner.  And someone just doctored

8  the documents, sent 'em into the Secretary of State, and walks

9  into a bank and now he's gone.

10        How -- and the irreparable injury, these people that

11 are gonna be suing, whether we can succeed to the defense

12 sayin', I'm sorry, you sued the wrong person; we're the LLC;

13 you came to my apartment in Manhattan to sue me, he's still

14 gonna have to defend himself.  Out there in this media -- in

15 this realm as far as his reputation goes, it is him that's not

16 providing the services.  Regard -- it almost doesn't matter

17 what this LLC is.

18        And the irreparable harm, Your Honor -- we can't

19 understate it enough -- these people out there that have bought

20 these webinars, these packages of webinars, they bought it

21 associated with him.  This isn't like going to Best Buy and

22 buying a TV.  You like the TV; you don't remember the salesman.

23 A lot of goodwill goes into the marketing of these products.

24 And right now Mr. VanDeHey doesn't know who's not satisfied

25 with whatever substitute instructor was being provided; does

2:17-cv-2230-JAD-NJK - September 8, 2017

1  not know whether substitute products were being provided.  I
2  did see something in here that has some form of compensation.
3  There is a discount package or some sort of a complimentary
4  service being provided.  Well, that's fine.  That'll just make
5  this customer get into RSD's product line.  That does nothing
6  to the expectations of these customers that have specifically
7  bought Mr. Valentine's products.
8            And right here, Your Honor, this was not a shell
9  corporation just to manage merchant accounts.  This is a
10  company that has been operated for 3 years on its own and has
11  thrived and thrived in a partnership with RSD.  So there is
12  goodwill associated with that.
13            And, Your Honor, the destruction -- this is not simply
14  about money.  The destruction of the business -- I mean, we
15  have here that RSD was going to sell their share for 75,000;
16  this will be dwarfed by the amount of liability and exposure
17  that my client has to third parties.
18            THE COURT:  Thank you.
19       (Pause in the proceedings.)
20       MR. GUTIERREZ:  Good afternoon, Your Honor.
21       THE COURT:  Good afternoon.
22       MR. GUTIERREZ:  Your Honor, I want to address the
23  questions that you had for counsel that I think are exactly why
24  we're here today which is we're here for injunctive relief.
25  Not just any ordinary injunctive relief but a mandatory

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1   injunction which is a lot higher standard than the preliminary

2   injunction standard that they've been quoting.

3          And, in just going through the elements and the

4   elements of irreparable harm, counsel could not articulate what

5   irreparable harm they would have.  Not a single client can he

6   point to or a single contractor could he point to that hasn't

7   been paid that's even threatening a lawsuit.  That's all

8   speculation.  In fact, the only evidence we have is Mr. Kho's

9   affidavit that says every single customer we've reached out and

10  given them an option:  Here's an additional product.  We'll

11  help you this way.  Here are the RSD contractors that all have

12  agreements with RSD.  We'll pay their fees.

13         What Valentine Life is it's -- it has one asset, that

14  asset's a bank account that holds money that people are

15  fighting over.  That is not, in any court in this country,

16  irreparable harm ever.  And, if there was such an immediate

17  harm that we have, why hasn't the plaintiff filed any type of

18  arbitration demand or a complaint?  The only claim we even have

19  here is under NRS 38.222 which is, well, we belong in

20  arbitration but we're coming for injunctive relief.

21         So, when we step back and look at what are the actual

22  claims that they have a likelihood of succeeding on the merits,

23  they don't even have a claim.  They don't have a single claim

24  out there.  And, even under that claim, it's gonna fail as a

25  matter of law.  But, if you look at what they are asking for,

──────2:17-cv-2230-JAD-NJK - September 8, 2017──────

 1 they are asking for all RSD assets.  Not once did counsel come

 2 up here and say, oh, Valentine Life or Mr. VanDeHey himself

 3 owns the email lists or the websites or the name RSD Todd.

 4        In fact, what we've proven and what we've shown is we

 5 have a 2004 contract agreement where everything that

 6 Mr. VanDeHey's produced in conjunction with his work with RSD

 7 belongs to RSD.  In fact, RSD has trademarks and copyrights on

 8 all of this.  If any irreparable harm there is, is if there

 9 is -- if these two -- if RSD and Mr. VanDeHey are forced to

10 work together, that would be irreparable harm as to RSD because

11 now we have trademark violations of the use of the name RSD

12 Todd; trade -- issues with copyrights on some of the products

13 that RSD owns that Mr. VanDeHey would try to sell.  Um --

14        THE COURT:  So one of the arguments that they raised is

15 that this independent contractor agreement was superseded by

16 the Valentine Life Operating Agreement.  What's your response

17 to that?

18        MR. GUTIERREZ:  Absolutely not.  They worked hand in

19 hand together because there's not a single merger clause in

20 that.  If you look at the actual Operating Agreement, not a

21 single merger clause that says this agreement supersedes all

22 prior agreements.  And, in fact, this is a course and conduct

23 of how RSD operates.  They have another contractor named Luke

24 Crowe who has the same type of agreement, an Operating

25 Agreement with the company that he owns 50/50 with RSD and then

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1   a separate Independent Contract Agreement.

2           And that's the exact same scenario we have here with

3   Mr. VanDeHey.  We have a company that was created.  It was

4   given one asset, which was a bank account, and everything else

5   was remained owned by RSD.  And that's the way RSD's been

6   operating this company and that's -- it's very clear that

7   plaintiff in how they pled their Complaint and how they

8   requested their relief in the Motion for Preliminary Injunction

9   never state that they own any of these assets.  All they say is

10  they operated them.  Well, that's what the Operating Agreement

11  says.  There's joint managerial control in operating this

12  company so . . .

13          And I think Your Honor raised a great point earlier is

14  if there is loss of goodwill and if there's a business harm

15  that belongs to Valentine Life who is not a party to this.  So

16  we're talking about Mr. VanDeHey individually and what his harm

17  is and that hasn't been shown.  There hasn't even been a

18  suggestion of that much less the high standard of proof that is

19  required for a mandatory injunction or for a likelihood of

20  success on the merits so . . .

21          And, Your Honor, if you could -- to go through what

22  counsel was stating about Mr. Kho's decision to dissolve the

23  company, why he did it, it's -- and it's apparent.  We go

24  through in detail the amount of damage that was uncovered

25  when -- financially to -- when RSD finally got ahold of the

2:17-cv-2230-JAD-NJK - September 8, 2017

1  bank account statements and the American Express card to see

2  what Mr. VanDeHey was doing with the money that was supposed to

3  be split.  Well, what they found was Mr. VanDeHey has paying

4  his personal residence.  He was paying for personal expenses.

5  He was not disclosing anything to them.  He was taking payments

6  from certain customers via PayPal and other means that was

7  never being disclosed to RSD.  And they had to put a stop to

8  it.  And, when they put a stop to it, they dissolved the

9  company.  That's -- the phone call was recorded because it was

10  a partner meeting to discuss dissolution.  That was the

11  agreement.  Mr. VanDeHey at no point objects to RSD taking its

12  assets, which they rightfully own, and moving forward.  And the

13  reason that they moved forward in such a manner and have the

14  split is because they have to have a separation between Todd

15  VanDeHey and RSD Todd which would be trademark infringement and

16  what they have.  We've provided all the registered trademarks

17  for Real Social Dynamics and RSD and RSD Immersion, and all

18  these products that they have.

19        So, Your Honor, just in going through the elements of

20  the relief that's being sought here today, we look at the

21  *Winter* case, which is the United States Supreme Court case on

22  injunctive relief, and we've talked about irreparable harm.  We

23  talked about that already.  They have not made a single

24  showing.  Their entire irreparable harm analysis is based

25  solely on speculation that a customer may get mad and at some

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  point find Mr. VanDeHey and then sue him.  That's not even

2  close to what they need to get into court today and get the

3  relief they sought.

4          We discussed the mitigation by RSD and what they did to

5  reach out to any customers that emailed them.  Um --

6          THE COURT:  Explain to me what's happened.  So, since

7  mid-August, the situation where the company -- where Valentine

8  Life gets dissolved.  Why did that happen?  How did that

9  happen?

10         MR. GUTIERREZ:  The --

11         THE COURT:  Under what authority did that happen?

12         MR. GUTIERREZ:  Under Section -- let me grab the

13  Operating Operation -- under Section 9.1 of the Operating

14  Agreement, which is a liq- --

15         THE COURT:  Exhibit M.

16         MR. GUTIERREZ:  -- a liquidating event, which is a

17  withdrawal of the shareholder --

18         THE COURT:  I'm sorry.  Tell me the section again.

19         MR. GUTIERREZ:  Sorry, Your Honor.  Section 9.1,

20  subsection (e) -- or (c), subsection (e), which states that

21  "Except as otherwise provided herein, the Company shall be

22  dissolved, liquidated and terminated upon the occurrence of any

23  of the following events," which are defined as "Liquidating

24  Events":

25         Section (e) says, "the withdrawal of a Shareholder."

1          So one shareholder withdraws, that's a liquidating

2    event that results in dissolution.  And that's what we have

3    here, Your Honor.  They're saying there's no basis for RSD to

4    dissolve the company.  That's exactly what they operated under.

5    And they had to dissolve the company and had to move forward so

6    there's separation and there is no more confusion that

7    Mr. VanDeHey is associated with RSD.  So there is -- I know the

8    plaintiff has kind of thrown smoke and mirrors sort of what's

9    been happening.  But every step that's been taken has been

10   taken pursuant to this Operating Agreement to move forward with

11   dissolution.

12          THE COURT:  So the evidence of the withdrawal is . . .

13          MR. GUTIERREZ:  RSD's withdrawal as a shareholder, as a

14   50/50 shareholder.  And the evidence would be -- I mean, what

15   we have is a conversation between Mr. Kho and Mr. VanDeHey and

16   Mr. Cook where it was stated that RSD is going to move forward

17   and move on.  And I think the exact words of Mr. VanDeHey:

18   Well, that that's the world we live in.  That's fine.  There's

19   nothing I can do to stop you.  And that's what we have here.

