1  JOSEPH A. GUTIERREZ, ESQ.
   Nevada Bar No. 9046
2  STEVEN G. KNAUSS, ESQ.
   Nevada Bar No. 12242
3  **MAIER GUTIERREZ & ASSOCIATES**
   8816 Spanish Ridge Avenue
4  Las Vegas, Nevada 89148
   Telephone: (702) 629-7900
5  Facsimile: (702) 629-7925
   E-mail:      jag@mgalaw.com
6               sgk@mgalaw.com

7  *Attorneys for Defendants Real Social Dynamics, Inc.,*
   *Nicholas Kho, and Owen Cook*

8

9              **UNITED STATES DISTRICT COURT**

10                 **DISTRICT OF NEVADA**

11

12  TODD VANDEHEY, an individual,          Case No.: 2:17-cv-02230-JAD-NJK

13              Plaintiff,                 **DEFENDANTS' OPPOSITION TO
                                           PLAINTIFF'S MOTION FOR SUMMARY
14  vs.                                    JUDGMENT AS TO COUNT ONE OF THE
                                           AMENDED COMPLAINT**
15  REAL SOCIAL DYNAMICS, INC., a Nevada
16  corporation; NICHOLAS KHO, an individual;
    OWEN COOK, an individual,
17
18              Defendants.

19

20       Defendants REAL SOCIAL DYNAMICS, INC. ("RSD"), NICHOLAS KHO ("Kho"), and

21  OWEN COOK ("Cook") (collectively "Defendants"), by and through their attorneys, the law firm of

22  MAIER GUTIERREZ & ASSOCIATES, hereby file this Opposition to Plaintiff TODD VANDEHEY'S

23  ("Vandehey") Motion for Summary Judgment as to Count One of the Amended Complaint [ECF No.

24  42] ("Motion").

25  / / /

26  / / /

27  / / /

28  / / /

                                1

1    This Opposition is based upon the papers and pleadings on file in this action, the

2    memorandum of points and authorities, the exhibits attached hereto, and any argument of counsel to

3    be made at the time of the hearing for this matter.

4        DATED this 10th day of November, 2017.

5                                        Respectfully submitted,

6                                        MAIER GUTIERREZ & ASSOCIATES

7

8        _/s/ Steven Knauss_____
     JOSEPH A. GUTIERREZ, ESQ.
9    Nevada Bar No. 9046
     STEVEN G. KNAUSS, ESQ.
10   Nevada Bar No. 12242
     Attorneys for Defendants Real Social Dynamics,
11   Inc., Nicholas Kho, and Owen Cook

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In his motion, Plaintiff seeks declaratory judgment pursuant to 28 U.S.C. 2201 and FRCP 57 to find that the non-competition and non-solicitation clauses of the July 27, 2004 Real Social Dynamics Contractor Agreement ("Contractor Agreement") between Plaintiff and Defendant RSD are void and unenforceable.  However, Plaintiff's Motion fails to demonstrate the absence of any genuine issue of material fact to justify entry of summary judgment in its favor.  Instead, Plaintiff moves for the entry of summary judgment by inappropriately attempting to convince this Court to act prematurely with regard to restrictive covenants which are not at issue, which no party has violated, and which could only be put at issue if Plaintiff chooses to do so.

Based upon the arguments made in Plaintiff's Motion, as well as the arguments presented herein, Plaintiff cannot prevail on its claims as a matter of law and Defendants respectfully request that Plaintiff's Motion be denied in its entirety.

### II.    STATEMENT OF UNDISPUTED FACTS

To avoid burdening the court with duplicative statements of undisputed fact, Defendants incorporate paragraphs 1 through 17 of Plaintiff's Statement of Undisputed Facts from his Motion, and request for judicial notice thereof.  Only paragraph 18 from Plaintiff's Statement of Undisputed Facts from his Motion is disputed by Defendants as examined below.

### III.    STATEMENT OF DISPUTED FACTS

The following material facts are in dispute:

1.    Neither Plaintiff nor Defendant has alleged a breach of the non-competition or non-solicitation clauses of the Contractor Agreement.

2.    Neither Plaintiff nor Defendant has based a cause of action against the other on a breach or violation of the non-competition or non-solicitation clauses of the Contractor Agreement.

3.    Plaintiff has not articulated any facts or events to demonstrate either party *has* breached the non-competition or non-solicitation clauses of the Contractor Agreement.

4.    Plaintiff has not articulated any facts or events to demonstrate either party *will* breach the non-competition or non-solicitation clauses of the Contractor Agreement.

5.      Plaintiff's "undisputed fact" No. 18 alleges that: "The Operating Agreement is separate and distinct from the Contractor Agreement, and the subject matter of the two do not overlap."  See ECF No. 42 at p. 4.  Plaintiff's employment by RSD was governed by the Contractor Agreement, which stayed in effect until Plaintiff's termination for cause on August 14, 2017.  *See* Todd Vandehey RSD Contractor Agreement, attached hereto as **Exhibit 1**.  Defendant disputes any implication that the rights and obligations defined within the Valentine Life Operating Agreement did not overlap or otherwise implicate the Contractor Agreement.  *See* Valentine Life Operating Agreement, attached hereto as **Exhibit 2**.

6.      The Valentine Life PayPal Account linked to todd@valentinelife.com is a business asset created, owned, and operated by RSD, the assets of which were depleted without authorization by Plaintiff to purchase sex toys, erotica, and adult/escort services.

7.      Plaintiff's Gmail account tvandehey@gmail.com is a business asset of RSD, and was used by Plaintiff for RSD client customer service, RSD client fulfillment, and the creation of RSD social media as well as other RSD business accounts.

## IV.   LEGAL ARGUMENT

### A.  LEGAL STANDARD

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate the lack of any genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  "The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial."  *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975).

A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such that a reasonably jury could return a verdict for the nonmoving party."  *Id.*  In analyzing a motion for summary judgment, all evidence must be viewed, and all reasonable inferences made, in the light most favorable to the nonmoving party.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Therefore, the moving party must show that no rational jury could view the evidence presented and still find for the nonmoving party. *See Anderson*, 477 U.S. at 254. Furthermore, if the moving party meets its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial. *See id.* at 323-24; *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).

**B. DECLARATORY JUDGMENT REGARDING THE NON-COMPETITION AND NON-SOLICITATION CLAUSES OF THE CONTRACTOR AGREEMENT IS INAPPROPRIATE.**

Plaintiff argues that he is "entitled to declaratory judgment adjudicating that the Non-Competition and Non-Solicitation Clauses of the Contractor Agreement are void and enforceable." See ECF No. 42 at p. 7. Plaintiff further states that "[t]he enforceability of the Non-Competition and Non-Solicitation Clauses is an ***actual controversy*** between Plaintiff and Defendants." *Id.* (emphasis added). However, there is no cause of action brought by Defendants alleging a breach of these clauses. In fact, at this time, there are no facts known to Defendant to even support such a claim.

Plaintiff cites no specific controversy or facts showing divergent or adverse legal interests with regard to these restrictive covenants. Instead, Plaintiff appears to believe the ripeness of this issue can be artificially accelerated if the issue "might" occur. *See* ECF No. 42 at p. 7 ("Defendants' termination of Plaintiff…raises the specter that the overly-broad provisions of the Non-Competition and Non-Solicitation Clauses of the Contractor Agreement ***might*** be enforced against the Plaintiff.") (emphasis added). Plaintiff is requesting declaratory relief on a hypothetical scenario that neither party has yet to articulate.

Even more curious, the only party with the ability to breach these covenants is the Plaintiff himself. In other words, Plaintiff is arguing that he ***might*** violate terms of the Contractor Agreement, and if/when he does, he wants to be sure that those future breaches of contract have been previously permitted by the court.

Even the case law cited by Plaintiff supporting this specious argument is done so with little

5

regard to the full context of the Court's words:

> The difference between an ***abstract question*** and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (emphasis added). Plaintiff omits the contrast between 'controversy', and an abstract question, which is what he is offering this Court: the abstract question, "are these restrictive covenants void/unreasonable?" There is no controversy on these covenants, and there is no immediacy to warrant a declaratory judgment.

Plaintiff rests his argument on two facts. One, the parties have adverse legal interests. This is undeniably true as the litigation thus far between the parties clearly illustrates. But, their adverse legal interests does not entail disputes over the non-solicitation and non-competition clauses of the Contractor Agreement. Two, Defendants mention both restrictive covenants in their Demand for Arbitration. However, Defendants bring no cause of action or speak to the enforcement or validity of the covenants. Defendants only mention that the clauses exist, not that they are to be enforced.

**C. THE NON-COMPETITION AND NON-SOLICITATION CLAUSES OF THE CONTRACTOR AGREEMENT ARE ENFORCEABLE.**

Even though the restrictive covenants are not ripe for declaratory judgment per Count One of Plaintiff's Amended Complaint, Defendant maintains that the clauses themselves are still valid and enforceable.

