# AFFIDAVIT OF NICHOLAS KHO

STATE OF NEVADA  
                        ss:  
COUNTY OF CLARK

I, NICHOLAS KHO, being duly sworn, deposes and says that:

1. I am over the age of eighteen and I have personal knowledge of all matters set forth herein. If called to do so, I would competently and truthfully testify to all matters set forth herein, except for those matters stated to be based upon information and belief.

2. Between January 2016 and August 2017, Todd Vandehey ("Todd") stole a significant amount of money from Real Social Dynamics via the Valentine Life bank account.

3. As a signatory for Valentine Life bank accounts, Todd had access to corporate funds and has made a series of unauthorized expenses and bank transfers to personal accounts. In addition, Todd has created multiple credit card accounts and credit lines without authorization from RSD, Valentine Life, or any other Shareholder. Such business credit was utilized by for Todd's personal expenses without any authorization. Todd was not authorized any bonuses or any other salary for any business work other than disbursements of 50% of the net income of profits calculated as the sales generated from the RSD Todd business, all of whose revenues were supposed to be deposited into the Valentine Life bank account; however, the latter did not happen due to Todd hiding sales.

4. A transfer of $52,907 was made by Todd to his personal bank account from the Valentine Life checking account as a personal disbursement without any authorization or legitimate justification as it was not profits nor was it a reimbursement. Todd claims it was a reimbursement for money he paid for legal expenses on behalf of Valentine Life for an agreement, but this is false because funds were transferred from the Valentine Life checking account in order to pay for the legal expenses and also we discovered that Todd paid the $52,907 for legal fees for himself personally naming himself as the client. Then, Todd proceeded to use the $52,907 in funds from the Valentine Life bank account to sue RSD with the same money. Therefore, Todd owes to RSD both the $52,907 he misappropriated from the Valentine Life account to directly pay Nissenbaum Law in addition to the $52,907 that Todd pocketed in cash for a total of $105,814.

5. In addition, Todd agreed that the legal expenses were to be paid by funds in the Valentine Life bank account for an agreement to be drafted. In addition, I believe that Todd has used additional funds from the Valentine Life checking account to pay personal expenses on his personal American Express credit card and also sue RSD, and the expenses of Todd's personal credit card was paid for by unauthorized transfers made by Todd from the Valentine Life checking account to the personal American Express credit card of Todd Vandehey. Also, Todd made the false claim that I agreed to cover all his legal expenses and such a conversation never happened nor did I authorize the transfer. In addition, Todd's attorney, Nissenbaum Law refused to provide to me the redacted statements of legal work for Todd, which added to the evidence of a lack of financial transparency even though Todd Vandehey made transfers from the Valentine Life checking account to cover the legal fees of Nissenbaum Law. Over a conference call, including Todd, Owen Cook and I, Todd said he would provide statements only after an agreement was signed to amend the operating agreement for Valentine Life, which appeared to mean that Todd was refusing financial transparency for these legal bills, which appeared extremely high because almost all legal letters and terms were written by Maier Gutierrez & Associates and not by Nissenbaum Law. In addition, Nissenbaum is engaged in a conflict of interest whereby Valentine Life, a company owned by RSD, is paying for legal action against RSD. According to the operating agreement

of Valentine Life, any expense over $50,000 must be authorized by RSD and unanimous consent of all Shareholders. This would account for $52,907 x 2 (totaling $105,814) owed to RSD for Todd's unauthorized personal disbursement.

6. Todd has had Valentine Life cover 100% of his personal rent in New York. This was not authorized nor was it a business expense. Todd agreed that he would pay $1,500/month of the rent incurred for an apartment he would share with staff. He has not reimbursed Valentine Life for these expenses even though he agreed to these expenses in phone conversations with Owen Cook and myself, and also reconfirmed in recorded Skype meetings between Todd Vandehey and Nicholas Kho. For the 18 months of Valentine Life covering Todd's personal rent, this would account for $27,000 in personal expenses owed from Todd to RSD for Todd's personal rent. However, Todd was not living with his staff, and, instead was living by himself or with his girlfriend and friends when they visited. Therefore, the entire amount of the $4,495 in monthly rent that was paid for via the Valentine Life checking account should be the responsibility of Todd. This accounts for 1 year of rent at $4,495 for a total of $53,940 and also additional rent of $1,500 of month for 6 months when he was living with staff for an additional $9,000. Therefore, the cumulative total of the liability for personal rent is $62,940.