20   We were shocked when we see a complaint for injunctive relief.

21          THE COURT:  So hold on.  Let me understand.

22          So the shareholder that withdrew was RSD?

23          MR. GUTIERREZ:  Correct.

24          THE COURT:  And then RSD -- if RSD withdrew, then how

25   did RSD dissolve it?

—————2:17-cv-2230-JAD-NJK - September 8, 2017—————

1      MR. GUTIERREZ:  Because then, Your Honor, you go to the

2   next provision, which would be Section 6.4, which is the wind

3   down of the company.  I'm sorry.  6 point . . .

4     (Pause in the proceedings.)

5      MR. GUTIERREZ:  I'm sorry.  9.2, the very next section.

6   "Upon the occurrence of a Liquidating Event" -- which we

7   have -- "the Company shall continue solely for the purposes of

8   winding up its affairs . . ., liquidating its assets."

9      So that's what we have is RSD moving forward with

10  liquidating and dissolving the company.  And what is the

11  company?  What does the company have?  It's a single bank

12  account from Bank of America.  And, if that's what we're

13  fighting over, that's strictly monetary damages.  Strictly.  At

14  no point has anybody on the plaintiff's side raised the claim

15  that they are entitled to ownership rights of the content on

16  the YouTube channel, the email lists, the social media.  All of

17  the things that they've requested in their injunctive relief at

18  no point has anyone said that is owned by either Mr. VanDeHey,

19  who is the plaintiff, or even Valentine Life, who is a

20  nonparty.

21      So what we're talking about is a bank accounts with

22  money.  And whoever -- it's my understanding that Mr. VanDeHey

23  took the money to pay some of his American Express bills.  But

24  that's money that both sides can argue over at arbitration, not

25  emergency injunctive relief before this Court, Your Honor,

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1   which is why we're here today.

2          Your Honor, we briefed at length the reasons for the

3   termination of Mr. VanDeHey as a contractor; what we believe

4   are misappropriation of funds.  That will be left for another

5   day, Your Honor, because this is not a fight about money which

6   we're here today for.

7          But, when you go to the likelihood of success on the

8   merits, Your Honor, we don't have any evidence or any proof

9   that would rise to that level of a likelihood of success on the

10  merits of their claims.  In fact, they don't have any claims.

11  The only claim they have is requesting arbitration.

12          So I'm really confused as to what that likelihood of

13  success would be and how they would meet that because it's

14  undisputed that the content and the email lists and the videos

15  that they want to be preserved to the status quo are owned by

16  RSD.  So it's why we used the same analogy of either an

17  employee or a contractor being terminated and then being asked

18  to have access to information, to emails, to clients, to work

19  product that is owned by the company.  That's exactly what we

20  have here.

21          So the next step, Your Honor, which they haven't talked

22  about is the balance of hardships which we -- the way it's

23  defined is looking at the effect of granting or denying a

24  temporary restraining order on either party -- or on this

25  party.  The effect of a TRO and the effect on RSD would have a

————2:17-cv-2230-JAD-NJK - September 8, 2017————

1  massive impact because, as we detailed, this company's been

2  around for over 15 years.  They've had a considerable amount of

3  time developing their client base, securing their intellectual

4  property, developing their platform, their training.  By

5  allowing Mr. VanDeHey to have access to that again through

6  Valentine Life, it would cause a huge likelihood of confusion

7  as to who it belongs to and with their customer lists.

8  Allowing him to have access to RSD's assets after what they've

9  uncovered about his conduct with the finances would be

10 irreparable to the company.  What would he do with that content

11 that belongs to RSD?  What would he do with those email lists

12 that belong to RSD?  And what's why it's problematic and the

13 balance of hardships definitely favors RSD in this case, Your

14 Honor.

15       A case in point.  One of the emails that Mr. VanDeHey

16 is looking for is todd@realsocialdynamics.com.  Real Social

17 Dynamics is a registered trademark of the defendants.

18 Mr. VanDeHey has absolutely no right to that.  We don't have a

19 single license agreement, we don't have a single contract, we

20 don't have a single provision in the Operating Agreement that

21 says these assets owned by RSD can be used by Valentine Life or

22 Mr. VanDeHey.  Not a single one.

23       The final element, Your Honor, would be looking at the

24 public interests in this which a mandatory injunction, which is

25 the relief being sought here, would be against the public's

2:17-cv-2230-JAD-NJK - September 8, 2017

1   interest because it would allow lawfully terminated contractors

2   to force a company to rehire them.  I think that's the issue we

3   have.  To allow them to have access to assets they do not own,

4   unfettered access.

5          And I think that's where we're at, Your Honor.  I think

6   this is a case strictly about money; about the one asset that

7   Valentine Life does have, which is a bank account with a

8   balance of -- I don't know what it is -- but at one point

9   75,000.  That could be handled during arbitration.  How much

10  Mr. VanDeHey took from the company could be handled at

11  arbitration.  How much he believes he's owed from RSD can be

12  handled at arbitration.  But it's telling that there is no

13  urgency with this because there has been no complaint filed by

14  the -- or arbitration demand by the plaintiff.

15         So, as we sit here, Your Honor, there is no irreparable

16  harm; there's no likelihood of success on the merits; the

17  balance of hardship weighs heavily in RSD's favor; and the

18  public interest at this stage, Your Honor, for a mandatory

19  injunction does not support this type of relief.

20         Your Honor, if you have any questions -- I know you've

21  read everything -- I can -- I'd be more than happy to answer

22  any questions you have.

23         THE COURT:  I don't think I have anymore questions.

24         MR. GUTIERREZ:  Thank you, Your Honor.

25         THE COURT:  Thank you.

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

 1          MR. PROCACCINI:  Your Honor, may I?

 2          THE COURT:  Mr. Procaccini.

 3          MR. PROCACCINI:  So, Your Honor, I don't -- I didn't

 4   gain much clarity into the probing into this whole mechanism

 5   that was used to dissolve Valentine Life.

 6          And, at paragraph 30 of Mr. Kho's declaration, which is

 7   Exhibit C to the opposition, at page 8 he says, "Section 9

 8   [sic] says the company will be dissolved upon Withdrawal of a

 9   Shareholder and I withdrew."  So I guess the withdrawn

10   shareholder then files documents with the Secretary of State to

11   appoint himself as President, Treasury, Vice President, and

12   Secretary.

13          THE COURT:  But isn't the whole gist of what

14   happened -- and how it got dissolved and why it got dissolved

15   and who gets what interest out of that -- isn't that what is

16   required to be mediated or arbitrated?

17          MR. PROCACCINI:  It frankly -- no.  It's all issues are

18   required to be mediated or arbitrated.  This -- the affidavit

19   of damages claims a total of $776,000 of unaccountable

20   income -- unaccountable moneys that's to be raised in the

21   arbitration and the mediation.  The irreparable harm, Your

22   Honor, is not quantified in dollars for the destruction of LLC;

23   it's to delay the initiation of the arbitration proceeding.

24          You know, NRS 38.222 empowers the court to provide a

25   provisional remedy to protect the effectiveness of the

─────2:17-cv-2230-JAD-NJK - September 8, 2017─────

1  arbitra- --

2         THE COURT:  Right.

3         MR. PROCACCINI:  -- the arbitral proceeding.

4         THE COURT:  Right.

5         When I've got somebody who is a party to the arbitral

6  proceeding.  But we don't have an arbitral proceeding yet.

7         MR. PROCACCINI:  Well, Your Honor, we -- when we filed

8  these papers, the intent was to plug a hole in the leak right

9  then and there, you know, as of a conversation on a Friday

10 night supposedly that led to an immediate termination; now we

11 have fraudulent documents filed with the Secretary of State;

12 seizures of bank accounts.  The point was to get to the status

13 quo ante.  The irreparable harm is to not be able to go back to

14 August 9th until all of these issues that seemed to be bubbling

15 up to the surface between these parties can be raised in an

16 arbitration or a mediation.

17         If there's no penalty to filing fraudulently documents

18 with the Secretary of State to seize what plaintiff's counsel

19 just said is the only asset of the company, the bank account,

20 then I don't know what deterrent, you know, there is to any

21 director just removing the board; taking a hundred percent of

22 what they say are the assets; and moving on because now there's

23 nothing left to mediate over.  There's nothing left to

24 arbitrate.  We've killed it; it's dead.  There's nothing to

25 fight over.  Then at that point -- so now we're being told that

1  because we were following the -- because we were seeking

2  emergent injunctive relief to basically prevent any more harm

3  from doing so, we should have filed an arbitration demand?

4  Then they would have had a motion to dismiss here because now

5  we've initiated an arbitration or we would have had a motion to

6  dismiss that because we have a --

7          THE COURT:  What I'm --

8          MR. PROCACCINI:  -- a TRO application.

9          THE COURT:  -- saying is the statute 38.222 is a remedy

10 for relief that a party to an arbitral proceeding --

11         MR. PROCACCINI:  Um-hum.

12         THE COURT:  -- can seek.  And we don't even have one of

13 those parties here yet because we don't have an arbitral

14 proceeding.  And you have an Operating Agreement that has an

15 arbitration provision; right?

16         MR. PROCACCINI:  Followed by a failed mediation

17 provision.  So perhaps, in hindsight, maybe that Monday morning

18 we should have just made a TRO for an arbitration that Monday

19 afternoon.  But we didn't know that the Secretary of State was

20 being advised of a different structure that we had never heard

21 of.  We didn't know that the Bank of America account had been

22 depleted.  At that point, we were agreeing on a mediation but

23 we were seeing that we had a dance partner that had no interest

24 in dancing.  We were being strung along, perhaps, with this

25 false hope that somehow Mr. VanDeHey would be able to actually

—————2:17-cv-2230-JAD-NJK - September 8, 2017—————

1  own a hundred percent of the company that he built from scratch

2  from a former 50 percent ownership interest.

3        And, you know, quite frankly, Your Honor, at that

4  point, time was of the essence.  Time still is of the essence.

5  As each day goes by, it looks more and more bleak that there

6  will be something eventually to fight over.  Right now the

7  patient is sick, but it's not dead.