### 1. A Five (5) Year Time Restriction in the Defendant's Industry is Reasonable.

A restrictive covenant on employment should be upheld if it is reasonably necessary to protect the business and goodwill of the employer. *FLS Transportation Services (USA) Inc. v. Casillas*, No. 3:17-cv-00013-MMD-VPC, 2017 WL 4127980, at *6 (D. Nev. Sept. 18, 2017) (citing *Jones v. Deeter*, 913 P.2d 1272, 1275 (Nev. 1996)). The amount of time the covenant lasts, the territory it covers, and the hardship imposed upon the person restricted are factors for the court to consider in determining whether such a covenant is reasonable. *Id.*

6

Here, the restrictive covenant prohibits Plaintiff from competing with RSD for five (5) years after leaving RSD's employ.  This is not unreasonable because the industry in which the parties conduct themselves rests entirely upon unique dating instructors promoting themselves as a brand. The look, style, and technique of each instructor cannot be duplicated, just like actors or musicians. Thus, RSD will incur losses from no longer promoting Vandehey or selling his products, because it will take a substantial amount of time to build a new brand around a new instructor.

**2.   An Eight (8) City Territory Restriction is Reasonable.**

The non-competition restriction also places a reasonable eight (8) city restriction on Plaintiff's future business for the following five (5) years.  Plaintiff distorts this restriction to be a global ban. See ECF No. 42 at p. 13.

The Nevada Supreme Court adopted the view that the territory in which the employer established customer contacts and good will must be the area in the agreement that is the territorial restriction in the covenant not to compete. *Camco, Inc. v. Baker,* 113 Nev. 512, 520, 936 P.2d 829, 834 (1997).  Similarly here, due to the nature of RSD's business it is not unreasonable to request that certain metropolitan areas where its customers are concentrated be off limits to former employees. The provisions of the covenant not to compete are not beyond what is necessary to protect RSD's interests.  The purpose of a covenant not to compete is to prevent the use of a company's trade secrets and proprietary information by a former employee, which is exactly the risk RSD is looking to mitigate with Vandehey.

**3.   Plaintiff's Will Not Suffer Undue Hardship.**

Enforcement of the restrictive covenants will not unduly restrict Plaintiff from finding gainful employment in a position that does not involve coaching men on how to date or speak to women.  RSD operates in a very specific line of work in a narrow industry, therefore it should not be any hardship for Plaintiff to find another job.  Had the contract restricted Plaintiff from working in any business involving dating, then such a restricting would likely be overbroad.

However, the 9th Circuit has held that the "reason for the termination of the parties' relationship matters."  *Ajilon Professional Staffing, LLC v. Griffin*, No. CV–09–561–PHX–DGC, 2009 WL 976522, at *1 (D. Ariz. Apr. 10, 2009).  Where the application of the non-compete provision results

from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship.  *Id*.  Here, Vandehey embezzled and/or wrongfully converted over $812,000.00 from RSD.[1]  An employee who defrauds and embezzles from his employer cannot be heard to complain about the hardship of enforcing a non-compete provision.

## D. THE COURT HAS DISCRETION TO REVISE THE NON-COMPETITION AND NON-SOLICITATION CLAUSES.

Even if the court finds a five-year period to be too long to enforce, or the geographic areas to be too large, other portions of the covenant not to compete and non-solicitation clauses should still be enforced.  In Nevada, covenants not to compete lasting two years have been found enforceable based on that length of time. *Camco, Inc. v. Baker,* 113 Nev. 512, 520.  Defendants' business involves many trade secrets and operational tactics that took years to develop, revise, and implement.  Plaintiff should not be allowed to simply avoid the entire breadth of the non-compete and non-solicitation clauses that he voluntarily signed.  Doing so would be prejudicial and unjust to Defendant RSD.

In *Hansen v. Edwards*, the Nevada Supreme Court reviewed a restriction from competition in an employment contract of a podiatrist, finding that "the substantial risk of losing patients to an employee is itself an adequate basis for a reasonably designed restraint." 83 Nev. 189, 192, 426 P.2d 792, 793.  Although the court in *Hansen* found that the non-compete agreement, which contained no time limitation and a prohibition from competition within 100 miles, was too restrictive, the court did preserve the validity of the contract by modifying the covenant, reducing the geographic scope, and applying a length of one year.  *Id*. at 193.  With these judicial modifications, the covenant was deemed valid and enforceable. *Id.*

Similarly, in *Ellis v. McDaniel*, the court considered the reasonableness of a restriction prohibiting competition in the practice of medicine as applied to an orthopedic surgeon.  95 Nev. 455, 596 P.2d 222 (1979).  The restrictive covenant was a two-year restriction from competition within a radius of five miles from the city of Elko.  *Id.*  The court found that the terms of the covenant were

---

[1] Defendant's allegations against Plaintiff include, but are not limited to: Theft of RSD audio/visual equipment, RSD email lists, RSD videos, and RSD website server access.

reasonable with respect to the doctor's practice of general medicine, but because there were no other orthopedic specialists on staff with his old employer or in the area, it was not reasonable to prohibit his specialty practice of orthopedic surgery. *Id.* The covenant was judicially modified in that regard while maintaining the time and space limitations which were upheld. *Id.* at 459-460. Thus, the broad and general covenant prohibiting the practice of medicine was found to be reasonable, but for public policy reasons, and due to the recognition of the need for the specialty service to the public, this court exercised its equitable powers and judicially modified the covenant to allow the practice of orthopedic surgery despite the prohibition. *Id.*

Likewise, in *Camco, Inc. v. Baker*, in interpreting a restriction prohibiting any position with an enterprise engaging in the pawn or check cashing business, the court did not object to the two-year restriction imposed, but it did find the territorial limitations to be overly restraining. 113 Nev. 512, 936 P.2d 829 (1997). The territorial limit restricted competition within 50 miles of any store that was existing or under construction, or "within 50 miles of any area which was the target of a corporate plan of expansion." *Id*. at 519-520. In determining the scope was unreasonable, this court found that "to be reasonable, the territorial restriction should be limited to the territory in which [the former employer] established customer contacts and good will." *Id*. at 521.

Applying the legal principles above, even if this court finds the non-competition and non-solicitation clauses in the Contractor Agreement unreasonable or unenforceable in their current form, it may revise or modify their text to render them reasonable and enforceable.

**E. PLAINTIFF IS FABRICATING A DISPUTE REGARDING THE RESTRICTIVE COVENANTS WITHIN THE CONTRACTOR AGREEMENT TO IMPEDE ARBITRATION.**

Plaintiff argues: "Defendants apparently are of the position that the enforceability of the Non-Competition and Non-Solicitation Clauses should be addressed by an arbitrator rather than this court." *See* ECF No. 42 at p. 15. Defendants' have never taken that position, nor have they even implied it. Until Plaintiff's instant Motion, there has never been a single dispute raised by either party regarding the enforceability of the restrictive covenants. Plaintiff is concocting disputes and clashes where none exist. Even the citation to Defendant's Demand for Arbitration, allegedly putting the enforceability of the covenants at issue, is nothing more than a bland recitation of the clauses themselves. They are

1  not accompanied by allegations of wrongdoing or demands to enforce their terms.

2  　　　Plaintiff argues at length under the precedent of the *Whitemaine* case, to convince this court

3  that two legal instruments (i.e. the Contractor Agreement and the Valentine Life Operating

4  Agreement) cannot be joined as a single contract.  *See Whitemaine v. Aniskovich*, 124 Nev. 302, 308-

5  309, 183 P.3d 137, 141-142 (2008).  The logic being that if the agreements are separate, and given

6  that the Contractor Agreement lacks an arbitration provision, then Plaintiff can keep a viable claim in

7  this court and thus out of arbitration.  However, Plaintiff's pedantic analysis and conclusion is entirely

8  irrelevant because no facts exist that bring the restrictive covenants within the Contractor Agreement

9  into dispute.  Without a dispute, or claim of damages, or even underlying facts, there is nothing to

10  arbitrate.

11  　　　Plaintiff is creating a straw man argument to convince this court that due to a fictitious

12  controversy, he should preemptively obtain a declaratory judgment to prevent a hypothetical,

13  imminent harm that he has not experienced and Defendants have not threatened.

14  　　　　　　　　　　　　　**V.　CONCLUSION**

15  　　　Based on the foregoing, Defendants respectfully request this Court deny Plaintiff's motion for

16  summary judgment as to count one of the amended complaint in its entirety.