7. According to David Zelman, who was living at an apartment paid for by Valentine Life, RSD Contractors were paying Todd $1,000/month each and Todd has not deposited any money for funds collected to the Valentine Life bank account. There have been 4 RSD Contractors paying rent for 18 months and this accounts for $72,000 in funds that have not been accounted for by Todd Vandehey as collected revenue for sub-letting apartment space paid for by Valentine Life and it appears that Todd has instead pocketed the $72,000 as an unauthorized personal disbursement.

8. Todd has made personal payments to his American Express Card in 2017 for a total of $61,302.51 after Valentine Life was dissolved using multiple smaller transactions to avoid detection. These transactions were fraudulent ACH transfers that were not authorized by Todd to make and these funds are owed to RSD as an unauthorized personal disbursement. There was no justification for transferring these funds to Todd's personal American Express card after dissolution of Valentine Life nor has Todd provided any business expense justification. American Express disclosed that funds have been partly transferred to the personal bank account of Todd's friend, Kaitlin Severin, because Todd did not have a credit-line of $61,302.51 available to him; however, Kaitlin may have a better credit score than Todd allowing her to get more credit-line and higher balances on American Express

9. In 2017, Todd claims he paid for operations on his personal American Express card even after I told Todd Vandehey that he was not authorized to commingle his personal and business funds in-person when Todd visited my house. I informed Todd that this action was illegal and not allowed. In addition, I told Todd that RSD requires having a CPA review the American Express statements, which were never provided to me for any transaction in 2017. Also, other than the $61,302.51 that Todd transferred to his personal American Express card, Todd made additional transfers in 2017 to American Express for a total of $27,269.91.

10. In 2016, Todd made $71,942.62 of charges on his personal American Express card. When requesting justification for these expenses via pdf statements from American Express, Todd instead gave custom Todd-created American Express Excel spreadsheets instead. Todd was not authorized to commingle business and personal expenses, which is also a potential crime to defraud RSD of money. In addition, the expenses that Todd submitted on his personal American Express included unjustified personal expenses, including personal food expenses at fine-dining restaurants and cafes, taxi and Uber expenses for his personal travel, extracurricular gym payments, Starbucks coffee, and payments to transfer travel points. None of the transactions sent to us in the custom excel sheets from Todd had a dollar amount next to them; instead, Todd submitted a total summation of all charges showing a grand total of $71,942.62 in questionable personal expenses paid for by the Valentine Life operating checking account.

11. Todd has in his possession audiovisual gear that has been paid for by Real Social Dynamics, which was utilized by Todd to create videos for RSD. Now that Todd no longer has business with RSD, the video equipment must be returned to Real Social Dynamics. This includes 2 A7s Sony camcorders, 1 Canon Mark iii 5D camera, 2 Manfrotto tripods, 1 Canon 50 lenses, 1 Canon 16-35mm lenses, 2 MacBook pro laptop computers, 10 LaCie hard drives, and 2 Metabones Adapters. The total value of this audiovisual gear is $20,139 and all of the mentioned video-equipment was put into the possession of Todd Vandehey prior to the creation of Valentine Life even though Todd utilized it before and after its incorporation due to the fact that Todd was working as a RSD Contractor on RSD official business. Now that Todd's business relationship with RSD has been dissolved, all of the RSD-owned video equipment must be returned to RSD or paid for in full by Todd to RSD for a total of $20,139, which excludes any shipping, handling, and taxes paid for by RSD. Additionally, I believe that Todd has purchased additional video equipment with RSD money that also must be returned.