8        Your Honor, if we're looking at the balance of the

9  hardships to be what RSD would have to do in order to plug this

10 company back in, what information it would have to make

11 available back to Mr. VanDeHey, there is no -- there is no

12 balance there.  There is no irreparable harm.  This is

13 information that Mr. VanDeHey, frankly, doesn't even receive.

14 We're talking about a third-party platform that uses an email

15 list in order to market and sell its products.  There is no

16 exposure to RSD if Mr. VanDeHey came in possession of that

17 information that's provided from that third-party provider.

18        There is no irreparable harm to RSD's trademark as if

19 as though it's inconceivable to have some sort of a sublicense

20 to use your brand where there's a comarketed affiliation, some

21 sort of a joint venture moving forward.  This is Valentine Life

22 in association with RSD on the YouTube channel.  This is smoke

23 and mirrors this whole threat of somehow invalidating the

24 trademark or copyrights of RSD if somehow Valentine Life

25 continues to use the brand that it's been associated with for

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  over three and a half years now.

2       So, Your Honor, if you have any other questions

3  regarding the dissolution of the company or in regard to the

4  irreparable harm.

5       THE COURT:  I don't think I do.

6       MR. PROCACCINI:  Thank you, Your Honor.

7       THE COURT:  Thank you so much.

8       All right, gentlemen.  Thank you for your briefing and

9  for your argument.

10      There are a lot of kind of loose ends here.  And the

11 first for me is the statute, whether I even have the authority

12 or whether this is the right forum for this dispute at this

13 moment in the first place because this is a Operating Agreement

14 that has an arbitration provision -- a mediation then

15 arbitration provision.  It's at Section 11.9 of the Operating

16 Agreement.  And the motion, the Emergency Motion for Temporary

17 Restraining Order and Preliminary Injunction, is frame up for

18 me to start out with NRS 38.222 and that section says that

19 "Before an arbitrator is appointed" -- in an arbitration,

20 essentially -- "and is authorized and able to act, the court,

21 upon motion of a party to an arbitral proceeding and for good

22 cause shown, may enter . . . provisional remedies."

23      And here I'm afraid that maybe we just have the cart

24 before the horse is part of the problem when I get to all of

25 these aspects of the analysis here, but it starts here because

───2:17-cv-2230-JAD-NJK - September 8, 2017───

1  we don't have parties to an arbitral proceeding yet.  We may

2  have maybe parties to a mediation.  I don't know and no one's

3  demonstrated to me that those would be proper parties and that

4  that would trigger for me the ability to act under 38.222.  But

5  it seems that there's more that the parties needed to do here

6  before coming to me to try to seek relief and -- so it's

7  unclear if there's even been a proceeding that has been

8  triggered here, let alone an arbitral one, that would authorize

9  me to act under 38.222.

10         Nevertheless, even assuming that I have the power and

11  authority to provide the relief, this injunctive relief that's

12  requested, I still have to deny the motion.  And the first

13  reason that I have to deny the motion is when I'm applying the

14  *Winter* factors, *Winter v. Nat. Res. Def. Council* -- it's 555

15  U.S. 7; it's a 2008 case -- these are the factors that we all

16  know.

17         We all know that preliminary injunction is an

18  extraordinary remedy never awarded as a right.  I have wide

19  discretion to decide whether to grant preliminary injunctive

20  relief.  The moving party has to show, one, the likelihood of

21  success on the claims; two, irreparable harm without

22  preliminary relief; three, the balance of equities tips in the

23  movant's favor; and, four, that an injunction is in the public

24  interest.

25         The first prong and the first factor at which this

——2:17-cv-2230-JAD-NJK - September 8, 2017——

1  fails for me is the likelihood of success on the merits of a

2  claim.  And, number one, it's because I don't know what the

3  claims would even be here.  Nobody has -- nobody's pled a

4  claim.  I don't know who is gonna sue who or what the nature of

5  those claims are gonna be.  If it's gonna be usurpation, if

6  it's going to be -- I mean, it sounds like both parties are

7  going to possibly allege usurpation.  But it's so ill-defined

8  at this point that I don't even know what the claims would be

9  that I'm trying to evaluate on their merits.

10         So it's just so premature here, but -- so I think that

11  the plaintiff has not shown a likelihood of success on the

12  merits of a claim, much less that the law and the facts clearly

13  compel that he or Valentine Life and unidentified employees or

14  contractors should be given access to these assets:  these

15  communications websites, social media accounts, business

16  accounts, financial accounts, and funds.

17         First, even setting aside what those claims might be --

18  and just -- if I presume that it's going to involve RSD's

19  alleged breach of the Operating Agreement and the alleged

20  tortious conduct of winding this up possibly fraudulently, as

21  it's alleged -- been alleged here today, I find no evidence

22  from the plaintiff that these assets that he wants the access

23  to are his.  It seems to me that they are Valentine Life's

24  assets.  And who current owns that is unclear to me.

25         It's undisputed that certainly at some point there was

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  this 50/50 deal between Mr. VanDeHey and RSD in the Valentine

2  Life entity and that it was Valentine Life who has this

3  checking account with Bank of America.  And so I'm troubled to

4  find that it's the plaintiff who has the likelihood of success

5  on claims at this point and that the assets that he wants

6  access to are his and not Valentine Life's.

7          So the evidence that I have seen from the defendants

8  shows that -- and I know it's in some way disputed -- but I

9  haven't seen evidence that the independent contractor agreement

10 terminated with the beginning of the LLC agreement.  I just --

11 I have no evidence to tell me that that independent contractor

12 agreement is dead or ended or no longer valid and that

13 agreement says that -- or provides that confidential

14 information -- like work product, computer software,

15 proprietary data, business operations, marketing and

16 development operations, and customers' information -- is

17 property of RSD.  And the definitions that are provided in that

18 agreement for those items of confidential information seem to

19 be broad enough to me at this point, based on the limited

20 information I have, to cover the assets that are at issue in

21 this case.  And RSD argues that they are and VanDeHey has not

22 provided to me evidence to the contrary.  And the plaintiff

23 does not even -- has not clearly alleged or demonstrated to me

24 that he owns these -- any of these subject assets other than

25 Valentine Life owning of Bank of America checking account.  So

———2:17-cv-2230-JAD-NJK - September 8, 2017———

1  I just -- I have an absence of proof to get me to the point

2  where I could find a likelihood of success on the merits of

3  some claim that I'm guessing as to what it might be.

4       He has alleged that the websites and social media

5  accounts were operated by Valentine Life, but I don't think

6  that that's the same thing as being owned by.  And plaintiff

7  had agreed that "he would have no interest in the Confidential

8  Information including, without limitation, no interest in

9  know-how, copyright, trademarks, trade names, notwithstanding

10 the fact that he may have created or contributed to the

11 creation of them."  And, in that Independent Contractor

12 Agreement, he further agreed "to immediately disclose to [RSD]

13 all Confidential Information developed in whole or in part by

14 [him] during the term of [his] Contract with [RSD] and to

15 assign to [Real Social] any right, title or interest [he] may

16 have in it."  He also agreed that upon RSD's request, he would

17 "turn over to [RSD] all documents, disks or other computer

18 media, or other material in [his] possession or

19 control . . . ."

20      So I just can't find that the "likelihood of success on

21 the merits of a claim" prong has been satisfied here.

22      I also can't find that irreparable harm has been

23 demonstrated.  Money "damages" -- as we all know -- "are not

24 traditionally considered irreparable because the injury can

25 later be remedied by a monetary award."  "Those seeking

————2:17-cv-2230-JAD-NJK - September 8, 2017————

1  injunctive relief" must do more than just state or argue that

2  they will suffer irreparable harm, they "must proffer evidence

3  sufficient to establish a likelihood of irreparable harm."  The

4  moving party has to show that he will be injured in a way that

5  money cannot remedy.  I don't find that the plaintiff has made

6  this showing.  He argues that Valentine Life's goodwill,

7  advertising efforts, and reputation will be damaged if these

8  assets are not restored.  But he's the plaintiff, not Valentine

9  Life.  And he hasn't -- I don't find that the plaintiff has

10  demonstrated that he personally will suffer irreparable harm,

11  particularly anything that goes beyond money damages or that

12  can't be remedied with money damages at this point.

13          There's certainly the argument on both sides that

14  everybody was talking about buying him out for $75,000.  And

15  so -- I mean, that gives me some indication that we are talking

16  about money here and that whatever injury has occurred to this

17  entity -- because I don't even find that it was injury to him

18  personally based on these allegations and the way that this is

19  framed -- but that it would not be remedied by dollars at this

20  point, by a monetary award.

21          So, because the test for a preliminary injunctive

22  relief under *Winter* requires satisfaction of all of the

23  factors, the failure to satisfy these two is fatal to this

24  motion.  So I am denying the Motion for -- Emergency Motion for

25  a Temporary Restraining Order and Preliminary Injunction.  It

—2:17-cv-2230-JAD-NJK - September 8, 2017—

1   is found in the docket at Documents 7 and 8.  So those will be

2   denied.

3         I am not intending to enter a separate order.  The

4   transcript from this case -- from this hearing will be my order

5   and my findings and conclusions are contained on that.

6         MR. GUTIERREZ:  Thank you, Your Honor.

7         MR. PROCACCINI:  Thank you, Your Honor.

8         THE COURT:  Thank you, everyone.  Thank you for your

9   argument.

10      (Proceedings concluded at 2:01 p.m.)

11

12                        --oOo--

13              COURT REPORTER'S CERTIFICATE

14

15      I, FELICIA RENE ZABIN, Official Court Reporter, United

16  States District Court, District of Nevada, Las Vegas, Nevada,

17  do hereby certify that pursuant to 28 U.S.C. § 753 the

18  foregoing is a true, complete, and correct transcript of the

19  proceedings had in connection with the above-entitled matter.