17  　　　DATED this 10ᵗʰ day of November, 2017.

18  　　　　　　　　　　　　Respectfully submitted,

19  　　　　　　　　　　　　**MAIER GUTIERREZ & ASSOCIATES**

20

21  　　　　　　　　　　　　　/s/ *Steven Knauss*

22  　　　　　　　　　　　　JOSEPH A. GUTIERREZ, ESQ.
　　　　　　　　　　　　Nevada Bar No. 9046

22  　　　　　　　　　　　　STEVEN G. KNAUSS, ESQ.

23  　　　　　　　　　　　　Nevada Bar No. 12242
　　　　　　　　　　　　*Attorneys for Defendants Real Social Dynamics,*

24  　　　　　　　　　　　　*Inc., Nicholas Kho, and Owen Cook*

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that I am an employee of MAIER GUTIERREZ & ASSOCIATES, and that on the 10th day of November, 2017, a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT ONE OF THE AMENDED COMPLAINT** was electronically filed with the Clerk of the Court using the Court's CM/ECF system, and served to all parties and counsels of record registered to receive CM/ECF notifications.

_/s/ *Charity Johnson*_____
An employee of MAIER GUTIERREZ & ASSOCIATES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INDEX OF EXHIBITS

| Description | Exhibit No. |
|---|---|
| Todd Vandehey RSD Contractor Agreement | 1 |
| Valentine Life Operating Agreement | 2 |

# Exhibit 1

## Todd Vandehey RSD Contractor Agreement

# Exhibit 1

## REAL SOCIAL DYNAMICS
### Contractor Agreement

**THIS CONTRACTOR AGREEMENT dated this 1st day of October, 2004**

**BETWEEN:**

Real Social Dynamics of 8312 Carlin Avenue, Sacramento, CA 95823
(the "Principal")

-    AND –

Todd VanDeHey of 2305 Smith Court, Longmont, Colorado, 80501
(the "Contractor")

**BACKGROUND:**

A.   The Principal is duly incorporated, organized and existing under the laws of the State of Nevada.

B.   The Principal is of the opinion that the Contractor has the necessary qualifications, experience and abilities to assist and benefit the Principal in its business.

C.   The Principal desires to employ the Contractor and the Contractor has agree to accept and enter such Contract upon the terms and conditions set out in this Agreement.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

**Commencement Date and Term**

1.   The Contractor will commence Contract with the Principal on October 1, 2004 (the 'Commencement Date').

2.   Subject to termination as provided in this Agreement, the Contractor is contracted for an indefinite term. The parties acknowledge that various provisions of this Agreement survive past termination of Contract.

**Position and Duties**

3.   The Principal agrees to employ the Contractor as an Executive Coach to be an Instructor for Real Social Dynamics Live Programs and complete Administrative Work, and the Contractor agrees to be contracted on the terms and conditions set out in this Agreement. The Contractor agrees to be subject to the general supervision of and act pursuant to the orders, advice and direction of the Principal.

4.   The Contractor will perform any and all duties now and later assigned to the Contractor by the Principal. The Contractor will also perform such other duties as are customarily performed by one holding such a position in other, same or similar business or enterprises as that engaged in by the Principal.

5.   The Contractor agrees to abide by the Principal's rules, regulations, and practices, including those concerning work schedules, vacation and sick leave, as they may from time to time be adopted or modified.

**Contractor Compensation**

6.   For the services rendered by the Contractor as required by this Agreement, the Principal will pay to the Contractor a salary set in accordance with the Principal's policy stated in the Contractor's Manual while this Agreement is in force. The Principal is entitled to deduct from the Contractor's compensation any applicable deductions and remittance as required by law.

7.   The Contractor understands that the Contractor's compensation as provided in this Agreement will constitute the full and exclusive monetary consideration and compensation for all services performed by the Contractor and for the performance of all the Contractor's promises and obligations in this Agreement.

8.   The Contractor understands and agrees that any additional compensation to the Contractor (whether a bonus or other form of additional compensation) will rest in the sole discretion of the Principal and that the Contractor will not earn or accrue any right to additional compensation by reason of the Contractor's Contract.

9.   The Principal will reimburse the Contractor for all necessary expenses incurred by the Contractor while traveling pursuant to the Principal's directions.

10.  The Principal agrees to permit a reasonable degree of flexibility in work hours. In cases where extra time is worked in a day or week, the Contractor agrees to take equivalent time off in place of overtime pay within three months, unless there is an express agreement to pay at overtime rates.

Contractor's Initials 
Principal's Initials

**Contractor Benefits**

11. The Contractor will be entitled to only those additional benefits that are currently in place for the Principal's Contractors as set out in the Principal's booklets and manuals.

12. The Contractor will be entitled in each year to such vacations as are stipulated by the Principal's policies.

**Avoiding Conflict of Opportunities**

13. It is understood and agreed that any business opportunity relating to or similar to the Principal's current or anticipated business opportunities (with the exception of personal investments in less than 5% of the equity of a business, investments in established family businesses, real estate, or investments in stocks and bonds traded on public stock exchanges) coming to the attention of the Contractor during the Contractor's Contract is an opportunity belonging to the Principal. Therefore, the Contractor will advise the Principal of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Principal.

14. Without the written consent of the Principal, the Contractor further agrees not to:
    a. solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Principal, and
    b. directly or indirectly, engage or participate in any other business activities that the Principal, in its reasonable discretion, determines to be in conflict with the best interests of the Principal.

**Inability to Contract for Principal**

15. In spite of anything contained in this Agreement to the contrary, the Contractor will not have the right to make any contracts or commitments for or on the behalf of the Principal without first obtaining the express written consent of the Principal.

**Confidential Information and Assignment of Inventions**

16. The Contractor acknowledges in any position the Contractor may hold, in and as a result of the Contractor's Contract by the Principal, the Contractor will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Principal and which information is the exclusive property of the Principal, including, without limitation:

    a. 'Confidential Information' means all data and information relating to the business and management of the Principal, including proprietary and trade secret technology and accounting records to which access is obtained by the Contractor, including Work Product, Computer Software, Other Proprietary Date, Business Operations, Marketing and Development Operations, and Customers. Confidential Information will also include any information that has been disclosed by a third party to the Principal and governed by a non-disclosure agreement entered into between the third party and the Principal. Confidential Information will not include information that:

        i. is generally known in the industry of the Principal;

        ii. is now or subsequently becomes generally  available to the public through no wrongful act of the Contractor;

        iii. the Contractor rightfully had in its possession prior to the disclosure to Contractor by the Principal;

        iv. is independently created by the Contractor without direct or indirect use of the Confidential Information; or

        v. the Contractor rightfully obtains from a third party who has the right to transfer or disclose it.

    b. 'Work Product' means work product resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development;

    c. 'Computer Software' which means computer software resulting from or related to work or projects performed or to be performed for the Principal or for clients of the Principal, of any type or form in any state of actual or anticipated research and development, including but not limited to programs and program modules, routines and subroutines, processes, algorithms, design concepts, design specifications, (design notes, annotations, documentation, flowcharts, coding sheets, and the like), source code, object code and load modules, programming, program patches and system designs;

    d. 'Other Proprietary Data' means information relating to the Principal's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, test data and test results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

    e. 'Business Operations' means internal personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Principal's business;

    f. 'Marketing and Development Operations' means marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Principal which have been or are being discussed; and

Contractor's Initials 
Principal's Initials

g.   'Customers' means names of customers and their representatives, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by clients of the Principal.

## Confidential Obligations

17.   The Contractor agrees that a material term of the Contractor's contract with the Principal is to keep all Confidential Information absolutely confidential and protect its release from the public. The Contractor agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Contractor has obtained or which was disclosed to the Contractor by the Principal as a result of the Contractor's Contract by the Principal. The Contractor agrees that if there is any question as to such disclosure then the Contractor will seek out senior management of the Principal prior to making any disclosure of the Principal's information that may be covered by this Agreement.

18.   The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Contractor in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement.

19.   The Contractor may disclose any of the Confidential Information:

a.   To a third party where Principal has consented in writing to such disclosure; and

b.   To the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body, however, the Contractor will first have given prompt notice to the Principal of any possible or prospective order (or proceeding pursuant to which any order may result), and the Principal will have been afforded a reasonable opportunity to prevent or limit any disclosure.

## Ownership and Title

20.   The Contractor acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Principal. Accordingly, the Contractor specifically agrees and acknowledges that he will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the fact that he may have created or contributed to the creation of the same.

21.   The Contractor does hereby waive any moral rights that he may have with respect to the Confidential Information.

22.   The Contractor agrees to immediately disclose to the Principal all Confidential Information developed in whole or in part by the Contractor during the term of the Contractor's Contract with the Principal and to assign to the Principal any right, title or interest the Contractor may have in the Confidential Information. The Contractor agrees to execute any instruments and to do all other things reasonably requested by the Principal (both during and after the Contractor's Contract with the Principal) in order to vest more fully in the Principal all ownership rights in those items transferred by the Contractor to the Principal.

## Return of Confidential Information

23.   The Contractor agrees that, upon request of the Principal or upon termination or expiration, as the case may be, or Contract, the Contractor will turn over to the Principal all documents, disks or other computer media, or other material in the possession or control of the Contractor that:

a.   May contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

b.   Connected with or derived from the Contractor's services to the Principal.