12. This year, Todd sent an email to me stating that he had taken out an unauthorized credit line for Valentine Life for $30,000 with 6 percent interest. He then paid to both RSD and himself a personal disbursement of $15,000 each for the credit line even though it was a loan. This was an unauthorized credit line, and it was an unauthorized series of disbursements because the only authorized disbursement to Todd or RSD should be for 50% split of calculated net profits. In addition, due to the fact that Todd took most of the money out of the Valentine Life business bank accounts and transferred the funds to his personal bank accounts and credit card accounts, the $30,000 credit line is still unpaid and the creditor is unknown. Also, I am wondering if the credit line exists at all because Todd has lied about so many other financial transactions and made other inappropriate financial payments. I believe that Todd committed fraud and lied about the creation of the credit-line and his only available credit was via credit cards at a rate much greater than 6% and likely over 20%.

13. Todd got approval for two Bank of America credit cards in the name of Valentine Life that were not authorized to be created and he spent on one of the credit cards a total of $1,383.09 of expenses that were not authorized to be spent and the usage of these funds do not appear to have any business expenses justification.

14. In August 2017, Todd retained the accounting services of I & U CPA services after sending an email to Owen Cook and I stating that he had not done proper accounting for the last year even though he was sending out personal disbursements to himself based on calculated net income. Todd paid $12,000 to I & U via 2 checks of $10,500 and $1500. Upon contacting the Department of Corporations in New York, we discovered that I & U is not a registered company in the State of New York. RSD staff, Magic Concierge, and Maier Gutierrez & Associates have been contacting I & U via phone and email for over 30 attempts in the last week and we have been unable to talk to anyone in the office of I & U. I personally contacted I & U via email and told the company that I needed to talk to them about the investigation we were conducting about the misappropriation of funds by Todd Vandehey in regards to their work with Valentine Life. Upon sending that email, a phone meeting was setup and I & U flaked on the meeting, claiming they called my phone, but there is no record of such phone call. In addition, I & U did not respond to any requests to additional phone calls. It is both curious that Todd setup such a large payment to I & U after knowing that we had already retained Tracee Gress as a CPA to do accounting, financial audit, and tax return. In addition, we looked up the address of I & U CPAs and their address on the 85th floor at 1 World Trade Center doesn't exist as office space according to the staff at 1 World Trade Center. Upon a phone call to Servcorp, which is located on the 85th floor of 1 World Trade Center, the front desk didn't know of I & U CPAs. On the other hand, the CEO of I & U, Ihsan Ugurlu, is listed as being registered as a CPA in New York. Additionally, when attempting to find a direct phone number to talk to someone at I & U, we could only find a phone number that goes to a voice-mail and a fax number. It makes me suspicious if I & U is a real company or if it a front company.

15. Todd rented an apartment for $7,800/month payable (an expense of $94,800 over a one

3

year lease) to 446-450 West 19 Realty LLC and never got approval from RSD as a Shareholder even though the operating agreement states expenses over $50,000 must be approved unanimously in advance. Rent was paid from the Valentine Life operating account for at least 2 months out as seen from checks deposited from the Valentine Life checking account.

16. Rent checks were made payable to Garrett Darling ($1250), David Zelman ($2985), Jon Piedra ($525) and Kevin Juica ($3497), both of who are RSD Contractors working with Todd, even though both contractors were living at the apartment of 446-450 West 19 Realty paid for by Valentine Life. Therefore, it is questionable why Todd would be paying for rent to staff even though they are staying at the apartment paid for by Valentine Life. The total value of these checks is $8,257.

17. Multiple pay checks were paid to RSD Contractors marking rent that was paid late or accounting corrections to RSD Contractors, such as Jon Piedra in May 2017 and Kevin Juica for multiple pay periods in November 2016. This has given me concern about improper fiscal management of payroll and tracking accounting with RSD staff and resources. Due to receiving multiple checks external to typical payroll, and marked with mysterious notations (i.e. rent or club bribes), I believe that Jon Piedra and Kevin Juica may also have been double paid money out of the Valentine Life bank account and then they paid some of these funds back to Todd Vandehey so that he may pocket additional misappropriated funds.