20

21  DATED:  September 12, 2017

22                        /s/ **Felicia Rene Zabin**
                     FELICIA RENE ZABIN, RPR, CCR NO. 478

23

24

25

# Exhibit 2

# Valentine Life Operating Agreement

# Exhibit 2

# OPERATING AGREEMENT FOR

# VALENTINE LIFE, LLC

# A NEVADA CORPORATION

THE OWNERSHIP INTERESTS IN VALENTINE LIFE, LLC (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN ARTICLE 8 OF THIS AGREEMENT AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS THEREOF. THEREFORE, PURCHASERS OF THE INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME. THE INTERESTS HAVE NOT BEEN REGISTERED: (1) UNDER ANY STATE SECURITIES LAWS (THE "STATE ACTS"); (2) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"); OR (3) UNDER THE SECURITIES LAWS OF ANY FOREIGN JURISDICTION (THE "FOREIGN ACTS"), AND NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 8 OF THIS AGREEMENT AND: (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACTS OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE FOREIGN ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER ANY APPLICABLE FOREIGN ACTS OR FOR WHICH SUCH REGISTRATION IS NOT OTHERWISE REQUIRED.

# OPERATING AGREEMENT FOR
# VALENTINE LIFE, LLC
# A NEVADA LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (this "Agreement") for VALENTINE LIFE, LLC(the "Company") is entered into by and between Real Social Dynamics Inc, a Nevada Corporation ("RSD"), as one Shareholder, Todd VanDeHey ("VanDeHey") as another Shareholder and such other parties as listed on Exhibit A attached hereto (together, the "Shareholders").

WHEREAS, the Company filed, on September 15, 2015, the Articles of Organization of VALENTINE LIFE, LLCwith the Secretary of State of the State of Nevada, a copy of which is attached hereto as Exhibit B; and

WHEREAS, the Shareholders desire to adopt an Operating Agreement to govern their respective rights and obligations as Shareholders of the Company and to set forth certain procedures for the governance of the Company.

NOW, THEREFORE in consideration of the premises, the mutual promises and obligations contained herein, and with the intent of being legally bound, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the capitalized words and phrases have the meanings set forth below:

Section 1.1    "Adjusted Capital Contribution" means, as of any day, a Shareholder's Capital Contribution(s) adjusted by distributions under Article 5.

Section 1.2    "Affiliate" has the meaning set forth in the Securities Exchange Act of 1934, as amended.

Section 1.3    "Agreement" means this Operating Agreement, as amended from time to time.

Section 1.4    "Business Day" means any Monday through Friday, excluding federal national holidays.

Section 1.5    "Capital Account" means with respect to each Shareholder the amount of money contributed by such Shareholder to the capital of the Company, increased by the aggregate fair market value (as determined by the Shareholders) of all property contributed by such Shareholder to the capital of the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), the aggregate amount of all Net Profits allocated to such Shareholder, and any and all items of gross income or gain specially allocated to such Shareholder pursuant to Section 4.1,

and decreased by the amount of money distributed to such Shareholder by the Company (exclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to such Shareholder), the aggregate fair market value (as determined by the Shareholders) of all property distributed to such Shareholder by the Company (net of liabilities secured by such distributed property that such Shareholder is considered to assume or take subject to under Section 752 of the Code), the amount of any Net Losses charged to such Shareholder, and any and all "nonrecourse deductions" specially allocated to such Shareholder pursuant to Article 4.

Section 1.6    "Cash Flow" means the excess, if any, of all cash receipts of the Company as of any applicable determination date in excess of the sum of (a) all cash disbursements (inclusive of any reimbursements made to any Shareholder and any repayment of loans made to any Shareholder, but exclusive of distributions to the Shareholders in their capacity as such) of the Company prior to that date, plus (b) any cash reserve, determined by the Shareholders, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide the funds therefore, or as otherwise established by the Shareholders under Section 5.3 of this Agreement.  Cash Flow shall be determined and distributed at such times as the Shareholders determine that funds are available therefore, taking into account the reasonable business needs of the Company.

Section 1.7    "Capital Contribution(s)" means, with respect to any Shareholder, the amount of money contributed to the Company.

Section 1.8    "Company" means VALENTINE LIFE, LLC, a Nevada limited liability company.

Section 1.9    "Company Property" means all real and personal property owned by the Company (including cash) and any improvements thereto, and shall include both tangible and intangible property.

Section 1.10    "Interest" means all of a Shareholder's interest in the Company held pursuant to Section 2.7 hereof, including any and all benefits to which the Shareholder may be entitled as provided in this Agreement, together with all obligations of the Shareholder to comply with the terms and provisions of this Agreement.

Section 1.11    "IRC" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

Section 1.12    "Liquidation" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining balance to the Shareholders).

Section 1.13    "Liquidating Event" has the meaning set forth in Section 9.1 hereof.

Section 1.14    "Manager" means any Person designated or elected to manage the Company pursuant to Section 6.1 of this Agreement.

Section 1.15    "Shareholder" means any Person that becomes a Shareholder pursuant to the terms of this Agreement.

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

Section 1.16  "Net Profits and Net Losses" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss); provided, however, for purposes of computing such taxable income or loss, (i) such taxable income or loss shall be adjusted by any and all adjustments required to be made in order to maintain Capital Account balances in compliance with Treasury Regulations Section 1.704-1(b) and (ii) any and all items of gross income or gain and/or partnership and/or partner "nonrecourse deductions" specially allocated to any Shareholder pursuant to Section 4 shall not be taken into account in calculating such taxable income or loss.

Section 1.17  "Percentage Interest" means the percentage interest of each Shareholder as set forth on the attached Exhibit A, as amended from time to time in accordance with this Agreement.

Section 1.18  "Permitted Transfer" has the meaning set forth in Section 8.1 hereof.

Section 1.19  "Person" means any individual, partnership, corporation, trust, or other entity.

Section 1.20  "Profits" and "Losses" means the Company's net taxable income or loss, as calculated for federal tax purposes.

Section 1.21  "Statute" means the provisions of the Nevada Revised Statutes as set forth in Title 7, Chapter 86 of the State of Nevada, as amended from time to time (or any corresponding provisions of succeeding law).

Section 1.22   "Term" has the meaning set forth in Section 2.4.

Section 1.23  "Transfer" means the voluntary or involuntary, direct or indirect, assignment, sale, pledge, gift or other conveyance of any legal or beneficial interest in an Interest.

Section 1.24  "Treasury Regulations" means any proposed, temporary, and/or final federal income tax regulation promulgated by the United States Department of the Treasury as heretofore and hereafter amended from time to time (and/or any corresponding provisions of any superseding revenue law and/or regulation).

ARTICLE 2
FORMATION OF COMPANY

Section 2.1   Formation.  The Shareholders have formed the Company pursuant to the provisions of the Statute by causing Articles of Organization conforming to the requirements of the Statute to be filed with the Secretary of State of the State of Nevada.

Section 2.2   Name.  Unless and until amended in accordance with this Agreement and the Statute, the name of the Company is VALENTINE LIFE, INC.

3

Section 2.3     Purpose.

(a)     The purpose of the Company is to engage in any lawful activities for which a limited liability company may be organized under the Statute, provided that the Corporation shall not conduct any banking, insurance or trust company business.  Specifically, the Company has been formed as a Corporation.

(b)     The Company may engage in any other lawful business activity permitted by the Statute subject to the unanimous written agreement of the Shareholders.

Section 2.4     Term.  The term (the "Term") of the Company commenced on May1, 2015 and shall continue until the termination of the Company in accordance with Article 9 of this Agreement.

Section 2.5     Principal Place of Business.  The principal place of business of the Company shall be in Las Vegas, NV, USA, or at such other place as the Shareholders shall from time to time designate in writing.

Section 2.6     Agent for Service of Process.  Until such time as the Shareholders have appointed a different person in the State of Nevada to act as the agent of the Company for service of process, the agent for service of process for the Company shall be in Nevada.

Section 2.7     Shareholders and Interests. The names and addresses of each Shareholder, and the Percentage Interests issued to each Shareholder, are set forth on the attached Exhibit A.

Section 2.8     Independent Activities; Transactions with Affiliates.

(a)     The Shareholders shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and it shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its sole discretion.

(b)     Each Shareholder acknowledges that the other Shareholders and their Affiliates are free to engage or invest in an unlimited number of activities or businesses, any one or more of which may be related to the activities or businesses of the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Shareholder, and neither this Agreement nor any activity undertaken pursuant to this Agreement shall prevent any Shareholder from engaging in such activities, or require any Shareholder to permit the Company or any Shareholder to participate in any such activities.

(c)     To the extent permitted by applicable law and except as otherwise provided in this Agreement, the Shareholders are hereby authorized to purchase property from, sell property to, or otherwise deal with the Company, provided that any such purchase, sale or other transaction is unanimously agreed upon in writing by the Shareholders and is in the ordinary course of the Company's business and shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase, or other transaction had been entered into with an independent third party.

ARTICLE 3
SHAREHOLDERS' CAPITAL CONTRIBUTIONS

Section 3.1    Contributions. The names, addresses, Capital Contributions, Units and Percentage Interests of the Shareholders are set forth on Exhibit A.

Section 3.2    Interest On and Return of Capital.  No Shareholder shall receive any interest, salary or drawing with respect to its Capital Contributions or for services rendered on behalf of the Company or otherwise in its capacity as Shareholder, except as may be provided in this Agreement.  No Shareholder shall have the right to demand or receive property other than cash (and then only in accordance with this Agreement) in return for its Capital Contribution.

Section 3.3    Loans from Shareholders or Affiliates. A Shareholder, or an Affiliate of a Shareholder, may make a loan to the Company on such terms and conditions as the Shareholders unanimously determine to be fair and reasonable in their sole discretion.

Section 3.4    Additional Capital Contributions.  Other than contributions by additional Shareholders, no Shareholder shall be required to make any Capital Contributions to the Company in excess of the amounts set forth in Exhibit A without the unanimous consent of all of the Shareholders which any such Shareholder may grant or withhold, condition or delay, in its sole and absolute discretion.

Section 3.5    Additional Shareholders.  The Shareholders shall not admit additional Persons as additional Shareholders under any circumstances.