## Non-Solicitation

24.   Any attempt on the part of the Contractor to induce others to leave the Principal's employ, or any effort by the Contractor to interfere with the Principal's relationship with its other Contractors and contractors would be harmful and damaging to the Principal. The Contractor agrees that during the term of his Contract with the Principal and for a period of five (5) years after the end of that term, the Contractor will not in any way, directly or indirectly:

a.   Induce or attempt to induce any Contractor or contractor of the Principal to quit Contract or retained with the Principal;

b.   Otherwise interfere with or disrupt the Principal's relationship with its Contractors and Employees;

c.   Discuss Contract opportunities or provide information about competitive Contract to any of the Principal's Contractors or Employees; or

d.   Solicit, entice, or hire away any Contractor or contractor of the Principal.

This obligation will be limited to those that were Contractors or contractors of the Principal when the Contractor was contracted by the Principal.

## Non-Competition

25.   Other than through Contract with a bona-fide independent party, or with the express written consent of the Principal, which will not be unreasonably withheld, the Contractor will not, during the continuance of the Agreement or within five (5) years after the termination or expiration, as the case may be, of this Agreement, be directly or indirectly involved with a business which is in direct competition with the Principal in the business line of how to be successful with women and dating.

Contractor's Initials  _TV_
Principal's Initials  _NJK_

26. For a period of five (5) years from the date of termination or expiration, as the case may be, of the Contractor's Contract with the Principal, the Contractor will not divert or attempt to divert from the Principal any business the Principal had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Contractor's Contract with the Principal.

27. The Contractor will not own, operate or work for a company or internet website that teaches men how to be successful with women and dating, for five (5) years from the date of termination or expiration, in Los Angeles, New York, San Francisco, Sydney, Melbourne, Toronto, Montreal, and London, and the Contractor will forfeit to Real Social Dynamics any revenue and income earned from operating or working for a company or internet website that teaches men how to be successful with women and dating during the 5 year period, and the Contractor is still obligated to keep all trade secrets confidential.

**Termination Due to Discontinuance of Business**

28. In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

**Termination For Disability**

29. In spite of anything contained in this Agreement to the contrary, in the event that the Principal will discontinue operating its business at the location where the Contractor is contracted, then, at the Principal's sole option, this Agreement will terminate as of the last day of the month in which the Principal ceases operations at such location with the same force and effect as if such last day of the month were originally set as the termination date of this Agreement.

**Termination of Contract**

30. Where the Contractor has breached any of the terms of this Agreement or where there is just cause for termination, the Principal may terminate the Contractor's Contract without notice.

31. The Contractor and the Principal agree that reasonable and sufficient notice of termination of Contract by the Principal is the greater of two weeks and any notice required under any relevant Contract legislation.

32. If the Contractor wishes to terminate his Contract with the Principal, the Contractor will provide the Principal with two weeks' notice. As an alternative, if the Contractor co-operates with the training and development of a replacement, then sufficient notice is given if it is sufficient notice to allow the Principal to find and train the replacement.

33. Should the Contractor terminate his Contract pursuant to this Agreement, and there is no constructive dismissal, the Contractor agrees to be reasonably available as a consultant for the purposes of maintaining any projects or developments created while contracted by the Principal. The Contractor agrees to negotiate the terms of the consulting work in good faith. In his capacity as a consultant for the Principal pursuant to this paragraph, the Contractor agrees to provide his present residential address and telephone number as well as his business address and telephone number.

34. The time specified in the notice by either the Contractor or the Principal may expire on any day of the month and upon the date of termination the Principal will forthwith pay to the Contractor any outstanding portion of the wage, accrued vacation and banked time, if any, calculated to the date of termination. Notwithstanding the date of termination, the Contractor acknowledges and agrees to diligently execute and complete his Contract responsibilities to the Principal at the reasonable direction of the Principal. Failure of the Contractor to reasonably execute his obligations to the Principal during the notice period will be considered to be an abandonment of his obligations and will be sufficient cause for immediate termination of the Contractor without compensation or notice.

**Remedies**

35. The Contractor agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Principal, would gravely affect the effective and successful conduct of the Principal's business and goodwill, and would be a material breach of this Agreement.

36. In the event of a breach or threatened breach by the Contractor of any of the provisions of this Agreement, the Contractor agrees that the Principal is entitled to, in addition to and not in limitation of any other rights and remedies available to the Principal at law or in equity, to a permanent injunction in order to prevent or restrain any such breach by the Contractor or by the Contractor's partners, agents, representatives, servants, Contractors, and/or any and all persons directly or indirectly acting for or with the Contractor.

37. The Contractor agrees to co-operate with the Principal following termination by providing documentation and other information to permit the Principal to evaluate whether the Contractor is honoring his post-Contract obligations set out in this Agreement.

**Severability**

38. Principal and Contractor acknowledge that this Agreement is reasonable, valid and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the Contractor's intention to give the Principal the broadest possible protection against the disclosure of the Confidential Information, against the Contractor soliciting the Principal's Contractors and contractors and against the Contractor using such Confidential Information in competing with the Principal.

39. In the event that any of the provisions of this Agreement will be held to be invalid or unenforceable in whole or in part, those provisions to the extent enforceable and all other provisions will nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Agreement and the remaining provisions had been executed by both parties subsequent to the expungement of the invalid provision.

Contractor's Initials 
Principal's Initials

**Notices**

40.  If Contractor loses or makes unauthorized disclosure of any of the Confidential Information, the Contractor will immediately notify the Principal and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

41.  All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and either served personally or sent by facsimile or e-mail. The address for any notice to be delivered to an of the parties to this Agreement is as follows:

    a.    Real Social Dynamics: 8312 Carlin Avenue, Sacramento, CA 95823
           Email: papa@realsocialdynamics.com

    b.    Todd VanDeHey: 2305 Smith Court, Longmont, Colorado, 80501
           Email: mike@realsocialdynamics.com

**Modification of Agreement**

42.  Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

**Governing Law**

43.  It is the intention of the parties to this Agreement that this Agreement and the performance under this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of Nevada, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**General Provisions**

44.  Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

45.  The Contractor is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Principal in enforcing this Agreement as a result of any default of this Agreement by the Contractor.

46.  No failure or delay by the Principal in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.

47.  This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Principal and the Contractor.

48.  This Agreement may be executed in counterparts.

49.  Time is of the essence in this Agreement.

50.  If there is a previous Contract agreement between the parties to this Agreement, the parties agree that this Agreement will replace that previous Contract agreement and the Contractor acknowledges that this Agreement was entered into in consideration of a compensation increase commencing the start of this Agreement. The Contractor acknowledges that it was agreed at that time that a new Contract agreement would be entered into in consideration of the compensation increase.

51.  This Agreement and the Contractor Manual constitutes the entire agreement between the parties and there are no further items or provisions, either oral or written. As of the effective date of this Agreement, this Agreement supersedes all other agreements between the parties. The parties to this Agreement stipulate that neither of them has made any representations with respect to the subject matter of this Agreement except such representations as are specifically set forth in this Agreement. Each of the parties acknowledges that it has relied on its own judgment in entering into this Agreement.

**IN WITNESS WHEREOF** Real Social Dynamics has duly affixed its signature by a duly authorized officer on this 1st day of October, 2004. By signing below, the Contractor acknowledges that he/she understands and accepts this obligation.

_____
Nicholas Kho, President
Real Social Dynamics, Inc.

_____
Todd VanDeHey

7/27/04
Date

Contractor's Initials  TV
Principal's Initials  NK

# Exhibit 2

## Valentine Life Operating Agreement

# Exhibit 2

# OPERATING AGREEMENT FOR

# VALENTINE LIFE, LLC

# A NEVADA CORPORATION

THE OWNERSHIP INTERESTS IN VALENTINE LIFE, LLC (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN ARTICLE 8 OF THIS AGREEMENT AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS THEREOF.  THEREFORE, PURCHASERS OF THE INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME.  THE INTERESTS HAVE NOT BEEN REGISTERED:  (1) UNDER ANY STATE SECURITIES LAWS (THE "STATE ACTS"); (2) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"); OR (3) UNDER THE SECURITIES LAWS OF ANY FOREIGN JURISDICTION (THE "FOREIGN ACTS"), AND NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 8 OF THIS AGREEMENT AND: (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACTS OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED; AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE FOREIGN ACTS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER ANY APPLICABLE FOREIGN ACTS OR FOR WHICH SUCH REGISTRATION IS NOT OTHERWISE REQUIRED.

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

# OPERATING AGREEMENT FOR
# VALENTINE LIFE, LLC
# A NEVADA LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (this "Agreement") for VALENTINE LIFE, LLC(the "Company") is entered into by and between Real Social Dynamics Inc, a Nevada Corporation ("RSD"), as one Shareholder, Todd VanDeHey ("VanDeHey") as another Shareholder and such other parties as listed on Exhibit A attached hereto (together, the "Shareholders").