18. In 2017, Todd solicited RSD management and contractors to invest in an improper and unethical scheme/hedge fund with guaranteed rates of return. Todd also solicited customers of RSD with this same proposal, but failed to obtain RSD's consent before doing so. Todd successfully convinced RSD customer, Tynan Hutchins, to invest in his hedge fund. In addition, Todd is not licensed to manage a hedge fund, which he does so from the State of New York, which requires hedge fund managers to be licensed and complete the Series 65. As a result of failing to be properly licensed, Todd is in violation of the Securities Exchange Act of 1934. Since 2010, Todd has also been soliciting investments into his company, Valentine Investment Partners LP (VIP), and also into Vandehey Capital LLC. Solicitation was done via seminars Todd conducted in Las Vegas to RSD and its business partners, as well as video presentations, and on a website at viphedgefund.com. Todd failed to disclose that he was not licensed until he had a meeting with me in-person in Las Vegas in February 2017. Furthermore, Todd solicited RSD to similarly convince/pitch clients and staff to invest in his hedge fund without being licensed. I am suspicious that Todd's inability to raise enough money for his hedge fund, without generating enough investment returns to cover losses, was a central reason for why Todd may have started to embezzle money from Valentine Life. Todd conveyed to me that he would use assets of Valentine Life to secure hedge fund investments for his clients, and Todd appears to have siphoned funds from the Valentine Life account to his personal account and Todd Valentine account, which appears to cover losses from his external investments. As a result, it leads me to believe that Todd was stealing from Valentine Life in order to cover losses from a Ponzi scheme, whereby Todd convinced VIP clients to provide Todd money to invest in his hedge fund, but Todd was using the money for personal expenses and not solely for investment purposes, which he led clients to believe. To hide his unethical scheme from RSD and other clients, Todd told me that he would hide the fact that he was soliciting investments without a license by getting clients to sign a contract to loan money to Todd at a 15% interest rate, which Todd said was the minimum amount of return that he could guarantee to the hedge fund investors, who signed a contract agreeing to this term. This is a highly unrealistic rate of return in the long run, and it is illegal to make a promise of such a return due to the SEC.gov making it clear on their website that you are committing fraud when you make a "promise of guaranteed returns with little or no risk". So I am suspicious that Todd failed to maintain this inflated investment return and that is why he attempted to steal from the Valentine Life operating account so that investors would not be incentivized to contact the SEC or other authorities to notify them of his illegal activities due to being unhappy with him losing the money that they invested into his hedge fund. On the other hand, Todd was licensed to sell insurance in Colorado, and Todd failed to also disclose this external business activity to RSD. All unauthorized business activities by Todd involving insurance sales and hedge fund management are violations of

Section 14b of the RSD Contractor Agreement that he signed due to Todd soliciting illegal business from RSD clients and financial transactions that RSD "determines to be in conflict with the best interests of the Principal [RSD]". Another disturbing fact is that it appears that Todd used Valentine Life funds to hire a law firm to work on his investment scheme as seen via bank transfer made from the Valentine Life operating account to a law firm that was utilized to work on the structure for his investment scheme. As a result of involving Valentine Life and RSD (and RSD clients) in an illegal investment scheme, Todd appears to have committed investment fraud, conversion, tortious interference, breach of contract, breach of fiduciary duty, unjust enrichment, and negligence. These violations include both civil and criminal actions by Todd.