ARTICLE 4
ALLOCATIONS

Section 4.1    Profits.  Profits for any taxable year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and in the reverse order and to the extent of, the aggregate Losses allocated to the Shareholders pursuant to Section 4.2 below for all periods, until the aggregate Profits allocated to the Shareholders pursuant to this Section 4.1(a) for all periods equals such aggregate Losses; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.2    Losses.  Losses for any tax year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and to the extent of, their respective positive Capital Account balance; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.3    <u>Limitation on Loss Allocations</u>.  Notwithstanding any other provisions of this Agreement, no allocation of Net Losses shall be made to any Shareholder to the extent such an allocation would cause or increase a deficit balance standing in such Shareholder's Capital Account (in excess of such Shareholder's allocable share of minimum gain and after taking into account any adjustments set forth in Treasury Regulation Section 1.704(b)-1(b)(2)(ii)(d)) and any such Net Losses instead shall be allocated to the Shareholders based upon their respective "interests" in the Company as determined in accordance with Treasury Regulation Section 1.704-1(b).  In addition, items of income and gain shall be specially allocated to the Shareholders in accordance with the qualified income offset provisions set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

Section 4.4    <u>Cumulative Allocations</u>.  The effect of the limitation on the amount of Net Losses and the qualified income offset provisions set forth in the first two (2) sentences of Section 4.3 above shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Article 4, so that the net amount of any items so allocated and the Net Profits, Net Losses and all other items allocated to each Shareholder pursuant to this Article 4 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Shareholder pursuant to the provisions of this Article 4 if such special allocations had not occurred.

Section 4.5    <u>Differing Tax Basis; Tax Allocations</u>.  Depreciation and/or cost recovery deductions and gain or loss with respect to each item of property treated as contributed to the capital of the Company shall be allocated among the Shareholders for federal income tax purposes in accordance with the principles of Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, and for state income tax purposes in accordance with comparable provisions of any applicable state law and the regulations promulgated thereunder, so as to take into account the variation, if any, between the adjusted tax basis of such property and its book value (as determined for purposes of the maintenance of Capital Accounts in accordance with this Agreement and Treasury Regulation Section 1.704-1(b)(2)(iv)(g)).

Section 4.6    <u>Other Special Allocations</u>.  The Company shall make other special allocations required or permitted in the Treasury Regulations under Section 704 of the Code after consultation with the Company's tax advisors so as to carry out the economic arrangement provided for in this Agreement and to have the Company's allocations respected for tax purposes.

ARTICLE 5<br><u>DISTRIBUTIONS</u>

Section 5.1    <u>Cash Flow</u>.  Cash Flow, if any, shall be distributed at such dates as determined by unanimous written consent of the Shareholders to the Shareholders in proportion to their respective Percentage Interests. RSD and VanDeHey shall be sole signatories on the Company Bank Account.

Section 5.2    <u>Amounts Withheld</u>.  All amounts withheld or paid as taxes pursuant to any provision of tax law with respect to any payment, distribution or allocation to the Company or the Shareholders shall be treated as amounts distributed to the Shareholders pursuant to this Article 5 for all purposes under this Agreement.  The Company is authorized to withhold from distributions to the Shareholders to pay over to (or reimburse the Company for) any amounts required to be so withheld or paid and shall allocate any such amounts to the Shareholders with respect to which such amount was withheld.

Section 5.3    <u>Contingency Reserves</u>.  The Shareholders may establish cash reserves (whether or not reflected on the financial statements) as the Shareholders unanimously determine to be reasonable in connection with the operation of the Company business.

ARTICLE 6
<u>MANAGEMENT</u>

Section 6.1    <u>Manager</u>.  The Company shall be managed by RSD and VanDeHey. Meetings of the Manager shall be required annually.

Section 6.2    <u>Manager of Operational and Day-to-Day Business and Affairs</u>.  The operational and day-to-day business and affairs of the Company shall be operated and managed jointly by RSD and Todd VanDeHey.  RSD and VanDeHey are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that RSD and VanDeHey shall not take any action, make any determination or provide any consent expressly reserved by Section 6.4 of this Agreement to the Shareholders.  No Shareholder, other than RSD or VanDeHey (subject to the terms of this Agreement), shall, acting individually, have the power to sign or bind the Company unless duly authorized to do so by unanimous written consent of the Shareholders. Notwithstanding the foregoing, RSD and VanDeHey shall have no liability to the Shareholders or the Company for exceeding the authority granted to him in the event a decision made or an action taken by him was made or taken with a reasonable good faith belief that such decision or action was (i) within the scope of the operational and day-to-day business and affairs of the Company and (ii) not prohibited by the terms of this Agreement.

Section 6.3    <u>Corporate Sponsorship, and Event Planning</u>.  VanDeHey and RSD shall jointly be the manager of event planning, which shall include but not be limited to planning and putting on live seminars, field trips, making DVDs, writing books and creating any other such content and media in his good faith belief will further the success of the Company. In addition, VanDeHey will be the manager of corporate sponsorship, which shall include but not be limited to obtaining advertising fees from corporations, creating marketing creative, managing marketing campaigns, and fundraising for non-profit organizations. RSD will be the manager jointly and unanimously with VanDeHey, which shall include but not be limited to information technology for managing Shareholders, communication with speakers for live events, financial management tuition, and monitoring Shareholders' communication. VanDeHey and RSD are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that VanDeHey and RSD shall not take any action, make any determination or provide any consent with regard

solely to the content and marketing operations expressly reserved by Section 6.4 of this Agreement to the Shareholders. .

Section 6.4    <u>Actions Expressly Reserved to the Shareholders</u>.  Notwithstanding the authority granted to RSD in Section 6.2 above, RSD may not do or permit to be done any of the following without the unanimous written consent of the Shareholders:

(a)    Any act or thing which the Act or this Agreement requires to be approved, consented to or authorized by all the Shareholders;

(b)    Voluntarily cause the dissolution of the Company;

(c)    Sell all or a significant part of the Company assets, or engage in any material recapitalization or merger;

(d)    Incur any liabilities in excess of $50,000; or

(e)    File any lawsuit or proceedings.

Section 6.5    <u>No Liability of Shareholders.</u> All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Shareholder shall be obligated personally for any such debt, obligation or liability of the Company.

Section 6.6    <u>Rights and Prohibitions of the Shareholders.</u>

(a)    Except as otherwise restricted herein, the Shareholders shall be entitled to the rights provided by the Act and to such other rights as are expressly set forth elsewhere herein.

(b)    Except as otherwise expressly provided for in this Agreement, the Shareholders shall not have the right:

(i)    to have their Capital Contributions returned until such time as the Company is terminated and liquidated and all Company liabilities have been paid or funds have been set aside therefore, and then only in accordance with the provisions of this Agreement;

(ii)    to sell or assign their Interests in the Company except in accordance with Article 8 hereof;

(iii)    to withdraw or reduce their Capital Contributions; or

(iv)    to demand or receive property other than cash in return for their Capital Contributions.

Section 6.7    <u>Limitation of Liability</u>.  In carrying out its obligations hereunder, the Shareholders shall not be liable to the Company or to the Shareholders for: (a) errors of judgment; (b) any mistake of fact or of law; (c) any actions undertaken in good faith and believed to be either in furtherance of the Shareholders' obligations under this Agreement or in

the best interests of the Company; or (d) any actions taken pursuant to advice of counsel to the Company.

Section 6.8    Indemnification.    The Company, to the extent of its assets, hereby indemnifies the Shareholders against, and agrees to hold, save, and defend same wholly harmless from, any loss, expense, damage, or liability (including attorneys' fees and costs of litigation) suffered or incurred by any of them by reason of anything which the Shareholders may in good faith do or refrain from doing for and on behalf of the Company; provided, however, that the Company shall not be required to indemnify the Shareholders for any loss or damage that the Shareholders may incur as a result of intentional misconduct, gross negligence, fraud, or a knowing violation of law, or for any transaction for which such Shareholders received a personal benefit in violation or breach of any provision of this Agreement.

ARTICLE 7
ACCOUNTING

Section 7.1    Books and Records.    The Company's books of account shall be maintained and kept at the Company's principal place of business.  The Company's accounting period shall be the calendar year.

Section 7.2    Tax Information.    Necessary tax information shall be delivered to each Shareholder within ninety (90) days after the end of each tax year of the Company.

ARTICLE 8
RESTRICTION ON TRANSFER OF CORPORATION INTERESTS

Section 8.1    Transfer or Assignment of Interests.    No transfer, sale, hypothecation, pledge, encumbrance, assignment or other disposition (each of the foregoing, a "Transfer") of a Shareholder's Interest, or any part thereof, will be valid without the unanimous consent of the other Shareholder.  Any Transfer of an Interest, including an involuntary Transfer, which does not satisfy the requirements of this Section 8.1 shall be subject to the provisions of Section 8.3 hereof; provided, however, that any Transfer by a Shareholder to a trust or other entity wholly owned by or established for the benefit of such Shareholder, or to a parent, spouse, sibling or descendant of such Shareholder or to a trust established exclusively for the benefit of one or more of such Persons (any such Transfer, a "Permitted Transfer"), shall not require consent pursuant to this Section 8.1.

Section 8.2    Right of First Refusal Upon Sale.    Other than with respect to Permitted Transfers, in the event that any Shareholder receives a bona fide offer for the purchase and sale of all or any portion of such Shareholder's Interest, the Shareholder shall first offer to sell such Interest or portion thereof to the other Shareholders and to the Company in accordance with the provisions of this Section 8.2.

(a)    Notice of Offer to Sell.    Promptly following the receipt of an offer to purchase all or any portion of his, her or its Interest, a Shareholder shall deliver a written notice (the "Sale Notice") to the Corporation and the other Shareholders stating (i) such Shareholder's bona fide intention to sell his, her or its Interest, (ii) the name and address of the proposed

9

transferee, (iii) the Interest or portion thereof to be sold, and (v) the purchase price and terms of payment upon which the Shareholder proposes to sell such Interest.

(b)      Election to Exercise Right of First Refusal  Within 30 days after receipt of the Sale Notice, each non-selling Shareholder shall notify the Manager in writing of his, her or its desire to purchase a portion of the Interest subject to the Sale Notice.  The failure of any Shareholder to so notify the Manager within the applicable period shall constitute an election on the part of that Shareholder not to purchase any portion of the Interest subject to the Sale Notice. Each Shareholder so electing to purchase shall be entitled to purchase a portion of such Interest in the same proportion that the Percentage Interest of such Shareholder bears to the aggregate of the Percentage Interest of all of the Shareholders electing to so purchase the Interest subject to the Sale Notice.  In the event any Shareholder elects to purchase none or less than all of his, her or its pro rata share of such Interest, then the other Shareholders can elect to purchase more than their pro rata share.  If such Shareholders fail to purchase the entire Interest subject to the Sale Notice, the Company may purchase any remaining share of such Interest.