WHEREAS, the Company filed, on September 15, 2015, the Articles of Organization of VALENTINE LIFE, LLCwith the Secretary of State of the State of Nevada, a copy of which is attached hereto as Exhibit B; and

WHEREAS, the Shareholders desire to adopt an Operating Agreement to govern their respective rights and obligations as Shareholders of the Company and to set forth certain procedures for the governance of the Company.

NOW, THEREFORE in consideration of the premises, the mutual promises and obligations contained herein, and with the intent of being legally bound, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the capitalized words and phrases have the meanings set forth below:

Section 1.1    "Adjusted Capital Contribution" means, as of any day, a Shareholder's Capital Contribution(s) adjusted by distributions under Article 5.

Section 1.2    "Affiliate" has the meaning set forth in the Securities Exchange Act of 1934, as amended.

Section 1.3    "Agreement" means this Operating Agreement, as amended from time to time.

Section 1.4    "Business Day" means any Monday through Friday, excluding federal national holidays.

Section 1.5    "Capital Account" means with respect to each Shareholder the amount of money contributed by such Shareholder to the capital of the Company, increased by the aggregate fair market value (as determined by the Shareholders) of all property contributed by such Shareholder to the capital of the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), the aggregate amount of all Net Profits allocated to such Shareholder, and any and all items of gross income or gain specially allocated to such Shareholder pursuant to Section 4.1,

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202

and decreased by the amount of money distributed to such Shareholder by the Company (exclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to such Shareholder), the aggregate fair market value (as determined by the Shareholders) of all property distributed to such Shareholder by the Company (net of liabilities secured by such distributed property that such Shareholder is considered to assume or take subject to under Section 752 of the Code), the amount of any Net Losses charged to such Shareholder, and any and all "nonrecourse deductions" specially allocated to such Shareholder pursuant to Article 4.

Section 1.6    "Cash Flow" means the excess, if any, of all cash receipts of the Company as of any applicable determination date in excess of the sum of (a) all cash disbursements (inclusive of any reimbursements made to any Shareholder and any repayment of loans made to any Shareholder, but exclusive of distributions to the Shareholders in their capacity as such) of the Company prior to that date, plus (b) any cash reserve, determined by the Shareholders, for anticipated cash disbursements that will have to be made before additional cash receipts from third parties will provide the funds therefore, or as otherwise established by the Shareholders under Section 5.3 of this Agreement.  Cash Flow shall be determined and distributed at such times as the Shareholders determine that funds are available therefore, taking into account the reasonable business needs of the Company.

Section 1.7    "Capital Contribution(s)" means, with respect to any Shareholder, the amount of money contributed to the Company.

Section 1.8    "Company" means VALENTINE LIFE, LLC, a Nevada limited liability company.

Section 1.9    "Company Property" means all real and personal property owned by the Company (including cash) and any improvements thereto, and shall include both tangible and intangible property.

Section 1.10    "Interest" means all of a Shareholder's interest in the Company held pursuant to Section 2.7 hereof, including any and all benefits to which the Shareholder may be entitled as provided in this Agreement, together with all obligations of the Shareholder to comply with the terms and provisions of this Agreement.

Section 1.11    "IRC" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

Section 1.12    "Liquidation" means the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining balance to the Shareholders).

Section 1.13    "Liquidating Event" has the meaning set forth in Section 9.1 hereof.

Section 1.14    "Manager" means any Person designated or elected to manage the Company pursuant to Section 6.1 of this Agreement.

Section 1.15    "Shareholder" means any Person that becomes a Shareholder pursuant to the terms of this Agreement.

Section 1.16   "<u>Net Profits and Net Losses</u>" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss); provided, however, for purposes of computing such taxable income or loss, (i) such taxable income or loss shall be adjusted by any and all adjustments required to be made in order to maintain Capital Account balances in compliance with Treasury Regulations Section 1.704-1(b) and (ii) any and all items of gross income or gain and/or partnership and/or partner "nonrecourse deductions" specially allocated to any Shareholder pursuant to Section 4 shall not be taken into account in calculating such taxable income or loss.

Section 1.17   "<u>Percentage Interest</u>" means the percentage interest of each Shareholder as set forth on the attached <u>Exhibit A</u>, as amended from time to time in accordance with this Agreement.

Section 1.18   "<u>Permitted Transfer</u>" has the meaning set forth in Section 8.1 hereof.

Section 1.19   "<u>Person</u>" means any individual, partnership, corporation, trust, or other entity.

Section 1.20   "<u>Profits</u>" and "<u>Losses</u>" means the Company's net taxable income or loss, as calculated for federal tax purposes.

Section 1.21   "<u>Statute</u>" means the provisions of the Nevada Revised Statutes as set forth in Title 7, Chapter 86 of the State of Nevada, as amended from time to time (or any corresponding provisions of succeeding law).

Section 1.22    "<u>Term</u>" has the meaning set forth in Section 2.4.

Section 1.23   "<u>Transfer</u>" means the voluntary or involuntary, direct or indirect, assignment, sale, pledge, gift or other conveyance of any legal or beneficial interest in an Interest.

Section 1.24   "<u>Treasury Regulations</u>" means any proposed, temporary, and/or final federal income tax regulation promulgated by the United States Department of the Treasury as heretofore and hereafter amended from time to time (and/or any corresponding provisions of any superseding revenue law and/or regulation).

ARTICLE 2
<u>FORMATION OF COMPANY</u>

Section 2.1    <u>Formation</u>.  The Shareholders have formed the Company pursuant to the provisions of the Statute by causing Articles of Organization conforming to the requirements of the Statute to be filed with the Secretary of State of the State of Nevada.

Section 2.2    <u>Name</u>.  Unless and until amended in accordance with this Agreement and the Statute, the name of the Company is VALENTINE LIFE, INC.

3

DocuSign Envelope ID: 5A8B20EF-BE5F-47EB-8D32-788034183202

Section 2.3       Purpose.

(a)       The purpose of the Company is to engage in any lawful activities for which a limited liability company may be organized under the Statute, provided that the Corporation shall not conduct any banking, insurance or trust company business.  Specifically, the Company has been formed as a Corporation.

(b)       The Company may engage in any other lawful business activity permitted by the Statute subject to the unanimous written agreement of the Shareholders.

Section 2.4       Term.  The term (the "Term") of the Company commenced on May1, 2015 and shall continue until the termination of the Company in accordance with Article 9 of this Agreement.

Section 2.5       Principal Place of Business.  The principal place of business of the Company shall be in Las Vegas, NV, USA, or at such other place as the Shareholders shall from time to time designate in writing.

Section 2.6       Agent for Service of Process.  Until such time as the Shareholders have appointed a different person in the State of Nevada to act as the agent of the Company for service of process, the agent for service of process for the Company shall be in Nevada.

Section 2.7       Shareholders and Interests. The names and addresses of each Shareholder, and the Percentage Interests issued to each Shareholder, are set forth on the attached Exhibit A.

Section 2.8       Independent Activities; Transactions with Affiliates.

(a)       The Shareholders shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and it shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its sole discretion.

(b)       Each Shareholder acknowledges that the other Shareholders and their Affiliates are free to engage or invest in an unlimited number of activities or businesses, any one or more of which may be related to the activities or businesses of the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Shareholder, and neither this Agreement nor any activity undertaken pursuant to this Agreement shall prevent any Shareholder from engaging in such activities, or require any Shareholder to permit the Company or any Shareholder to participate in any such activities.

(c)       To the extent permitted by applicable law and except as otherwise provided in this Agreement, the Shareholders are hereby authorized to purchase property from, sell property to, or otherwise deal with the Company, provided that any such purchase, sale or other transaction is unanimously agreed upon in writing by the Shareholders and is in the ordinary course of the Company's business and shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase, or other transaction had been entered into with an independent third party.

ARTICLE 3
SHAREHOLDERS' CAPITAL CONTRIBUTIONS

Section 3.1    Contributions. The names, addresses, Capital Contributions, Units and Percentage Interests of the Shareholders are set forth on Exhibit A.

Section 3.2    Interest On and Return of Capital.  No Shareholder shall receive any interest, salary or drawing with respect to its Capital Contributions or for services rendered on behalf of the Company or otherwise in its capacity as Shareholder, except as may be provided in this Agreement.  No Shareholder shall have the right to demand or receive property other than cash (and then only in accordance with this Agreement) in return for its Capital Contribution.

Section 3.3    Loans from Shareholders or Affiliates.  A Shareholder, or an Affiliate of a Shareholder, may make a loan to the Company on such terms and conditions as the Shareholders unanimously determine to be fair and reasonable in their sole discretion.

Section 3.4    Additional Capital Contributions.  Other than contributions by additional Shareholders, no Shareholder shall be required to make any Capital Contributions to the Company in excess of the amounts set forth in Exhibit A without the unanimous consent of all of the Shareholders which any such Shareholder may grant or withhold, condition or delay, in its sole and absolute discretion.

Section 3.5    Additional Shareholders.  The Shareholders shall not admit additional Persons as additional Shareholders under any circumstances.