19. My email account of papa@realsocialdynamics.com was linked to both the Valentine Life bank account and Todd's personal Bank of America bank account because it was attached to the Valentine Life bank account when I opened the account with Todd in-person in Las Vegas at Bank of America. By default, Bank of America links the personal account and business account of signatories whenever a business bank account is created. I have told Todd to unlink his personal account from his business account because Todd said to me multiple times that it was preventing him from paying RSD via a wire transfer; however, he later told me that his statement was untrue and that he was able to send money via wire transfers anytime. Thus, I believe he originally stated that he was unable to pay via wire transfer so that he could delay paying RSD while he was traveling internationally until he returned to the USA. As a result of my email account being associated with the personal and business accounts of both Todd Vandehey and Valentine Life, I have received a combined total of 17 NSF (Not Sufficient Fund) fee notifications sent to my email address, of combined NSF notifications between both the Valentine Life business account (1 NSF Fee) Todd's personal bank account (16 NSF fees). This has given me alarm about fiscal mismanagement by Todd in his banking because he was spending more money from these bank accounts than was in the accounts themselves.

20. Due to Todd having poor financial credit ratings on Experian and Transunion, and the fact that Todd told me that he was not filing personal income tax returns, I signed a guarantor document to allow Todd to rent an apartment for $4,495/month (an expenses of $59,940/year in addition to utilities) because I had excellent credit ratings on Experian and Transunion and file both corporate and personal income tax returns to satisfy credit requirements to rent a luxury apartment. Checks were paid monthly to 234-236 W 14th LLC for Apartment 2A. Although Todd eventually moved out of this expensive apartment for an even more expensive apartment, I didn't authorize higher rent to be paid and Todd was fully aware that authorizations for additional expenditures over $50,000 without Shareholder authorization in violation of the Valentine Life operating agreement. In addition, I did not authorize Todd to use my name as a guarantor for any other apartment than the original apartment for $4,495/month.

21. Unknown petty cash payments are seen on the June and July 2016 bank statements, such as $200 to John Piedra for petty cash, Yuriy Chernin for $60 with check notes of club bribes, petty cash, and $120 for club bribes to Jon Piedra. Also, there was an April 2017 petty cash payment to Todd for $300.07. These mysterious payments total $687.

22. Todd has 2 merchant accounts to process credit cards and there were only deposits into the Valentine Life checking account from 1 of the 2 merchant accounts via Inchek, which makes me want to be able to audit the other merchant account to see if Todd misappropriated Valentine Life revenue from this other merchant account.

23. Todd has 2 merchant accounts to process credit cards and there were only deposits into the Valentine Life checking account from 1 of the 2 merchant accounts via Inchek, which makes me want to be able to audit the other merchant account to see if Todd misappropriated Valentine Life revenue from this other merchant account.

24.  As RSD uses Clickbank as a credit card processing company that accepts credit cards similar to a merchant account. Todd changed the settings in the Real Social Dynamics Clickbank account to not release funds and also attempted to change the email on the account from a Real Social Dynamics email account to his personal account in order to hide the money in the account; however, my Chief Operations Officer, Stuart Lewis, was able to revert the changes Todd attempted to make so that we could regain financial transparency over funds from Clickbank.

25.  Although Todd and I signed a Valentine Life operating agreement stating that both RSD and Todd would be signatories on the Valentine Life bank accounts, Todd unilaterally decided to go to the Santa Monica branch of Bank of America in 2016 to remove me as a signatory on the bank account and then removed my access from the online banking. After multiple meetings over several months, Todd provided an online login; however, Todd removed the login access because he didn't want to give financial transparency to RSD. Therefore, I had a phone conversation with Todd and convinced him to give me a new login. He complied and gave me login access, but it expired because I didn't login for 30 days. Therefore, we requested another login and Todd complied with our request and provided a new login over 30 days after we requested a new login. I maintained access to the account until Todd removed me as a signatory from the account in August 2016 without authorization. Therefore, I re-added myself to the Valentine Life bank account due to the improper financial management actions of Todd Vandehey and then shutdown the account. Unfortunately, 2-3 days before I was able to shut down the account, Todd made an unauthorized transfer of $61,302.51 to his personal American Express account leaving $12,090.77 left in the account, which is less than the liabilities of the company and making it impossible for Valentine Life to complete outstanding fulfillment to clients without Real Social Dynamics using its own funds to process refunds and complete fulfillment of obligations to our clients and staff for Valentine Life responsibilities, including the responsibilities to pay credit-lines of $30,000 and other financial obligations that must be fulfilled due to the dissolution of Valentine Life and the financial mismanagement of Todd Vandehey via comingling funds and financial misappropriation of business funds to personal accounts established by Todd at various financial institutions. Fortunately, Bank of America has agreed that Todd committed bank fraud and they processed paperwork in order to recover the funds that were taken by Todd from the Valentine Life checking account via unauthorized ACH transfer to his personal account.