(c)      Exercising Right of First Refusal..  Within 90 days after receipt of the Sale Notice, the Company and the Shareholders electing to purchase the Interest subject to the Sale Notice shall exercise his or its first right to purchase or obtain such Interest upon the price and terms of payment designated in the Sale Notice by providing written notice to the other Shareholder of his election to purchase.  If the Sale Notice provides for the payment of non-cash consideration, the Company and the purchasing Shareholders each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered, as determined by the Managers or, in the absence of an agreement among the Managers as to such value, by a nationally recognized firm of appraisers jointly selected by the Manager.  If the third party offer is all cash paid at the close of escrow, the Shareholder or company shall have the right to pay for the purchase on reasonable terms over a period not to exceed one year by executing a promissory note with interest at 6% per annum with monthly payments of principal and interest, no prepayment penalty so long as the electing Shareholder or company puts up its memebership interest as collateral until the sale is completed.

(d)      Lapse of Right of First Refusal.  If the Company or the other Shareholders elect not to purchase or obtain all of the interest subject to the Sale Notice, then the selling Shareholder may sell the Interest described in the Sale Notice to the proposed transferee, provided such sale (i) is completed within 30 days after the expiration of the Company and the other Shareholders' right to purchase such Interest, (ii) is made on terms no less favorable to the selling Shareholder than as designated in the Sale Notice, and (iii) the requirements of Section 8.1 have been met.  If such interest is not so sold, the selling Shareholder must give notice in accordance with this Section 8.2 prior to any subsequent sale of such Shareholder's Interest.

Section 8.3      Buyout Option

(a)      Buyout Notice.  Any Shareholder (a "Remaining Shareholder") or its designated Affiliate shall have the right (the "Buyout Option") to purchase all, but not less than all, of the Interest of any other Shareholder (a "Departing Shareholder") in the event the Departing Shareholder Transfers any portion of such Shareholder's Corporation Interest other

than as permitted pursuant to Section 8.1 hereof ( "Buyout Event 1")., or if the Shareholders are deadlocked for a period of at least 30 days on any decision requiring unanimous consent of the Shareholders ("Buyout Event 2").  Under Buyout Event 2 the Shareholder making the offer shall be called the Tendering Shareholder and the other Shareholder will be called the Responding Shareholder

(b)     Within 30 days of receipt of notice of  Buyout Event 1, the Remaining Shareholder shall give written notice (the "Buyout Notice") to the Departing Shareholder of the Remaining Shareholder's desire to purchase the Departing Shareholder's Company Interest.  In the event that there is more than one Remaining Shareholder at the time a Buyout Event occurs, the Remaining Shareholders shall be entitled to exercise the Buyout Option pro rata in accordance with their respective Percentage Interests.

(c)     Within thirty days (30) of receipt of the notice of Buyout Event 2, the Responding Shareholder shall have the right to elect, by delivery of written notice to the Tendering Shareholder no later than thirty (30) days following receipt of such offer by the Responding Shareholder, to either (i) sell its Ownership Interest to the Tendering Shareholder pursuant to the terms of the Offer or (ii) purchase the Ownership Interest of the Tendering Shareholder pursuant to the terms of the Offer. If the Responding Shareholder does not make such election, by written notice to the Tendering Shareholder, within thirty (30) days, then the Responding Shareholder shall be deemed to have elected to sell its Ownership Interest to the Tendering Shareholder.

(d)     Purchase Price of the Shareholder's Company Interest.  The purchase price of the Shareholder's Interest shall be the Fair Market Value thereof.  For purposes hereof, the "Fair Market Value" of such Interest shall be such value as is mutually agreed upon among the Shareholders but shall take into consideration all inventory, accounts receivable, and cash on hand and its subsidiaries as of the date of the notice, together with a schedule of all debt of the Corporation and its subsidiaries,; provided, however, that in the event that the Shareholders are unable to agree upon a Fair Market Value within 30 days of the date of either Buyout Notice, the Fair Market Value shall be determined by an independent appraiser affiliated with a nationally recognized firm of accountants, appraisers or investment bankers and selected by the Manager in the exercise of their reasonable discretion.  The appraiser shall render a written report setting forth its determination of Fair Market Value as promptly as possible..  In making such determination, the appraiser shall value the Company as a going concern and shall take into consideration (i) the transferability and liquidity of the Departing Shareholder's Interest, (ii) the fact that additional capital may be required, from time to time, in connection with the business of the Company, and (iii) the economic risk and liability associated with the ownership of such Interest.  Absent manifest error, the appraiser's determination of Fair Market Value shall be final and binding on all parties.  The fees and expenses of any appraiser shall be paid by the Company.

(e)     Exercise Terms.  The Buyout Notice, which shall be served by certified mail, return receipt requested, shall specify the date on which the Transfer pursuant to an exercise of the Buyout Option shall be consummated, which date shall be no earlier than 30 days nor later than 90 days from the date of the Buyout Notice, unless otherwise agreed by the Remaining Shareholder and the Departing Shareholder, or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder.  Except as may be

otherwise agreed by the Remaining Shareholder and the Departing Shareholder or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder, the Shareholder purchasing the other Shareholder's Ownership Interest shall pay at least 20% of the purchase price in cash, with the balance of the purchase price payable pursuant to a promissory note bearing interest at 110% of the then current applicable federal rate for mid-term obligations (as determined pursuant to Section 7872 of the Code). Such note shall be payable in equal installments of principal and interest over a period not to exceed five years. Any such promissory note may be prepaid at any time without premium or penalty. The Shareholder selling his Interest shall be transferred free and clear of all liens and encumbrances and, except as otherwise provided, the selling Shareholder shall be released at the closing from any guarantees, obligations, liabilities or similar undertakings to third parties given by such Shareholder on behalf of the Company.

(f)     Further Cooperation.  On the closing of the purchase and sale of the Departing Shareholder's Company Interest, or in the case of Buyout Event 2, between selling Shareholder's Company Interest pursuant to an exercise of the Buyout Option, each Shareholder shall execute, acknowledge and deliver to each other Shareholder such instruments, and take such actions, as each Shareholder may reasonably request in order to effect the purchase and sale of the Company Interest pursuant to the terms and conditions of this Section 8.3.

(g)     Company Option.  In the event the Remaining Shareholder under Buyout Event 1 elects not to exercise any of its rights under this Section 8.3, the Company, at its election, may assume such rights.

Section 8.4     Void Transfers.  If the Managers determine in their sole discretion that any Transfer would cause the termination of the Company under the Code, then such Transfer shall be null and void.

Section 8.5     Substitution of Shareholders.  A transferee of an Interest shall become a substitute Shareholder, provided that (i) the Transfer was valid under Section 8.1 hereof and not voided by the Manager pursuant to Section 8.4 hereof, (ii) the transferee has become a party to this Agreement, and (iii) the transferee pays any reasonable expenses in connection with his, her or its admission as a Shareholder.  A transferee who becomes a substituted Shareholder has, to the extent transferred, all of the rights, powers and duties of a Shareholder under this Agreement and the Statute.

Section 8.6     Subsequent Transfers Subject to Terms of Agreement.  After the consummation of any Transfer of any part of an Interest, the Interest or portion thereof so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions hereof.

Section 8.7     Purchase Terms Varied by Agreement.  Provided that the restrictions set forth in this Agreement have been satisfied, nothing contained herein is intended to prohibit Shareholders from agreeing upon other terms and conditions for the purchase by the Company or any other Shareholder of the Interest (or any portion thereof) of any Shareholder desiring to retire, withdraw or resign.

Section 8.8    <u>Spousal Consent</u>.  Each Shareholder who is married as of the date hereof or who subsequently becomes married shall obtain his or her spouse's signature to a spousal consent.

ARTICLE 9
<u>DISSOLUTION, LIQUIDATION AND TERMINATION</u>

Section 9.1    <u>Liquidating Events</u>.  Except as otherwise provided herein, the Company shall be dissolved, liquidated and terminated upon the occurrence of any of the following events ("<u>Liquidating Events</u>"):

(a)    the bankruptcy of RSD or VanDeHey;

(b)    the disposition by the Company of all or substantially all of its right, title and interest in and to its assets; provided, however, that if the Shareholders so determine, the Company may remain in existence to collect the proceeds from any notes and mortgages executed in favor of the Company arising out of the sale of Company Property;

(c)    the occurrence of any event that, under the laws of any jurisdiction governing the existence of the Company and, in contravention of the terms of this Agreement, shall dissolve the Company;

(d)    the bankruptcy of the Company;

(e)    the withdrawal of a Shareholder;

(f)    the express written agreement of all of the Shareholders; or

(g)    fifty years after commencement of the Term.

Section 9.2    <u>Dissolution, Liquidation and Termination of Company</u>.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Shareholders, and no Shareholder shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Article 9.  The Shareholders shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and the Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof.

Section 9.3    <u>Distributions Upon Dissolution, Liquidation and Termination</u>.  Upon dissolution, liquidation and termination of the Company pursuant to Section 9.2 hereof, and subject to Section 9.4, the Shareholders shall cause all proceeds derived from the liquidation of the Company Property to be applied and distributed in the following manner and order of priority:

13

        (a)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Shareholders, in the order of priority as provided by law;

        (b)    Second, to the payment and discharge of all of the Company's debts and liabilities to Shareholders; and

        (c)    Thereafter, to the Shareholders in proportion to, and to the extent of, the positive balance standing in each such Shareholder's Capital Account (after taking into account all Capital Account adjustments for the taxable year of such Liquidation).

Section 9.4    Negative Capital Account Restoration.  No Shareholder shall have any obligation whatsoever upon the Liquidation of such Shareholder's Interest, the Liquidation of the Company or in any other event, to contribute all or any portion of any negative balance standing in such Shareholder's Capital Account to the Company, to any other Shareholder or to any other person or entity.