ARTICLE 4
ALLOCATIONS

Section 4.1    Profits.  Profits for any taxable year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and in the reverse order and to the extent of, the aggregate Losses allocated to the Shareholders pursuant to Section 4.2 below for all periods, until the aggregate Profits allocated to the Shareholders pursuant to this Section 4.1(a) for all periods equals such aggregate Losses; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.2    Losses.  Losses for any tax year shall be allocated in the following order:

(a)    First, to the Shareholders in proportion to, and to the extent of, their respective positive Capital Account balance; and

(b)    Thereafter, to the Shareholders in proportion to their respective Percentage Interests.

Section 4.3    Limitation on Loss Allocations.  Notwithstanding any other provisions of this Agreement, no allocation of Net Losses shall be made to any Shareholder to the extent such an allocation would cause or increase a deficit balance standing in such Shareholder's Capital Account (in excess of such Shareholder's allocable share of minimum gain and after taking into account any adjustments set forth in Treasury Regulation Section 1.704(b)-1(b)(2)(ii)(d)) and any such Net Losses shall instead be allocated to the Shareholders based upon their respective "interests" in the Company as determined in accordance with Treasury Regulation Section 1.704-1(b).  In addition, items of income and gain shall be specially allocated to the Shareholders in accordance with the qualified income offset provisions set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

Section 4.4    Cumulative Allocations.  The effect of the limitation on the amount of Net Losses and the qualified income offset provisions set forth in the first two (2) sentences of Section 4.3 above shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Article 4, so that the net amount of any items so allocated and the Net Profits, Net Losses and all other items allocated to each Shareholder pursuant to this Article 4 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Shareholder pursuant to the provisions of this Article 4 if such special allocations had not occurred.

Section 4.5    Differing Tax Basis; Tax Allocations.  Depreciation and/or cost recovery deductions and gain or loss with respect to each item of property treated as contributed to the capital of the Company shall be allocated among the Shareholders for federal income tax purposes in accordance with the principles of Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, and for state income tax purposes in accordance with comparable provisions of any applicable state law and the regulations promulgated thereunder, so as to take into account the variation, if any, between the adjusted tax basis of such property and its book value (as determined for purposes of the maintenance of Capital Accounts in accordance with this Agreement and Treasury Regulation Section 1.704-1(b)(2)(iv)(g)).

Section 4.6    Other Special Allocations.  The Company shall make other special allocations required or permitted in the Treasury Regulations under Section 704 of the Code after consultation with the Company's tax advisors so as to carry out the economic arrangement provided for in this Agreement and to have the Company's allocations respected for tax purposes.

ARTICLE 5
DISTRIBUTIONS

Section 5.1    Cash Flow.  Cash Flow, if any, shall be distributed at such dates as determined by unanimous written consent of the Shareholders to the Shareholders in proportion to their respective Percentage Interests. RSD and VanDeHey shall be sole signatories on the Company Bank Account.

Section 5.2     <u>Amounts Withheld</u>.  All amounts withheld or paid as taxes pursuant to any provision of tax law with respect to any payment, distribution or allocation to the Company or the Shareholders shall be treated as amounts distributed to the Shareholders pursuant to this Article 5 for all purposes under this Agreement.  The Company is authorized to withhold from distributions to the Shareholders to pay over to (or reimburse the Company for) any amounts required to be so withheld or paid and shall allocate any such amounts to the Shareholders with respect to which such amount was withheld.

Section 5.3     <u>Contingency Reserves</u>.  The Shareholders may establish cash reserves (whether or not reflected on the financial statements) as the Shareholders unanimously determine to be reasonable in connection with the operation of the Company business.

ARTICLE 6
<u>MANAGEMENT</u>

Section 6.1     <u>Manager</u>.  The Company shall be managed by RSD and VanDeHey. Meetings of the Manager shall be required annually.

Section 6.2     <u>Manager of Operational and Day-to-Day Business and Affairs</u>.  The operational and day-to-day business and affairs of the Company shall be operated and managed jointly by RSD and Todd VanDeHey.  RSD and VanDeHey are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that RSD and VanDeHey shall not take any action, make any determination or provide any consent expressly reserved by Section 6.4 of this Agreement to the Shareholders.  No Shareholder, other than RSD or VanDeHey (subject to the terms of this Agreement), shall, acting individually, have the power to sign or bind the Company unless duly authorized to do so by unanimous written consent of the Shareholders. Notwithstanding the foregoing, RSD and VanDeHey shall have no liability to the Shareholders or the Company for exceeding the authority granted to him in the event a decision made or an action taken by him was made or taken with a reasonable good faith belief that such decision or action was (i) within the scope of the operational and day-to-day business and affairs of the Company and (ii) not prohibited by the terms of this Agreement.

Section 6.3     <u>Corporate Sponsorship, and Event Planning.</u>  VanDeHey and RSD shall jointly be the manager of event planning, which shall include but not be limited to planning and putting on live seminars, field trips, making DVDs, writing books and creating any other such content and media in his good faith belief will further the success of the Company. In addition, VanDeHey will be the manager of corporate sponsorship, which shall include but not be limited to obtaining advertising fees from corporations, creating marketing creative, managing marketing campaigns, and fundraising for non-profit organizations. RSD will be the manager jointly and unanimously with VanDeHey, which shall include but not be limited to information technology for managing Shareholders, communication with speakers for live events, financial management tuition, and monitoring Shareholders' communication. VanDeHey and RSD are authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement; <u>provided</u>, <u>however</u>, that VanDeHey and RSD shall not take any action, make any determination or provide any consent with regard

7

solely to the content and marketing operations expressly reserved by Section 6.4 of this Agreement to the Shareholders. .

Section 6.4    Actions Expressly Reserved to the Shareholders.  Notwithstanding the authority granted to RSD in Section 6.2 above, RSD may not do or permit to be done any of the following without the unanimous written consent of the Shareholders:

(a)    Any act or thing which the Act or this Agreement requires to be approved, consented to or authorized by all the Shareholders;

(b)    Voluntarily cause the dissolution of the Company;

(c)    Sell all or a significant part of the Company assets, or engage in any material recapitalization or merger;

(d)    Incur any liabilities in excess of $50,000; or

(e)    File any lawsuit or proceedings.

Section 6.5    No Liability of Shareholders. All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Shareholder shall be obligated personally for any such debt, obligation or liability of the Company.

Section 6.6    Rights and Prohibitions of the Shareholders.

(a)    Except as otherwise restricted herein, the Shareholders shall be entitled to the rights provided by the Act and to such other rights as are expressly set forth elsewhere herein.

(b)    Except as otherwise expressly provided for in this Agreement, the Shareholders shall not have the right:

(i)    to have their Capital Contributions returned until such time as the Company is terminated and liquidated and all Company liabilities have been paid or funds have been set aside therefore, and then only in accordance with the provisions of this Agreement;

(ii)    to sell or assign their Interests in the Company except in accordance with Article 8 hereof;

(iii)    to withdraw or reduce their Capital Contributions; or

(iv)    to demand or receive property other than cash in return for their Capital Contributions.

Section 6.7    Limitation of Liability.  In carrying out its obligations hereunder, the Shareholders shall not be liable to the Company or to the Shareholders for: (a) errors of judgment; (b) any mistake of fact or of law; (c) any actions undertaken in good faith and believed to be either in furtherance of the Shareholders' obligations under this Agreement or in

the best interests of the Company; or (d) any actions taken pursuant to advice of counsel to the Company.

Section 6.8    Indemnification.    The Company, to the extent of its assets, hereby indemnifies the Shareholders against, and agrees to hold, save, and defend same wholly harmless from, any loss, expense, damage, or liability (including attorneys' fees and costs of litigation) suffered or incurred by any of them by reason of anything which the Shareholders may in good faith do or refrain from doing for and on behalf of the Company; provided, however, that the Company shall not be required to indemnify the Shareholders for any loss or damage that the Shareholders may incur as a result of intentional misconduct, gross negligence, fraud, or a knowing violation of law, or for any transaction for which such Shareholders received a personal benefit in violation or breach of any provision of this Agreement.

ARTICLE 7
ACCOUNTING

Section 7.1    Books and Records.    The Company's books of account shall be maintained and kept at the Company's principal place of business.  The Company's accounting period shall be the calendar year.

Section 7.2    Tax Information.    Necessary tax information shall be delivered to each Shareholder within ninety (90) days after the end of each tax year of the Company.

ARTICLE 8
RESTRICTION ON TRANSFER OF CORPORATION INTERESTS

Section 8.1    Transfer or Assignment of Interests.    No transfer, sale, hypothecation, pledge, encumbrance, assignment or other disposition (each of the foregoing, a "Transfer") of a Shareholder's Interest, or any part thereof, will be valid without the unanimous consent of the other Shareholder.  Any Transfer of an Interest, including an involuntary Transfer, which does not satisfy the requirements of this Section 8.1 shall be subject to the provisions of Section 8.3 hereof; provided, however, that any Transfer by a Shareholder to a trust or other entity wholly owned by or established for the benefit of such Shareholder, or to a parent, spouse, sibling or descendant of such Shareholder or to a trust established exclusively for the benefit of one or more of such Persons (any such Transfer, a "Permitted Transfer"), shall not require consent pursuant to this Section 8.1.