26.  David Zelman has informed RSD Staff that Todd is paying for an additional apartment for Todd's girlfriend and child that may be approximately $4,000-5,000/month and it is unknown if funds from the Valentine Life bank account are paying for this apartment or if Todd is using misappropriated funds to cover the rent for this apartment.

27.  Clients that are canceling RSD Immersion Programs in September are requesting refunds for their travel and I believe Valentine Life should be responsible for these refunds. Money inappropriately taken by Todd should cover these expenses. As a result, there are multiple clients who paid $1,497 for RSD Immersion and digital products relating to the RSD Todd brand that have requested refunds. In addition, travel expenses lost by clients are being reimbursed and these expenses should be expenses deducted from Valentine Life's funds. The total of refunds and travel reimbursements is $34,163.

28.  Todd pays RSD Contractors in the same sporadic manner that his personal distributions have been made. There is no tracking for how Todd paid RSD Contractors or accountability even though he has weekly meetings to discuss Todd's work with RSD Contractors with Mikhail Kuznetsov (RSD Chief Marketing Officer) and Stuart Lewis (Chief Operations Officer). RSD's Officers have told Todd on multiple weekly meetings that RSD needs to know how RSD Contractors are being paid and for what services. I have personally reminded Todd that we need to track payments of all RSD Contractors working with Todd and justification for their work, and my statements were also made while at the offices of Maier Gutierrez & Associates in Las Vegas. Every check paid to RSD Contractors are for various amounts and even though payroll for RSD Contractors exceed $50,000, there is no justification

or approval by RSD for the payroll of RSD Contractors, who also appear to receive sporadic bonuses as notated on checks. This is a violation of the operating agreement of Valentine Life, which requires expenses over $50,000 to receive unanimous approval from all Shareholders.

29. Multiple RSD customers who have purchased products and services from RSD Todd-affiliated websites appear in the RSD Shopping Cart because Todd and RSD have an agreement that all customer data for clients who purchased RSD Todd services would be shared with RSD. However, multiple customers have contacted RSD customer service requesting refunds and they have not appeared in the RSD shopping cart. This means that Todd Vandehey has created separate online shopping carts whereby he is accepting orders that have remained hidden from RSD so that Todd does not have to disclose this revenue. These customers are requesting refunds from RSD Todd-affiliated products and services. In addition, we have had to pay for the payroll of bookkeepers, marketing staff, and customer service representatives that work for RSD to resolve customer issues and investigate how Todd may have inappropriately hidden clients' records and financial payments due to a lack of financial transparency and potential misappropriation of funds from Todd. So far, the payroll expenses for RSD Contractors working on these project to resolve Todd's improper actions is $15,853.97

30. Todd is accepting money from a PayPal account for RSD Immersion program clients and other RSD students that have purchased products and services from RSD. These funds were paid into a Valentine Life PayPal account via credit card payments and PayPal payments. We have also received deposits for various amounts from a Valentine Life PayPal account, and the statements from that PayPal accounts have not been revealed to RSD by Todd, which makes me wonder if Todd is personally pocketed cash from the Valentine Life PayPal account or if he is paying for personal expenses from the Valentine Life PayPal account.