## ARTICLE 10
## WAIVERS

Notwithstanding any provision of the Act, each Shareholder hereby waives any right to seek or assert: (a) judicial dissolution of the Company; (b) dissenters' rights; or (c) derivative actions on behalf of the Company.

## ARTICLE 11
## MISCELLANEOUS

Section 11.1    Notices.  Whenever any notice or consent or other written communication is required or permitted hereunder, such notice or consent or other communication shall be in writing and shall be: (a) delivered in person; (b) sent by United States mail; (c) delivered in person by an international air or local courier service; (d) transmitted by facsimile telecommunication or electronic mail when directed to the address, facsimile or electronic mail address, respectively, which was provided to the Company by the Shareholder.  Except as expressly stated otherwise in this Agreement, any notice or other communication delivered by hand or by air courier shall be deemed effectively given when delivered, any notice or other communication sent by United States mail shall be deemed effectively given two Business Days after it is mailed, and any notice or other communication transmitted by facsimile telecommunication or electronic mail shall be deemed effectively given on the date of transmission.

Section 11.2    Partnership Intended Solely for Tax Purposes.  The Shareholders have formed the Company as a Nevada limited liability company under the Nevada Act, and do not intend to form a general or limited partnership under Nevada or any other state law.  The Shareholders do not intend to be partners to one another or to any third party for any legal purposes other than tax purposes.  The Shareholders intend the Company to be classified and treated as a partnership solely for federal and state income taxation purposes.  Each Shareholder agrees to act consistently with the foregoing provisions of this Section 11.2 for all purposes, including, without limitation, for purposes of reporting the transactions contemplated herein to the Internal Revenue Service and all state and local taxing authorities.

Section 11.3   Effective Date of Agreement.   This Agreement shall become effective upon commencement of the Term.

Section 11.4   Binding Effect.   This Agreement shall be binding upon all of the parties hereto and their transferees, assigns, agents, successors in interest, personal representatives, estates, heirs and legatees.

Section 11.5   Counterparts.   This Agreement may be signed in multiple counterparts. Each counterpart will be considered an original, but all of them in the aggregate will constitute one instrument.

Section 11.6   Governing Law.   This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of Nevada.

Section 11.7    Amendments.   Amendments to this Agreement must be in writing and shall only be effective with the unanimous written consent or approval of the Shareholders.

Section 11.8   Entire Agreement.   This Agreement contains the entire understanding and agreement among the Shareholders regarding the subject matter hereof.   There are no agreements, arrangements or understandings, oral or written, between or among the Shareholders hereto relating to the subject matter of this Agreement that are not fully expressed herein.

Section 11.9   Mediation/Arbitration – Dispute Resolution.   Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge.   If either party fails engage in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation.   In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County.   Such controversy or claim shall be heard by a single arbitration (the "Arbitrator").   The award shall be made within six months of selection of the Arbitrator.   Judgment on the award may be entered in any court having jurisdiction and the parties hereby consent to the jurisdiction of the Superior Court for Clark County, Nevada, and of the United States District Court for the Central District of Nevada, for injunctive relief, specific performance or other relief in aid of any proceedings hereunder, but not otherwise.   The arbitration shall be held in Las Vegas, Nevada or as otherwise mutually agreed by the parties hereto.   The Arbitrator shall determine issues of arbitrability but may not limit, expand or otherwise modify the terms of this Agreement nor have any authority to award punitive or other damages in excess of compensatory damages and each party irrevocably waives any claim thereto.   The Arbitrator shall permit, to the extent reasonably necessary, all forms of discovery.   Both parties shall have the right without order from the Arbitrator to take one deposition of the principals involved in a controversy or claim submitted to arbitration hereunder and one deposition of a third party witness and an expert witness, if any.   The parties, their representatives, other participants and the Arbitrator shall hold the existence, content and result of the arbitration in confidence except as disclosure is required by law or as is reasonably necessary to defend claim or procedural rights of the party making the disclosure.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereunto have executed this Agreement as of the date set forth below.

Date: 10/5/2015
_____

**SHAREHOLDERS:**

_____
Real Social Dynamics

DocuSigned by:

*Todd Vanderley*

~~Todd VanDehey~~

**EXHIBIT A**

**VALENTINE LIFE, INC**

**SCHEDULE
OF
SHAREHOLDER NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, UNITS AND
PERCENTAGE INTERESTS**

**(as of September 15, 2015)**

| Names, Addresses, Facsimile Numbers and E-mail Addresses of Shareholders | Capital Contribution | Units | Percentage Interest |
|---|---|---|---|
| Real Social Dynamics<br>8491 West Sunset Boulevard<br>Suite 452<br>West Hollywood, CA 90069<br>United States of America | $50.00 | 50 Shares | 50.00% |
| Todd VanDeHey<br>145 E Harmon Avenue, Unit 20602<br>Las Vegas, NV 89109<br>United States of America | $50.00 | 50 Shares | 50.00% |
| TOTAL | $100 | 100,000 | 100.00% |

## __EXHIBIT B__

**VALENTINE LIFE, VALENTINE LIFE, INC
VALENTINE LIFE, INC**


**ARTICLES OF ORGANIZATION FILED SEPTEMBER 15, 2015**




[ATTACHED]

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

# Exhibit 3

# Todd Vandehey RSD Contractor Agreement

# Exhibit 3

## REAL SOCIAL DYNAMICS
### Contractor Agreement

**THIS CONTRACTOR AGREEMENT dated this 1st day of October, 2004**

**BETWEEN:**

Real Social Dynamics of 8312 Carlin Avenue, Sacramento, CA 95823
(the "Principal")

-    AND –

Todd VanDeHey of 2305 Smith Court, Longmont, Colorado, 80501
(the "Contractor")

**BACKGROUND:**

A.    The Principal is duly incorporated, organized and existing under the laws of the State of Nevada.

B.    The Principal is of the opinion that the Contractor has the necessary qualifications, experience and abilities to assist and benefit the Principal in its business.

C.    The Principal desires to employ the Contractor and the Contractor has agree to accept and enter such Contract upon the terms and conditions set out in this Agreement.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

**Commencement Date and Term**

1.    The Contractor will commence Contract with the Principal on October 1, 2004 (the 'Commencement Date').

2.    Subject to termination as provided in this Agreement, the Contractor is contracted for an indefinite term. The parties acknowledge that various provisions of this Agreement survive past termination of Contract.

**Position and Duties**

3.    The Principal agrees to employ the Contractor as an Executive Coach to be an Instructor for Real Social Dynamics Live Programs and complete Administrative Work, and the Contractor agrees to be contracted on the terms and conditions set out in this Agreement. The Contractor agrees to be subject to the general supervision of and act pursuant to the orders, advice and direction of the Principal.

4.    The Contractor will perform any and all duties now and later assigned to the Contractor by the Principal. The Contractor will also perform such other duties as are customarily performed by one holding such a position in other, same or similar business or enterprises as that engaged in by the Principal.

5.    The Contractor agrees to abide by the Principal's rules, regulations, and practices, including those concerning work schedules, vacation and sick leave, as they may from time to time be adopted or modified.

**Contractor Compensation**

6.    For the services rendered by the Contractor as required by this Agreement, the Principal will pay to the Contractor a salary set in accordance with the Principal's policy stated in the Contractor's Manual while this Agreement is in force. The Principal is entitled to deduct from the Contractor's compensation any applicable deductions and remittance as required by law.

7.    The Contractor understands that the Contractor's compensation as provided in this Agreement will constitute the full and exclusive monetary consideration and compensation for all services performed by the Contractor and for the performance of all the Contractor's promises and obligations in this Agreement.

8.    The Contractor understands and agrees that any additional compensation to the Contractor (whether a bonus or other form of additional compensation) will rest in the sole discretion of the Principal and that the Contractor will not earn or accrue any right to additional compensation by reason of the Contractor's Contract.

9.    The Principal will reimburse the Contractor for all necessary expenses incurred by the Contractor while traveling pursuant to the Principal's directions.

10.   The Principal agrees to permit a reasonable degree of flexibility in work hours. In cases where extra time is worked in a day or week, the Contractor agrees to take equivalent time off in place of overtime pay within three months, unless there is an express agreement to pay at overtime rates.

Contractor's Initials 
Principal's Initials

**Contractor Benefits**

11.  The Contractor will be entitled to only those additional benefits that are currently in place for the Principal's Contractors as set out in the Principal's booklets and manuals.

12.  The Contractor will be entitled in each year to such vacations as are stipulated by the Principal's policies.

**Avoiding Conflict of Opportunities**

13.  It is understood and agreed that any business opportunity relating to or similar to the Principal's current or anticipated business opportunities (with the exception of personal investments in less than 5% of the equity of a business, investments in established family businesses, real estate, or investments in stocks and bonds traded on public stock exchanges) coming to the attention of the Contractor during the Contractor's Contract is an opportunity belonging to the Principal. Therefore, the Contractor will advise the Principal of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Principal.

14.  Without the written consent of the Principal, the Contractor further agrees not to:
     a.  solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Principal, and
     b.  directly or indirectly, engage or participate in any other business activities that the Principal, in its reasonable discretion, determines to be in conflict with the best interests of the Principal.

**Inability to Contract for Principal**

15.  In spite of anything contained in this Agreement to the contrary, the Contractor will not have the right to make any contracts or commitments for or on the behalf of the Principal without first obtaining the express written consent of the Principal.