Section 8.2    Right of First Refusal Upon Sale.    Other than with respect to Permitted Transfers, in the event that any Shareholder receives a bona fide offer for the purchase and sale of all or any portion of such Shareholder's Interest, the Shareholder shall first offer to sell such Interest or portion thereof to the other Shareholders and to the Company in accordance with the provisions of this Section 8.2.

(a)    Notice of Offer to Sell.    Promptly following the receipt of an offer to purchase all or any portion of his, her or its Interest, a Shareholder shall deliver a written notice (the "Sale Notice") to the Corporation and the other Shareholders stating (i) such Shareholder's bona fide intention to sell his, her or its Interest, (ii) the name and address of the proposed

9

transferee, (iii) the Interest or portion thereof to be sold, and (v) the purchase price and terms of payment upon which the Shareholder proposes to sell such Interest.

(b)   <u>Election to Exercise Right of First Refusal</u>  Within 30 days after receipt of the Sale Notice, each non-selling Shareholder shall notify the Manager in writing of his, her or its desire to purchase a portion of the Interest subject to the Sale Notice.  The failure of any Shareholder to so notify the Manager within the applicable period shall constitute an election on the part of that Shareholder not to purchase any portion of the Interest subject to the Sale Notice.  Each Shareholder so electing to purchase shall be entitled to purchase a portion of such Interest in the same proportion that the Percentage Interest of such Shareholder bears to the aggregate of the Percentage Interest of all of the Shareholders electing to so purchase the Interest subject to the Sale Notice.  In the event any Shareholder elects to purchase none or less than all of his, her or its pro rata share of such Interest, then the other Shareholders can elect to purchase more than their pro rata share.  If such Shareholders fail to purchase the entire Interest subject to the Sale Notice, the Company may purchase any remaining share of such Interest.

(c)   <u>Exercising Right of First Refusal</u>..  Within 90 days after receipt of the Sale Notice, the Company and the Shareholders electing to purchase the Interest subject to the Sale Notice shall exercise his or its first right to purchase or obtain such Interest upon the price and terms of payment designated in the Sale Notice by providing written notice to the other Shareholder of his election to purchase.  If the Sale Notice provides for the payment of non-cash consideration, the Company and the purchasing Shareholders each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered, as determined by the Managers or, in the absence of an agreement among the Managers as to such value, by a nationally recognized firm of appraisers jointly selected by the Manager.  If the third party offer is all cash paid at the close of escrow, the Shareholder or company shall have the right to pay for the purchase on reasonable terms over a period not to exceed one year by executing a promissory note with interest at 6% per annum with monthly payments of principal and interest, no prepayment penalty so long as the electing Shareholder or company puts up its memebership interest as collateral until the sale is completed.

(d)   <u>Lapse of Right of First Refusal</u>.  If the Company or the other Shareholders elect not to purchase or obtain all of the interest subject to the Sale Notice, then the selling Shareholder may sell the Interest described in the Sale Notice to the proposed transferee, provided such sale (i) is completed within 30 days after the expiration of the Company and the other Shareholders' right to purchase such Interest, (ii) is made on terms no less favorable to the selling Shareholder than as designated in the Sale Notice, and (iii) the requirements of Section 8.1 have been met.  If such interest is not so sold, the selling Shareholder must give notice in accordance with this Section 8.2 prior to any subsequent sale of such Shareholder's Interest.

Section 8.3   <u>Buyout Option</u>

(a)   <u>Buyout Notice</u>.  Any Shareholder (a "Remaining Shareholder") or its designated Affiliate shall have the right (the "Buyout Option") to purchase all, but not less than all, of the Interest of any other Shareholder (a "Departing Shareholder") in the event the Departing Shareholder Transfers any portion of such Shareholder's Corporation Interest other

DocuSign Envelope ID: 5A8B20EE-BE5E-47EB-8D32-788034183202

than as permitted pursuant to Section 8.1 hereof ( "Buyout Event 1")., or if the Shareholders are deadlocked for a period of at least 30 days on any decision requiring unanimous consent of the Shareholders ("Buyout Event 2").  Under Buyout Event 2 the Shareholder making the offer shall be called the Tendering Shareholder and the other Shareholder will be called the Responding Shareholder

(b)     Within 30 days of receipt of notice of  Buyout Event 1, the Remaining Shareholder shall give written notice (the "Buyout Notice") to the Departing Shareholder of the Remaining Shareholder's desire to purchase the Departing Shareholder's Company Interest.  In the event that there is more than one Remaining Shareholder at the time a Buyout Event occurs, the Remaining Shareholders shall be entitled to exercise the Buyout Option pro rata in accordance with their respective Percentage Interests.

(c)     Within thirty days (30) of receipt of the notice of Buyout Event 2, the Responding Shareholder shall have the right to elect, by delivery of written notice to the Tendering Shareholder no later than thirty (30) days following receipt of such offer by the Responding Shareholder, to either (i) sell its Ownership Interest to the Tendering Shareholder pursuant to the terms of the Offer or (ii) purchase the Ownership Interest of the Tendering Shareholder pursuant to the terms of the Offer. If the Responding Shareholder does not make such election, by written notice to the Tendering Shareholder, within thirty (30) days, then the Responding Shareholder shall be deemed to have elected to sell its Ownership Interest to the Tendering Shareholder.

(d)     Purchase Price of the Shareholder's Company Interest.  The purchase price of the Shareholder's Interest shall be the Fair Market Value thereof.  For purposes hereof, the "Fair Market Value" of such Interest shall be such value as is mutually agreed upon among the Shareholders but shall take into consideration all inventory, accounts receivable, and cash on hand and its subsidiaries as of the date of the notice, together with a schedule of all debt of the Corporation and its subsidiaries,; provided, however, that in the event that the Shareholders are unable to agree upon a Fair Market Value within 30 days of the date of either Buyout Notice, the Fair Market Value shall be determined by an independent appraiser affiliated with a nationally recognized firm of accountants, appraisers or investment bankers and selected by the Manager in the exercise of their reasonable discretion.  The appraiser shall render a written report setting forth its determination of Fair Market Value as promptly as possible..  In making such determination, the appraiser shall value the Company as a going concern and shall take into consideration (i) the transferability and liquidity of the Departing Shareholder's Interest, (ii) the fact that additional capital may be required, from time to time, in connection with the business of the Company, and (iii) the economic risk and liability associated with the ownership of such Interest.  Absent manifest error, the appraiser's determination of Fair Market Value shall be final and binding on all parties.  The fees and expenses of any appraiser shall be paid by the Company.

(e)     Exercise Terms.  The Buyout Notice, which shall be served by certified mail, return receipt requested, shall specify the date on which the Transfer pursuant to an exercise of the Buyout Option shall be consummated, which date shall be no earlier than 30 days nor later than 90 days from the date of the Buyout Notice, unless otherwise agreed by the Remaining Shareholder and the Departing Shareholder, or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder.  Except as may be

otherwise agreed by the Remaining Shareholder and the Departing Shareholder or in the case of Buyout Event 2, between the tendering Shareholder and the Responding Shareholder, the Shareholder purchasing the other Shareholder's Ownership Interest shall pay at least 20% of the purchase price in cash, with the balance of the purchase price payable pursuant to a promissory note bearing interest at 110% of the then current applicable federal rate for mid-term obligations (as determined pursuant to Section 7872 of the Code). Such note shall be payable in equal installments of principal and interest over a period not to exceed five years. Any such promissory note may be prepaid at any time without premium or penalty. The Shareholder selling his Interest shall be transferred free and clear of all liens and encumbrances and, except as otherwise provided, the selling Shareholder shall be released at the closing from any guarantees, obligations, liabilities or similar undertakings to third parties given by such Shareholder on behalf of the Company.

(f)    Further Cooperation.  On the closing of the purchase and sale of the Departing Shareholder's Company Interest, or in the case of Buyout Event 2, between selling Shareholder's Company Interest pursuant to an exercise of the Buyout Option, each Shareholder shall execute, acknowledge and deliver to each other Shareholder such instruments, and take such actions, as each Shareholder may reasonably request in order to effect the purchase and sale of the Company Interest pursuant to the terms and conditions of this Section 8.3.

(g)    Company Option.  In the event the Remaining Shareholder under Buyout Event 1 elects not to exercise any of its rights under this Section 8.3, the Company, at its election, may assume such rights.

Section 8.4    Void Transfers.  If the Managers determine in their sole discretion that any Transfer would cause the termination of the Company under the Code, then such Transfer shall be null and void.