31. On May 19, 2017, Todd has emailed Stuart Lewis, Michael Ampikapon (the Real Social Dynamics Chief Financial Officer), and I mentioning that he had to make a $6,785 transfer to his personal bank account in order to pay RSD Contractor payroll even though they are receiving checks from the Valentine Life bank account and Todd has not provided any evidence that he paid the RSD Contractors with the cash from Todd's personal bank account. This is suspicious because Todd could have sent a wire transfer to staff or had Bank of America send checks through the online banking portal instead of paying himself cash to pay for RSD Contractors' payroll.

32. The amount of cash that Todd has transferred for 50% of profits to his personal checking account far exceeds the money transferred to the RSD checking account even though Todd has agreed via email, meetings, agreements, and in-person conversations that profit distributions between RSD and Todd should be the same.

33. In 2016, Todd paid himself more than 50% of the profits by paying himself a much higher percentage of the profits than he paid to RSD. The amount paid from Valentine Life to RSD's checking account was a total of $52,391.73. On the other hand, the amount that Todd paid himself out of the Valentine Life checking account to his personal checking account was $203,727.97. Initial deposits from 2015 from RSD were $15,000 and $5,100 from Todd for a total of $20,100 (which can be attributed to money Todd earned from RSD as a RSD Contractor prior to the creation of Valentine Life). During January 2016, RSD made a deposit into the Valentine Life bank account for $21,744.34 and, in February 2016, RSD transferred to Valentine Life a payment of $66,557.26 (on February 26) and an additional payment of $7,500. The total of these deposits was $95,801.60 of which $15,000 was revenue from RSD Immersion and $100,901.60 was money owed to Todd. On March 11, Todd transferred $61,526.26 to himself personally and the balance owed to him shortly thereafter. If you deduct the $100,901.60 that Todd earned prior to Valentine Life from the $203,727.97 that Todd paid to himself from Valentine Life, you discover that Todd paid himself personal disbursements from profits of Valentine Life in the amount of $122,926.37, which is $50,434.64 more profits than the $52,391.73 that was paid to RSD in 2016. Therefore, Todd owes to RSD the $50,434.64 in excess payments that Todd paid to himself.

7

34. Todd failed to pay proper profit distributions in 2017 by overpaying himself more money than he was supposed to according to the agreement that RSD and Todd would be sharing profits 50/50. In 2017, Todd paid to RSD a total of $93,173. On the other hand, in 2017, if you exclude the $52,907 payment made to Todd, the amount that Todd has paid himself in personal disbursements was $102,603.90. This means that Todd paid himself both the $52,907 in personal disbursement and an additional amount of $9,430,90 more than the amount that he paid to RSD in 2017. Therefore, Todd owes to RSD the $9,430.90 in excess personal payments that he paid to himself in unauthorized funds.

35. Todd's legal counsel has also sent legal letters attempting to gain access to RSD assets and inappropriately filed a motion to seek a TRO (temporary restraining order) to attempt to allow Todd Vandehey to access RSD properties so that he can continue to misallocate funds and participate in hiding financial transparency from RSD. All legal costs associated with disputing Todd's false and malicious claims should be paid for by Todd Vandehey personally for frivolous attempts at motions and threats for lawsuits. On the other hand, Todd should also pay for the costs associated for additional legal work and accounting work to recover the funds that were misappropriated by Todd Vandehey, including any lawsuits where RSD is a Plaintiff against Todd for potential misappropriated funds and any additional violations by Todd.

36. The profit margins for RSD Todd revenues have dropped to less than 50% of what they were from the time Todd was involved with managing some operations. During a phone call with Todd in August 2017, Todd admitted he expected profits to drop lower as well. This is unacceptable and also makes me wonder if the profits may not be as bad if there was proper reconciliation and a disallowance of excessive personal disbursements and personal expenses due to potential problems incurred from comingling and financial misappropriation and attempts by Todd to prevent proper accounting. Todd has continually claimed in meetings with me that he didn't want to spend money on accounting and that he preferred to do it himself, but I question his intentions of such a decision being solely for being thrifty with money. Todd's profits when compared to every other RSD Instructor business line are unusually low. In 2016, average instructor profits are 38.32% whereas Todd declares profits of 12.87%, which is the lowest among all 8 RSD Instructors working on the same compensation structure as RSD Todd. Comparatively, Todd's profit margin was 25.62% in 2015 and 20.49% in 2014.