**Confidential Information and Assignment of Inventions**

16.  The Contractor acknowledges in any position the Contractor may hold, in and as a result of the Contractor's Contract by the Principal, the Contractor will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Principal and which information is the exclusive property of the Principal, including, without limitation:

     a.  'Confidential Information' means all data and information relating to the business and management of the Principal, including proprietary and trade secret technology and accounting records to which access is obtained by the Contractor, including Work Product, Computer Software, Other Proprietary Date, Business Operations, Marketing and Development Operations, and Customers. Confidential Information will also include any information that has been disclosed by a third party to the Principal and governed by a non-disclosure agreement entered into between the third party and the Principal. Confidential Information will not include information that:

          i.    is generally known in the industry of the Principal;

          ii.   is now or subsequently becomes generally  available to the public through no wrongful act of the Contractor;

          iii.  the Contractor rightfully had in its possession prior to the disclosure to Contractor by the Principal;

          iv.   is independently created by the Contractor without direct or indirect use of the Confidential Information; or

          v.    the Contractor rightfully obtains from a third party who has the right to transfer or disclose it.

     b.  'Work Product' means work product resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development;

     c.  'Computer Software' which means computer software resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development, including but not limited to programs and program modules, routines and subroutines, processes, algorithms, design concepts, design specifications, (design notes, annotations, documentation, flowcharts, coding sheets, and the like), source code, object code and load modules, programming, program patches and system designs;

     d.  'Other Proprietary Data' means information relating to the Principal's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, test data and test results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

     e.  'Business Operations' means internal personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Principal's business;

     f.  'Marketing and Development Operations' means marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Principal which have been or are being discussed; and

Contractor's Initials TV
Principal's Initials NJK

g.   'Customers' means names of customers and their representatives, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by clients of the Principal.

**Confidential Obligations**

17.   The Contractor agrees that a material term of the Contractor's contract with the Principal is to keep all Confidential Information absolutely confidential and protect its release from the public. The Contractor agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Contractor has obtained or which was disclosed to the Contractor by the Principal as a result of the Contractor's Contract by the Principal. The Contractor agrees that if there is any question as to such disclosure then the Contractor will seek out senior management of the Principal prior to making any disclosure of the Principal's information that may be covered by this Agreement.

18.   The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Contractor in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement.

19.   The Contractor may disclose any of the Confidential Information:

a.   To a third party where Principal has consented in writing to such disclosure; and

b.   To the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body, however, the Contractor will first have given prompt notice to the Principal of any possible or prospective order (or proceeding pursuant to which any order may result), and the Principal will have been afforded a reasonable opportunity to prevent or limit any disclosure.

**Ownership and Title**

20.   The Contractor acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Principal. Accordingly, the Contractor specifically agrees and acknowledges that he will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the fact that he may have created or contributed to the creation of the same.

21.   The Contractor does hereby waive any moral rights that he may have with respect to the Confidential Information.

22.   The Contractor agrees to immediately disclose to the Principal all Confidential Information developed in whole or in part by the Contractor during the term of the Contractor's Contract with the Principal and to assign to the Principal any right, title or interest the Contractor may have in the Confidential Information. The Contractor agrees to execute any instruments and to do all other things reasonably requested by the Principal (both during and after the Contractor's Contract with the Principal) in order to vest more fully in the Principal all ownership rights in those items transferred by the Contractor to the Principal.

**Return of Confidential Information**

23.   The Contractor agrees that, upon request of the Principal or upon termination or expiration, as the case may be, or Contract, the Contractor will turn over to the Principal all documents, disks or other computer media, or other material in the possession or control of the Contractor that:

a.   May contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

b.   Connected with or derived from the Contractor's services to the Principal.

**Non-Solicitation**

24.   Any attempt on the part of the Contractor to induce others to leave the Principal's employ, or any effort by the Contractor to interfere with the Principal's relationship with its other Contractors and contractors would be harmful and damaging to the Principal. The Contractor agrees that during the term of his Contract with the Principal and for a period of five (5) years after the end of that term, the Contractor will not in any way, directly or indirectly:

a.   Induce or attempt to induce any Contractor or contractor of the Principal to quit Contract or retained with the Principal;

b.   Otherwise interfere with or disrupt the Principal's relationship with its Contractors and Employees;

c.   Discuss Contract opportunities or provide information about competitive Contract to any of the Principal's Contractors or Employees; or

d.   Solicit, entice, or hire away any Contractor or contractor of the Principal.

This obligation will be limited to those that were Contractors or contractors of the Principal when the Contractor was contracted by the Principal.

**Non-Competition**

25.   Other than through Contract with a bona-fide independent party, or with the express written consent of the Principal, which will not be unreasonably withheld, the Contractor will not, during the continuance of the Agreement or within five (5) years after the termination or expiration, as the case may be, of this Agreement, be directly or indirectly involved with a business which is in direct competition with the Principal in the business line of how to be successful with women and dating.

Contractor's Initials _TV_
Principal's Initials _NJK_

26. For a period of five (5) years from the date of termination or expiration, as the case may be, of the Contractor's Contract with the Principal, the Contractor will not divert or attempt to divert from the Principal any business the Principal had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Contractor's Contract with the Principal.

27. The Contractor will not own, operate or work for a company or internet website that teaches men how to be successful with women and dating, for five (5) years from the date of termination or expiration, in Los Angeles, New York, San Francisco, Sydney, Melbourne, Toronto, Montreal, and London, and the Contractor will forfeit to Real Social Dynamics any revenue and income earned from operating or working for a company or internet website that teaches men how to be successful with women and dating during the 5 year period, and the Contractor is still obligated to keep all trade secrets confidential.

## Termination Due to Discontinuance of Business

28. In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

## Termination For Disability

29. In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

## Termination of Contract

30. Where the Contractor has breached any of the terms of this Agreement or where there is just cause for termination, the Principal may terminate the Contractor's Contract without notice.

31. The Contractor and the Principal agree that reasonable and sufficient notice of termination of Contract by the Principal is the greater of two weeks and any notice required under any relevant Contract legislation.

32. If the Contractor wishes to terminate his Contract with the Principal, the Contractor will provide the Principal with two weeks' notice. As an alternative, if the Contractor co-operates with the training and development of a replacement, then sufficient notice is given if it is sufficient notice to allow the Principal to find and train the replacement.

33. Should the Contractor terminate his Contract pursuant to this Agreement, and there is no constructive dismissal, the Contractor agrees to be reasonably available as a consultant for the purposes of maintaining any projects or developments created while contracted by the Principal. The Contractor agrees to negotiate the terms of the consulting work in good faith. In his capacity as a consultant for the Principal pursuant to this paragraph, the Contractor agrees to provide his present residential address and telephone number as well as his business address and telephone number.

34. The time specified in the notice by either the Contractor or the Principal may expire on any day of the month and upon the date of termination the Principal will forthwith pay to the Contractor any outstanding portion of the wage, accrued vacation and banked time, if any, calculated to the date of termination. Notwithstanding the date of termination, the Contractor acknowledges and agrees to diligently execute and complete his Contract responsibilities to the Principal at the reasonable direction of the Principal. Failure of the Contractor to reasonably execute his obligations to the Principal during the notice period will be considered to be an abandonment of his obligations and will be sufficient cause for immediate termination of the Contractor without compensation or notice.

## Remedies

35. The Contractor agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Principal, would gravely affect the effective and successful conduct of the Principal's business and goodwill, and would be a material breach of this Agreement.

36. In the event of a breach or threatened breach by the Contractor of any of the provisions of this Agreement, the Contractor agrees that the Principal is entitled to, in addition to and not in limitation of any other rights and remedies available to the Principal at law or in equity, to a permanent injunction in order to prevent or restrain any such breach by the Contractor or by the Contractor's partners, agents, representatives, servants, Contractors, and/or any and all persons directly or indirectly acting for or with the Contractor.

37. The Contractor agrees to co-operate with the Principal following termination by providing documentation and other information to permit the Principal to evaluate whether the Contractor is honoring his post-Contract obligations set out in this Agreement.

## Severability

38. Principal and Contractor acknowledge that this Agreement is reasonable, valid and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the Contractor's intention to give the Principal the broadest possible protection against the disclosure of the Confidential Information, against the Contractor soliciting the Principal's Contractors and contractors and against the Contractor using such Confidential Information in competing with the Principal.

39. In the event that any of the provisions of this Agreement will be held to be invalid or unenforceable in whole or in part, those provisions to the extent enforceable and all other provisions will nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Agreement and the remaining provisions had been executed by both parties subsequent to the expungement of the invalid provision.

Contractor's Initials 
Principal's Initials

**Notices**

40. If Contractor loses or makes unauthorized disclosure of any of the Confidential Information, the Contractor will immediately notify the Principal and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

41. All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and either served personally or sent by facsimile or e-mail. The address for any notice to be delivered to an of the parties to this Agreement is as follows:

   a.   Real Social Dynamics: 8312 Carlin Avenue, Sacramento, CA 95823
        Email: papa@realsocialdynamics.com

   b.   Todd VanDeHey: 2305 Smith Court, Longmont, Colorado, 80501
        Email: mike@realsocialdynamics.com

**Modification of Agreement**

42. Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

**Governing Law**

43. It is the intention of the parties to this Agreement that this Agreement and the performance under this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of Nevada, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**General Provisions**

44. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

45. The Contractor is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Principal in enforcing this Agreement as a result of any default of this Agreement by the Contractor.

46. No failure or delay by the Principal in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.

47. This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Principal and the Contractor.

48. This Agreement may be executed in counterparts.

49. Time is of the essence in this Agreement.

50. If there is a previous Contract agreement between the parties to this Agreement, the parties agree that this Agreement will replace that previous Contract agreement and the Contractor acknowledges that this Agreement was entered into in consideration of a compensation increase commencing the start of this Agreement. The Contractor acknowledges that it was agreed at that time that a new Contract agreement would be entered into in consideration of the compensation increase.

51. This Agreement and the Contractor Manual constitutes the entire agreement between the parties and there are no further items or provisions, either oral or written. As of the effective date of this Agreement, this Agreement supersedes all other agreements between the parties. The parties to this Agreement stipulate that neither of them has made any representations with respect to the subject matter of this Agreement except such representations as are specifically set forth in this Agreement. Each of the parties acknowledges that it has relied on its own judgment in entering into this Agreement.

**IN WITNESS WHEREOF** Real Social Dynamics has duly affixed its signature by a duly authorized officer on this 1st day of October, 2004. By signing below, the Contractor acknowledges that he/she understands and accepts this obligation.

_____
Nicholas Kho, President
Real Social Dynamics, Inc.

_____
Todd VanDeHey

_____7/27/04_____
Date

Contractor's Initials  TV
Principal's Initials  NJK