Section 8.5    Substitution of Shareholders.  A transferee of an Interest shall become a substitute Shareholder, provided that (i) the Transfer was valid under Section 8.1 hereof and not voided by the Manager pursuant to Section 8.4 hereof, (ii) the transferee has become a party to this Agreement, and (iii) the transferee pays any reasonable expenses in connection with his, her or its admission as a Shareholder.  A transferee who becomes a substituted Shareholder has, to the extent transferred, all of the rights, powers and duties of a Shareholder under this Agreement and the Statute.

Section 8.6    Subsequent Transfers Subject to Terms of Agreement.  After the consummation of any Transfer of any part of an Interest, the Interest or portion thereof so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions hereof.

Section 8.7    Purchase Terms Varied by Agreement.  Provided that the restrictions set forth in this Agreement have been satisfied, nothing contained herein is intended to prohibit Shareholders from agreeing upon other terms and conditions for the purchase by the Company or any other Shareholder of the Interest (or any portion thereof) of any Shareholder desiring to retire, withdraw or resign.

DocuSign Envelope ID: 5A8B20EE-BE5E-47EB-8D32-788034183202

Section 8.8    <u>Spousal Consent</u>.  Each Shareholder who is married as of the date hereof or who subsequently becomes married shall obtain his or her spouse's signature to a spousal consent.

ARTICLE 9
DISSOLUTION, LIQUIDATION AND TERMINATION

Section 9.1    <u>Liquidating Events</u>.  Except as otherwise provided herein, the Company shall be dissolved, liquidated and terminated upon the occurrence of any of the following events ("<u>Liquidating Events</u>"):

(a)    the bankruptcy of RSD or VanDeHey;

(b)    the disposition by the Company of all or substantially all of its right, title and interest in and to its assets; provided, however, that if the Shareholders so determine, the Company may remain in existence to collect the proceeds from any notes and mortgages executed in favor of the Company arising out of the sale of Company Property;

(c)    the occurrence of any event that, under the laws of any jurisdiction governing the existence of the Company and, in contravention of the terms of this Agreement, shall dissolve the Company;

(d)    the bankruptcy of the Company;

(e)    the withdrawal of a Shareholder;

(f)    the express written agreement of all of the Shareholders; or

(g)    fifty years after commencement of the Term.

Section 9.2    <u>Dissolution, Liquidation and Termination of Company</u>.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Shareholders, and no Shareholder shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Article 9.  The Shareholders shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and the Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof.

Section 9.3    <u>Distributions Upon Dissolution, Liquidation and Termination</u>.  Upon dissolution, liquidation and termination of the Company pursuant to Section 9.2 hereof, and subject to Section 9.4, the Shareholders shall cause all proceeds derived from the liquidation of the Company Property to be applied and distributed in the following manner and order of priority:

(a)   First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Shareholders, in the order of priority as provided by law;

(b)   Second, to the payment and discharge of all of the Company's debts and liabilities to Shareholders; and

(c)   Thereafter, to the Shareholders in proportion to, and to the extent of, the positive balance standing in each such Shareholder's Capital Account (after taking into account all Capital Account adjustments for the taxable year of such Liquidation).

Section 9.4   <u>Negative Capital Account Restoration</u>.  No Shareholder shall have any obligation whatsoever upon the Liquidation of such Shareholder's Interest, the Liquidation of the Company or in any other event, to contribute all or any portion of any negative balance standing in such Shareholder's Capital Account to the Company, to any other Shareholder or to any other person or entity.

ARTICLE 10
<u>WAIVERS</u>

Notwithstanding any provision of the Act, each Shareholder hereby waives any right to seek or assert: (a) judicial dissolution of the Company; (b) dissenters' rights; or (c) derivative actions on behalf of the Company.

ARTICLE 11
<u>MISCELLANEOUS</u>

Section 11.1   <u>Notices</u>.  Whenever any notice or consent or other written communication is required or permitted hereunder, such notice or consent or other communication shall be in writing and shall be: (a) delivered in person; (b) sent by United States mail; (c) delivered in person by an international air or local courier service; (d) transmitted by facsimile telecommunication or electronic mail when directed to the address, facsimile or electronic mail address, respectively, which was provided to the Company by the Shareholder.  Except as expressly stated otherwise in this Agreement, any notice or other communication delivered by hand or by air courier shall be deemed effectively given when delivered, any notice or other communication sent by United States mail shall be deemed effectively given two Business Days after it is mailed, and any notice or other communication transmitted by facsimile telecommunication or electronic mail shall be deemed effectively given on the date of transmission.

Section 11.2   <u>Partnership Intended Solely for Tax Purposes</u>.  The Shareholders have formed the Company as a Nevada limited liability company under the Nevada Act, and do not intend to form a general or limited partnership under Nevada or any other state law.  The Shareholders do not intend to be partners to one another or to any third party for any legal purposes other than tax purposes.  The Shareholders intend the Company to be classified and treated as a partnership solely for federal and state income taxation purposes.  Each Shareholder agrees to act consistently with the foregoing provisions of this Section 11.2 for all purposes, including, without limitation, for purposes of reporting the transactions contemplated herein to the Internal Revenue Service and all state and local taxing authorities.

14

Section 11.3   Effective Date of Agreement.   This Agreement shall become effective upon commencement of the Term.

Section 11.4   Binding Effect.   This Agreement shall be binding upon all of the parties hereto and their transferees, assigns, agents, successors in interest, personal representatives, estates, heirs and legatees.

Section 11.5   Counterparts.   This Agreement may be signed in multiple counterparts. Each counterpart will be considered an original, but all of them in the aggregate will constitute one instrument.

Section 11.6   Governing Law.   This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of Nevada.

Section 11.7    Amendments.   Amendments to this Agreement must be in writing and shall only be effective with the unanimous written consent or approval of the Shareholders.

Section 11.8   Entire Agreement.   This Agreement contains the entire understanding and agreement among the Shareholders regarding the subject matter hereof.   There are no agreements, arrangements or understandings, oral or written, between or among the Shareholders hereto relating to the subject matter of this Agreement that are not fully expressed herein.

Section 11.9   Mediation/Arbitration – Dispute Resolution.   Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall first be submitted to mediation with a retired judge.   If either party fails engage in mediation, that party shall lose his right to collect attorneys fees and costs as the prevailing party in any subsequent mediation.   In the event that the mediation does not resolve the dispute, the Shareholders are to submit the dispute to binding, non-appealable arbitration administered by the Judicial Arbitration Mediation Services (JAMS) at one of its offices in Clark County.   Such controversy or claim shall be heard by a single arbitration (the "Arbitrator").   The award shall be made within six months of selection of the Arbitrator.   Judgment on the award may be entered in any court having jurisdiction and the parties hereby consent to the jurisdiction of the Superior Court for Clark County, Nevada, and of the United States District Court for the Central District of Nevada, for injunctive relief, specific performance or other relief in aid of any proceedings hereunder, but not otherwise.   The arbitration shall be held in Las Vegas, Nevada or as otherwise mutually agreed by the parties hereto.   The Arbitrator shall determine issues of arbitrability but may not limit, expand or otherwise modify the terms of this Agreement nor have any authority to award punitive or other damages in excess of compensatory damages and each party irrevocably waives any claim thereto.   The Arbitrator shall permit, to the extent reasonably necessary, all forms of discovery.   Both parties shall have the right without order from the Arbitrator to take one deposition of the principals involved in a controversy or claim submitted to arbitration hereunder and one deposition of a third party witness and an expert witness, if any.   The parties, their representatives, other participants and the Arbitrator shall hold the existence, content and result of the arbitration in confidence except as disclosure is required by law or as is reasonably necessary to defend claim or procedural rights of the party making the disclosure.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereunto have executed this Agreement as of the date set forth below.

Date: 10/5/2015 _____

**SHAREHOLDERS:**

_____

Real Social Dynamics

DocuSigned by:

*Todd Vanderley*

Todd VanDeHey

**EXHIBIT A**

**VALENTINE LIFE, INC**

**SCHEDULE
OF
SHAREHOLDER NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, UNITS AND
PERCENTAGE INTERESTS**

**(as of September 15, 2015)**

| Names, Addresses, Facsimile Numbers and E-mail Addresses of Shareholders | Capital Contribution | Units | Percentage Interest |
|---|---|---|---|
| Real Social Dynamics<br>8491 West Sunset Boulevard<br>Suite 452<br>West Hollywood, CA 90069<br>United States of America | $50.00 | 50 Shares | 50.00% |
| Todd VanDeHey<br>145 E Harmon Avenue, Unit 20602<br>Las Vegas, NV 89109<br>United States of America | $50.00 | 50 Shares | 50.00% |
| TOTAL | $100 | 100,000 | 100.00% |

## **EXHIBIT B**

**VALENTINE LIFE, VALENTINE LIFE, INC
VALENTINE LIFE, INC**


**ARTICLES OF ORGANIZATION FILED SEPTEMBER 15, 2015**




[ATTACHED]

DocuSign Envelope ID: 5A8B20EE-BE5F-47EB-8D32-788034183202