37. When Todd Vandehey made personal disbursements, he transferred the funds owed to himself personally into his personal bank account or his "personal business account" known as Todd Valentine Corporation, which acted as a holding company for Todd's personal funds. However, Todd also made personal transfers to his personal American Express, pocketed cash, made unknown transfers from the Valentine Life PayPal account, and also there is a credit line of $30,000 that Todd claimed to create for Valentine Life without any more details shared about the account.

38. Todd violating the terms of his work under the RSD Contractor Agreement and is also under investigation for potential embezzlement by RSD. Therefore, he can be terminated from RSD and have the relationship dissolved at any point. In addition, Todd violated the terms of his RSD Contractor Agreement. For violation of the RSD Contractor Agreement Point 23, Todd did not return all Confidential Information back to RSD, including access to websites created by RSD Contractors (including textanddatesmachine.com, daygameaccelerator.com, and attractionunlocked.com). Also, Todd was found in violation of Point 37 of the RSD Contractor Agreement and he failed to provide the requested accounting documentation, including legal bills, to assist in determining if Todd was in breach of contract. As a result, according to Point 45 of the RSD Contractor Agreement, Todd is liable to pay in full all legal expenses, including the legal bills of Real Social Dynamics as a result of default of this RSD Contractor Agreement. Although this amount will be expected to be much higher in the future, legal bills incurred by Real Social Dynamics as a result of the Contractor violating the RSD Contractor Agreement is presently at $8,843.33.

39. RSD has had to process refunds and complete fulfillment for RSD Todd business after dissolution of Valentine Life and the termination of Todd Vandehey as a RSD Instructor and RSD Contractor. In order to satisfy RSD customers who purchased RSD Todd-affiliated products and canceled RSD Immersion programs, RSD has had to provide products and services for free to clients as added value to ensure that these customers remained happy. This includes transferring clients to more expensive programs, such as the RSD Bootcamp or giving digital products to clients. We also agreed to reimburse clients for their non-refundable travel costs for airfare and lodgings. The total additional expenses for Bootcamp upgrades, travel reimbursements, and digital product value that would retail over $80,000.

40. Todd Vandehey was collecting money via EventBrite payment processing and he never revealed these sales to RSD so that he could pocket these funds and not reveal the sales of these customers. On May 14, 2017, Todd received a check for $1,100 (from $1,244.68 sales after Eventbrite commissions) from selling Attraction Unlocked in New York and $765 (from $857.82 sales after Eventbrite commissions) was sent to Todd for Calibration Masterclass on February 6, 2017. Both of these checks were received by Todd and deposited in a personal bank account (most likely because it was not deposited in a Valentine Life account) after it was mailed to Todd at Todd Vandehey 1930 Village Center Circle #3-9717 Las Vegas, Nevada, 83914. Todd hid $2,102.50 in sales and $1,865 in personal check money pocketed after EventBrite fees were deducted from the sales, which is grand theft and conversion from RSD.

41. Financial audit from a Certified Public Accountant must be completed on all financial records relating to Valentine Life to determine the total amount of misappropriated funds overall because there are additional damages that should be added to the list of expenses in addition to all of the damages listed on this Affidavit of Damages. The total dollar amount of misappropriated money listed in this Affidavit of Damages is for $812,665.97.

I declare that, to the best of my knowledge and belief, the information herein is true, correct, and complete.

Executed this 26 day of February, 2018.

*Nicholas Kho*
NICHOLAS KHO

SUBSCRIBED and SWORN to before me this 26 day of February, 2018.

NOTARY PUBLIC
In and for the State of Nevada, County of Clark

JULIA CHUMBLER
Notary Public State of Nevada
No. 15-1957-1
My Appt. Exp. June 10, 2019

9